**25CV099309 - LESLIE, SANDRA vs. TRAVEL AND LEISURE CO**

## SUMMARY

| | | |
|---|---|---|
| **Judge:** | **Court Type:** | **Case Type:** |
| PEELER, ROBERT W. | CIVIL | OTHER CIVIL |
| **Case Number:** | **Uniform Case Number:** | **Status:** |
| 25CV099309 | 2025CV099309CVHXMX | OPEN |
| **Clerk File Date:** | **Status Date:** | **Waive Speedy Trial:** |
| 7/18/2025 | 7/18/2025 | ☐ |
| **Total Fees Due:** | **Custody Location:** | **Agency:** |
| 0.00 | | |
| **Agency Report Number:** | | |

## PARTIES

| TYPE | PARTY NAME | ATTORNEY |
|---|---|---|
| PRIMARY DEF. | TRAVEL AND LEISURE CO | |
| ADD. PLAINTIFF | WALL, DONALD | 1 SNYDER, BRENT S (Main Attorney)<br>3 DANN, MARC E<br>2 FLICK, BRIAN D.<br>4 RAMIREZ, MARITA I |
| PLAINTIFF | LESLIE, SANDRA | 1 SNYDER, BRENT S (Main Attorney)<br>3 DANN, MARC E<br>2 FLICK, BRIAN D.<br>4 RAMIREZ, MARITA I |
| DEFENDANT | BARCLAYS BANK DELAWARE | |

## EVENTS

| DATE | EVENT | JUDGE | LOCATION | RESULT | |
|---|---|---|---|---|---|
| | | | No Events on Case | | |

## CASE DOCKETS

| IMAGE | DATE | ENTRY |
|---|---|---|
| 📄 2 | 7/29/2025 | SUCCESSFUL SERVICE SUMMONS BY CERTIFIED MAIL ISSUED 07/25/25 TO: BARCLAYS BANK DELAWARE; SIGNED BY ? ON 07/28/25 |
| 📄 2 | 7/29/2025 | SUCCESSFUL SERVICE SUMMONS BY CERTIFIED MAIL ISSUED 07/25/25 TO: TRAVEL AND LEISURE CO; SIGNED BY ? ON 07/28/25 |
| 📄 1 | 7/25/2025 | CERTIFIED MAIL TRACKING INFORMATION - SEE SCAN IMAGES FOR TRACKING NUMBERS |
| 📄 1 | 7/25/2025 | CERTIFIED MAIL TRACKING INFORMATION - SEE SCAN IMAGES FOR TRACKING NUMBERS |
| | 7/23/2025 | CLERK'S COMMENT - COMPLAINT EMAILED TO ATTORNEY GENERAL'S OFFICE |
| | 7/23/2025 | FILE FOLDER LABEL |
| 📄 1 | 7/23/2025 | SUMMONS ISSUED. REASON: CONSUMER SALES COMPLAINT |
| | 7/23/2025 | SENT TO BE SERVED SUMMONS BY CERTIFIED MAIL ISSUED TO: TRAVEL AND LEISURE CO |
| 👁 1 | 7/23/2025 | SUMMONS ISSUED. REASON: CONSUMER SALES COMPLAINT |
| | 7/23/2025 | SENT TO BE SERVED SUMMONS BY CERTIFIED MAIL ISSUED TO: BARCLAYS BANK DELAWARE |
| | 7/23/2025 | ATTORNEY: SNYDER, BRENT S ASSIGNED |
| | 7/23/2025 | CLERK'S COMMENT - EMAILED ATTY WITH REQUEST FOR UNPAID JURY DEMAND |
| 👁 1 | 7/18/2025 | PRAECIPE FOR SERVICE - CM |
| 📄 259 | 7/18/2025 | COMPLAINT FOR DAMAGES |
| | 7/18/2025 | JUDGE PEELER, ROBERT W.: ASSIGNED |
| | 7/18/2025 | CASE FILED 07/18/2025 CASE NUMBER 25CV099309 |

---

**EXHIBIT**

**A**

## IN THE COURT OF COMMON PLEAS
## WARREN COUNTY, OHIO

**SANDRA LESLIE**
425 Crossbow Drive
Maineville, OH 45039

And

**DONALD WALL**
425 Crossbow Drive
Maineville, OH 45039

      Plaintiffs

v.

**TRAVEL and LEISURE CO.**
℅ WYNDHAM WORLDWIDE
OPERATIONS, INC.
6277 SEA HARBOR DRIVE
ORLANDO FL 32821

And

**BARCLAYS BANK DELAWARE**
℅ CORPORATION SERVICE COMPANY
1160 DUBLIN ROAD, SUITE 400
COLUMBUS OH 43215

      Defendants.

Case No. **25CV99309**

JUDGE **PEELER**

**COMPLAINT FOR DAMAGES**

**JURY DEMAND ENDORSED HEREON**

Plaintiffs Sandra Leslie and Donald Wall and for their Complaint for Damages against

Defendants Travel and Leisure Co. and Barclays Bank Delaware hereby state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiffs Sandra Leslie ("Sandra") and Donald Hall ("Donald") (collectively, the

"Plaintiffs") are each natural persons who reside in the City of Maineville, County of Warren,

State of Ohio and Plaintiffs have resided at this location for all relevant times herein.

2.    Each of the Plaintiffs are a "consumer" as that term is defined by R.C. 1345.01(D).

3.    Each of the Plaintiffs are a "cardholder" as that term is defined by 15 U.S.C. § 1602(n).

4.    Defendant Travel and Leisure Co. f/k/a Wyndham Destinations ("Wyndham") is a foreign corporation incorporated under the laws of the State of Delaware that is registered with the Ohio Secretary of State and does business in Ohio.

5.    Defendant Wyndham is the largest vacation ownership company in the world and owns numerous brands and subsidiary corporations relevant to the allegations herein including by not limited to Wyndham Consumer Finance, Inc., Wyndham Destination Network, LLC, Wyndham Resort Development Corporation, Wyndham Vacation Ownership, Inc., and Wyndham Vacation Resorts, Inc.

6.    Defendant Wyndham is a "supplier" as that term is defined by R.C. 1345.01(C) because it is engaged in the business of effecting or soliciting consumer transactions.  In this case, Defendant Wyndham engaged in the business of promoting and selling vacation packages/timeshares/vacation clubs that allow consumers to purchase timeshare interests.

7.    Defendant Barclays Bank Delaware ("Barclays") is a commercial bank, incorporated under the laws of the State of Delaware that is registered with the Ohio Secretary of State and regulated by the Office of the Comptroller of the Currency.

8.    Venue lies in this Court pursuant to Civ. R. 3(C)(3) and/or Civ. R. 3(C)(7) and/or Civ. R. 3(C)(12) as Warren County is the venue where the Plaintiffs resided and were solicited by Defendants in order to conduct the activity that gave rise to this Complaint.

## INTRODUCTION

9.     Plaintiffs' transactions with Defendant Wyndham each constitute a consumer transaction as that term is defined by R.C. 1345.01(A) because the contracts were for a service for personal, family or household use, namely the purchase of an interest in time share properties or vacation club points to be used at various properties owned by Defendant Wyndham.

10.     Plaintiffs have a private right of action under R.C. 1345.09 for the allegations and transactions described herein as applicable.

11.     Plaintiffs have a private right of action pursuant to Tenn. Code Ann.. § 66-32-118(a) for the allegations and transactions described herein as applicable.

12.     Plaintiffs have a private right of action pursuant to 15 U.S.C. § 1640 for the allegations and transactions described herein as applicable.

## STATEMENT OF FACTS

13.     Plaintiff Sandra Leslie is currently 83 years of age and her husband, Plaintiff Donald Wall, is 88 years of age.

14.     On or about August 17, 2024 Plaintiffs attended a sales presentation by Defendant Wyndham in Pigeon Forge, Tennessee which lasted for six (6) hours.

15.     At that presentation, through the aggressive sales tactics of Defendants' representatives Plaintiffs were talked into purchasing an interest in "CW Preferred West." This transaction had a total cost of $25,279.00 with a down payment of $3,787.35 and closing costs of $30.00 (contract ending in 1021). The payment was charged to a newly opened Barclays Credit Card issued by Defendants (5381) as part of the sale. A copy of the contract ending in 1021 is attached as **Exhibit 1**.

16.     At the time of allegedly signing the paperwork to purchase an interest in "CW Preferred West" and apply for the Credit Card Plaintiffs were not presented any documentation to review in advance, were only provided an opportunity to review documents electronically and sign in the same manner, did not understand the terms of the agreement, and were intentionally, negligently, or fraudulently mislead as to the terms and conditions in addition to the benefits and costs of the Credit Card and the time-share.

17.     Additionally, upon information and belief the required credit card disclosures were not provided to Plaintiffs.

18.     Mr. Wall has no recollection of reading or signing any documents regarding the CW Preferred transaction.

19.     Plaintiffs were not provided paper copies of the 1021 for at least two months.

20.     Concerned about the situation they found themselves in, and knowing that they could not afford the expense nor utilize the benefit of using the time-share, Plaintiffs on or about October 28, 2024 reached out to Defendant Wyndham whose representatives, upon information and belief spoke to "Parker" and "Annika" in a transaction they to this day do not understand, talked the Plaintiffs into trading in the Contract with CW Preferred West (1021) for an ownership interest in ClubWyndham Access Vacation Ownership Plan "(AVOP") (contract ending in 0810). A copy of the purchase documents is attached hereto as **Exhibit 2.**

21.     This transaction required a payment of $2,705.29 which was charged to another newly opened Barclays Credit Card (4611).

22.     At the time of allegedly signing the paperwork to purchase an interest in "AVOP" and apply for the Credit Card Plaintiffs were not presented any documentation to review in advance, were only provided an opportunity to review documents electronically and sign in the

4

same manner, did not understand the terms of the agreement, and were intentionally, negligently or fraudulently misled, as to the terms and conditions in addition to the benefits and costs of the Credit Card and the time-share.

23.    Additionally, upon information and belief the required credit card disclosures were not provided to Plaintiffs.

24.    Mr. Wall has no recollection of reading or signing any documents regarding the AVOP transaction.

25.    As part of the purchase of AVOP with the Wyndham/Barclays Credit Card, Plaintiffs were given a membership in RCI/Club Wyndham Plus/Wyndham Rewards Program (Wyndham Rewards"). Upon information and belief this is a contract or account ending in 5418. See Exhibit 2.

26.    The Wyndham Rewards, on information and belief, is a rewards-based program based on the accrual of points connected to the Credit Card(s) issued by the Defendants.

27.    Additionally, upon information and belief the required Credit Card disclosures were not provided to Plaintiffs

28.    Mr. Wall has no recollection of ever signing any of the documents bearing his electronic signature.

29.    Plaintiffs thereafter were called by Wyndham and offered a "free" 3-day/2-night stay at Springhill Suites at Christmas Tree Lane in Pigeon Forge, TN so long as they attended a two-hour presentation.

30.    Plaintiffs accepted that offer and were told that failure to attend the presentation would cost them $150.00 and cancellation would cost $75.00.

31.     On December 16, 2024, Plaintiffs traveled to Pigeon Forge, TN to use the "free" stay as their anniversary was the previous day.

32.     At the presentation which in reality was five-half hours not two hours as previously communicated, Plaintiffs repeatedly informed Diane aka "DD" that they wanted out of all contracts and to leave the presentation. DD told Plaintiffs that they would have to pay for a year of the contract from December 2024 - December of 2025 and then they could then opt-out of the contract(s).

33.     Through the aggressive sales tactics of Defendants' representatives DD and others Plaintiffs were talked into in a transaction they to this day do not understand into "cashing in" the "points" from the 5418 contract/account and trading in the 0810 contract to apply to a down payment for yet another time-share "Club Wyndham Access" (contract ending in 2735). A copy of contract 2735 is attached hereto as **Exhibit 3.**

34.     This new contract dated December 17, 2024, after applying the "equity" from the traded contracts in the amount of $5,460.56 cost Plaintiffs another downpayment of $7,096.95 and closing costs of $25.00 which was charged to a third Credit Card issued by the Plaintiffs (4611).

35.     As with the other contracts, Plaintiffs were not presented any documentation to review in advance, were only provided a manner to review the documents electronically and sign in the same manner, did not understand the terms of the agreement, and were intentionally, negligently or fraudulently mislead, as to the terms and conditions in addition to the benefits and costs of the Credit Card and the time-share.

36.     Mr. Wall has no recollection of ever signing any of the documents bearing his electronic signature.

37.     Additionally, upon information and belief the required credit card disclosures were not provided to Plaintiffs.

38.     Plaintiffs thereafter were offered a "free" stay from January 27 - February 3, 2025 at Wyndham Bonnet Creek Resort in Lake Buena Vista, Florida with no conditions.

39.     Plaintiffs, because they had family nearby, accepted that offer and traveled to Lake Buena Vista to take advantage of the "free" stay.

40.     Plaintiffs while at Wyndham Bonnet Creek Resort again told Defendant Wyndham's representatives they wanted out of the contracts and that they wanted to talk to someone in the corporate office (based in Orlando, Florida) and did not want to talk to a sales agent or attend another presentation.

41.     Plaintiffs were directed to talk to an "Alex Taylor" who was from "corporate" the next day in Orlando but, as luck would have it, "just happened" to be at the Bonnet Creek Resort that day.

42.     Plaintiffs on January 28, 2025 met with Alex Taylor and "Anthony" whom Plaintiffs informed repeatedly they wanted out of the contracts and the credit cards.

43.     At that meeting which lasted from noon until 8:30p.m. in another transaction they to this day do not understand, Alex and Anthony talked Plaintiffs into entering yet another contract (0559) under the guise of downsizing and that Plaintiffs could then opt-out of everything after four (4) months because of Plaintiffs age. Plaintiffs were instructed not to tell this to anyone. A copy of the purchase documents is attached hereto as **Exhibit 4.**

44.     This fourth contract dated January 28, 2025 was to purchase an interest in Wyndham Bonnet Creek Resort located even farther away in Florida.

45.     After applying the "rewards" Plaintiffs apparently had on either one or both of the Credit Cards in the amount of $11,374.39 as the down payment, cost Plaintiffs financed another loan of $17,313.14 to be paid via auto pay on a credit card previously issued by the Defendants.

46.     The fourth contract increased the total debt owed to Wyndham from $62,679.49 to $79,992.63, requiring a monthly payment of $1,242.62 and a monthly maintenance fee of $384.67. *Id.*

47.     As with all previous contracts, Plaintiffs were not presented any documentation to review in advance, were only provided a manner to review the documents electronically and sign in the same manner, did not understand the terms of the agreement, and were intentionally, negligently or fraudulently mislead, as to the terms and conditions in addition to the benefits and costs of the Credit Card and the time-share.

48.     Plaintiffs made and continued to attempt to make the monthly payment to the credit cards; but by May of 2025 found themselves unable to afford the astronomical payments.

49.     After defaulting in or around May 2025 on the credit cards issued by Defendants, Plaintiffs began to receive numerous telephone calls regarding the

## COUNT ONE: AGAINST WYNDHAM
## VIOLATION OF THE CSPA, R.C. 1345.01, et seq.

50.     Plaintiffs allege and incorporate herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

51.     As demonstrated by the allegations set forth in the preceding paragraphs, the transactions between the Plaintiffs and Defendants are "consumer transactions" as the Plaintiffs' transactions with the Defendants was for personal, household, and/or family use, specifically for a timeshare interest or the purchasing of points to be used at Defendant Wyndham's properties and financed by Defendant Barclays.

8

52. As demonstrated above, *supra*, and demonstrated by Exhibits 1-4, Wyndham engaged in a series of unfair, unlawful and/or deceptive acts by:

a. Failing to provide documents in a form readable for the Plaintiffs at the time of signing the contracts.

b. Using high pressure sales tactics to prey upon the elderly.

c. Being pressured into multiple upgrades or trade-ins over the course of six (6) months.

d. Coercing the Plaintiffs to enter into agreements when Defendants knew, or should have known, of their inability to understand the transaction(s);

e. Wyndham's conduct relating to their sales presentations constituted a "bait and switch" tactic by advertising items to lure the Plaintiffs, then inducing them to buy different and more expensive contracts when the consumer could not afford the first contract.

f. Requiring or pressuring the Plaintiffs to open at least three (3) credit cards issued by the Defendants.

g. Intentionally and/or negligently, Wyndham sales agents omitted or misrepresented to Plaintiffs the facts regarding the price, costs, expenses, and/or values of the Wyndham timeshare properties/points being sold to Plaintiffs.

h. Plaintiffs were afforded a credit in the amount of their so called "equity" under an existing timeshare; however, this amount constituted a false and fraudulent statement for the sole purpose of convincing Plaintiffs to increase the ownership and to incur further indebtedness and monetary obligations to Defendants.

i. Intentionally and/or negligently, Plaintiffs were falsely told by Wyndham that Wyndham would buy the timeshare back if Plaintiffs were not happy with the purchase.

j. Intentionally and/or negligently, Plaintiffs were falsely told by Wyndham that Plaintiffs could opt-out of certain contracts after various amounts of time or payments.

k. Plaintiffs were forced to make pressured and hurried decisions by Wyndham and forced to sit through hours-long sales presentations or meetings with financial penalties attached for not doing so.

53. Wyndham's actions, as described herein constitute deceptive, unfair, and/or unconscionable acts and practices in violation of R.C. 1345.02.

54. The actions of Defendant described herein is conduct which is subject to treble damages under the CSPA. See *In re Bluegreen Vacations*., PIF No. 10002067 (April 2002), *State of Ohio ex rel. Montgomery* PIF No. 10001817. A copy of PIF Nos. 10002067 and 10001817 are attached as **Collective Exhibit 5.** The Ohio Attorney General has made these determinations available for public inspection pursuant to R.C. 1345.05(A)(3).

55. As a result of Wyndham's actions, Wyndham is liable to each Plaintiff for actual damages, statutory damages, non-economic damages of up to Five Thousand Dollars ($5,000.00), treble damages, costs, and attorneys' fees pursuant to R.C. 1345.09.

<div align="center">

**COUNT TWO: AGAINST WYNDHAM**
**VIOLATION OF THE TENNESSEE TIMESHARE ACT**

</div>

56. Plaintiffs allege and incorporate herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

57. Wyndham operates a multisite timeshare plan in which the purchaser purchases

<div align="center">10</div>

an interest as defined by The Tennessee Time-Share Act Tenn. Code Ann. § 66-32-101, *et seq*.

58.     As described above, the actions of Wyndham have violated and continue to violate the Tennessee Time-Share Act.

59.     At all relevant times, Wyndham and its subsidiaries were developers, sellers, and/or managing entities of a timeshare plan under the Tennessee Time-Share Act.

60.     The Tennessee Time-Share Act specifically prohibits misleading oral statements from being made in a timeshare sales presentation.

61.     Wyndham made numerous oral misrepresentations to Plaintiffs, as described *supra*.

62.     Wyndham used the misrepresentations and omissions by its agents to induce Plaintiffs into signing the timeshare contracts.

63.     These misrepresentations were false, or Wyndham knew or should have known them to be false, and the misrepresentations were made for Wyndham's financial gain.

64.     Plaintiffs reasonably relied on the foregoing misrepresentations, reassurances, and omissions by Defendants, which induced Plaintiffs into purchasing timeshare properties/points from Wyndham.

65.     Plaintiffs would not have entered into the purchase agreements but for these misrepresentations, reassurances, and omissions.

66.     As a direct and proximate result of Wyndham's foregoing violations of the Tennessee Time-Share Act, Plaintiffs suffered damages and are entitled to recover damages, including but not limited to actual and punitive damages, and reasonable attorneys' fees, from Wyndham.

## COUNT THREE: AGAINST BOTH DEFENDANTS
## VIOLATION OF THE TRUTH IN LENDING ACT

**15 U.S.C. §§ 1601 et seq., Regulation Z**

67.    Plaintiffs allege and incorporate herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

68.    TILA, 15 U.S.C. § 1601, *et seq.* was implemented by 12 C.F.R. Part 1026, commonly referred to as Regulation Z (Reg. Z).

69.    Under TILA, the term "creditor" includes a person who both regularly extends consumer credit for which the payment of a finance charge is or may be required, and is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or by agreement. The term "creditor" also includes card issuers where the payment of a finance charge is or may be required. *See* 15 U.S.C. § 1602(g).

70.    TILA defines "card issuer" as "any person who issues a credit card, or the agent of such person with respect to such card." 15 U.S.C. § 1602(o).

71.    The credit cards issued by Defendant Barclays were issued under an open-end consumer credit plan by agreement with Plaintiff, where the payment of a finance charge may be required, and therefore, Barclays is a "card issuer" as defined by the TILA.

72.    Wyndham is a "card issuer" as that term is defined by 15 U.S.C. § 1602(o) as it was or is an agent of Defendant Barclays who issued the credit cards more at issue *supra*.

73.    15 U.S.C. § 1631, *et seq.* requires creditors to make certain disclosures as set forth within that subsection.

74.    Specifically, in regards to an open-end consumer credit plan, such as the credit cards issued by Defendants herein to Plaintiffs herein, 15 U.S.C. § 1631(c) sets forth the disclosures required to be made and provided to Plaintiffs at the time they were coerced into applying for the three (3) credit cards described *supra*.

75.    The disclosures required by TILA must be "clearly and conspicuously disclosed" pursuant to 15 U.S.C. § 1632(a); 12 C.F.R. § 1206.5(a).

76.    The "clear and conspicuous" standard generally requires that disclosures be in a reasonably understandable form. See Official Interpretations - Comment for 1026.5(a)(1).

77.    Plaintiffs were not provided the required disclosures in a format they could read nor given an opportunity to read them or keep them in violation of 15 U.S.C. §§ 1631 and 1632.

78.    Plaintiffs did not have an opportunity to review the disclosures and Mr. Wall has no recollection of signing any disclosures and therefor did not request or agree to the disclosure being provided in electronic format. *See* 12 C.F.R § 1206.5(a)(1).

79.    Defendants' acts and omissions as set forth *supra* were not unintentional, but rather part of a deliberate pattern and practice to coerce the sale of timeshares and opening of credit cards to fund the timeshare purchases.

80.    Upon information and belief Defendant(s) does not maintain (i.e., actually employ or implement) procedures to avoid errors under the TILA.

81.    Any procedures maintained (i.e., actually employed or implemented) by Defendant(s) to avoid errors under the TILA failed to avoid using false, deceptive, misleading, or unfair sales tactics when selling timeshares and/or offering to open or the opening of credit cards to fund the timeshare purchases.

82.    The acts and omissions of Defendants as set forth *supra* constitute numerous violations of TILA, Reg. Z and thus Plaintiffs are each entitled to actual damages, twice the amount of any finance charge in connection with the transaction, with a minimum of $500 and a maximum of $5,000, or such higher amount as may be appropriate in the case of an established

pattern or practice of such failures; costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1640(a)(1), (a)(2)(A)(i), and (a)(3).

## COUNT FOUR: AGAINST WYNDHAM
## NEGLIGENT MISREPRESENTATION

83.     Plaintiffs allege and incorporate herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

84.     Defendant was acting in the course of their business.

85.     During the dealings with Plaintiffs, Defendant negligently supplied false information as set forth herein.

86.     Defendant intended the information to guide Plaintiffs in Plaintiffs' purchases and credit transactions.

87.     Plaintiffs relied upon Defendants' representations during the sale of the timeshares and credit card solicitations which substantially influenced their decision to purchase the timeshares and open the credit cards.

88.     Plaintiffs justifiably relied upon the false information, guidance, knowledge and suggestions of Defendant.

89.     Defendant's representations were false, and Defendant failed to exercise reasonable care in communicating the information to Plaintiffs.

90.     As a direct and proximate result of Defendants negligent misrepresentations, Plaintiffs suffered a financial loss and are now in substantial debt which they cannot afford.

91.     Plaintiffs would not have entered into the transactions without Defendants' representations.

92.     As a direct and proximate result of Defendant's negligent misrepresentation, Plaintiffs are entitled to recover actual and punitive damages.

## COUNT FIVE: AGAINST WYNDHAM
## FRAUDULENT INDUCEMENT

93.     Plaintiffs allege and incorporate herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

94.     Defendant was acting in the course of its business.

95.     Defendant, by and through its employees/agents and with actual and/or constructive knowledge, made fraudulent misrepresentations regarding the timeshares as set forth herein.

96.     The Defendants' fraudulent representations were done with utter disregard and recklessness as to the truth or falsity of the timeshare purchase agreements including but not limited to value, use, ability to resell or cancel, and monthly cost of ownership.

97.     Defendant intended the information to guide Plaintiffs in Plaintiffs' purchases and credit transactions.

98.     Plaintiffs relied upon Defendants' fraudulent representations during the sale of the timeshares which substantially influenced their decision to purchase the timeshares and open the credit cards.

99.     Plaintiffs would not have entered into the transactions without Defendant's fraudulent representations.

100.    Plaintiffs justifiably relied upon the false information, guidance, knowledge and suggestions of Defendant and was fraudulently induced to purchase the timeshares and open the credit cards in reliance thereon.

101.    Defendant's representations were false, and Defendant failed to exercise reasonable care in communicating the information to Plaintiffs.

102. As a direct and proximate result, Plaintiffs suffered a financial loss and are now in substantial debt which they cannot afford.

103. Plaintiffs would not have entered into the transactions without Defendant's representations.

104. As a direct and proximate result of Defendant's fraudulent misrepresentation, Plaintiffs are entitled to recover actual and punitive damages.

### **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs Sandra Leslie and Donald Wall respectfully request an Order from this Court granting Judgment against Defendants, as follows:

A. For recission of the timeshare contracts for the allegations contained in Count One of the Complaint pursuant to pursuant to R.C. 1345.09(A) and/or (B);

B. For or an award of actual, statutory, and treble damages to Plaintiffs in a total amount to be determined at trial against Defendant Wyndham for the allegations contained in Count One of the Complaint pursuant to R.C. 1345.09(A) and/or (B);

C. For an award of non-economic damages of up to $5,000.00 to each Plaintiff against Defendant Wyndham for the allegations contained in Count One of the Complaint pursuant to R.C. 1345.09(A) and/or (B);

D. For an award of all of Plaintiffs' reasonable attorneys' fees and costs against Defendant Wyndham for the allegations contained in Count One of the Complaint R.C. 1345.09(F)(2);

E. For or an award of actual damages to Plaintiffs in a total amount to be determined at trial against Defendant Wyndham for the allegations contained in Count Two of the Complaint pursuant to Tenn. Code Ann. §66-32-118;

F. For or an award of punitive damages to Plaintiffs for any action found to be willfully taken by Defendant Wyndham in a total amount to be determined at trial against Defendant Wyndham for the allegations contained in Count Two of the Complaint pursuant to Tenn. Code Ann. §66-32-118;

G. For an award of all of Plaintiffs' reasonable attorneys' fees against Defendant Wyndham for the allegations contained in Count Two of the Complaint pursuant to Tenn. Code Ann. §66-32-118;

H. For an award of actual damages to Plaintiffs in an amount to be determined at trial against both Defendants pursuant to 15 U.S.C. § 1640(a)(1) for the allegations contained in Count Three of the Complaint;

I. For an award of statutory damages to Plaintiffs in an amount to be determined at trial against both Defendants pursuant to 15 U.S.C. § 1640(a)(2)(A)(i) for the allegations contained in Count Three of the Complaint;

J. For an award of all of Plaintiffs' reasonable attorneys' fees and costs against both Defendants for the allegations contained in Count Three of the Complaint pursuant to 15 U.S.C. § 1640(a)(3);

K. For an award of all actual, nominal, statutory, compensatory, consequential, incidental, enhanced, and punitive damages as well as restitution and disgorgement as allowed by law or equity to Plaintiffs against Defendant Wyndham for the allegations contained in Count Four and/or Five of the Complaint; and

L. For all other relief this Court deems just and proper.

Respectfully submitted,

/s/ Brent S. Snyder
Brent S. Snyder (0104059)
Brian D. Flick (0081605)
Marc E. Dann (0039425)
Marita I. Ramirez (0101882)
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
216/373-0539
216/373-0536 – fax
notices@dannlaw.com
*Counsel for Plaintiffs*

## **JURY DEMAND**

Plaintiffs Sandra Leslie and Donald Wall hereby demand a jury for all issues herein that are so triable.

/s/ Brent S. Snyder
Brent S. Snyder (0104059)
Brian D. Flick (0081605)
Marc E. Dann (0039425)
Marita I. Ramirez (0101882)
DannLaw
*Counsel for Plaintiffs*

# EXHIBIT 1

**CLUB WYNDHAM**

| | | Owner name: | LESLIE WALL | Date: | 8/17/2024 |
| --- | --- | --- | --- | --- | --- |
| | | | | Member number: | |
| | | | | Contract number: | |

### Ownership Review Summary

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| New points purchased today*: | 154,000 | | Today's Purchase Price: | $ | 24,900.00 |
| Use year / Deposit frequency: | Oct 1 – Sept 30 / Annual | | Today's Processing Fee: | $ | 349.00 |
| Inventory purchased: | CW PREFER WEST | | Today's Closing Costs: | $ | 30.00 |
| | | | Today's Total: | $ | 25,279.00 |

### Other Memberships and Enrollments

| | | | |
| --- | --- | --- | --- |
| External exchange company: | RCI | | **VIP by Wyndham Status** |
| Internal exchange company: | Club Wyndham Plus | | VIP Level: Standard |
| TravelIP by TKL | Yes | | Temporary VIP Level: VIP Bronze |
| Plus Partners (CW Travel Agency): | Yes | | |
| Vacation Sidekick: | Yes | | **CLUBWYNDHAM.COM** |
| Wyndham Rewards #: | 505628842K | | |
| Club Pass: | Yes | | New Owner Reservations: 866-514-6172 |
| Bonus Points: | 246,000 | | Club Wyndham Travel Agency: 1-833-780-8862 |

| Today's Incentive: | 246000 BONUS POINTS |
| --- | --- |

### Your Financial Deposit Today

| | | | | |
| --- | --- | --- | --- | --- |
| Today's deposits (and methods of payment): | | New Wyndham Rewards CC | $ | 3,787.35 |
| | | | $ | |
| | Closing Costs | New Wyndham Rewards CC | $ | 30.00 |
| Total applied to contract today: | | | $ | 3,817.35 |

### Owner Onboarding Specialist Only

**Loan Summary**

| | | | |
| --- | --- | --- | --- |
| Total loan balance with Wyndham for this contract*** | | $ | 21,461.65 |
| Loan payment amount for this contract** | | $ | 335.01 |
| Auto Pay   Yes          Auto Pay method: | | | |
| First loan payment date for THIS CONTRACT: 10/1/2024 | | | |

| CLUB WYNDHAM Plus Assessment Summary (Maintenance Fee) | | | Monthly |
| --- | --- | --- | --- |

| | | | |
| --- | --- | --- | --- |
| Monthly assessment for: this contract | | $ | 112.15 |
| Auto Pay:   Yes          Auto Pay method: New Wyn Rew CC | | | |
| Next assessment payment date: 10/1/2024 | | | |

New Wyndham Rewards  Credit Card Downpayment Today : $3,817.35

Interest-Free Financing: 0% interest for the first 9 months(New Credit Card)  (Today's down payment only)

I have reviewed and agree with the information noted above.

I agree that I will be a member of the programs noted above under "Your Other Memberships and Enrollments." (Certain programs may carry additional enrollment and renewal fees. Please refer to the disclosure documents for additional information.)

I have reviewed and understand the attached Buyer's Acknowledgment.

I agree that I will be a member of CLUB WYNDHAM Plus and that I have reviewed and agreed to the terms of the attached Assignment Agreement and Use Restriction.

I have reviewed and agree to abide by the terms and conditions of the Enrollment Agreement.

| | | | |
| --- | --- | --- | --- |
| SANDRA LESLIE | 8/17/2024 | Kyle Cates | 8/17/2024 |
| Owner's Signature | | Wyndham Owner Onboarding Signature | |
| DONALD WALL | 8/17/2024 | Kyle Cates | |
| Owner's Signature | | Wyndham Owner Onboarding Print Name | |
| | 8/17/2024 | | 8/17/2024 |
| Owner's Signature | | Owner's Signature | |

*Points total does not include existing Bonus Point contracts
**Amount financed does not include any existing loan balances with any third party companies outside of today's purchase
(i.e., Vacation Club Line of Credit, Citizens Pay, Wyndham Rewards Credit Card)

| For New Owners | Your owner website: ClubWyndham.com | 21516 (rev 48506) |
| --- | --- | --- |

Docusign Envelope ID: 79D4FFDE-1049-4868-95B4-4C60SC5C6094



Contract Number: _____  021

## AGENCY DISCLOSURE
### AS REQUIRED BY TENNESSEE LAW

Every real estate licensee is required to disclose his or her agency status in a real estate transaction to any buyer or seller who is not represented by an agent and with whom the licensee is working directly in the transaction. The purpose of this Agency Disclosure is to acknowledge that this disclosure occurred.  A copy of this Agency Disclosure must be provided to anyone who signs it.

**Notice is hereby given that the agency status of this Licensee in this transaction is as follows:**

**Licensee is the Agent for the Seller.**

As required by law, this Agency Disclosure is delivered to you, as an unrepresented buyer, in writing prior to the preparation of any offer to purchase.

Buyer confirms that the Licensee's Agency status was communicated orally before any real estate services were provided.

This Agency Disclosure does not constitute an agency contract or establish an agency relationship between you and the Licensee.

Any complaints alleging a violation by the Licensee of the Tennessee Code Annotated 62-13-312 must be filed within the applicable statute of limitations for the violation set out in 62-13-313(e).  The Tennessee Real Estate Commission is located at 500 James Robertson Pkwy, Nashville, TN 37243-1151 and its telephone number is (800) 342.4031.

_____     _____
Signature of Licensee                        Date   8-17-24

I acknowledge and confirm the above disclosure of agency status by Licensee.

_____     _____
Signature of Buyer                           Date   7-7-24

_____     _____
Signature of Buyer                           Date   8-18-24

No. 1964-NP Rev. 5-10

Docusign Envelope ID: T9D4FFCE-1048-4B6B-95B4-6C606C5C6094

# *Wyndham Vacation Resorts, Inc.*
## SalePoint Cover Sheet

| | |
|---|---|
| Customer Name: | SANDRA LESLIE |
| Customer Address: | 425 CROSSBOW DR , MAINVILLE, OH |
| Customer Phone: | |
| Contract Number: | 021     Member No: | :046 |
| Salesman: | TYLER MURRELL |
| User: | 559677 |
| Printer: | |
| Site: | PIGEON FORGE THE ISLAND |

| FORMS PRINTED | KEYED | VLO | PROCESSED | LAS VEGAS COMPLIANCE |
|---|---|---|---|---|
| FORMNO3029 | | | | |
| FORMNO2706DRP | | | | |
| AFORMNO2528 | | | | |
| FORMNO3525 | | | | |
| FORMNO3190 | | | | |
| FORMNO3161A | | | | |
| FORMNO2201 | | | | |
| WVD0006 | | | | |
| FORMNO3356SVCW_12 23 | | | | |
| FORMNO3586 | | | | |
| FORMNO3212 | | | | |
| FORMNO3073 | | | | |
| FORMNO2692DRP | | | | |
| FORMNO3337 | | | | |
| FORMNO2867 | | | | |
| FORMNO2242 | | | | |
| FORMNO3258 | | | | |
| FORMNO3142 | | | | |
| FORM805SVC | | | | |
| FORMNO2537 | | | | |
| FORMNO3468 | | | | |

Docusign Envelope ID: 79D4FFCE-1047-486B-95B4-9C605C5C8094

Contract Number          021

## VIDEO AND SOUND RECORDING CONSENT FORM

I/we, **SANDRA LESLIE and DONALD WALL JOINT TENANTS WITH THE RIGHT OF SURVIVORSHIP**, authorize Wyndham Vacation Ownership, Inc., Shell Vacations, LLC. and their subsidiaries (**"Wyndham"**) to take and use video and sound recordings of the vacation ownership purchase document review.

I/we understand that the video and sound recordings (**"Recordings"**) may be used for quality assurance training or monitoring purposes, as well as to ensure compliance with industry regulations and for other business purposes.

I/we understand and agree to the conditions outlined in this video and sound recording consent form.

I/we understand that the Recordings are the property of Wyndham and I will not be given a copy of either recording, nor will the Recordings be part of any agreement or contract I enter into with Wyndham.

I/we acknowledge that I am fully aware of the contents of this consent form and am under no disability, duress, or undue influence at the time of my signing this consent form.

X _SANDRA LESLIE_         8/17/2024
Owner Sandra Leslie         Date Signed

X _DONALD WALL_         8/17/2024
Owner Donald Wall         Date Signed

X
Owner         Date Signed

X
Owner         Date Signed

No. 3029/Rev. 3-17

Document Envelope ID: 73D4FFCE-1018-4368-B5B4-3C505C5C60B4

## EXHIBIT to OWNERSHIP REVIEW
### BUYER'S ACKNOWLEDGMENT

Contract Number:    1021

Purchaser(s): SANDRA LESLIE and DONALD WALL

To ensure Purchaser(s) understands the benefits of the timeshare purchase with SVC - West, LLC ("Developer") whose address is 6277 Sea Harbor Dr., Orlando, FL 328876000 and understands membership in the CLUB WYNDHAM® Plus Program ("CLUB WYNDHAM Plus"), it is important for Purchaser(s) to review each of the following:

1. Timeshare Purchase. Purchaser acknowledges the purchase of a timeshare interest ("Ownership Interest") with SVC - West, LLC whose address is 6277 Sea Harbor Dr., Orlando, FL 326070000.

2. Assignment to CLUB WYNDHAM Plus. Purchaser acknowledges that Wyndham Vacation Resorts, Inc. is the Plan Manager of Club Wyndham Plus. Purchaser understands the use rights in the Ownership Interest are being assigned to CLUB WYNDHAM Plus. In exchange, Purchaser will be allocated 154,000 CLUB WYNDHAM Plus Points annually based on the use rights stated in Purchaser's contract and that the Use Year is OCTOBER 1ST through SEPTEMBER 30TH.

3. Future CLUB WYNDHAM Plus Changes. Purchaser(s) acknowledges that the current CLUB WYNDHAM Plus Program features and benefits are described in the written program directories and disclosure materials provided with the purchase and that such features and benefits can change or be eliminated in the future. Purchaser(s) further acknowledges that no promises or guarantees were made to Purchaser(s) either verbally or in writing of any future program enhancements or resort amenity additions or benefits.

4. Personal Use and Enjoyment. Subject to certain strict eligibility requirements, limited resale, rental, and buy-back options may be currently available through Developer or related affiliates. Please contact Developer - Attention: Certified Exit at 1-855-312-9040 for further details on eligibility requirements and available options.

   There is no assurance that Purchaser(s) may resell a timeshare for a certain price or on particular terms. Purchaser(s) acknowledges that this purchase is (i) for personal use and enjoyment and not for commercial or investment purposes and (ii) not being made based upon any representation that the timeshare interest has any future market value or resale potential.

5. No Expectation of Tax Benefit or Profit. Purchaser(s) acknowledges that the purchase of the Ownership Interest was not made with any expectation of the deductibility under federal or state tax laws or deductibility of other expenses relating to the purchase or with any expectation of deriving any profit or tax advantage, including from:

   Resale Assistance    Rental Income    Investment    Tax Benefit

6. Not Buying for Maintenance Fee Offset. Purchaser(s) understands that SVC - West, LLC or its parents, subsidiaries and affiliates may present various programs from time to time that may provide Purchaser(s) with opportunities to offset a portion of the maintenance fee obligation associated with Purchaser's Ownership Interest. Purchaser(s) acknowledges the purchase made today was not made based on any of these programs and has no expectation that Purchaser's participation in these programs will fully or continuously offset any or all of the maintenance fee obligation.

7. No Pets. Purchaser(s) understands that pets are not allowed at any resort property, except for service animals which have been trained to work or perform tasks for the benefit of an individual with a disability.

Docusign Envelope ID: 79D4FFCE-1039-436B-89B4-8Q895Q5C6094

## SalePoint Owner Information Sheet

Contract Number:    **021**    Date of Sale: 08-17-2024    Points Purchased: **154,000**
Inventory Purchased: Shell Owners Club - West

| Primary Owner Information | |
|---|---|
| Name: | Sandra Leslie |
| Address: | 425 Crossbow Dr , Mainville, OH 45039 |
| Phone number(s): | |
| Email address: | |
| Marital Status: | |
| Spouse Name: | |
| Title to be taken as: | |

| Secondary Owner Information | |
|---|---|
| Name: | Donald Wall |
| Address: | 425 Crossbow Dr , Mainville, OH 45039 |
| Phone number(s): | |
| Email address: | |
| Marital Status: | |
| Spouse Name: | |
| Title to be taken as: | Joint Tenants With The Right Of Survivorship |

Wyndham Vacation Ownership, Inc., Shell Vacations, LLC, and their parents, subsidiaries, and affiliates (collectively "WVO") have my/our express written permission to send me/us advertising or telemarketing calls, texts, or other messages (including, but not limited to, SMS/MMS, push notifications, and in-app messaging) using an automated telephone dialing system or artificial or pre-recorded voice message at any cell phone or phone number I/we have provided above.

Additionally, I/we understand that WVO will share my/our cell phone or phone number(s) with WVO's affiliates and third-party service providers, including, but not limited to, billing or collection companies that WVO has contracted with to provide these types of services on its behalf.  WVO, its affiliates and third-party service providers have my/our express permission to send me/us calls, texts, or other messages (including, but not limited to, SMS/MMS, push notifications, and in-app messaging) using an automated dialing system or artificial or pre-recorded voice message at any cell phone or phone number I/we have provided, or at any number WVO or its affiliates and third-party service providers may obtain for the following purposes: (a) to resolve an issue or dispute regarding my/our purchase of property and/or services from WVO; (b) in connection with payment processing, including payment confirmations and account status; (c) to collect on a debt; or (d) as necessary regarding my/our purchase or property and/or services from WVO.

By granting this consent, I/we understand that it is not a condition of my/our purchase of property and/or services from WVO or its parents or subsidiaries and I/we have the right to refuse to give such consent.

| Sandra Leslie | 8/17/2024 | Donald Wall | 8/17/2024 |
|---|---|---|---|
| Signature  Sandra Leslie | Date | Signature  Donald Wall | Date |
| Signature | Date | Signature | Date |

00291-2401021                                           No. 2528/Rev. 11-23

Docusign Envelope ID: 79D4FFCE-1049-488B-85B4-9C005C5C0094

| X | I/we authorize WVO to send text or other messages regarding the above account, including but not limited to SMS, MMS, push notifications, and in-app messaging at the cell phone number(s) provided herein. |

*Message and data rates may apply.*

Message frequency will vary, for example, based on the transactions you engage in or your account status. To stop receiving text messages, you agree to reply "STOP" to the text message, or to call 1-800-739-4031, After opting out, you may receive one additional text message confirming that your request has been received and processed. For help related to the text message, reply "HELP."

Please visit www.clubwyndham.wyndhamdestinations.com for the complete Terms of Use and Privacy Notice.

Docusign Envelope ID: F904FFCE-1049-489B-9584-9D60BC506084

## Retail Installment Contract

### *Shell Owners Club*

### *WEST*

| Purchase Agreement |
| --- |

| Contract No. | )21 | Membership No. | 46 | | |
| --- | --- | --- | --- | --- | --- |
| Use Year Begin Date: | October 1st | #of Points: | Point Type: | | Expiration Date: |
| Use Year End Date: | September 30th | 154,000 | Club | | None |

Your Membership is a:

[X] Permanent Membership (Premier Member). It will not expire.

In this retail installment contract (*"Agreement"*), (*"Seller"*) means SVC – West, LLC, a California limited liability company (formerly known as SVC-West, L.P., a California limited partnership) and (*"Association"*) means SHELL OWNERS ASSOCIATION – WEST, a California non-profit corporation, the Association responsible for the implementation and operation of the Shell Owners Club - West timeshare plan. Their address is 6277 Sea Harbor Drive, Orlando Florida, 32821, telephone number (407) 825-5200 and fax number (407) 248-4496. (*"You"*), (*"Your"*) and (*"Buyer"*) mean the Buyers shown on the last page of this Agreement, separately and together. The Seller and Buyer may hereinafter be referred to collectively as the (*"Parties"*) or individually as a (*"Party"*).

**Arbitration Notice:** PARAGRAPH 29 CONTAINS AN ARBITRATION PROVISION THAT MAY SUBSTANTIALLY AFFECT YOUR RIGHTS IF A DISPUTE ARISES BETWEEN YOU AND SELLER. YOU HAVE THE RIGHT TO REJECT THE ARBITRATION PROVISION AS SET FORTH IN THE ARBITRATION PROVISION.

1. **Shell Owners Club.** By signing this Agreement, Seller agrees to sell to you and you agree to buy from Seller a timeshare right to use interest in the Shell Owners Club - West timeshare plan. In this Agreement, your timeshare right to use interest is called a (*"membership"*) and it includes:

A. A membership in the Association. The Association holds title or the legal right to use certain dwelling units or accommodations (in this Agreement these are called your *"home club units"*). Unless you sell your membership, your membership is cancelled or the timeshare plan is terminated, your membership is perpetual. The term of the timeshare plan is also indefinite and will continue until terminated as provided in the bylaws of the Association. You do not own any real estate interest in any of the home club units;

B. The right each year to receive the number of (*"home club points"*) shown above. Home club points are attributable to the home club units.

C. The right to use those home club points to reserve a home club unit in the manner provided in the home club documents; and

D. The right to use and occupy a home club unit and the common furnishings during the time period reserved (your *"vacation period"*).

2. **Your Basic Rights and Duties.** As an owner of a membership, you will be a member of the Association. As a member, you will have all of the rights, privileges and duties provided by certain documents called the (*"home club documents"*). The home club documents created and govern Shell Owners Club - West which is also called the (*"home club"*), the (*"home club program"*) or just the (*"program"*) in this Agreement. They include (a) the articles of incorporation and bylaws of the Association; (b) any rules and regulations adopted by the Association (the "association

Docusign Envelope ID: 79D4FFCE-1A49-485B-9584-9CE05C5CB9A4



||||7777777777777

Contract No.                    021

*rules"*); (c) any declaration dedicating property to the program; and (d) any trust agreement for property held in trust for the benefit of the Association (a *"master trust"*). Your rights as a member of the program are further defined, limited, and governed by the home club documents and can be changed as provided in them. Some of those rights are described here.

A.  **Use Rights.** Each year, you will have the right to receive the number of home club points shown on Page 1 of this Agreement. To do so, you must follow the rules contained in the home club documents. Your affiliation with CLUB WYNDHAM® Plus (**"CWP"**) may change the way you reserve and use your home club points.

B.  **You May Transfer Your Membership.** You may transfer your membership to anyone else (**"new member"**) except another vacation plan, an individual or entity that is a known or suspected fraudulent person or is delinquent in the payment of any assessments or fees to Seller or the Association, or a competitor of the developer or Shell Vacations. (**"Competitor"**) is defined in the bylaws. You must pay a transfer fee before you transfer your membership. The Association may deny any such transfers. You must follow the requirements of the home club documents for such transfer.

Neither the Seller nor the Association has any obligation to repurchase your membership or help you find a buyer for it.

C.  **Your Acknowledgments.**

By signing this Agreement, you acknowledge and promise that:

(i)   You are buying the membership for no purpose other than for your recreational and social use and enjoyment. You are not purchasing the membership as an investment from which you hope to make a financial profit or gain, or for financial returns of any other kind, including through resale, refinancing, tax advantages, or appreciation or depreciation. Neither the Association nor Seller has made any promises about such benefits.

(ii)   You received a completed Truth in Lending Disclosure Statement found on Page 17 before signing this Agreement.

(iii)   You may not use the home club units for any commercial purpose not expressly authorized by the Association, Seller, or one of their affiliates, including commercial rental activities. Commercial rental activities include using the Internet or other media to advertise rental opportunities.

(iv)   All information you submit to Seller to receive financing is complete and accurate.

(v)   Neither you nor your relatives own more than 10 memberships in the home club program.

(vi)   You are legally capable and authorized to sign this Agreement.

(vii)   Association and Seller make no representation that you will be able to participate in any buyback, resale, or rental program that may be offered now or in the future. Furthermore, you are not purchasing your membership in anticipation of or in reliance upon any such program being offered now or in the future or the strength of a secondary market for the resale of your membership.

(viii)   Seller has signed this Agreement in consideration of and reliance on your creditworthiness and reliability.

(ix)   You are not in bankruptcy, have no current intention to file in bankruptcy, and have not consulted an attorney regarding a possible bankruptcy filing within the past 6 months.

(x)   You agree to all of the obligations, covenants, requirements, and benefits of being a member or owning a membership that are in the home club documents or club rules, as they may be amended from time to time.

D.  **You May Give Away, or Exchange Your Vacation Period.** You may allow someone else to use your assigned unit during your vacation period. You may also exchange your vacation period with people having use rights in another program or project by participating in an exchange program. You promise to obey the rules of any exchange company that has an affiliation agreement with the Association. You may not give your membership, your vacation period or your use rights to another vacation plan or a competitor of the developer or Shell Vacations and if you attempt to do so, you agree that the Seller or Shell Vacations may go to court to get an injunction to stop you or, if you transfer

DocuSign Envelope ID: 79DXFF CS-1819-488B-B3BA-8CAC8C5C6694



Contract No.                021

your vacation plan to an individual or entity that is a known or suspected fraudulent person or is delinquent in the payment of any assessments or fees to Seller or the Association, or to a competitor, the transfer will be void and invalid and the Association will not recognize the transferee as a new member.

E. **You May Request a Reservation of a Unit in Another Shell Club.** Your home club is part of the Shell Vacations Club (the **"club"**). The club is not a separate company. It is an exchange and reservation service business owned and operated by Shell Vacations Club, LLC (**"Shell Vacations"**). The home club program and other vacation plans participating in the club are called (**"Shell Clubs"**). To the extent that you affiliate with CWP, your reservation and use rules will be governed by CWP.

Among other things, this means that you may reserve a unit included in another Shell Club or CWP affiliated location. You may only do so after the other Shell Club's home club reservation period ends, and you must follow the club's reservation rules. The club will confirm your reservation request if the kind of unit is available for the time periods that you ask for in your reservation request. Confirmation of any particular reservation cannot be guaranteed, however.

3. **Duration of Membership.** You will become a member upon closing. Your rights as a member will continue in perpetuity unless you sell your membership, your membership is cancelled, or the home club program is terminated. The Seller sets the number of points required for a membership and may change it from time to time. This Agreement will remain in effect for so long as you are a member. If you buy more home club points; however, you must sign a new purchase agreement.

4. **Association Title Insurance.** The Association holds title to or has the legal right to reserve and occupy all of the real estate included in your home club. This property may consist of a variety of types of real property interests. Some of these may be condominium or apartment units. Some of these may be timeshare interests in vacation plans which are not part of your home club. In this Agreement, the (**"Vacation Property"**) describes all of these real property interests, taken together. The Vacation Property is either

A. Free of any mortgage or trust deed; or

B. If all or some of it is subject to a mortgage or a trust deed, the holder of that encumbrance has agreed with the Association that it will not interfere with the membership rights of the members of the Association and the home club; or

C. If neither Paragraph 4A nor 4B is true, the Association will own unencumbered Vacation Property, but no points will be issued by the Association unless and until either Paragraph 4A or 4B is true.

5. **Home Club Assessments.** In addition to the initial purchase price for your membership, each year you agree to pay the regular and any special assessments charged by the Association. These assessments are used to pay the cost of operating and maintaining your home club and the home club units. This includes housekeeping services, insurance, real estate taxes, condominium association dues, exchange company fees, and so on. You must pay the assessments within ten (10) days after the Association sends you a bill for them and whether or not you reserve or use a unit in any particular year. The Association's board of directors may raise assessments as provided in the home club documents.

6. **Reserve Account Start-Up Payment.** Before the closing, you must pay a one-time Reserve Account Startup Payment. After closing, this amount will be deposited with the Association in a savings account used to pay for capital improvements (things like new furniture or appliances, and so on).

7. **Use Years.** Subject to Paragraph 15 and to the specific provisions of the home club documents and the club rules, your right to reserve a home club unit for use during your first use year will begin on the closing date. Your use year will begin and end on the dates shown on Page 1 unless the Association notifies you of a change. Your affiliation with CWP may change your use year.

8. **Personal Charges.** You must pay certain expenses called (**"personal charges"**). Personal charges include charges for things like long distance telephone calls, extra housekeeping services, sports equipment rental, and any damage beyond normal wear and tear, to your assigned unit or its furnishings that occurs during your vacation period.

9. **Security Agreement with the Association; Default.** You promise to pay all assessments and personal charges on time; to obey the home club documents and perform your duties under them; and to keep every other promise that you make in this Agreement. If you do not do so, you will have violated this Agreement and you will be in default. If you are in default, the Association may take any action permitted by the home club documents or by law. For example, it may suspend your rights to make a reservation or an exchange; refuse to let you check in; or terminate and sell your membership and use the money from the sale to pay your debts. If your default is that you failed to make any payment to

Document Envelope ID: 79CHFF0E-10AA-4408-8A04-6D08CC8088M

 ||||||777777777777

Contract No.                    321

the Association on time, the Association will not terminate if you cure your default within sixty (60) days after it mails or personally delivers to you a notice saying that you are in default and that it intends to terminate. The Association must give the Seller a copy of that notice. If the Seller notifies the Association that it has assigned its rights to a third party, the Association must also give a copy of that notice to that third party.

You agree that this Agreement is a security agreement. You give the Association a security interest in the following items: (a) your membership; (b) all of your rights under this Agreement and the home club documents; (c) the Auto Pay Plan (if you have chosen to make automatic payments);(d) all rights described in Item (b) that you acquire in the future; (e) all replacements or additions to the rights described as items (a) and (b); and (f) all proceeds (money) that you receive for items (a) through (e).

This means that your membership and other rights are ("collateral") for your obligations to keep your promises in this Agreement, to obey the home club documents, and to pay the assessments and personal charges.

**10.   Security Agreement with Seller; Default.**   You also give the Seller a purchase money security interest in the same items that are identified in the second paragraph of Paragraph 9. In this case, your membership and other rights are collateral for your obligations to keep your promises to the Seller in this Agreement and to pay, on time, the purchase price, any finance charges, late fees, and all other charges related to your purchase of the membership. If you do not do so, you will have violated this Agreement and you will be in default. You will also be in default if you misrepresented a material fact in this Agreement or in your credit application. The Seller's security interest protects against that, too. The Association agrees that the Seller's security interest is superior to the Association's security interest (this means that the Seller gets paid first).

In order to make certain that the security interest you are giving to Seller is protected against possible claims by others against the collateral, the Seller may ask you to sign certain additional papers called (**"financing statements"**). The Seller may ask you to sign them now or later or both. You agree to sign them and to sign any other papers the Seller asks you to sign that are related to those financing statements, and to take any other action Seller may request for you to take for Seller to perfect, preserve, and protect the security interest. Furthermore, you authorize Seller, as a secured party, to file any documents and take any other actions necessary to perfect, preserve, and protect the security interest.

You also give the Seller the right to consent to any vote that you may cast on certain matters that substantially affect the Seller's security interest in your membership. This means that the Seller has a veto on certain votes that go with your membership and home club points until you have paid the purchase price, any finance charges and late fees and all other charges that you promise to pay the Seller in this Agreement. The Seller's right to consent will apply to your votes on any member votes: (a) to change the insurance on the Vacation Property or the way that insurance proceeds will be paid; (b) on the way to defend or settle any condemnation of the Vacation Property, or on the way that condemnation proceeds will be paid; (c) to construct any additions to or improvements on the Vacation Property, or on any substantial repair or rebuilding of the Vacation Property; (d) to buy any real estate; (e) to encumber the Vacation Property; and (f) to terminate the Home Club Program or to change any provisions of the Club Documents which establish any of the following: the basic use entitlements of the Members, the voting rights of members, the creation of new types of memberships, the establishment of the right to collect and enforce assessments, the methods for adding and deleting Vacation Property, the obligations of the Association to insure, manage, repair the Vacation Property or to reconstruct, restore and replace damaged or condemned property and the amendment and termination of the Home Club Program.

**11.   Default Before Closing.**   If you default before closing and you do not cure this default on or before closing, Seller may (a) cancel this Agreement and all of your rights under this Agreement (including any rights to use and occupy home club units) without further notice, or (b) enforce this Agreement, or (c) do anything else permitted by law or this Agreement. If Seller decides to cancel, then the provisions of Paragraph 18 below apply.

**12.   Default After Closing.**   If you default after closing, the Seller may (a) require immediate payment in full of the entire remaining balance of the purchase price plus all accrued and unpaid finance charges and any other amounts due under this Agreement, (b) terminate this Agreement, retain all payments you have previously made, and retain the membership described in this Agreement such that you will have no further rights with respect to the membership, subject to applicable law (if you have paid any assessments to the Association, then those amounts will be retained), (c) terminate your membership in any way allowed under Article 3 of the Uniform Commercial Code or other applicable law,

(d) suspend or cause to be suspended the reservation and use rights and other privileges under your membership, (e) initiate a collection lawsuit against you to collect any unpaid amounts under this Agreement, or (f) exercise any other right or remedy permitted by law or this Agreement. If your default is that you failed to make any payment due Seller, the

DocuSign Envelope ID: 79DAFFCE-1142-48EB-86B4-9CA0ACAC493A

||||||777777777777

Contract No.                    001

Seller will not terminate your membership if you cure your default and pay the Seller back for all costs Seller incurred in collecting payment, within thirty (30) days after the Seller mails or personally delivers to you a notice telling you that you are in default and that it intends to terminate. So long as you are in default, the Seller may also refuse to permit the use of your membership, and may cause Shell Vacations to refuse to allow the use of the club, by you or any other Party including making new reservations and using previously made reservations, until you cure your default.

13.  **Your Promises and Statements.** You understand and agree that:

A.  **Membership.** This Agreement is evidence that you own your membership. Your membership gives you the right to use and occupy the Vacation Property on the terms contained in this Agreement and in the home club documents. Vacation Property means the property included in the home club program. The Association in which you are a member, and not you, owns or has the legal right to use all of the Vacation Property.

B.  **Home Club Documents and Club Rules.** The home club documents are binding on your membership, on you and on anyone else who owns your membership, now or later. You and any later owner must obey the home club documents. While the home club program is part of the club, you must obey the club rules. The ("**club rules**") are rules adopted by Shell Vacations. They explain how to make reservations and govern your rights and duties as a member of the club. If this Agreement is inconsistent with the home club documents or the club rules, the home club documents and club rules will control. If you affiliate with CWP, the CWP rules will govern your use.

C.  **What You Should Read.** When you sign this Agreement, the sales people should give you the applicable Public Offering Statement and the Governing Documents booklet containing a number of documents. These documents are: the home club documents, and certain club documents. By signing this Agreement, you acknowledge that you have received these documents, which spell out the rights, limits and duties of everyone who owns a membership. You also acknowledge that you have signed the Receipt of Public Offering Statement, with the Notice of Cancellation attached thereto. Seller recommends that you read all those documents carefully before you sign this Agreement. If you sign this Agreement and don't cancel, then you accept the rights those documents give to Seller, the Association and Shell Vacations. Also, you accept all of the limits and duties which those documents impose on you.

D.  **Changes to Legal Documents.** The Association can change the home club documents in the ways the home club documents say. Also, Seller has the right to change the home club documents to comply with applicable laws and regulations or the requirements of any governmental agency that apply to the sale of memberships or in certain other situations. In addition, Shell Vacations has the right to change the club rules and the other club documents. You accept these possibilities and agree to keep all your promises in this Agreement even if the home club documents or the club documents are changed after you sign this Agreement.

E.  **Changes to a Resort.** Under the home club documents, the Seller, the Association or perhaps other owners' associations may, but do not have to, remodel or expand the resorts containing home club units. This may result in noise, dust and so on, as well as the presence of contractors, architects and others. It may also mean that certain parts of a resort may be unavailable. You understand and accept these possibilities. You agree that your rights under this Agreement are subject to the rights of those parties to do these things, or any of them that they choose to do. In the manner provided in the home club documents or the documents governing a particular resort. You must keep all your promises in this Agreement even if these things happen after you sign it.

F.  **Warranties.** Seller makes no express or implied representation or warranty concerning the Vacation Property, including any warranties, statutory or otherwise, of habitability, merchantability or fitness for a particular purpose, except as may be required by law as of the date hereof or as may be contained in the agreement between Seller and the Association by which the Vacation Property was transferred to the Association. Seller expressly disclaims, and you irrevocably waive, each of these warranties except as specifically required by law as of the date hereof or as contained in or required by the home club documents. Accordingly, any repairs to the Vacation Property not covered by reserves may result in a special assessment.

G.  **Developer and Manager.** The Seller created the home club. The Seller transferred or caused someone else to transfer the Vacation Property to the Association or to a trustee. In return for this, (1) the Association must issue memberships to whomever the Seller chooses and only to persons chosen by the Seller, and (2) the Seller alone has the right (a) to market and sell the memberships, and (b) to receive all amounts paid for or under each purchase agreement except for assessments and personal charges charged by the Association and club fees charged by Shell Vacations. Under a management agreement with the Association, the Seller, Shell Vacations, or one of their affiliates will manage the program and the Vacation Property (except for vacation property included in another vacation plan managed by someone else).

ClubTN                                      5                           No. 3529/Rev 12-23

DocuSign Envelope ID: 7804FFC9-1149-456B-95B4-9C6C5C5C8084



||||777777777777

Contract No.                021

H. **Competitor.** You promise that you are not a competitor. This is a material fact. You also promise that you will not knowingly sell or transfer your membership to a competitor. If you are a competitor or if you become a competitor before or after closing, then the Seller may cancel this Agreement and keep all amounts paid by you before the Seller learned that you are or became a competitor. The Seller cannot lose this right to cancel. For example, the Seller may cancel later even if it knows that you are a competitor now, or even if it does not cancel until a long time after it learns that you are or have become a competitor.

14. **Shell Vacations Club.** You understand and agree to the following with respect to the club:

A. **Club Members.** ("*Shell Vacations Club*") is a trade name adopted by Shell Vacations, an affiliate of the Seller. This trade name describes the services that Shell Vacations provides to members of the club. You and every other home club member will also be a member of the Shell Vacations Club. In addition, members of other Shell clubs and people who join the club directly will also be members of the Shell Vacations Club. Club members, including you, must comply with the club documents in order to receive the benefits of the club. If you assign your interest to CWP, your use and reservations will be governed by the CWP rules.

B. **Club Fees.** In addition to the assessments and personal charges charged by the Association and the initiation fee, the ("*annual club fee*") pays the costs of providing the reservation system and other benefits provided by the club plus a fee to Shell Vacations for managing and arranging these benefits. The Association will send you a bill for your annual club fees with your bill for your regular assessment. You must pay it with your regular assessment. You must also pay any transaction fees (for example, cancellation fees) required by the club rules, and any other club fees for optional benefits that you choose to purchase from the club. Shell Vacations may enforce your promise to pay club fees plus interest and late charges. For example, it may refuse to process or confirm your reservation requests until you pay all amounts due. If you assign your interest to CWP, the Shell Vacation Club annual club fee will be waived and your club fee will be replaced by a CWP Program Fee.

C. **Duration of Membership.** The Association, the Seller and Shell Vacations have signed an ("*affiliation agreement*"). It provides that all home club members must also be club members. The program will be a part of the club (and you will be a club member) for so long as the affiliation agreement says in effect. Your club membership ends when the affiliation agreement ends or when you are no longer a member of the home club. Shell Vacations or the Association may terminate the affiliation agreement under certain limited circumstances as stated in the affiliation agreement.

D. **Reservation Periods.** The home club documents establish a period called the ("*Home Club Reservation Period*" or "*HCRP*"). During the HCRP, only you and other home club members may request reservations for home club units. After the HCRP ends, any club member, including members of other Shell Clubs, can request a reservation for a home club unit. The extent to which you affiliate with CWP, your reservation and use rules will be governed by the CWP rules. Likewise, each other Shell Club is likely to have a Home Club Reservation Period during which only members of that Shell Club may reserve units included in that Shell Club. After that, however, you will be permitted to request a reservation for a unit in that other Shell Club. This means that there will be open competition for the reservation of use periods after the Home Club Reservation Period ends. As a result, there is no guarantee that you will be able to obtain the specific reservations you desire. The earlier you make a request, the more likely it is that your request may be confirmed.

15. **Availability of Units.** The number of home club points you own will determine what kind of unit and use periods you may reserve. The rules set different times, called ("*reservation windows*"), when members may request a reservation. During certain reservation windows (such as the home plan reservation window) only certain members may request a reservation. Also, some members may have permanent reservations for the use of certain units or time periods.

Within each reservation window, reservations for available units are usually confirmed on a first requested, first confirmed basis. Availability will vary based upon such factors as: (i) unit size and location, (ii) time of year, (iii) the demand for any particular resort or kind of unit, and (iv) the number of units and nights available at any particular resort.

As a result, there is no guarantee that the specific reservations you desire will be available to you. Confirmation is more likely the earlier you make a request. Keep this in mind, especially for resorts in great demand or having limited availability where competition for reservations may be greatest.

Docusign Envelope ID: 78D4FFCE-1046-4A88-85B4-9C99A02CC634

|||||777777777777

Contract No. 021

Also, for the first sixty (60) days of the reservation window for home club units, priority is given to reservation requests for seven (7) or more consecutive nights over requests for reservations having fewer than seven (7) consecutive nights. If you purchase a membership having fewer points than the minimum number required for making a reservation for a week or more, that priority period must expire before you can make a reservation request and the availability of units that you might wish to reserve may be limited.

16. **Purchase Money Protection.** All payments made by you shall be protected by a surety bond delivered to the California Department of Real Estate as an alternate assurance in lieu of escrowing deposits with Chicago Title Insurance Company, a Florida corporation, having an address at 2400 Maitland Center Parkway, Suite 110, Maitland, Florida 32751 ("**Escrow Agent**"), from the date of sale until closing has occurred.

The following fees apply to all Buyers regardless of whether the Buyer's purchase of a membership is paid in cash or financed, in whole or in part, by Seller:

A. **Processing Fee.** You agree to pay a non-refundable processing fee of $349.00 to Seller for processing the purchase of the membership.

B. **Closing Fee.** You agree to pay a non-refundable closing fee of $30.00 in cash to Seller prior to closing, to be disbursed to Chicago Title Insurance Company for closing-related services.

17. **Completion of the Sale.**

A. This Agreement will become effective upon execution by the parties and shall be deemed to have closed (the "**closing**") when all of the following conditions have occurred: (a) any applicable rescission period has expired and you have not exercised your right to cancel this Agreement; (b) you have paid Seller a down payment equal to not less than ten percent (10%) of the sum of the purchase price and processing fee in immediately available funds; (c) the Association has enough unsold home club points, and the right kind of points, to allow it to issue your membership; (d) your membership has been issued to you on the books and records of the Association; and (e) the appropriate parties have both signed this Agreement and all other documents which Seller deems necessary for your membership to be issued to you. The date that closing occurs is the ("**closing date**"). In no event will the closing occur later than the first anniversary of executing this Agreement. If the closing does not occur within such time frame or on or before an extended closing date mutually agreed to by Seller and you (but in no event later than 1 year after the date you sign this Agreement), then Seller shall order all money provided by you for the purchase to be refunded to you. Either you or the Seller may cancel this Agreement if the closing does not occur within one (1) year after you sign this Agreement, and in that case you will get your money back if you are not otherwise in default. If you are in default under this Agreement, however, you may not cancel the Agreement unless the Seller allows it.

B. If you relinquish for any reason a timeshare interest in any other timeshare resort or program ("**Relinquished Time Share**") in connection with your purchase of a membership, you covenant to cooperate and sign and deliver a deed or other instrument acceptable to the Seller (or Seller's designee) to clear title and convey all of your interest in the Relinquished Time Share to the Seller or a party designated by the Seller, free and clear of any debt not expressly approved by the Seller ("**Deed-transfer**"). The Seller or other designated party may record the Deed-transfer at closing. Until closing occurs, you are responsible for all obligations related to the Relinquished Time Share, including paying assessments and fees ("**Relinquished Time Share Obligations**"). If the closing does not happen, the Deed-transfer will be cancelled and the Relinquished Time Share returned to you, and you will remain responsible for the Relinquished Time Share Obligations.

18. **LIQUIDATED DAMAGES. YOU UNDERSTAND THAT THE MEMBERSHIP IS PART OF A VACATION OWNERSHIP PROGRAM CONSISTING OF NUMEROUS MEMBERSHIPS. WHEN YOU SIGN THIS AGREEMENT, SELLER WILL REMOVE THE MEMBERSHIP SUBJECT HERETO FROM THE LIST OF MEMBERSHIPS BEING OFFERED FOR SALE. ONCE THIS HAPPENS, THE MEMBERSHIP BEING SOLD TO YOU WILL NO LONGER BE AVAILABLE FOR SALE BECAUSE OF THE EXECUTION OF THIS AGREEMENT. ONCE YOU SIGN THIS AGREEMENT, SELLER WILL NOT BE ABLE TO SELL THE MEMBERSHIP WHICH IS BEING SOLD TO YOU. BECAUSE OF THESE MATTERS, YOU AND SELLER AGREE THAT IT IS EXTREMELY DIFFICULT TO DETERMINE THE AMOUNT OF THE DAMAGES THAT YOUR FAILURE TO COMPLY WITH THIS AGREEMENT TO PURCHASE THE MEMBERSHIP WOULD CAUSE ACCORDINGLY, IF YOU FAIL TO COMPLETE THE PURCHASE OF THE MEMBERSHIP BECAUSE OF YOUR DEFAULT, SELLER SHALL BE RELEASED FROM ITS OBLIGATION TO SELL YOU THE MEMBERSHIP. IN THIS CASE, SELLER MAY PURSUE AGAINST YOU ANY CLAIM OR**

Docusign Envelope ID: 79D4FFCE-1U49-406B-9584-9C009C8C8094

|||||7777777777777

Contract No:          021

REMEDY THAT SELLER MAY HAVE: PROVIDED, HOWEVER, THAT BY INITIALING BELOW, YOU AND SELLER AGREE THAT SELLER MAY KEEP YOUR DEPOSIT AS SELLER'S LIQUIDATED DAMAGES. YOU AGREE THAT THIS AMOUNT IS NOT A PENALTY AND THAT THIS AMOUNT SUBSTANTIALLY COMPENSATES SELLER FOR ANY DAMAGES SELLER MAY HAVE SUFFERED.

INITIALS:

Buyer(s) [JE] , [WM] , _____          Seller [HC]

19.  Electronic Transactions.

A.  **Electronic Signatures and Copies.** This Agreement, together with all related documents and instruments to be signed by you and the Seller, may be executed electronically or manually. Execution may be completed in counterparts (including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically), which together constitute a single agreement. As between you and the Seller, any copy of this Agreement (including a copy printed from an image of this Agreement that has been stored electronically) shall have the same legal effect as an original.

B.  **Transferable Record.** If the Seller is providing financing to you and you sign an electronically created Agreement using an electronic signature, you agree that this Agreement will be a (**"transferable record"**) under the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

C.  **Provenance.** The Seller shall upload all applicable electronically executed documents or instruments, including without limitation this Agreement, to the Seller's electronic vault hosted by eOriginal or a similar vendor (the **"Original Vault"**). If any document or instrument is manually executed, the Seller may, in its discretion, convert the tangible record of the document or instrument into electronic form and cause the electronic version to be uploaded to the Original Vault. Collectively, any document or instrument uploaded to the Original Vault shall be referred to as a (**"Vaulted Document"**). For purposes of establishing security interests or rights in, or title to, any Vaulted Document, you and the Seller agree as follows:

(i)  no original, tangible, or manually executed Vaulted Document will be the authoritative copy, original, or transferable record of the Vaulted Document;

(ii)  except as expressly provided in Subsection (v) below, possession of a tangible, manually executed original, transferable record or copy of the Vaulted Document will not perfect or prove any security interest, or establish title to or any other right;

(iii)  the sole authoritative copy and transferable record of any Vaulted Document will be the one uploaded into the Original Vault (the **"Authoritative Copy"**);

(iv)  at the Seller's or its successor's discretion, the Authoritative Copy of any Vaulted Document may be printed and marked or designated by the Seller or such successor as the tangible Authoritative Copy of the Vaulted Document; and

(v)  no person or entity (including, without limitation, any lender, subsequent assignee or purchaser, custodian or trustee of any Vaulted Document) will have rights in, title to or a security interest in such Vaulted Document, unless such person or entity can demonstrate that it has possession or control of the Authoritative Copy of the Vaulted Document (whether in tangible or electronic form) whose provenance can be established to the initial authoritative copy first uploaded to the Original Vault.

D.  **Rights to Vaulted Documents.** Any person who asserts or attempts to gain title to or a security interest or rights in, any Vaulted Document by any procedure except as provided above, including by possession of a tangible, manually executed original or copy of an electronic, non-authoritative copy of such Vaulted Document, violates the rights of the Seller and any subsequent assignee.

20.  **Limitation of Liability.** BUYER AND BUYER'S GUESTS (INCLUDING BUYER'S FAMILY AND OTHER VISITORS) ASSUME ALL RISKS OF LOSS OR DAMAGE TO PERSONS OR PROPERTY IN USING THE UNITS OR OTHER FACILITIES MADE AVAILABLE TO BUYER THROUGH THE HOME CLUB OR THE CLUB. BUYER EXPRESSLY AGREES THAT IN NO EVENT SHALL SELLER, ITS PARENT COMPANIES, SUBSIDIARIES, AFFILIATES, SUCCESSORS, OR ASSIGNS, AND ALL OF THEIR AND SELLER'S EMPLOYEES, AGENTS, OFFICERS, AND DIRECTORS, BE LIABLE TO BUYER FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL,

DocuSign Envelope ID: 78D4FFC8-1018-468B-8584-4C8A5C5G3094

||||||7777777777777

Contract No:                      321

EXEMPLARY, PUNITIVE, OR OTHER ENHANCED DAMAGES ARISING OUT OF, RELATING TO, AND/OR IN CONNECTION WITH THE MARKETING PROCESS, SALES PROCESS, PURCHASE OF THE MEMBERSHIP, USE OF THE MEMBERSHIP, AND/OR ANY BREACH OF THIS AGREEMENT. SELLER'S MAXIMUM LIABILITY TO BUYER ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT) OR THE MARKETING, SALE, PURCHASE, OR USE OF THE MEMBERSHIP, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, SHALL BE THE TOTAL AMOUNT PAID TO SELLER UNDER THIS AGREEMENT (REDUCED BY THE PROPORTION (I.E. VALUE) OF ANY BENEFITS YOU RECEIVED UNDER THIS AGREEMENT). BUYER EXPRESSLY WAIVES ANY RIGHT TO SEEK RELIEF IN EXCESS OF THE LIMITATION OF LIABILITY SPECIFIED IN THIS PARAGRAPH.

21. Miscellaneous.

A. **Communications With Buyer.** You authorize the Messaging Parties to provide Membership Communications to you via the Communication Methods. This authorization constitutes a bargained-for exchange for value and is express and valuable consideration for Seller's decision to enter into this Agreement with you, and Seller does not intend it to be revocable. However, to the extent you have the right under applicable law to revoke this authorization, you agree you may do so only by mailing notice to Seller at Seller's address set forth on Page 1 of this Agreement or by emailing Seller at WyndhamConsumerFinance@wyn.com.

You understand and agree that:

(i)    You may incur a charge for the Membership Communications which the Messaging Parties may send to you.

(ii)   The Messaging Parties are not liable to you for any fee, inconvenience, annoyance, or loss of privacy in connection with the Membership Communications.

(iii)  Anyone with access to your telephone or email account may listen to or read the Membership Communications, even though the Messaging Parties will try to communicate only with you.

For purposes of this Paragraph 21, ("**Messaging Parties**") means, collectively and without limitation: (i) Seller and its affiliates; (ii) the Association and its affiliates; and (iii) the assignees, successors, agents, servicers, service providers, and representatives of the entities set forth in (i) and (ii). ("**Membership Communications**") means servicing and other membership-related communications about scheduled payments, fees, missed payments, and other important information regarding this Agreement, your Membership, or your relationship with any of the Messaging Parties; and ("**Communication Methods**") means automated telephone dialing, text messaging, push notifications, in-app messaging, artificial or prerecorded voice message systems, "ringless" voicemail, and email.

B. **You Must Do Everything On Time.** Time is of the essence of this Agreement. This means that if you promised to do something by a specific time, you have broken this Agreement if you do not do it by that time. Doing it later is not acceptable.

C. **More Than One Buyer.** If more than one person signs as the Buyer, each is fully obligated to keep all of the promises in this Agreement, including the promise to pay the full amounts due. The Seller and the Association may enforce their rights against any one of you separately or against some or all of you together. This means that any one may be required to pay all of the amounts owed. Each of you is "*jointly and severally*" liable.

D. **Credit Reporting; Identity Theft.** Seller may report information about your purchase on credit or this Agreement to other creditors, financial institutions, and credit bureaus. Late payments, missed payments or other defaults under this Agreement may be reflected in your credit report. If you believe that Seller has furnished any inaccurate information about your performance under this Agreement to a consumer reporting agency, or if you believe that you have been the victim of identity theft in connection with this Agreement, write to Seller at Wyndham Consumer Finance, Attention: Fraud/Dispute, 10750 West Charleston Boulevard, Suite 130, Las Vegas, Nevada 89135. In your letter, (a) provide your name and the date of this Agreement (b) identify the specific information that is being disputed; (c) explain the basis for the dispute; and (d) provide any documentation you have in support of your dispute. If you believe that you have been the victim of identity theft, submit an identity theft affidavit or identity theft report.

E. **Our Entire Agreement.** This Agreement (including the Truth in Lending Disclosure Statement and all other documents signed at the same time as this Agreement), the home club documents and the club documents are the ("**Binding Documents**"). The Binding Documents constitute the entire and final expression of the agreement between

Document Envelope ID: F8D4FFCE-1039-486N-96B4-9C636D6C6004



Contract No.     021

you, Seller, and the Association and may not be contradicted by evidence of any alleged oral agreement. No Party is liable or can be bound to the other Party in any manner by any representations, warranties, covenants, or agreements except as set forth in the Binding Documents. The Binding Documents are binding upon and inure to the benefit of the heirs, executors, administrators, successors, and assigns of you, Seller, and the Association. If this Agreement is inconsistent with the home club documents or the club rules, then those documents will control.

F. **Other.** Any Party who wants to give notice under this Agreement (including any notice of cancellation under applicable law) must put it in writing. Notices must be mailed, faxed, or personally delivered. If there is more than one Buyer, notice given to any one of them will be treated as if it was given to all of them. If Buyer is a corporation, partnership, limited liability company, trust or other business entity, the notice may be delivered, faxed, or mailed to any officer, partner, member, manager or trustee of Buyer. Notice to the Seller must be sent to the Seller's address on Page 1 of this Agreement.

If any part of this Agreement is found to be invalid, the rest will still remain in full force and effect. This Agreement will continue in effect even after you make your final payment of the purchase price. Just because the Seller or the Association overlooks ("waives") your default one time does not mean that it must do so if you default again. If there is more than one member signing this Agreement, Seller or the Association can waive or delay enforcing a right as to one member without waiving it as to any other member.

You may not record this Agreement in any recording office in any state. If you do, Seller can sign and record a document terminating this Agreement and you give Seller a special power of attorney to sign that document in your name as well.

G. **Use of Brokers.** The broker and salespersons are the agents of Seller only and are not representing you or acting as your agent in this transaction. By signing below, you confirm that before you signed this Agreement you received and understood the written and oral disclosure that broker and its salespersons represents only the Seller was provided.

H. **Monitoring of Communications.** Seller may monitor and record your phone conversations with any of Seller's representatives for training, quality control, evidentiary, or any other purpose. However, Seller is not under any obligation to monitor, record, retain or reproduce such recordings, unless required by applicable law.

I. **Amendment.** The terms of this Agreement may only be changed by a writing signed by you and Seller (and as applicable, the Association). No change to this Agreement will release any Party from liability unless specifically stated in writing.

J. **Severability.** Except as provided in the Arbitration Provision, if any provision of this Agreement is determined to be void or unenforceable under any applicable law, rule, or regulation, all other provisions of this Agreement will remain valid and enforceable.

K. **Rights Cumulative.** Seller's exercise of all rights and remedies under this Agreement is cumulative. The exercise of one right or remedy does not prevent Seller from exercising any other right or remedy available.

L. **Further Assurances.** If there is any error or omission in this Agreement (or this Agreement is lost), you agree to sign and deliver such documents (including this Agreement) and take such actions as Seller may reasonably request to correct the error or omission.

22. **Additional Creditor.** The Seller has the right to receive payment of the purchase price and any finance charges and other fees and charges authorized under this Agreement. The Seller may assign this right to someone else. After that assignment, you will be obligated to make all payments to that person instead of to the Seller. You may not transfer or assign your obligations under this Agreement without Seller's consent.

23. **Purchase Price.** You agree to pay to Seller the purchase price. Seller acknowledges receiving the deposit in the amount shown in the accompanying Truth in Lending Disclosure Statement. You agree to pay the rest of the purchase price:

A. If you are paying all cash for your membership, then you must pay the amount shown on your Truth in Lending Disclosure Statement under the heading of "Down Payment". You must pay this amount to the Seller by debit card, credit card, personal check, cashier's check or any other method that Seller authorizes within three (3) days after the Seller asks you for it.

DocuSign Envelope ID: 73D4FFCE-1049-4368-95B4-8D582C5D8004

|||||77777777777777

Contract No:        321

B.  If you are receiving financing from the Seller as described below in Paragraph 24, you must pay to Seller at the time this Agreement is executed a deposit equal to the amount shown in the accompanying Truth in Lending Disclosure Statement found on Page 17 under the heading of "Down Payment". In certain circumstances, you may be able to defer a portion of the deposit into one or more payments (the **"pick-up payments"**), and you will be given a separate Truth in Lending Disclosure Statement that indicates the amounts and dates of each of these pick-up payments and obligates you to pay the pick-up payments. In that case, you must pay the amount of each pick-up payment to Wyndham Consumer Finance, Attention: Account Servicing Operations, 6277 Sea Harbor, Orlando, Florida, 32821, telephone number 1-877-337-4355 by debit card, credit card, personal check, cashier's check or any other method that Seller authorizes by the applicable due date. The Seller will never impose finance charges on the pick-up payments. If you have elected to defer a portion of the Down Payment, this means that you owe $ _N/A_  today and that the remaining portion of the Down Payment must be paid in _N/A_  monthly installments of $ _N/A_  each, as further described in the separate Truth in Lending Disclosure Statement and other related documents you may receive.

24.  **Purchase Financing Obligations.** If Seller is providing the financing for your purchase, the following apply:

A.  **Definitions.** Definitions that are used in this paragraph regarding your financing:

(i)  **"APP" or "Auto Pay Plan"** means an automatic payment service which authorizes amounts to be withdrawn automatically from your bank account or credit card through a prearranged automatic payment plan pursuant to the Pre-Authorized Auto Pay Plan Set-up Form, which shall be incorporated as a part hereof by reference.

(ii)  **"Holder"** means any third party to whom the Seller assigns its rights under this Agreement.

(iii)  **"Maturity date"** means the date when the financed part of your purchase price must be paid in full.

(iv)  **"Truth in Lending Disclosure Statement"** means the Truth in Lending Disclosure Statement found on Page 17 of this Agreement.

B.  **Your Promise to Pay.** You promise to pay to Seller the (**"Amount Financed"**) as disclosed on the Truth in Lending Disclosure Statement, any other fees incurred under this Agreement, and finance charges on the unpaid principal balance. To do this, you agree to make monthly payments in accordance with the (**"Payment Schedule"**) disclosed in the Truth in Lending Disclosure Statement. Except as described below under "Monthly Payments", payments will be credited first to fees, then to finance charges and then to principal. Seller has the right to assign its interest in this Agreement to a holder. If the Seller does assign those rights to a holder, you will make your payments to the holder and not to the Seller.

C.  **Monthly Payments.** Monthly payments start on the date indicated on the Payment Schedule shown in your Truth in Lending Disclosure Statement and will continue on the same day of each and every successive month after that until the maturity date. Some of your payments may be due before this sale actually closes.

D.  **Payments Before Closing.** Seller may not demand payment of the entire amount due if you don't make a payment you are supposed to make before closing. If you do not make a payment that is due before closing, however, you will be in default under this Agreement and Seller can terminate this Agreement.

E.  **Payments After Closing.** Seller will provide you with payment coupons and/or statements to be used for your payments. Upon closing, Seller will give you notice of how and where all future payments are to be made.

F.  **Payment Amounts.** The Payment Schedule of your Truth in Lending Disclosure Statement tells you the amount of your monthly payments, starting on the first monthly payment date.

Each of the monthly payments shall be in the amount shown in the Payment Schedule found on your Truth in Lending Disclosure Statement.

The amount of the monthly payment would be sufficient to repay the principal sum then due, together with finance charges, in full in equal payments by the maturity date if all payments are made.

DocuSign Envelope ID: 7934FFCE-1018-4868-95B4-8C505C5C8094

‖‖‖7777777777777

Contract No. [21]

G. **Finance Charges.** Seller charges a finance charge at an annualized rate equal to the Annual Percentage Rate disclosed in the Truth in Lending Disclosure Statement found on Page 17. Finance charges on the unpaid principal balance will accrue at a daily rate equal to the Annual Percentage Rate divided by 365 beginning the next calendar day after the Parties have signed this Agreement (or beginning on the day after you pay your final pick-up payment, if you are deferring a portion of the Down Payment as described in Paragraph 23.B above) until the later of the maturity date or the date you pay the outstanding balance in full. The rate will never exceed 17.99%.

H. **Prepayment.** You may prepay the amount you owe Seller in whole or in part at any time, without penalty. If a partial prepayment is less than the amount of the next scheduled payment, then you must pay the difference on or before the corresponding due date. You cannot rely on an excess payment made on or before one due date to satisfy the payment obligation associated with the next due date. Seller may deposit any check or other payment you provide to Seller for less than your total outstanding balance that is marked "payment in full" or with any similar language without such deposit effecting a satisfaction of your total outstanding balance.

I. **Final Payment.** The final payment due for the financed part of the purchase price of the membership shall be in the amount of the then-outstanding part of the principal plus all accrued and unpaid finance charges and outstanding fees (if any).

J. **Late Charge.** You will be charged a late charge of $5.00 for each payment that is more than ten (10) days late.

K. **Returned Payment Fee.** If any check that you use to pay Seller is returned unpaid or is dishonored for any reason, you agree to pay Seller, in addition to any applicable late fees, a returned payment fee of $15.00 or such other lower amount permitted by applicable law.

L. **Attorneys' Fees; Collection Costs.** You agree to pay any court costs and disbursements which Seller incurs in collecting outstanding amounts under this Agreement. If an outstanding amount is referred for collection to an attorney that is not employed by Seller, you agree to pay attorney's fees as permitted by applicable law.

M. **Compliance with Applicable Law.** If a law which applies to this Agreement and which sets maximum charges is finally interpreted so that any fees collected or to be collected under this Agreement exceed the permitted limits, then: (1) any such fees will automatically be reduced to the maximum permitted limit, retroactively effective as of the date of this Agreement, and as though this Agreement originally provided for the reduced fees; and (2) any sums already collected from you which exceeded permitted limits will be credited or refunded to you. Also, if Seller inadvertently collects more payments than permitted by this Agreement, Seller will credit or refund to you any such excess payments.

25. **Credit Terms.** The Truth in Lending Disclosure Statement contains detailed terms of your credit arrangement with Seller.

26. **Principal Contact Person and Authorized Users.** If more than one person, a partnership, corporation, trust, or other kind of company buys the membership, then, the Buyer must choose one person to be the principal contact person for the membership. The (*"principal contact person"*) is the person who may act on behalf of all owners of the membership. The Buyer may permit someone other than the Buyer or principal contact person to contact reservation services to make or cancel reservations for the Buyer's membership. Buyer may change the principal contact person and authorized users only by giving written notice to the Association.

27. **Seller's Execution.** The Parties acknowledge and agree that this Agreement has been executed by Seller in Tennessee.

28. **Governing Law.** Except as otherwise set forth in the Arbitration Provision, this Agreement and all related disputes are governed by the State of Tennessee, without regard to Tennessee's choice of law rules. EXCEPT AS OTHERWISE PROVIDED BY APPLICABLE LAW, YOU WAIVE YOUR RIGHT TO A TRIAL BY JURY OR A CLASS OR COLLECTIVE ACTION FOR A LEGAL CLAIM ARISING UNDER THIS AGREEMENT.

DocuSign Envelope ID: 79D4FFCE-1049-486B-9584-9C605C6C6094

||||7777777777777

Contract No          021

29.  ARBITRATION PROVISION ("*Arbitration Provision*" or "*Provision*"):

### Scope of Arbitration Provision

| Question | Short Answer | Governing Language |
|---|---|---|
| What is arbitration? | An alternative to court | In arbitration, a neutral third-party arbitrator ("*Arbitrator*") resolves Claims in an informal hearing on an individual basis. |
| Is it different from court and jury trials? | Yes | The hearing is private. There is no court or jury. It is usually less formal, faster and less expensive than a court lawsuit. Pre-hearing fact finding is limited. Appeals are limited. Courts rarely overturn arbitration awards. |
| Can you reject (i.e., opt out of) this Provision so it does not apply? | Yes, within 60 days | Send a signed written (not electronic) notice within 60 days after you sign your Agreement to SVC West, LLC 8277 Sea Harbor Drive, Orlando, Florida 32821, Attention: Legal Department/Account Servicing Operations. Include your name, address and Contract Number and state that you "opt out" of the Provision. Opting out will not affect the rest of this Agreement. The opt out will apply only to this Agreement. |
| What is this Provision? | An agreement to arbitrate Claims | Unless you opt out, either you or Seller may elect to arbitrate any "*Claim*" (defined below) on an individual basis. |
| Who does the Provision cover? | You, Seller and certain third parties | In addition to you and Seller, this Provision can be enforced by, or against (a) Seller's parent companies, subsidiaries, affiliates, successors, and assigns, and all of their and Seller's employees, agents, officers and directors; (b) any other person or entity you sue in a Claim you bring against Seller; (c) your heirs, successors and assigns; and (d) any other person or entity to which your membership is subsequently resold, conveyed, or transferred. |
| What "Claims" does the Provision cover? | All Claims (with certain exceptions described in the next section) | "*Claims*" broadly includes all past, present or future disputes between you and Seller arising out of or relating to: (a) this Agreement, including any breach, termination, default, or cancellation under this Agreement; (b) the home club units and Vacation Property; (c) the home club program; (d) your membership; (e) the Association; (f) home club points, reservations (or cancellations), exchange programs (including Shell Vacations Club), or rewards programs; (g) personal information, data breach, identity theft, and privacy; (h) marketing or sales solicitations, representations, advertisements, promotions, or disclosures; (i) collection of delinquent amounts and the manner of collection; (j) assessments or other fees; (k) CWP; (l) communications with or concerning you, including Membership Communications and Communication Methods; (m) credit reporting; or (n) the relationships between you and Seller resulting from any of the foregoing. "Claims" includes disputes based on statute, regulation, ordinance, constitution, Uniform Commercial Code, equity or common law (contracts, torts, negligence, fraud or other intentional wrongs) and claims seeking damages and/or injunctive, declaratory or other equitable relief on an individual basis. |

Docusign Envelope ID: 7904FFDE-1049-466B-95B4-2C60SCSO6094

||||||7777777777777

Contract No                                021

| Question | Short Answer | Governing Language |
|---|---|---|
| What disputes are not covered by this Provision | Disputes about this Provision; small claims; self-help remedies | Disputes not subject to this Provision include: (a) disputes about the validity, enforceability, coverage, or scope of this Provision or any part thereof, which are for a court to decide (but disputes about the validity or enforceability of the Agreement as a whole are for the arbitrator to decide); (b) any individual action by you or Seller in small claims or an equivalent court, unless that action is transferred, removed or appealed to a different court; (c) your or Seller's use of lawful self-help remedies, including set-off, repossession or the sale of collateral, and remedies that do not seek money damages, including pre-judgment seizure, injunctions or equitable relief, and (d) bringing an individual action in court that is limited to preventing the other Party from using a self-help or non-judicial remedy and that does not involve a request for damages or monetary relief. |
| Who handles the arbitration? | Usually AAA or JAMS | Arbitrations are conducted under this Provision and the applicable rules of the Arbitration Administrator in effect when the arbitration is started. The "Arbitration Administrator" is either:<br><br>• The American Arbitration Association ("AAA"), 120 Broadway, 21st Floor, New York, NY 10271, www.adr.org, 1-800-778-7879;<br><br>• JAMS, 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.com, 1-800-352-5267; or<br><br>• Any other company or arbitrator picked by agreement of the Parties.<br><br>If none of these options is available, a court with jurisdiction will pick the Arbitration Administrator or arbitrator, who must agree to abide by this Provision. A single neutral arbitrator will be appointed who must be a lawyer with at least ten years of experience or a retired judge unless the Parties otherwise agree. |
| Can Claims be litigated? | Sometimes | In addition to disputes not covered by this Provision (see above), either Party may bring a lawsuit if the other Party does not demand arbitration. Even if all Parties have opted to litigate a Claim in court, any Party may elect arbitration of a Claim made by a new Party or any Claim later asserted by a Party in that or any related or unrelated lawsuit (including a Claim initially asserted on an individual basis but modified to be asserted on a class, representative or multi-party basis). |
| Are you and Seller giving up any rights? | Yes, Jury Trial Waiver and Class Action Waiver | For Claims that are arbitrated, you and Seller give up the rights to:<br><br>1. Have juries decide Claims.<br><br>2. Have courts (other than small-claims courts) decide Claims.<br><br>3. Participate in a class or collective action in court or in arbitration, either as a class representative or class member.<br><br>4. Serve as a private attorney general or in a representative capacity in court or in arbitration.<br><br>5. Join or consolidate Claims with Claims of others unless all Parties otherwise agree.<br><br>(Numbers 3, 4 and 5 collectively are the "Class Action Waiver"). The arbitrator will not conduct any arbitration inconsistent with this section or issue any relief that applies to any person or entity except you or Seller individually. |

DocuSign Envelope ID: 7904FFC5-10W4W55-6584-620M5C55066M

||||777777777777

Contract No.                021

| Question | Short Answer | Governing Language |
|---|---|---|
| What happens if a part of this Provision cannot be enforced? | It depends | If any portion of this Provision is held to be invalid or unenforceable, the remaining portions will nevertheless remain in force, subject to two exceptions (i) if a determination is made that the Class Action Waiver is unenforceable and that determination is not reversed on appeal, then this Provision (except for this sentence) will be void in its entirety; and (ii) if a court determines that a public injunctive relief Claim may proceed notwithstanding the Class Action Waiver, and that determination is not reversed on appeal, then the public injunctive relief Claim will be decided by a court, any individual Claims will be arbitrated, and the Parties will ask the court to stay the public injunctive relief Claim until the other Claims have been finally concluded |
| What law applies? | The FAA | This Agreement involves interstate commerce. Thus, the Federal Arbitration Act ("FAA") governs this Provision. The arbitrator must apply applicable substantive law consistent with the FAA and must honor statutes of limitation and privilege rights. If this Provision conflicts with the Arbitration Administrator's rules or this Agreement, this Provision will govern. |
| Will this Provision continue to govern? | Yes | The Provision shall continue to stay in force even if (a) the Agreement is rescinded, cancelled, terminated, amended or fully performed, (b) there is a breach, default, renewal, prepayment, or payment, (c) you transfer or otherwise relinquish your Membership, (d) your Agreement is discharged through bankruptcy, or (e) there is a sale, transfer or assignment of a Party's interest. |

## Process

| How does an arbitration start? | By initiating or demanding arbitration | The complaining Party may commence a lawsuit or an arbitration, subject to the terms of this Provision. To start an arbitration, the complaining Party selects the Arbitration Administrator and follows the Arbitration Administrator's rules. If one Party begins or threatens a lawsuit, the other Party can demand arbitration. This demand can be made in court papers, such as a motion to compel arbitration. |
|---|---|---|
| Will any hearing be held nearby? | Yes | The Parties may decide that an in-person hearing is unnecessary and that the arbitrator can resolve a Claim based on written filings or a conference call. However, any Party may request an in-person arbitration hearing, which will take place either in Orlando, Florida, Las Vegas, Nevada or in the location where you purchased your membership (if in person). |
| What is the legal effect of an award? | It binds the Parties. | The arbitrator's award will be final and binding, except for appeal rights under the FAA, which are very limited. No finding, award or judgment from any other arbitration will impact the arbitration of any Claim, and no finding, award or judgment from this arbitration will impact any other arbitration. Any court with jurisdiction may enter judgment on the arbitrator's award. |
| Are there appeal rights? | Very limited | |

## Arbitration Fees and Awards

| Who bears arbitration fees? | Payment is determined by the rules | The payment of filing, administrative and arbitrator fees shall be governed by the Arbitration Administrators rules and applicable law, unless otherwise stated in this Agreement. |
|---|---|---|
| Can you recover your legal fees and costs? | Only if permitted by applicable law | The Parties shall bear their own legal fees and expenses for any arbitration proceeding unless applicable law provides otherwise. |
| Will you ever owe us an arbitration or attorney's fees? | For bad faith | The arbitrator can require a Party to pay the other Party's fees and costs if (1) the arbitrator finds that the Party has acted in bad faith (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), and (2) this power does not make this Provision invalid. |
| Can an award be explained? | Yes | A Party may request details from the arbitrator within 14 days of the ruling. The arbitrator will determine whether to grant such request. |

Copyright Envision ID: FSO4I-FCE-7049-4865-95B4-0CSD5CEC00004

|||||| 7777777777777
Contract No.                    221

**Creditor/Seller:** SVC - West, LLC, 6277 Sea Harbor Drive, Orlando, Florida 32821.
**Owner:** the Buyer(s) indicated in the signature block below,

## TRUTH IN LENDING DISCLOSURE STATEMENT

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate: | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf: | The amount you will have paid after you have made all payments as scheduled: | The total cost of your purchase on credit including your down payment of $3,787.35 |
| 13.99% | $18,739.55 | $21,461.85 | $40,201.20 | $43,988.55 |

Your payment schedule will be:

| No. of payments: | Amount of Each Payment: | Payments are due monthly, on the same date each month Beginning: 10-01-2024 |
|---|---|---|
| 120 | $335.01 | |

**Late Charge:** If any installment payment is not paid in full within 10 days after its scheduled due date, Owner will be charged a late charge of $5.00.

**Security:** Owner is giving the Seller a purchase money security interest in the membership being purchased and, if Owner so elected, the Auto Pay Plan ("APP").

**Prepayment** If Owner prepays the balance due, in whole or in part, there will be no penalty.

**Auto Pay Rate:** Did Owner Enroll in the APP using Owner's checking or savings account?
___Yes  X No. If "Yes" is checked, the following applies. By enrolling in the APP using Owner's checking or savings account, Owner's Annual Percentage Rate disclosed above reflects a reduction of one-half percent (½%) (the *"Reduction"*) over the Annual Percentage Rate that would otherwise apply. The Annual Percentage Rate disclosed above will automatically increase by the amount of the Reduction in the event any one of the following occurs: (a) Owner discontinues participation in Seller's APP, (b) Owner's financial institution is unable or unwilling to participate, or (c) Seller or any Holder or Co-Holder discontinues Owner's participation for reasonable cause. Any increase in the Annual Percentage Rate will take the form of higher payment amounts. For example, if Owner must pay $10,600.00 at 17.49% for 7 years and the rate increases to 17.99%, Owner's regular monthly payment would increase by approximately $5.00.

**Contract Reference:** Owner should refer to this Agreement for information about nonpayment, default, and the right to accelerate maturity of Owner's payment obligation, and prepayment rebates and penalties.

### ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| a. Cash Price (exclusive of tax) | $ | 24,900.00 |
| b. State and Local Taxes | $ | 0.00 |
| c. Processing Fee (Paid to Seller) | $ | 349.00 |
| d. Total Cash Price (a) + (b) + (c) | $ | 25,249.00 |
| e. Total Down Payment (1) + (2) + (3) | $ | 3,787.35 |
| 1. Cash Down Payment | $ | 3,787.35 |
| 2. Net Agreed Value of Trade-in | $ | 0.00 |
| 3. Deferred Down Payment | $ | 0.00 |
| f. Amount Financed (d) - (e) | $ | 21,461.55 |

Closing Fee: $30

The Closing Fee is the separate non-refundable fee paid in cash to Seller, to be disbursed to Chicago Title Insurance Company, a Florida corporation (*"Escrow Agent"*) for closing-related services regardless of whether the purchase is financed.

The undersigned Owner(s) acknowledge(s) receipt of a fully completed copy of this disclosure on this date.

Sandra Leslie                                    Donald Wall

Signature Sandra Leslie                          Signature Donald Wall

Signature
8/17/2024                                        Signature

Date

Docusign Envelope ID: 79D4FFCE-1049-4B6B-9984-8C605C5C6094

ClubTN

No 3525/Rev.12-23

Docusign Envelope ID: 7SD4FFCE-D48-4688-95B4-2C800C5C6094

|||||7777777777777

Contract No. 021

### STATUTORY NOTICES AND RIGHT OF CANCELLATION

**State Specific Provisions** To the extent that any terms or provisions below modify or conflict with any terms or provisions of this Agreement, the terms and provisions below control.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER(S) OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

### NOTICE TO THE BUYER

a. DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES.

b. YOU ARE ENTITLED TO AN EXACT COPY OF THE CONTRACT YOU SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS.

BY SIGNING THIS AGREEMENT BELOW, EACH BUYER CONFIRMS THAT THE BUYER HAS RECEIVED A FULLY COMPLETED COPY OF THIS AGREEMENT AND AGREES TO THE TERMS OF THIS AGREEMENT.

### RIGHT OF CANCELLATION

YOU MAY CANCEL A CONTRACT TO PURCHASE A TIME-SHARE INTERVAL WITHIN TEN (10) DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT, WHERE YOU HAVE MADE AN ON-SITE INSPECTION OF THE TIME-SHARE PROJECT BEFORE SIGNING THE CONTRACT, AND, IF YOU HAVE NOT MADE SUCH AN INSPECTION, WITHIN FIFTEEN (15) DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT. IF YOU ELECT TO CANCEL, YOU MAY DO SO BY:

(a) HAND DELIVERING NOTICE OF CANCELLATION TO THE OTHER PARTY AT SVC - WEST, LLC, ATTENTION: RESCISSIONS DEPARTMENT, 6277 SEA HARBOR DRIVE, ORLANDO, FLORIDA 32821, WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT; OR

(b) MAILING NOTICE OF CANCELLATION BY PREPAID UNITED STATES MAIL AT SVC - WEST, LLC, ATTENTION: RESCISSIONS DEPARTMENT, 6277 SEA HARBOR DRIVE, ORLANDO, FLORIDA 32821, POSTMARKED ANYTIME WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT, TO THE OTHER PARTY OR TO THE OTHER PARTY'S AGENT FOR SERVICE OF PROCESS; OR

(c) SENDING NOTICE OF CANCELLATION VIA ELECTRONIC MAIL AT RESCISSIONS.WVR@WYN.COM, TIME STAMPED WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT TO THE OTHER PARTY.

| | |
|---|---|
| _Sandra Leslie_ 8/17/2024 | 425 Crossbow Dr |
| Buyer Sandra Leslie — Date Signed | Street Address |
| _Donald Wall_ 8/17/2024 | Mainville — OH — 45039 |
| Buyer Donald Wall — Date Signed | City — State — Zip |
| | (937) 218-0488 |
| Buyer — Date Signed | Phone (Area Code) |
| | |
| Buyer — Date Signed | SHELL OWNERS ASSOCIATION - WEST, a California non-profit mutual benefit corporation. |
| SVC - WEST, LLC, a California limited liability company | By _Kyle Cates_ 8/17/2024 |
| By _Kyle Cates_ 8/17/2024 | Authorized Agent — Date Signed |
| Authorized Agent — 00 — Date Signed | Name of Seller's Sales Agent: Kyle Cates |
| | Seller's Sales Agent's Signature: _Kyle Cates_ |

ClubTN

17

No.3525/Rev 12-23

Shell Vacations Club to Club Wyndham Plus

021
Contract Number

## CLUB WYNDHAM® Plus
## VACATION OWNERSHIP ASSIGNMENT AGREEMENT
## AND USE RESTRICTION

THIS VACATION OWNERSHIP ASSIGNMENT AGREEMENT AND USE RESTRICTION ("*Agreement*") is made this 17th day of August, 2024 by and between Wyndham Vacation Resorts, Inc., a Delaware Corporation located at 6277 Sea Harbor Dr. Orlando, FL 32821 ("*Plan Manager*") and Sandra Leslie And Donald Wall ("*Owner*").

WHEREAS, the Second Amended and Restated FairShare Vacation Plan Use Management Trust Agreement effective March 14, 2006, recorded in the Office of the Circuit Clerk in Cleburne County, Arkansas and other various jurisdictions, which document is incorporated herein by reference, as amended from time to time ("*Trust Agreement*"), sets forth the terms, restrictions and conditions of the FairShare Vacation Plan ("*Plan*") described therein as well as the obligations of the Plan Manager to those owners who have subjected their property to the FairShare Vacation Plan Use Management Trust ("*Trust*") or who acquire property which has been previously subjected to the Trust Agreement and whose use, occupancy and possessory rights have previously been assigned to the Trust ("*Agreement*"), all in accordance with the terms and conditions of the Plan; and

WHEREAS, Owner is the purchaser of an ownership interest ("*Ownership*") in the SHELL OWNERS CLUB-WEST (the "*Club*") which entitles Owner to use Owner's rights to reserve the use of accommodations in the Club as described in the SHELL OWNERS CLUB-WEST purchase contract ("*Contract*") #            021; and

WHEREAS, Owner desires to subject the Ownership to the Trust Agreement and assign the use, occupancy and possessory rights in the Ownership to the Trust, all in accordance with the Trust Agreement.

NOW THEREFORE, in consideration of $ Fee Waived paid by Owner to Plan Manager, and the mutual promises contained herein and in furtherance of the Assignment, the parties agree as follows:

1. Definitions. Except as otherwise provided herein, capitalized terms shall have the same definition as set forth in the Trust Agreement. This Agreement, as well as the interest of the Trustee set forth herein, shall be subject to the prior rights in the Contract of any mortgagee or secured party. Nothing contained herein shall contravene the obligation of Owner under the Contract or security agreement executed in connection with Owner's purchase of the Ownership.

2. Assignment. Owner hereby subjects the Ownership to the Trust Agreement and assigns the use, occupancy and possessory rights in the Ownership to the Trust, to be administered in accordance with the Trust Agreement, and agrees that Owner's Use Rights shall be governed by the Trust Agreement.

3. Points. Plan Manager shall assign Owner 154,000 Points which shall be used through the CLUB WYNDHAM Plus Program to reserve accommodations subjected to the Trust in accordance with the Trust Agreement. Points are symbolic of the value of Owner's Use Rights and are to be used in each FULL year.

4. Voting Rights. Notwithstanding the Assignment, Owner shall retain Owner's voting right in the Club.

5. CLUB WYNDHAM Plus Assessment. Owner agrees to pay an annual CLUB WYNDHAM Plus Assessment ("*Assessment*") to the Trust for certain expenses of the Plan in accordance with the Trust Agreement, which Assessment shall include Owner's share of the expenses associated with the operation and maintenance of the Plan and may include Owner's proportionate share of Owner's regular assessment attributable to the Ownership ("*SOA Fee*"). The Assessment shall be payable annually in advance in either one installment or in monthly installments pursuant to an approved auto pay plan. The Plan Manager shall cause the SOA Fee portion of the Assessment to be deposited into a CLUB WYNDHAM Plus escrow account ("*Escrow Account*") until such funds become due and are delivered to the SOA. Owner authorizes the Trustee or its assignees to withdraw the SOA Fee from and out of the Escrow Account and pay same over to the SOA so long as said Ownership is subjected to the Plan.

6. Association. Pursuant to the Assignment, Owner becomes a Member of the FairShare Vacation Owners Association ("*Association*") and as such agrees to abide by all requirements set forth in the Articles and Bylaws of the Association. Owner also has the right to vote Owner's interest as a Member of the Association.

7. Use and Occupancy Rights. Owner hereby assigns Owner's use and occupancy rights in the Ownership to the Trust for the period of time this Agreement is effective and accordingly grants to the Trustee and the Plan Manager the right to assign the possession and Use Rights of the Ownership on an annual basis or biennial basis, if applicable, to other Members in the Plan in return for Owner's Use Rights to utilize the CLUB WYNDHAM Plus Program or exchange in accordance with the Trust Agreement.

8. Effective Date. This Agreement shall become effective on the date first written above.

9. Termination. This Agreement and all rights granted hereunder may be terminated by Owner, or by Owner's successors or assigns, at any time; however, any such termination shall be subject to any outstanding reservations. Election to terminate will be noted but all reservations existing as of the termination date will be honored. No new reservations will be accepted on or after the termination date. If this Agreement is terminated, future access to the Plan will require approval of the Plan Manager and include a conversion fee. If not terminated sooner, termination will occur on the earlier of the following dates: (a) termination of the Club; (b) termination of the Plan; or (c) termination by Trustee in accordance with the Trust Agreement. Upon termination, Owner's Points will be extinguished and Owner will no longer have the right to make reservations in accommodations subjected to the Trust Agreement and all use, occupancy and possessory rights in the Ownership shall automatically revert to Owner.

10. Binding Agreement. This Agreement and the terms and conditions of the Trust Agreement shall be binding upon Owner, Owner's heirs, successors and assigns, provided, however, the application of this covenant on the Ownership may be terminated in accordance with paragraph 9 above, or shall terminate automatically if and when the Ownership shall be held by Wyndham Vacation Resorts, Inc. ("*Wyndham*") subsequent to conveyance to Owner.

SVC – CWF

No. 3190/Rev.6-20

Contract No.          021

11. <u>Default</u>. Upon termination of this Agreement or in the event Owner defaults on Owner's obligation under the Contract or security agreement resulting in the termination of the Contract or the acquisition of the Ownership by Owner's secured party, this Agreement shall be deemed terminated and cancelled and all rights of Owner hereunder shall cease. Upon such termination Plan Manager shall cause the use, occupancy and possessory rights in the Ownership to be re-assigned back to Owner or the acquiring secured party; subject to any Owner commitments or confirmed reservations by another Plan participant which may have been made pursuant to the Plan. Any fees due the Trust by Owner shall be deducted at the date of termination from the Assessments paid by Owner. Upon such termination, all benefits and obligations of Owner under the Contract or security agreement shall continue in force and effect.

12. <u>CLUB WYNDHAM Plus VIP Program</u>. The CLUB WYNDHAM Plus VIP Program (*"VIP Program"*) and its accompanying benefits are made available by Wyndham to CLUB WYNDHAM Plus Members who have achieved certain eligibility criteria as set forth in the CLUB WYNDHAM Plus Member's Directory (*"Member's Directory"*). Owner should refer to the Member's Directory for the terms and conditions of the VIP Program.

13. <u>Miscellaneous</u>. The parties hereto agree to execute any additional instruments which may be necessary or convenient to carry out the intent and purpose of this Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the day and year first above written.

OWNER: _Sandra Leslie_____
                Sandra Leslie

WYNDHAM VACATION RESORTS, INC., PLAN MANAGER

OWNER: _Donald Wall_____
                Donald Wall

By _____
     Authorized Representative      00

OWNER: _____

OWNER: _____

# Financial Review Summary

| | | | |
|---|---|---|---|
| Name(s): | Sandra Leslie and Donald Wall | Contract #: | )21 |
| Address: | 425 Crossbow Dr | Member #: | '346 |
| | Mainville, OH 45039 USA | Date: 08-17-2024 | |
| Phone Number: | | Email Address: | |
| Bonus Points: | 246,000 | | |
| End Date of Bonus Points: | 09-30-2026 | | |

Inventory Name: Shell Owners Club - West

## New Purchase Financial Details

| | | |
|---|---|---|
| Gross Purchase Price: | $ | 48,700.00 |
| Discount: | $ | 23,800.00 |
| Net Purchase Price: | $ | 24,900.00 |
| Traded Contract Net Price: | $ | 0.00 |
| Processing Fee: | $ | 349.00 |
| Total Purchase Price: | $ | 25,249.00 |
| Down Payment Today: | $ | 3,787.35 |
| Loan Payment Amount: | $ | 335.01 |
| Loan Payment Date: | | 10-01-2024 |
| Term: | | 120 |
| Interest Rate: | | 13.99% |
| Interest Rate Variable Non-PAC:* | | 13.99% |
| Amount Financed: | $ | 21,461.65 |

Loan and Dues are subject to a billing charge if not paid through the approved Auto Pay Plan

* No auto-pay or credit card auto-pay

## Payments Made In Full Over The Full Term

| | | | | | |
|---|---|---|---|---|---|
| Finance Charge Total: | $ | 18,739.55 | | | |
| Total Sales Price (Down Payment + Total Payments) | $ | 43,988.55 | Total of Payments with Interest | $ | 40,201.20 |
| ARDA-ROC: | $ | 0.00 | (Paid to American Resort Development Association – Resort Owners' Coalition) | | |

# Financial Review Summary

## Club Wyndham Plus Monthly Maintenance Dues

Total Points - Today's Contract _____ 154,000

| Points Based Assessment | | | Auto Pay | Yes |
|---|---|---|---|---|
| Club Wyndham Plus Program Fee | $ | 16.67 | First Payment Date | 10-01-2024 |
| HOA Fee and Real Estate Taxes | $ | 95.48 | | |
| Total Assessment Amount | $ | 112.15 | | |
| Frequency | | Monthly | | |

I have reviewed and agree with the information noted above. This includes, but is not limited to, my understanding and agreement of all financial terms including our initial deposit, monthly loan payments, total loan balance, and monthly maintenance fee assessments.

| _SANDRA LESLIE_ | 8/17/2024 | _DONALD WALL_ | 8/17/2024 |
|---|---|---|---|
| Owner's Signature: Sandra Leslie | Date | Owner's Signature: Donald Wall | Date |

| | | | |
|---|---|---|---|
| Owner's Signature: | Date | Owner's Signature: | Date |

SVC - WEST, LLC

By: _____

Authorized Representative of Seller    CO

Pre-authorized Auto Pay Plan Set-up Form

| OWNER INFORMATION |
|---|

Owner Name(s): Sandra Leslie and Donald Wall
Contract Number: 121
Member Number: 148

| MONTHLY PAYMENT UNDER CONTRACT | ___ Enroll ___ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 10-01-2024 | Frequency: Monthly | | Amount: $335.01 |
| BANK INFORMATION | | CREDIT CARD INFORMATION | |
| ___ Checking* ___ Savings* | | Credit Card Type: Visa** | |
| Routing: | | Credit Card #: | |
| Bank Account #: | | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX389A | |
| Name on Account: | | Name on Card: Sandra Leslie | |
| Name of Bank: | | (As it appears on card) | |

| CLUB WYNDHAM® PLUS (INCLUDES PAYMENT OF CWA ASSESSMENTS) | ___ Enroll ___ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 10-01-2024 | Frequency: Monthly | | Amount: $112.15 |
| BANK INFORMATION | | CREDIT CARD INFORMATION | |
| ___ Checking* ___ Savings* | | Credit Card Type: VISA** | |
| Routing: | | Credit Card #: | |
| Bank Account #: | | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX389A | |
| Name on Account: | | Name on Card: Sandra Leslie | |
| Name of Bank: | | (As it appears on card) | |

| Vacation Sidekick™ | ___ Enroll ___ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 09-01-2025 | Frequency: Annually | | Amount***: $59.95 |
| BANK INFORMATION | | CREDIT CARD INFORMATION | |
| ___ Checking* ___ Savings* | | Credit Card Type: ** | |
| Routing: | | Credit Card #: | |
| Bank Account #: | | Name on Card: | |
| Name on Account: | | (As it appears on card) | |
| Name of Bank: | | | |

*  If your checking or savings account is with a foreign bank, please complete the Credit Card Information section.
**  At this time, Discover Cards can be used for US accounts only.
***  Vacation Sidekick memberships fees may vary. Refer to our Vacation Sidekick Membership Agreement for more details.
All funds in US Dollars unless noted.

## AUTHORIZATION FOR PAYMENT

Under this Pre-authorized Auto Pay Plan Set-up Form ("Authorization"), Wyndham Vacation Resorts, Inc., together with its affiliates, successors, assigns, agents, and service providers (collectively, "Wyndham") is authorized to initiate ACH debits from my bank account(s) or charges to my credit card account(s) indicated above. These debits or charges will be in the amounts (and on or after the dates) listed above for each agreement and/or membership for which I have provided payment information. In this Authorization, Amounts due for assessments and charges may increase due to changes in assessments and charges as provided in my vacation ownership's governing documents, and Wyndham may adjust the payment amounts due accordingly and to electronically debit or charge to my bank account(s) or credit card account(s) the adjusted amount. Payment amounts authorized above may vary for various reasons, including early payments or late payments (and interest that may accrue on late payments). I have the right to receive written notice if a debit or charge will vary, and Wyndham will generally provide at least ten (10) days' advance written notice of any such variance. However Wyndham need not provide written notice if the amount of the debit or charge is less than the amount authorized above or no more than ten percent (10% in excess of this amount.

If Wyndham makes an error in processing a debit or charge, Wyndham may correct the error by initiating an electronic credit or debit. If I make a typographical or similar error in providing Wyndham with relevant information, Wyndham may correct the error upon receiving corrected information from me or my financial institution.

If the payment due date(s) authorized above falls on a weekend or holiday, the payment may be executed on the next business day. Because this is an electronic transaction, these funds may be withdrawn from my account or charged to my credit card each period as soon as the above noted transaction date occurs. Any ACH transaction rejected for Non-Sufficient Funds (NSF) will be subject to a fee of up to $50 (as permitted by law) indicating as a separate transaction. If the amount due is not timely paid, late fees and interest may be charged as provided in the agreement(s) and membership(s) described above. Wyndham may at its discretion attempt to process any rejected or unsuccessful debit or charge again within ten (10) days.

I may choose to revoke this Authorization: (i) by telephone at 1-895-418-3808, or (ii) in writing by mail to Wyndham Consumer Finance, P.C. Box 98944, Las Vegas, Nevada 89193-8944. This Authorization in no way limits any right I may have under federal law to stop payment by contacting my financial institution. I must notify Wyndham in writing of any changes to my bank account(s) or credit card account(s), or termination of this Authorization at least five (5) days before the next billing date. Wyndham may update my bank account and/or credit card account details with information received from any card or account updating services.

This Authorization is subject to applicable law and network rules. Wyndham reserves the right to terminate this Authorization at any time and for any reason, including excessive returned payments. If this Authorization is cancelled by either me or Wyndham, my obligation to repay my underlying obligations to Wyndham remains in effect and I will be responsible for making my payments by another payment method.

No. 2201/Rev. 12-22

Contract Number: 021

This Authorization cannot be used to change my existing due date(s). This Authorization becomes effective for the next scheduled payment upon receipt of the signed Authorization (but please allow up to seven (7) business days for processing). References in this Authorization to "I" and "my" in the singular include the plural if more than one individual signs below.

My signature below confirms that I understand, acknowledge, and agree to this Authorization.

| Authorized Signature on Payment Plan: | Print Name: | Date: |
|---|---|---|
| Signature: SANDRA LESLIE | Print Name: Sandra Leslie | Date: 8/17/2024 |
| Signature: DONALD WALL | Print Name: Donald Wall | Date: 8/17/2024 |
| Signature: | Print Name: | Date: |
| Signature: | Print Name: | Date: |

Mail Form to: P.O. Box 98944, Las Vegas, Nevada 89193-8944          For Inquiries: 1-866-418-3809

Enroll Online: www.myclubwyndham.com/payments

Docusign Envelope ID: 79D4FFCE-1D49-485B-B5B4-9C625C5C6D94

Contract Number     021

## ELECTRONIC DELIVERY OF CONSUMER DOCUMENTS

X       The undersigned purchaser(s) hereby expressly acknowledge that they have chosen **not** documentation related to this purchase electronically, and therefore will receive a **printed hard copy** of all consumer documentation.

_____   The undersigned purchaser(s) hereby expressly elect(s) to receive **all*** consumer documentation related to this purchase **electronically** via DocuSign.

DocuSign can be accessed utilizing supported browsers, which include Chrome, Firefox, Safari, and Microsoft Edge via https://www.docusign.com on most modern computer systems. DocuSign can also be accessed on mobile platforms by downloading the mobile application from either the Apple App Store or the Google Play Store.

An invitation with instructions to access this platform will be provided via email.

DIGITAL COPIES SHOULD NOT BE ELECTED UNLESS THE DOCUMENTATION CAN BE VIEWED PRIOR TO THE CANCELLATION PERIOD. REFER TO STATE SPECIFIC DISCLOSURE DOCUMENTS AND CONTRACT FOR STATE SPECIFIC CANCELLATION RIGHTS WHICH ARE AFFORDED TO YOU.

*FOR ALL SALES IN FLORIDA OR TEXAS, OR SALES TO TEXAS RESIDENTS IN ANY STATE, purchaser(s) WILL BE provided an executed paper copy of the contract document.

| | |
|---|---|
| Sandra Leslie | Donald Wall |
| Purchaser's Printed Name | Purchaser's Printed Name |
| _SANDRA LESLIE_ | _DONALD WALL_ |
| Signature | Signature |
| 8/17/2024 | 8/17/2024 |
| Date | Date |
| | |
| Print Name | Print Name |
| | |
| Signature | Signature |
| | |
| Date | Date |

No. 3358/Rev. 12-23

Docusign Envelope ID: 79D4FFCE-1049-489B-96B4-9C8000506004

Contract Number        021

THE STATE OF TENNESSEE
PUBLIC OFFERING STATEMENT
RECEIPT

NAME OF TIME-SHARE PROJECT: SVC-WEST, LLC
NAME OF SUBDIVIDER: SHELL OWNERS CLUB - WEST

PURCHASERS ACKNOWLEDGEMENT OF RECEIVING THE TENNESSEE TIME-SHARE PUBLIC OFFERING STATEMENT DATED: JANUARY 23, 2024

This Tennessee Public Offering Statement consists of 375 pages, which have been filed with the Tennessee Real Estate Commission.

I have received a copy of the Tennessee Public Offering Statement required by the Tennessee Real Estate Commission pursuant to the Tennessee Time-Share Act.

PURCHASER CANCELLATION:

YOU MAY CANCEL A CONTRACT TO PURCHASE A TIME-SHARE INTERVAL WITHIN TEN (10) DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT, WHERE YOU HAVE MADE AN ON-SITE INSPECTION OF THE TIME-SHARE PROJECT BEFORE SIGNING THE CONTRACT, AND IF YOU HAVE NOT MADE SUCH AN INSPECTION, WITHIN FIFTEEN (15) DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT. IF YOU ELECT TO CANCEL, YOU MAY DO SO BY:

(A)  HAND DELIVERING NOTICE OF CANCELLATION TO THE OTHER PARTY AT SVC -WEST, LLC, ATTENTION: RESCISSIONS DEPARTMENT, 6277 SEA HARBOR DRIVE, ORLANDO, FLORIDA 32821, WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT; OR

(B)  MAILING NOTICE OF CANCELLATION BY PREPAID UNITED STATES MAIL AT SVC -WEST, LLC, ATTENTION: RESCISSIONS DEPARTMENT, 6277 SEA HARBOR DRIVE, ORLANDO, FLORIDA 32821, POSTMARKED ANYTIME WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT, TO THE OTHER PARTY OR TO THE OTHER PARTY'S AGENT FOR SERVICE OF PROCESS; OR

(C)  SENDING NOTICE OF CANCELLATION VIA ELECTRONIC MAIL AT RESCISSIONS.WVR@WYN.COM, TIME STAMPED WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT, TO THE OTHER PARTY.

| | |
|---|---|
| 8/17/2024 | _signed_eSig_ |
| DATE | PURCHASER |
| 8/17/2024 | _signed_eSig_ |
| DATE | PURCHASER |
| | |
| DATE | PURCHASER |
| | |
| DATE | PURCHASER |

(Form3588) WSTTN-NP

Docusign Envelope ID: 79D4FFCE-1C4B-488B-95B4-9C805C8C8094

# Acknowledgement Receipt
## for Disclosure Documents

Contract No:                 021

Owner(s) hereby acknowledges that Owner has received copies of the documents and disclosures listed below.

- Governing Documents for SHELL OWNERS CLUB-WEST

- Trust Agreement and Accompanying Documents

- CLUB WYNDHAM Plus Program Summary

- WYNDHAM CLUB PASS, LLC - Disclosure Summary for Wyndham Club Pass Program

- WYNDHAM CLUB PASS, LLC - Disclosure Summary Supplement for Wyndham Club Pass Program

- Acknowledgment and Disclosure Statement for CLUB WYNDHAM Plus/Wyndham Rewards Program

- SVC Exchange Disclosure Statement

- Shell Vacations, LLC - Financial Privacy Policy

- Servicing Disclosure Statement


| | |
|---|---|
| *Sandra Leslie* | 8/17/2024 |
| Owner  Sandra  Leslie | Date |
| *Donald Wall* | 8/17/2024 |
| Owner  Donald  Wall | Date |
| | |
| Owner | Date |
| | |
| Owner | Date |

No. 3212/Rev. 3-22

DocuSign Envelope ID: 760AFFCE-1449-486B-99B4-9C605C2C00B4

Contract Number: 021
Bonus Contract Number: 418



# Incentive Acknowledgment Disclosure

## CLUB WYNDHAM®PLUS BONUS POINTS
### SVC - West, LLC

By purchasing a timeshare interest through SVC - West, LLC (**"Developer"**), Buyer has the option to select:

CLUB WYNDHAM® PLUS BONUS POINTS

---

### BONUS POINTS:

Buyer will receive 246,000 CLUB WYNDHAM Plus Bonus Points (**"Bonus Points"**).

Bonus Points Use Period:  Start Date:  03-01-2025
                          End Date:   09-30-2026

Buyer will also be eligible for CLUB WYNDHAM Plus VIP status through Bonus Points End Date: Yes _X_ No____

---

### Terms and Conditions

GENERAL:

1. Buyer may receive temporary CLUB WYNDHAM Plus VIP status depending upon the number of Bonus Points awarded combined with the number of points purchased. CLUB WYNDHAM Plus VIP status will remain in effect through the Bonus Points Use Period End Date, if applicable.

2. If Buyer cancels the timeshare purchase contract during the applicable cancellation period, the right to receive Bonus Points or the Bonus Play Vacation Package will be automatically cancelled without notice, penalty or obligation.

3. This benefit is not assignable or otherwise transferable by the Buyer.

4. Individuals should not purchase a vacation ownership interest in reliance upon the continued availability of this benefit. If all or a portion of the benefit described in the statement becomes unavailable as the result of events beyond the control of the Developer, the offering of such benefit may be terminated.

5. Buyer should not rely upon any representations other than those contained in this document, in the CLUB WYNDHAM Plus Program Guidelines, and the Bonus Play Vacation Package Terms and Conditions.

6. Wyndham Vacation Resorts, Inc. is the Plan Manager of CLUB WYNDHAM Plus and its address is 6277 Sea Harbor Drive, Orlando, Florida 32821.

BONUS POINTS:

1. Bonus Points will be automatically awarded to the Buyer unless otherwise selected.

2. The Buyer's CLUB WYNDHAM Plus Membership must be in good standing in order to use Bonus Points.

3. Bonus Points entitle Buyer to reserve accommodations through the CLUB WYNDHAM Plus program between the Bonus Points Use Period Start Date and End Date. Reservations utilizing Bonus Points may not result in check-in occurring prior to the Use Period Start Date. Bonus Points cannot be renewed or extended beyond the Use Period End Date.

4. Bonus Points are subject to the terms and conditions of the CLUB WYNDHAM Plus Program Guidelines located in the CLUB WYNDHAM Plus Member's Directory (**"Directory"**). Buyer will also receive Housekeeping Credits and Reservation Transactions as described in the Directory. Bonus Points cannot be used for Advance Reservation Priority reservations.

No. 3023 Rev. 6-17

Docusign Envelope ID: 79D4FFCE-1649-488B-95B4-9C605C5G0084



## Enrollment Agreement

Date: 08-17-2024                    Member Number          546          Contract Number:          021

Member Name: Sandra  Leslie

Member Name: Donald  Wall

Member Name:

Member Name:

Street Address: 425 Crossbow Dr

City: Mainville                    State  OH                          Zip Code: 45039

Country: USA                       Email Address:

Home Phone                         Work Phone:

### RCI Enrollment

- RCI Member
- RCI PlusPartners Member

### Vacation Sidekick™

Vacation Sidekick is a unique entertainment, recreation, vacation and travel program offering a wide variety of benefits and privileges to its Members on an annual basis. Vacation Sidekick membership entitles the Member's family, including up to two adults and their dependent children up to age 21, to all benefits, discounts and other privileges as provided in the terms and conditions.

INITIAL ANNUAL MEMBERSHIP FEE $ _____ Complimentary _____

Initial Annual Membership Fee includes annual membership for first term of twelve (12) months.

ANNUAL MEMBERSHIP FEE BASED ON MEMBERSHIP TYPE:

| Membership Type | Annual Membership Fee |
|---|---|
| CLUB WYNDHAM | $59.95 |
| CLUB WYNDHAM Bronze | $59.95 |
| CLUB WYNDHAM Silver | $59.95 |
| CLUB WYNDHAM Gold | $0 |
| CLUB WYNDHAM Platinum | $0 |
| CLUB WYNDHAM Founders | $0 |

No. 2692/Rev. 8-21

Docusign Envelope ID: 7904FFCE-1348-4868-98B4-0C605C3C60A1

Contract Number: T    021

# Enrollment Agreement Terms and Conditions

### RCI Exchange

RCI, LLC and Wyndham Vacation Resorts, Inc. are both subsidiaries of Travel + Leisure Co., but operate as independent companies.

Wyndham Vacation Resorts will enroll and pay your initial annual RCI membership fee. Renewal fees are part of annual CLUB WYNDHAM Plus Assessment. Confirming a reservation through RCI requires an exchange fee, which is listed in the RCI Disclosure Guide and is subject to change.

### Vacation Sidekick Membership

Vacation Sidekick provides various travel-related benefits and privileges to its Members. You become a Member of Vacation Sidekick by submitting this Vacation Sidekick Membership Agreement (**"Agreement"**) and by payment of applicable membership fees. This Agreement, when signed by Member and a Vacation Sidekick representative, forms a legally binding contract between Member and Wyndham Vacation Resorts, Inc. (**"Sponsor"**), subject to the following terms and conditions:

    1.  **Membership.**  Membership in Vacation Sidekick is available to individuals and their immediate families only. Membership in Vacation Sidekick is non-transferable and may not be sold.

    2.  **Vacation Sidekick Programs and Benefits.**  Programs and benefits offered to Vacation Sidekick Members are described and depicted in the Member's kit, a copy of which has been provided to Member along with this Membership Agreement. These programs and benefits are subject to separate terms and conditions of suppliers of these benefits and are subject to change at any time. Vacation Sidekick benefits may be changed or eliminated without prior notice to Members. Sponsor accepts no responsibility for acts or omissions of any persons providing such programs or benefits directly to Members. There may be certain additional costs, fees and expenses associated with certain Vacation Sidekick programs or benefits currently available or added by Sponsor from time to time and such additional costs, if any, shall be borne solely by Member. Any fees required are disclosed in the materials for the specific benefit.

    3.  **Personal Expenses.**  Member is responsible for payment of any personal expenses incurred while utilizing any Vacation Sidekick program or benefit. Use of or participation in Vacation Sidekick is completely voluntary, and payment of any fee or other cost associated with Vacation Sidekick is required only upon that use or participation.

    4.  **Membership Suspension and Termination.**  This Agreement, together with Member status, may be suspended or terminated by Sponsor without further obligation if Member fails to comply with these terms and conditions or the terms of the various programs and benefits of Vacation Sidekick or if Member becomes delinquent on any amounts owed to Sponsor and/or its affiliates. Further, Membership may be terminated for any misuse of the Vacation Sidekick program, violation of any federal, state or local law or regulation in connection with use, failure to pay for charges associated with a Vacation Sidekick program or benefit or for any other reason. Membership in Vacation Sidekick will automatically terminate if Member is no longer a CLUB WYNDHAM Plus Owner.

    5.  **Program Changes.**  Terms and conditions of this Agreement and of Vacation Sidekick programs and benefits may be changed from time to time at sole discretion of Sponsor. **Sponsor reserves its right to increase the annual fee or future fees from time to time.** Members shall be notified of any information regarding such changes in Vacation Sidekick from publications or by written correspondence. Current editions of these publications supersede prior editions with respect to terms and conditions of membership and Vacation Sidekick programs and benefits. Sponsor is bound only by representations that it makes concerning terms and conditions of its programs and benefits set forth in its official publications or written correspondence and is not responsible for contrary or conflicting representations made by any other person.

DocuSign Envelope ID: 79D4FFCE-1049-486B-8EB4-9C6D6C3C8004

Contract Number:  021

6. **Limitation of Liability and Release.** Sponsor, its subsidiaries, officers, directors, employees and agents, including without limitation, its advertising agencies, printers and other suppliers, shall not be liable for and expressly disclaim any and all liability for any injury, liability, expense, cost, damage, penalty or loss of any kind incurred or caused by a Member, their family, or their guests (i) in connection with the utilization of or participation in any Vacation Sidekick program or benefit, or (ii) resulting from any acts or omissions of any individual or entity providing a product, benefit or service in Vacation Sidekick program. Sponsor's liability for any other loss or damage incurred by a Member through use of the Vacation Sidekick programs or benefits is limited to membership fees paid by such Member. Member hereby agrees to release and hold harmless Sponsor, its subsidiaries, successors and assigns, its and their advertising agencies, printers and other suppliers, as well as its officers, directors, employees and agents for any injury, liability, expense, cost, damage, penalty or loss of any kind incurred by Member, the Member's family or guest during any trip or utilization of any Vacation Sidekick program or benefit and for any related damage, theft or loss caused or incurred by the Member, the Member's family or guest.

7. **Effective Date and Activation.** This Agreement is effective when signed by the Member and the Sponsor's Vacation Sidekick Representative. Member must activate Vacation Sidekick Membership as indicated on the Vacation Sidekick Savings Card before commencing use. If Member delays activation of the Vacation Sidekick Savings Card, the period of time between the effective date and the activation date shall be lost.

8. **Effect of Termination.** Termination of Membership in Vacation Sidekick will have no effect on such Member's vacation ownership contractual obligations or agreements and will not result in termination of an ownership interest which a Member may have in real estate, including but not limited to a timeshare, lot, home, condominium, townhouse or undivided interest. Membership in Vacation Sidekick is no additional consideration for the purchase of a vacation ownership interest. Cancellation of Membership in Vacation Sidekick shall in no way relieve a Member of their obligation under any other contract or agreement.

9. **Availability of Programs and Benefits.** As Vacation Sidekick depends on services and programs offered by unrelated third party suppliers, Sponsor cannot guarantee continued availability of all programs and benefits. If a Vacation Sidekick program or benefit becomes unavailable for any reason whatsoever, Member waives any and all claims against Sponsor resulting from unavailability of such program or benefit.

10. **Miscellaneous Disclosures.** Continued availability of Vacation Sidekick is not necessary for use and enjoyment of any accommodation within Member's timeshare plan. No costs of acquisition, operation, maintenance, or repair of Vacation Sidekick are passed on to purchasers of a vacation ownership interest in a timeshare plan as a common expense.

I acknowledge receipt of the "Enrollment Agreement Terms and Conditions" document and agree to abide by these terms and conditions.

Contract Number          321



## TRAVEL UP
### BY TRAVEL + LEISURE™

ACKNOWLEDGMENT AND DISCLOSURE STATEMENT
WITH RESPECT TO INCIDENTAL BENEFIT
Travel Up by Travel + Leisure

1. Travel Up by Travel + Leisure as more fully described by the rules which are attached hereto as Exhibit "A" (*"Rules"*), and also incorporated herein by reference is subject to the user fees and costs and the restrictions upon use and availability as set forth in the attached Rules.

2. Use and participation in the incidental benefit described in this statement (*"Incidental Benefit"*) is completely voluntary and the payment of any fee or other cost is only required upon such use or participation.

3. No costs of acquisition, operation, maintenance, or repair of the Incidental Benefit are passed on to purchasers of the timeshare plan as common expenses of the timeshare plan (*"Purchaser(s)"*) or as common expenses of a component site of a multisite timeshare plan.

4. The Incidental Benefit described in this statement is not assignable or otherwise transferable.

5. The continued availability of the Incidental Benefit is not necessary in order for any accommodation or facility of the timeshare plan to be available for use by purchasers of the timeshare plan in a manner consistent in all material respects with the manner portrayed by any promotional material, advertising, or purchaser public offering statement.

6. The continued availability to purchasers of timeshare plan accommodations on no greater than a one-to-one use right to use night requirement ratio is not dependent upon continued availability of the Incidental Benefit.

7. The initial term of the Incidental benefit will be for a period of one (1) year after the first date that the timeshare plan is available for use by the Purchaser. This benefit will auto-renew each year unless you are notified that the program is charging or expiring. Nothing herein shall prevent the renewal or extension of the availability of an incidental benefit.

The undersigned Purchaser(s) acknowledge that he/she/they have read the foregoing document and the attached Exhibit "A".

| | |
|---|---|
| *SANDRA LESLIE* | 8/17/2024 |
| PURCHASER Sandra Leslie | DATE |
| *DONALD WALL* | 8/17/2024 |
| PURCHASER Donald Wall | DATE |
| | |
| PURCHASER | DATE |
| | |
| PURCHASER | DATE |

EXHIBIT A                                                                 Contract Number          071

## Travel Up by Travel + Leisure RULES

The Travel Up by Travel + Leisure Rules ("Rules") are promulgated this May 20th, 2021, by Wyndham Vacation Ownership Inc. or a subsidiary thereof (collectively, "Wyndham", "WVO" "We" or "Our") for the benefit of recipients of the Travel Up by Travel + Leisure ("Member" or "You"). The Rules are as follows:

**Membership Rules**

a.   Travel Up by Travel + Leisure provides eligible Owners (as defined below) a membership ("Membership") to book ancillary travel products such as car rentals, hotels, activities, flights and cruises ("Bookings") for cash at Member pricing. Bookings can be completed at www.clubwyndham.com.

b.   The Membership is available to eligible Club Wyndham members that purchased a new or incremental vacation ownership interest ("Vacation Ownership Interest") after May 20th, 2021 directly from Wyndham or an authorized reseller ("Owners").

c.   If an Owner cancels the purchase of this Vacation Ownership Interest during the applicable cancellation period, this offer will become void automatically without notice, penalty, or obligation.

d.   Travel Up by Travel + Leisure membership is non-transferable. In the event an Owner upgrades or trades the new or incremental Vacation Ownership Interest for an additional Vacation Ownership Interest from Wyndham, the Owner's Membership at the time of the upgrade or trade will continue to be active.

e.   All products and services offered through Travel Up by Travel + Leisure are available for cash purchase for Travel Up by Travel + Leisure members only. All offers are based on availability and travel products are not guaranteed until confirmation is received from the travel provider or supplier through Travel Up by Travel + Leisure.

f.   Travel product rates and prices are based on availability and subject to change without notice. We do not guarantee travel for specific dates, locations, or special events.

g.   Members will be charged applicable taxes and fees to their payment method at time of Booking. Taxes and fees include an estimated total that will be paid to the travel provider or supplier for taxes and government fees it owes in connection with the Members Booking, including but not limited to, sales and use tax, occupancy tax, room tax, excise tax, value added tax and other applicable taxes ("Taxes and Fees").

h.   The charge for Taxes and Fees varies based on a number of factors including, without limitation, the amount owed to the travel provider and the location where a Member travels.

i.   Depending on the type of Booking a Member makes through Travel Up by Travel + Leisure, they may be charged additional fees by suppliers, including, but not limited to: Certain mandatory hotel specific service fees, including but not limited to resort fees, energy surcharges, newspaper delivery fees, in-room safe fees, tourism fees, security deposits and/or housekeeping fees. Certain optional incidental fees, including but not limited to: parking charges, minibar charges, phone use charges, room service charges and/or movie rentals; and port expenses, specialty dining, show fees, drink package costs, and/or additional activity costs ("Additional Fees"). Payment of these Additional Fees is the sole responsibility of the Member.

j.   Owners with access to Travel Up by Travel + Leisure have no obligation to pay any membership, subscription, or annual fees to access the membership benefits. Any use or participation in Travel Up by Travel + Leisure is completely voluntary and the payment for any products and services is only required upon such use or participation.

k.   Membership purchases, benefits and transactions may not be used for any commercial purpose, sold, bartered, or exchanged for any other consideration. Any unauthorized commercial use including but not limited to any transfer of any rights or benefits conferred pursuant to any subscription agreement is grounds for immediate termination and closure of your Membership without (a) refund or (b) any further duty, obligation or liability to the Member.

l.   Access to the Travel Up by Travel + Leisure membership, will not be allowed if the Member is delinquent in the payment of any applicable Club maintenance fees, taxes, special assessments, or Club program fees. Participation will also not be allowed by Club Wyndham members with delinquent mortgage payments to Wyndham Vacation Ownership, Inc. or a subsidiary thereof, or who are otherwise in default under their sales contract, if any.

m.   Each travel provider has specific cancellation policies and penalties separate and apart from Travel Up by Travel + Leisure which can include forfeiture. Travel provider policies may treat name changes and departure date changes as cancellations.

n.   In the event Members must cancel any travel Booking, please contact Travel Up by Travel + Leisure customer service immediately at 866-315-8200, or in writing at the following address:

       Travel Up by Travel + Leisure
       Attn: Cancellations
       5890 Michigan Rd
       Carmel, IN 46032

o.   Cancellations will be effective as of the date of receipt of the request by Travel Up by Travel + Leisure ("Cancellation Date"). It is Members' responsibility to ensure cancellation requests are properly received by Travel Up by Travel + Leisure. Refunds may take up to eight (8) weeks from the Cancellation Date.

p.   By purchasing products and services through Travel Up by Travel + Leisure, Member acknowledges and agrees to be bound by Club Wyndham's Terms and Conditions and the terms and conditions of the Travel Up by Travel + Leisure Membership, as well as any applicable terms and conditions subject to the third party travel providers and Member accepts all terms and conditions on the behalf of any traveling companion(s), and/or guests (including minors) (collectively "Guests"). From time to time, Travel Up by Travel + Leisure, products and services may be fulfilled by a third party provider, under contract with Resort Rental, LLC or its affiliates. In that instance, the terms and conditions of such third party provider shall apply to the member.

q.   All terms and conditions are subject to change at any time at the sole discretion of Travel Up by Travel + Leisure, without prior notice to Members. By purchasing products and services through Travel Up by Travel + Leisure, Member acknowledges and agrees to be bound by any posted revisions to these Terms and Conditions.

FOR A FULL LIST OF TRAVEL UP BY TRAVEL + LEISURE TERMS AND CONDITIONS VISIT:
https://www.travelupwyndhamdestinations.com/termsandconditions

Docusign Envelope ID: 79D4FFCB-1048-488B-85B4-9C868C5C6094





Contract Number: 021

Member Number: 046

## Wyndham Rewards® Points/Maintenance Fee Reference Guide for New Cardholders

### How You Earn

| Wyndham Rewards Earning Examples |
|---|
| **Wyndham Rewards® hotel stays**<br>10 Wyndham Rewards Points per $1 spent<br>*Minimum of 1000 points per night stay |
| **Wyndham Rewards® Earner Card**<br>Earn 5 Wyndham Rewards points per $1 on Hotels by Wyndham and gas purchases |
| Earn 2 Wyndham Rewards Points per $1 spent on eligible purchases made at Wyndham Timeshare resorts (including maintenance fee and loan payments) and on eligible dining and grocery purchases (excluding Target® and Wal-mart®). |
| 1 Wyndham Rewards point per $1 spent on purchases using the Wyndham Rewards Visa Card everywhere else (excluding Wyndham Timeshare down payments) |
| **Avis® or Budget® 1-day car rental**<br>100 Wyndham Rewards points per Day |

| Wyndham Rewards Points Earned | The amount of CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees) that can be paid from converting Wyndham Rewards Points |
|---|---|
| Wyndham Rewards Points | CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees) |
| 40,000 | $200 |
| 80,000 | $400 |
| 120,000 | $600 |
| 200,000 | $1,000 |

1,000 CLUB WYNDHAM Points equals 400 Wyndham Rewards Points. CLUB WYNDHAM Plus Points to Wyndham Rewards Conversion Rates subject to change and conversion fee of $99.00 per conversion applies.

10,000 Wyndham Rewards Points equals $50 towards CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees). Redemption Levels are subject to change and are maintained exclusively by Wyndham Rewards.

No.2857/Rev.1 ~23

Docusign Envelope ID: 79D4FFC8-1019-486B-9B94-9C605C5C8094





Contract Number:     321
Member Number:     046

## ACKNOWLEDGMENT AND DISCLOSURE STATEMENT
### Club Wyndham® Plus/Wyndham Rewards® Program

1. The CLUB WYNDHAM Plus/Wyndham Rewards Program as more fully described by the Program Rules herein.

2. Use and participation in the CLUB WYNDHAM Plus/Wyndham Rewards Program is completely voluntary and the payment of any fee or other cost is only required upon such use or participation.

3. The CLUB WYNDHAM Plus/Wyndham Rewards Program is not assignable or otherwise transferable.

4. If all or a portion of the CLUB WYNDHAM Plus/Wyndham Rewards Program becomes unavailable the offering of this program may be terminated.

5. The continued availability of the CLUB WYNDHAM Plus/Wyndham Rewards Program is not necessary for a purchaser's use and enjoyment of any accommodations in the timeshare plan purchased.

6. If you cancel your purchase contract within the stated cancellation period, the CLUB WYNDHAM Plus/Wyndham Rewards Program will not be available

### Club Wyndham® Plus/Wyndham Rewards® Program Rules

The CLUB WYNDHAM Plus/Wyndham Rewards Program Rules ("**Rules**") are promulgated this 20th day of July, 2009, by Wyndham Fulfillment Group, LLC ("**Wyndham Fulfillment Group**") for the benefit of CLUB WYNDHAM Plus Members. The Rules are as follows:

#### Program Rules

a. The CLUB WYNDHAM Plus/Wyndham Rewards Program (**"Program"**) means that program offered by Wyndham Fulfillment Group in which CLUB WYNDHAM Plus Members may trade Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points. All terms used herein shall have the same meaning given to them in the documents creating the CLUB WYNDHAM Plus program, as amended from time to time.

b. The Wyndham Rewards Program is offered by Wyndham Rewards, Inc., a subsidiary of Wyndham Hotel Group, LLC, its successors and assigns, for use by guests of participating Wyndham hotel and resort properties whereby such guests can accumulate points redeemable for, among other things, hotel rooms at participating Wyndham hotels and resorts worldwide, car rentals, travel activities, and purchases from participating merchants or service providers. The rules for the Wyndham Rewards Program will be distributed separately from this document, and are incorporated herein by reference as if fully set forth. (See current Wyndham Rewards Membership Guide).

c. Neither Wyndham Fulfillment Group nor Wyndham Vacation Ownership, Inc., or its subsidiaries guarantee that a CLUB WYNDHAM Plus Member utilizing the Wyndham Rewards Program will be able to stay at a particular participating Wyndham hotel or resort during any specific time or will be able to redeem Wyndham Rewards points for any particular activity or service.

d. Wyndham Fulfillment Group reserves the right to modify, alter, delete or add new terms and conditions to the Program Rules at any time without notice. Wyndham Fulfillment Group may terminate the Program at any time by providing written notice to CLUB WYNDHAM Plus Members. In that event, the right to trade Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points will end. Wyndham Rewards, Inc. may terminate the Wyndham Rewards Program at any time as described in the current Wyndham Rewards Membership Guide.

e. Wyndham Rewards, Inc. reserves the right to modify, alter, delete or add new terms and conditions to the Wyndham Rewards Program at any time without notice. This includes modifying, altering, adding or deleting Wyndham Rewards point values, redemption levels, conversion ratios, conditions for active status, rewards, "Earning Participants" or "Rewards Participants" to the Wyndham Rewards Program at any time without notice. In addition, Wyndham Rewards, Inc. may convert the Wyndham Rewards Program and members points into different awards programs having different point values at any time without notice. This means that the number of Wyndham Rewards points needed to reach a rewards level may be increased, the time for earning them reduced, or the rewards changed so you may not be able to obtain.

No. 2242/Rev.11-23

Docusign Envelope ID: 1504FFC5-9543-4859-83E4-8CFC903C41E4

Contract Number: 021

Member Number: 046

sem or obtain certain rewards no matter how long you participate in the Wyndham Rewards Program. To view or obtain the most up to date terms and conditions for the Wyndham Rewards Program, visit wyndhamrewards.com or call 1-866-996-7937.

f. All redemption of Wyndham Rewards points will be in accordance with the procedures outlined in the Wyndham Rewards Membership Guide. A Wyndham Rewards account may be maintained in the name of each CLUB WYNDHAM Plus Member, however, Wyndham Rewards points will be credited to only one Wyndham Rewards account, not multiple accounts, based upon direction received by CLUB WYNDHAM Plus from the member where the CLUB WYNDHAM Plus membership is held by more than one individual.

g. CLUB WYNDHAM Plus Members may request to trade all or part of their regular use year Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points during the twelve (12) month period prior to their use year start date. A minimum of 1,000 Qualified CLUB WYNDHAM Plus Points may be traded for Wyndham Rewards points. Requests to trade for Wyndham Rewards points are non-reversible and are considered a final transaction. Multiple requests are permitted provided they are submitted prior to the CLUB WYNDHAM Plus Member's use year start date.

h. "Qualified CLUB WYNDHAM Plus Points" means those CLUB WYNDHAM Plus Points associated with ownership interests purchased directly through Wyndham Vacation Resorts, Inc. or its affiliates, such ownership interests acquired by will or intestate succession, or such ownership interests acquired by an "Immediate Relative" of the CLUB WYNDHAM Plus Member. "Immediate Relative" includes parents, spouses, domestic partners, siblings, children and grandchildren. Wyndham Fulfillment Group, in its sole discretion with or without prior notice, has the unilateral right to expand or contract the list of persons eligible to participate in the Program at any time in the future.

i. Subject to Paragraphs (g) and (h) above, the following CLUB WYNDHAM Plus Points are not eligible to be traded for Wyndham Rewards points: CLUB WYNDHAM Plus Points which are not acquired through Wyndham vacation Resorts, Inc. or its affiliates, CLUB WYNDHAM Plus Points acquired through a non-Wyndham affiliated maker, Bonus Points, PIC Points, Borrowed CLUB WYNDHAM Plus Points, Rented CLUB WYNDHAM Plus Points, Transferred CLUB WYNDHAM Plus Points, Discovery Program Points and Pool Credits. Wyndham Fulfillment Group, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of eligible CLUB WYNDHAM Plus Points which may be traded for Wyndham Rewards points.

j. Participation in the Program, which includes the ability to request a trade for Wyndham Rewards points and the depositing of Wyndham Rewards points in a CLUB WYNDHAM Plus Members Wyndham Rewards account, will not be allowed if the CLUB WYNDHAM Plus Member is delinquent in the payment of any applicable maintenance fees, taxes, special assessments, or CLUB WYNDHAM Plus Program Fees. Participation will also not be allowed by CLUB WYNDHAM Plus Members with delinquent mortgage payments to Wyndham Vacation Ownership, Inc. or a subsidiary thereof, or who are otherwise in default under their sales contract, if any. In addition, a CLUB WYNDHAM Plus Member will not be permitted to request a trade for Wyndham Rewards points if their vacation ownership account is pending an upgrade transaction.

k. CLUB WYNDHAM Plus Members may trade for Wyndham Rewards points every calendar year. Each request to trade will require a separate transaction fee.

The fee to trade for Wyndham Rewards points is payable at the time each request to trade for Wyndham Rewards points is made. The current fee is $99.00, is non-refundable, and is subject to change without notice.

m. Upon requesting a trade of Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points, the Qualified CLUB WYNDHAM Plus Points traded through the Program will be assigned to Wyndham Fulfillment Group for its own purposes including, but not limited to, renting accommodations to the public.

n. Wyndham Rewards points will become available to the CLUB WYNDHAM Plus Member for use at the start of the use year corresponding with the Qualified CLUB WYNDHAM Plus Points that are traded.

o. The Wyndham Rewards points which may be received when trading Qualified CLUB WYNDHAM Plus Points is based on the following formula: 400 Wyndham Rewards points for each 1,000 Qualified CLUB WYNDHAM Plus Points traded. Wyndham Fulfillment Group reserves the right to change the above formula at any time without notice.

p. Questions relating to the Program or trading Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points should be directed to the Vacation Planning Center (1-800-251-8736 Option 1)

No. 2242/Rev. 11-23

Docusign Envelope ID: 79D4FFCE-1049-486B-95B4-9C605C508094

# Membership Certificate

## Shell Owners Club - West

This certificate is issued by the SHELL OWNERS ASSOCIATION - WEST and signifies the below owner(s) as a member(s) of the association with the right to participate in the Shell Owners Club - West.

Owner(s):   Sandra Leslie and Donald Wall Joint Tenants With The Right Of Survivorship

Issued this Day of     August 17th, 2024

*Contract Number:     021

Number of Points     154,000

*This certificate supersedes any previously issued certificates for the above contract number.

No. 3258/Rev. 9-20

Docusign Envelope ID: 79D4FFCE-1049-488B-95B4-8C805C5C8094

| | |
|---|---|
| Contract Number | 021 |
| Date of Sale | 08-17-2024 |

## Guaranteed Discount

### Valid for One Year from Today's Purchase

Should you elect to upgrade with Shell within one year of today's purchase you will be eligible for a discount off the gross price per thousand points.

Gross Purchase Price per Thousand $316

Guaranteed Discount -$28

Guaranteed Gross Purchase Price per Thousand $288

*Annika . Lopez @ wyn.com*

*total 10-21-24 ₂*
*Brooke Legacy*
*8 911 S. Sandy Delray Suite 100*
*Sandy, UT 84070*
*801 - 999 -3366*

Eligibility:

- To be eligble, you must be in good standing as a Club WYNDHAM Member and must be current in all fees and expenses.

Terms and Conditions:

- Your Discount Offer will expire within one year from the date on which your purchase agreement is fully executed.

- The discount offer is off of the current gross price at the time of your upgrade purchase.

- This discount offer may not be combined with any other purchase incentives or discounts.

- Based on inventory availability,

- Presidential Reserve inventory is excluded.

- Equity trades are not eligible.

Docusign Envelope ID: 79D4FFCE-1049-486B-95B4-9C605C9C6994

Contract Number:     021

## Notice of Servicing Transfer

Lender:   SVC - West, LLC

Address:  6277 Sea Harbor Drive, Orlando, Florida 32821

Date:   08-17-2024

You are hereby notified that the servicing of your loan, that is, the right to collect payment from you, is being transferred from your lender, SVC-West, LLC, to Wyndham Vacation Resorts, Inc. ("**WVR**"), effective as of the date stated below the signature block (**"Effective Date"**). This means that after this date, WVR will be collecting your loan payments from you. Nothing else about your loan will change.

WVR will collect your payments going forward. WVR will start accepting payments received from you as of the Effective Date.

Send all payments due on or after the Effective Date to WVR at this address: Attention - Consumer Finance, 10750 W. Charleston Boulevard, Suite 130, Las Vegas, Nevada 89135.

If you have any questions about your loan or this transfer, please contact WVR using the information below:

        Servicer:

        Wyndham Vacation Resorts, Inc.

        Attention - Consumer Finance

        1-888-739-4016

        10750 W. Charleston Boulevard, Suite 130, Las Vegas, Nevada 89135

Wyndham Vacation Resorts, Inc.

Date: **08-17-2024**

No. 805S/C/Rev.09-20

Contract Number: 121

| FACTS | WHAT DOES SHELL VACATIONS, LLC DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Credit scores and payment history<br>• Purchase history and account transactions |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Shell Vacations, LLC ("SVC") chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Shell Vacations, LLC share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes – such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes – To offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | Yes | No |
| For our affiliates' everyday business purposes – information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes – information about your creditworthiness | Yes | Yes |
| For our affiliates to market to you | Yes | Yes |
| For nonaffiliates to market to you | Yes | Yes |

| To limit our sharing | • Mail in the form below<br><br>Please note:<br><br>If you are a new customer, we can begin sharing your information 30 days from the date we sent this notice. When you are no longer our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | Call 1-800-251-8736 or go to https://clubwyndham.wyndhamdestinations.com |
|---|---|

**Mail-in Form**

| If you have a joint account, your choice(s) will apply to everyone on your account unless you mark below.<br><br>Apply my choices only to me | Mark any/all you want to limit:<br><br>___ Do not share my personal information with nonaffiliates to market their products and services to me.<br><br>___ Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br><br>___ Do not allow affiliates to use my personal information to market to me. |
|---|---|
| | Name<br>Address<br><br>City, State Zip<br>Member / Contract # |
| Mail To: | Member Privacy Shell Vacations, LLC<br>P.O. Box 93944 Las Vegas, Nevada 89193-3944 |

Contract Number:                121

## Who we are

| Who is providing this notice? | Shell Vacations, LLC; SVC-West, LLC, SVC-Hawaii, LLC, and Wyndham Vacation Resorts, Inc. |
|---|---|

## What we do

| How does Shell Vacations, LLC protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
|---|---|
| How does Shell Vacations, LLC collect my personal information? | We collect your personal information, for example, when you<br>• Apply for financing or give us your income information<br>• Provide account information or provide employment information<br>• Give us your contact information<br>We also collect your information from others, such as credit bureaus, affiliates, or other companies |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account unless you tell us otherwise. |

## Definitions

| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• Our affiliates include companies with a Wyndham name including Wyndham Vacation Resorts, Inc., and Wyndham Consumer Finance, Inc., as well as companies listed in the public filings of Wyndham Destinations, Inc., at https://investor.wyndhamdestinations.com/financial-information/sec-filings/default.aspx |
|---|---|
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• Nonaffiliates we may share with may include other developers, financial institutions and services companies, associations and exchanges, and other companies. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• Our joint marketing partners may include other developers, financial institutions, financial services companies, and other companies |

## Other important information

VT: Accounts with a Vermont mailing address are automatically treated as if they have limited the sharing as described on page 1. For joint marketing we will only disclose your name, contact information and information about your transactions.

CA: Accounts with a California mailing address are automatically treated as if they have limited the sharing with nonaffiliates as described on page 1. You may receive a separate notice regarding your rights and additional choices.

No. (57)Rev. 8-19

Docusign Envelope ID: 79D4FFCE-1049-486B-95B4-9C665C5Z6004

Contract No. 021

## ASSOCIATION BUDGET NOTICE

The Association Budget copy provided in the Disclosure Statement/Public Offering Statement may not reflect the most current maintenance fees. For your convenience, we have provided an updated Association Budget reflecting the **2024** maintenance fees of the timeshare interest being purchased.

Form 3458 Rev.12-23

Docusign Envelope ID: 75D4FFCE-4049-4668-9584-8C605C5C8094

Contract No.                         021

Number No.                           46

## Incentive Acknowledgment
## Disclosure
### SVC – West, LLC.

By purchasing a timeshare interest through SVC – West, LLC. (*"Wyndham"*),
Buyer will receive **210,000** Wyndham Rewards points.

### Terms and Conditions

1. You must be a Wyndham Rewards member to receive your Wyndham Rewards Points. Within 45 days from your date of purchase you will receive an email containing your Wyndham points pack at the email on file. This email will contain instructions on claiming your Wyndham Rewards Points. Redemption must be completed within 90 days of the date of activation on your points pack. Wyndham Rewards redemption levels and merchandise are subject to change and are maintained exclusively by Wyndham Rewards. Please visit **WyndhamRewards.com** or call 1-866-996-7937 for full program information.

2. If Buyer cancels the timeshare purchase contract during the applicable cancellation period, the right to receive Wyndham Rewards Points will be automatically cancelled without notice, penalty or obligation.

3. This benefit is not assignable or otherwise transferable by the Buyer.

4. Your CLUB WYNDHAM Prefer account, including loan payments (if applicable), must be current and in good standing to redeem this offer.

5. Individuals should not purchase a vacation ownership interest in reliance upon the continued availability of this benefit. If all or a portion of the benefit described in the statement becomes unavailable as the result of events beyond the control of the Developer, the offering of such benefit may be terminated.

6. Buyer should not rely upon any representations other than those contained in this document, and in the CLUB WYNDHAM Plus Program Guidelines.

7. SVC – West, LLC., 6277 Sea Harbor Drive, Orlando, 32821.

Form 3413-NP Rev.05-22

Docusign Envelope ID: 75D4FFCE-1049-486B-96B4-9C605C6C0094

SHELL OWNERS ASSOCIATION - WEST
MAINTENANCE FEE BUDGET
2024

| | SOA Admin | IOA's | Donatello | Vino Bello | Desert Rose | Inn At The Park | Total |
|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | |
| SOA Maintenance Fee Income | $ 69,539,496 | $ | $ - | $ - | $ - | $ - | 69,539,496 |
| Billing Service Revenue | 461,811 | | | | | | 461,811 |
| Interest Income | 115,608 | | | | | | 115,608 |
| Rental Income | 1,301,438 | | | | | | 1,301,438 |
| Late Fee Revenue | 411,568 | | | | | | 411,568 |
| Total Revenue | $ 71,888,320 | $ - | $ - | $ - | $ - | $ - | 71,830,320 |
| | | | | | | | |
| **EXPENSES:** | | | | | | | |
| **Resort Expenses:** | | | | | | | |
| Facilities/Repairs/Maintenance | | $ | $ - | 728,085 | 1,129,076 | 1,121,801 | 184,647 | 4,262,608 |
| Housekeeping | | | | 994,705 | 2,501,983 | 1,630,434 | 657,008 | 6,294,442 |
| Guest Services/Reservation | | | | 840,435 | 1,699,513 | 1,485,382 | | 4,022,272 |
| Administration/Acctg/HR | | | | 489,375 | 2,210,874 | 921,687 | 60,457 | 3,684,441 |
| Telephone | | | | 29,912 | 116,902 | | | 144,834 |
| Utilities/Electric/Gas | | | | | 661,430 | 642,684 | | 1,526,374 |
| Property Taxes | | | | 103,067 | 861,490 | 277,810 | 40,552 | 1,983,369 |
| Property Insurance | | | | 172,155 | 417,760 | 243,250 | 16,533 | 849,658 |
| Fees Due to Inn at the Park Condo | | | | | | | | 966,517 |
| Fees Due to PPCA | | | | 1,862,330 | | | | 1,862,330 |
| Management Fee | 818,497 | | | 598,579 | 403,619 | 1,079,283 | 339,954 | 3,164,620 |
| Reserve Contributions | | | | 450,335 | 1,714,772 | 2,231,640 | 364,952 | 4,348,699 |
| Total Resort Expenses | $ 818,497 | $ - | $ - | 6,452,840 | 11,439,388 | 11,490,589 | 2,405,104 | 32,505,640 |
| | | | | | | | |
| **Association Billings** | | | | | | | |
| Fees Due to Peacock Suites IOA | $ | $ - | 5,398,118 | $ | | | | 5,398,118 |
| Fees Due to Inn at Opera KTA | | | 2,531,218 | | | | | 2,531,218 |
| Fees Due to SEW IOA | | | 1,121,183 | | | | | 1,121,183 |
| Fees Due to Whispering Woods IOA | | | 1,159,414 | | | | | 1,159,414 |
| Fees Due to Club Donatello | | | 133,750 | | | | | 133,750 |
| Fees Due to Legacy Golf Resort Association | | | 11,286,728 | | | | | 11,286,728 |
| Fees Due to IOA for Orange Tree Resort | | | 5,257,876 | | | | | 5,257,876 |
| Rent Due to Starr Pass Golf Suites Association | | | 2,898,690 | | | | | 2,898,690 |
| Fees Due to Little Sweden Condo Association | | | 1,590,502 | | | | | 1,590,502 |
| Fees Due to Sedona Villas | | | 844,976 | | | | | 844,976 |
| Total Association Billings | $ - | $ - | 31,199,425 | $ - | $ - | $ - | $ - | 31,199,425 |
| | | | | | | | |
| **General and Administrative Expenses** | | | | | | | |
| Accounting Fee | $ 560,513 | $ - | $ | $ | $ | $ | | 560,513 |
| Audit Fees | 29,511 | | | | | | | 29,511 |
| Annual Owners Meeting | 53,249 | | | | | | | 53,249 |
| Property Taxes | 289,189 | | | | | | | 289,189 |
| Income Tax | 88,377 | | | | | | | 88,377 |
| Financial Services & Credit Cards | 840,428 | | | | | | | 840,428 |
| Insurance | 11,721 | | | | | | | 11,721 |
| Reserve for Uncollectable | 6,361,577 | | | | | | | 6,361,577 |
| Association Claimed Inventory | 611 | | | | | | | 611 |
| Total General and Administrative Expenses | $ 8,130,376 | $ - | $ - | $ - | $ - | $ - | $ - | 8,134,376 |
| | | | | | | | |
| **TOTAL EXPENSES** | $ 8,947,811 | $ 31,199,425 | $ 6,452,840 | $ 11,439,388 | $ 11,490,589 | $ 2,405,606 | 71,924,438 |
| | | | | | | | |
| **NET SURPLUS/(DEFICIT)** | | | | | | | $ (282) |

**Maintenance Fee Rate 2024**

| SVC Cost Per Point | Club Wyndham Cost Per 1000 Points |
|---|---|
| $ 0.2976 | $ 7.44 |

The budget, including all expense and revenue projections, is based on and prepared in accordance with the information available at the time of preparation, including without limitation, historical records, forecasted data and other sources believed to be reliable, but which are not guaranteed. Normal budgetary assumptions are that costs will increase with inflation. If expenses during the year exceed the estimates used in preparation of this budget, or if unforeseen events occur, the Association may have to increase the budget during the year, levy a special assessment or a combination thereof. Further, all revenue projections included herein are being furnished for informational purposes and remain subject to market fluctuations, Acts of God or other extrinsic and uncontrollable factors.

Docusign Envelope ID: 79D4FFCE-1049-488B-95B4-9C605C5C5094

## Wyndham Rewards Earner Credit Card Approval Response

**Application Date & Time:**
08/17/2024 03:48 PM EDT

**ACS ID:**
14854468

**Barclay's Application ID:**
300000097644546

**Approved Credit Limit Amount:**
$4,000

**Response:**
Approved

### Customer Information

**First Name:**
DONALD

**Last Name:**
WALL

**Street Address:**
425 crossbow dr

**City:**
MAINVILLE

**State:**
Ohio

**Zip Code:**
45039

### Merchant Information

**Entity Name:**
Wyndham Vacation Resorts

**Location:**
00291 PIGEON FORGE THE ISLAND

Docusign Envelope ID: 79D4FFCE-1048-4865-9584-8C685C5D6094

<u>Credit Card Cardmember Account Summary Initial Disclosure</u>

The Credit Card Cardmember Agreement with full Terms and Conditions will arrive with your Wyndham Rewards Earner Card.

Communications are generally available only in English unless otherwise specifically noted. Spanish-speaking customer service is available.

---

**Interest Rates and Interest Charges**

| | |
|---|---|
| Annual Percentage Rate (APR) for Purchases | **20.99%**<br><br>This APR will vary with the market based on the Prime Rate.<br><br>For your Initial Qualifying Wyndham Timeshare Purchase[1] (see below) that posts to your account within 30 days of account opening, **0%** introductory APR for the first 9 billing cycles from the transaction date. After that, your APR will be **20.99%**. This APR will vary with the market based on the Prime Rate. For any Qualifying Wyndham Timeshare Purchases[1] (see below) that post to your account after the first 30 days of account opening, **0%** promotional APR for 5 billing cycles from the transaction date. After that, your APR will be **20.99%**. This APR will vary with the market based on the Prime Rate. |
| APR for Balance Transfers | 0% introductory APR for the first fifteen billing cycles following each balance transfer that posts to your account within 45 days of account opening.<br><br>After that, (and for balance transfers that do not post within 45 days of account opening) your APR will be **20.99%**. This APR will vary with the market based on the Prime Rate. |
| APR for Cash Advances | 29.99%<br><br>This APR will vary with the market based on the Prime Rate. |
| Paying Interest | Your due date is at least 23 days after the close of each billing cycle. We will not charge you interest on purchases if you pay your entire balance by the due date each month. We will begin charging interest on balance transfers and cash advances on the transactional date. |
| Minimum Interest Charge | If you are charged interest, the charge will be no less than $0.50 |
| For Credit Card Tips from the Consumer Financial Protection Bureau | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore. |

Docusign Envelope ID: 79D4FFCE-1049-4868-95B4-9D805C5C6094

| Fees | |
|---|---|
| **Annual Fee** | $0 |
| **Transaction Fees:** | |
| • Balance Transfer | Either $5 or 5% of the amount of each transfer, whichever is greater. |
| • Cash Advance | Either $10 or 5% of the amount of each cash advance, whichever is greater. |
| • Foreign Transaction | 0% of each transaction in U.S. dollars. |
| **Penalty Fees:** | |
| • Late Payment | Up to $40 |
| • Returned Payment | Up to $40 |

**How We Will Calculate Your Balance:** We use a method called "daily balance (including new purchases)". See your Cardmember Agreement for more details.

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided in your Cardmember Agreement.

## CARDMEMBER AGREEMENT

### Introduction.

This Agreement and your Cardmember Agreement establish the terms of your credit card Account ("Account") with Barclays Bank Delaware, Wilmington, Delaware. Please review all such documents carefully and keep with your records. All extensions of credit in connection with your Account are being made by Barclays Bank Delaware in Wilmington, Delaware.

### Using Your Account/Acceptance of These Terms.

You do not need to accept the Account and this Agreement and none of the fees on this Account (except as otherwise provided herein) will apply unless you use the Account. If your Account has an Annual Fee (see the Account Summary Table to determine if this Account has an Annual Fee) and provided that you have not otherwise used the Account to

Docusign Envelope ID: 79D4FFCE-1049-4B5B-95B4-8D908D5C6884

make a Purchase, Balance Transfer or Cash Advance or paid the Annual Fee, you may close the Account within thirty days after Account opening by contacting us at the number on the back of your Card, and if you do, you will not be responsible for paying the Annual Fee. By signing, keeping, using or otherwise accepting your Card or Account, you agree to the terms and conditions of this Agreement. You may obtain credit in the form of Purchases, Balance Transfers and Cash Advances by using your Card, your account number, Checks, or other credit devices. You agree that we may credit your Account rather than issue cash refunds when you reverse transactions that were originally charged to your Account. You agree that you will not use your Card or Account in connection with any transaction that is prohibited or unenforceable and that if you do engage in such a transaction you waive any claim that the charge is uncollectible on the grounds the transaction was prohibited or unenforceable. The Card must be returned to us upon request. We may replace your Card with another Card at anytime.

## Definitions.

If we use a capitalized term in this document but we do not define the term in this document, the term has the meaning as used in your monthly statement.

"You" and "your" refer to each person who has applied for, accepted, or used the Account and each person who has agreed to be responsible for the Account.

"We", "us" and "our" refer to Barclays Bank Delaware ("Barclays").

¹Qualifying Wyndham Timeshare Purchase means all Wyndham timeshare down payment purchases made with this credit card account. as determined by the merchant identification number provided by Wyndham.

## Easy Pay Promotional Offers.

From time to time we may, at our option, make certain special promotional offers available for certain types of Purchases ("Easy Pay Offers"). Details of the APR and the promotional repayment terms for any available Easy Pay Offer will be described in the specific offer. For Easy Pay Offers, the minimum payments during the Easy Pay Offer term are designed to pay the promotional balance in full at the end of the promotional repayment term if on-time payments are made. Payments are calculated by adding the promotional Purchase balance at the time the Purchase is enrolled in the Easy Pay Offer (each an "Easy Pay Balance") and the amount of projected interest that would accrue on the Easy Pay Balance during the promotional repayment term at the applicable APR if only on-time minimum payments are made. This amount is then divided by the number of months in the promotional period and rounded up to the next dollar (each an "Easy Pay Payment Amount").

Enrollment of the eligible Purchase in the Easy Pay Offer may take up to 24 to 72 hours after you have accepted the Easy Pay Offer. Prior to enrollment the then current non-promotional APR may be applied to the applicable purchase from the transaction date until the actual enrollment date if in that billing cycle you incur interest charges on Purchases.

If you do not make each required Easy Pay Payment Amount on time during the repayment period and/or there is a remaining Easy Pay Balance at the end of the promotional term, this remaining balance will become part of the Principal Balance and will (i) become subject to the then current non-promotional APR for Purchases on the Account and (ii) be subject to the non-Easy Pay Offer Minimum Payment Due calculation applicable to the Principal Balance described in "Your Minimum Payment Each Month." The then current non-promotional APR will be applied to the remaining Easy Pay Balance amount on the first day of the next billing cycle after expiration of the Easy Pay promotion on any remaining balance. If you accept an Easy Pay Offer, you acknowledge and agree that the specific terms of the Easy Pay Offer will modify and become part of this Agreement. and all other terms and conditions of this Agreement will apply to the Easy Pay Offer.

## Variable Rate Information

The standard Annual Percentage Rates (APRs) on your Account that are used to determine the amount of interest for

Docusign Envelope ID: 790471CE-1049-4883-8684-8C809C9C6094

be charged for Purchases, Balance Transfers, and Cash Advances are variable rates. The APRs on your Account correspond to daily periodic rates ("DPR") and are calculated by multiplying the applicable DPR by 365. The DPRs on your Account equal 1/365th of the sum of 1) the applicable Prime Rate. 2) plus 12.49% for Purchases (Maximum APR 29.99%), plus 12.49% for Balance Transfers (Maximum APR 29.99%); and plus 22.99% for Cash Advances (Maximum APR 29.99%). The "Prime Rate" used in determining the APRs in each billing cycle will be the highest rate published in the Money Rates column of *The Wall Street Journal* on the last business day of each month. An increase or decrease in the Prime Rate will cause a corresponding increase or decrease to your variable rates on the first day of the billing cycle that begins in the same month in which the applicable Prime Rate is published. Any such increase or decrease will cause a corresponding increase or decrease in the amount of interest assessed and possibly in the amount of the Minimum Payment Due. If *The Wall Street Journal* does not publish the U.S. Prime Rate, or if it changes the definition of the U.S. Prime Rate, we may substitute another index.

### The current rates on your Account.

The DPR for all Wyndham Timeshare Purchases during its introductory period is 0.00% (which corresponds to an introductory APR of 0%). See below for the DPR and APR that will apply to any outstanding remaining Wyndham Timeshare Purchases balance at the end of the introductory period (see above for the term of the introductory period).

As of 06/28/2024 the Prime Rate was 8.5%. The DPR for all other Purchases (and the DPR for the Wyndham Timeshare Purchases at the end of the introductory period), would have been 0.0575% (which corresponds to an APR of 20.99%). The DPR for Balance Transfers would have been 0.0575% (which corresponds to an APR of 20.99%). The DPR for Cash Advances would have been 0.0822% (which corresponds to an APR of 29.99%).

### Military Lending Act Protections.

Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account). To receive this information and a description of your payment obligation orally, please call 866-540-3074.

If you are covered by the Military Lending Act, then notwithstanding anything to the contrary in this agreement, to the extent required by the Military Lending Act, nothing in this agreement will be deemed a waiver of the right to legal recourse under any otherwise applicable provision of state or federal law.

### How We Will Calculate Interest.

We use a method called "daily balance (including new purchases)." We calculate interest separately for each "Balance Subject to Interest Rate." These include for example, Purchases at the current rate, Balance Transfers at the current rate, Cash Advances at the current rate, and different promotional balances. Your monthly billing statement shows each "Balance Subject to Interest Rate."

Docusign Envelope ID: 78D4FFC5-1045-4B88-95B4-SCBD5C6C4094

To calculate interest, we first calculate a daily balance for each Balance Subject to Interest Rate. We start with the balance, for that Balance Subject to Interest Rate, as of the end of the previous day. We add any interest calculated on the previous day's balance. (This means interest is compounded daily). We add any new Purchases, Balance Transfers or Cash Advances to the appropriate balance, subtract any new payments or credits from the appropriate balance, and make other adjustments. A credit balance is treated as a balance of zero. We then multiply each daily balance by the applicable DPR. We do this for each day in the billing period. That gives us the daily interest. We add up all the daily interest for all of the daily balances to get the total interest for the billing period.

### Accrual of Interest and How to Avoid Paying Interest on Purchases.

On Purchases, interest begins to accrue as of the transaction date. However, you can avoid paying interest on Purchases in any given billing cycle if you pay your Statement Balance in full by the Payment Due Date. For Balance Transfers, interest will accrue from the transaction date which generally will be the day we send the Balance Transfer to the payee. For Checks, interest will accrue from the transaction date which generally will be the day the payee accepts the Check. For Cash Advances, interest will accrue from the transaction date which generally will be the day you take the Cash Advance. If you are charged interest in a billing cycle, we will charge a Minimum Interest Charge (or "Minimum Charge") on your Account if the total interest charge in that billing cycle is less than the amount of the Minimum Interest Charge that is disclosed in the Account Summary Table.

If you have a promotional APR offer(s) on your Account, you can avoid paying interest on non-promotional Purchases if you pay, by the Payment Due Date, the amount that equals your Easy Pay Payment Amount(s) plus your Statement Balance, minus any promotional Balance Transfer balance or special category Purchase (such as an Easy Pay Balance) with a reduced APR, and minus any Deferred Financing Purchase during all but the last billing period of the promotional period. If one or more of the balances on your Account is subject to one of these promotional APR offers, this will be more fully explained on your monthly Statement.

### Transaction Fees.

If you use your Card or Account to obtain a Cash Advance, we will charge a Cash Advance Fee for each such Cash Advance. If you use your Card or Account to make a Balance Transfer, we will charge a Balance Transfer Fee for each such Balance Transfer. If you use your Card or Account to purchase Cash Equivalents, we will charge a Cash Advance Fee (sometimes we may refer to this as a Cash Equivalent Fee) for each such transaction. If you use your Card or Account for a Foreign Transaction, we will charge a Foreign Transaction Fee for each such transaction. Balance Transfer Checks and Cash Advance Checks are subject to the same Transaction Fee as Balance Transfers and Cash Advances, respectively. The present amounts of those charges are stated in the Account Summary Table.

### Account Fees.

In addition to the fees listed in the Account Summary Table, we may also assess the Account Fees listed below.

### Annual Fee.

If your Account has an Annual Fee, generally it will be billed at account opening and every twelve months thereafter. The amount of the Annual Fee, if there is one on your Account, is listed in the Account Summary Table.

### Late Payment Fee – If we do not receive a payment from you in at least the amount of your Minimum Payment Due by the Payment Due Date shown on your monthly statement, we may charge you a Late Payment Fee. The amount of the Late Payment Fee will be determined in accordance with applicable law. Thus, the fee generally will not exceed the amount of the applicable Minimum Payment Due. In addition, this fee will not exceed $40. If you have not been assessed a late fee in the 6 preceding billing cycles, this fee will not exceed $29.

Docusign Envelope ID: 7904FF0E-1049-486D-95B4-4C005C50B294

**Returned Payment Fee** – If your bank does not honor a check or direct debit you deliver to us, or we must return a check because it is not signed or is otherwise irregular, we may charge you a Returned Payment Fee. The amount of the Returned Payment Fee will be determined in accordance with applicable law. Thus, the fee generally will not exceed the amount of the applicable Minimum Payment Due. In addition, this fee will not exceed $40. If you have not been assessed a returned payment fee in the 6 preceding billing cycles, this fee will not exceed $25.

**Returned Check Fee** – If we return a Convenience Check (which includes a Balance Transfer Check or Cash Advance Check) unpaid because it exceeds your available credit line at the time it is processed, your Account is closed or otherwise does not have charging privileges, you did not comply with our instructions regarding the Check or your Account is past due, we may charge you a Returned Check Fee. The amount of the Returned Check Fee will be determined in accordance with applicable law. Thus, the fee generally will not exceed the amount of the returned Convenience Check. In addition, this fee will not exceed $40. If you have not been assessed a returned check fee in the 6 preceding billing cycles, this fee will not exceed $25.

**Check Stop Payment Fee**–If we stop payment on a Convenience Check at your request, we may charge you a Check Stop Payment Fee of $39.95.

## ARBITRATION.
### THIS ARBITRATION PROVISION DOES NOT APPLY TO YOU IF YOU ARE SUBJECT TO THE PROTECTIONS OF THE MILITARY LENDING ACT.

This arbitration provision provides for binding arbitration of all Claims by either you or us against the other if either you or we choose to refer the Claim to arbitration. The terms "you," "we," and "us" are defined below for purposes of this arbitration provision. A "Claim" covered by this provision is any claim, dispute or controversy by either you or us against the other, arising from or relating in any way to this Agreement, your Account, any transaction or activity on your Account, our relationship, products or services provided by us or a third party in connection with this Agreement or your Account, including (without limitation) claims, disputes or controversies based on contract, tort (including intentional torts), fraud, agency, negligence, statutory or regulatory provisions or any other source of law and (except as otherwise specifically provided in this Agreement). All issues shall be for the arbitrator to decide except issues related to the scope, enforceability, interpretation, or formation of this arbitration agreement, which shall be for the court to decide. For purposes of this arbitration provision, "you" includes yourself, any authorized user on the Account and any of your agents, beneficiaries or assigns, or anyone acting on behalf of the foregoing, and "we" or "us" includes our employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns, and to the extent included in a proceeding in which Barclays is a party, Barclays' service providers and marketing partners.

In arbitration, a neutral arbitrator—not a judge or a jury—decides whether to award relief. Procedures are also simpler in arbitration than in court. For example, discovery is more limited. Review of the arbitrator's decision by appeal is also limited (as described below in this arbitration provision). You and we agree that all Claims must be arbitrated on an individual basis between you and us, and not on a class, representative, or any other kind of collective basis. As a result, class actions and other representative or collective basis proceedings are not available for resolution of Claims. Apart from Claims arising from the same Account, no claims may be joined together in the arbitration. The arbitrator shall not have any authority to entertain a claim, or to award any relief, on behalf of or against anyone other than a named party to the arbitration proceeding.

**TO BE CLEAR, ARBITRATION WITH RESPECT TO A CLAIM IS BINDING AND NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT. IN ARBITRATION YOU AND WE WILL NOT HAVE THE RIGHTS THAT ARE PROVIDED IN COURT INCLUDING THE RIGHT TO A TRIAL BY JUDGE OR JURY AND THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN PROCEEDINGS BROUGHT BY OTHERS SUCH AS CLASS ACTIONS OR SIMILAR PROCEEDINGS. IN ADDITION, THE RIGHT TO DISCOVERY AND THE RIGHT TO APPEAL ARE ALSO LIMITED OR ELIMINATED BY ARBITRATION. ALL OF THESE RIGHTS ARE WAIVED AND ALL CLAIMS MUST BE RESOLVED THROUGH ARBITRATION.**

If any Claim is advanced in a court, arbitration may be elected under this provision instead, and the right to elect arbitration shall not be deemed to have been waived if the election is made at any time before commencement of trial. Alternatively, you or we may pursue a Claim within the jurisdiction of the Justice of the Peace Court in Delaware, or the

DocuSign Envelope ID: 19DAFFDE-1049-499B-95B4-5C6deCbC9B94

equivalent court in your home jurisdiction; provided that the action remains in that court, is made on behalf of or against you only and is not made part of a class action, private attorney general action or other representative or collective action. You and we agree to honor a request by the other to remove an action to these small claims courts (i.e., Justice of the Peace Court in Delaware or the equivalent court in your home jurisdiction), provided that the opposing party receives the request within forty-five days of the notice of commencement of arbitration. Any arbitration proceeding shall be stayed pending determinations by the small claims court, including determination of its jurisdiction to address the Claim.

The arbitration shall be administered by the American Arbitration Association, www.adr.org, 950 Warren Avenue, East Providence, Rhode Island, 02914, 1-866-293-4053 (the "Administrator"). The Administrator provides information about arbitration, its arbitration rules and procedures, fee schedule and claims forms at its web site or by mail as set forth above. The arbitration hearing may be conducted in person, by telephone, or based on documents, as appropriate. The Administrator will apply the rules and procedures in effect and applicable to the claim at the time the arbitration is filed. The Claim will be heard before a single arbitrator. The arbitration will not be consolidated with any other arbitration proceedings. The Administrator shall resolve each dispute in accordance with applicable law.

If you commence arbitration, you must provide us the notice required by the Administrator's rules and procedures. The notice may be sent to us at Barclays Bank Delaware, P.O. Box 8801, Wilmington, DE 19899-8801. If we commence arbitration, we will provide you notice at your last known billing address. Any in-person arbitration hearing at which you appear will take place at a location within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16. No class actions, joinder or consolidation of any Claim with a Claim of any other person or entity shall be allowable in arbitration, without the written consent of both you and us. In the event that there is a dispute about whether limiting arbitration of the parties' dispute to non-class proceedings is enforceable under applicable law, then that question shall be resolved by litigation in a court rather than by the arbitrator; and to the extent it is determined that resolution of a Claim shall proceed on a class basis, it shall so proceed in a court of competent jurisdiction rather than in arbitration.

A party can appeal an arbitrator's award pursuant to the AAA's Optional Appellate Arbitration Rules ("Appellate Rules") within 30 days of the date of the issuance of the arbitrator's award issuance. As specified in the Appellate Rules, a party may appeal on the grounds that the arbitrator's award is based on an error of law that is material and prejudicial or that the award is based on determinations of fact that are clearly erroneous. As further specified in the Appellate Rules, the decision by the appellate tribunal shall become the final award for purposes of judicial enforcement proceedings. Any final arbitration award will be binding on the named parties and enforceable by any court having jurisdiction. Judgment upon any arbitration award may be entered in any court having jurisdiction. We will pay, or reimburse you for, all fees or costs to the extent required by law or the rules of the arbitration Administrator. Whether or not required by law or such rules, if you prevail at arbitration on any Claim against us, we will reimburse you for any fees paid to the Administrator in connection with the arbitration proceedings. Under no circumstances will we seek from you payment or reimbursement of any fees that we incur in connection with arbitration. If you are required to advance any fees or costs to the arbitration Administrator, but you ask us to do so in your stead, we will consider and respond to your request.

This arbitration agreement applies to all Claims now in existence or that may arise in the future, and it survives the assignment or termination of the Cardmember Agreement and the Account relationship, including your payment in full, and your filing of bankruptcy or obtaining a discharge in bankruptcy. Nothing in this Agreement shall be construed to prevent any party's use of (or advancement of any claims, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or property interests for contractual debts now or hereafter owed by either party to the other under this Agreement.

### Foreign Currency Conversion.

For Mastercard Cards, we and Mastercard (or their affiliates) will convert transactions in foreign currencies into U.S. Dollars. Mastercard will use their currency conversion procedures that are current at the time of the transaction. Currently, Mastercard selects a rate from the range of rates available in the wholesale currency markets for the applicable central processing date, which rate may vary from the rate Mastercard itself receives, or the government mandated rate in effect for the applicable central processing date. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your Card or Account.

Docusign Envelope ID: 7904FFCE-1049-488B-9584-9C805C5C6094

**For Visa Cards**, we and Visa (or their affiliates) will convert transactions in foreign currencies into U.S. Dollars. Visa will use its currency conversion procedures that are current at the time of the transaction. Currently, Visa selects a rate from the range of rates available in the wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa itself receives, or the government mandated rate in effect for the applicable central processing date. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your Card or Account.

## GOVERNING LAW.

THIS AGREEMENT AND YOUR ACCOUNT WILL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE AND, AS APPLICABLE, FEDERAL LAW.

### YOUR BILLING RIGHTS

*Your Billing Rights: Keep this Document for Future Use*

This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.

*What To Do If You Find A Mistake On Your Statement*

If you think there is an error on your statement, write to us at:

Card Services

P.O. Box 8802

Wilmington, DE 19899-8802.

In your letter, give us the following information:

- *Account Information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors *in writing*. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

*What Will Happen After We Receive Your Letter*

When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.

Docusign Envelope ID: 79D4FFCE-1049-488B-95B4-9C605C6Q6094

2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

While we investigate whether or not there has been an error:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

After we finish our investigation, one of two things will happen:

- *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe there was a mistake:* You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

*Your Rights If You Are Dissatisfied With Your Credit Card Purchases*

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services).
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at:

Docusign Envelope ID: 70D4FFCE-1CVB-45EB-95B4-4C8C6C5C6094

Card Services

P.O. Box 8802

Wilmington, DE 19899-8802.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation: we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

### Information That We Collect & Share About You

Barclays' Privacy Policy is available online at www.BarclaysUS.com. You agree that Wyndham and Barclays may share information about you and your account to administer the Wyndham Rewards Program in conjunction with the Wyndham Rewards Earner® Card.

### Introductory Bonus Offer:

Earn a \$50 statement credit after your first Wyndham timeshare maintenance fee or timeshare loan payment purchase, less credits, returns, and adjustments, within the first 90 days after account open date. The statement credit will be reflected on the billing statement after you have qualified to earn the bonus.

(BO1077

# WYNDHAM REWARDS EARNER® CARD REWARD RULES

This document describes how the Wyndham Rewards Earner® Card Account rewards work and is an agreement between you and Barclays Bank Delaware. You agree that use of your Card Account indicates your acceptance of these Reward Rules. In this document, the following words have special meanings:

- "Barclays", "we", "us", or "our" means Barclays Bank Delaware.
- "Card" means any credit card or account number used to access your Card Account.
- "Card Account" means your Wyndham Rewards Earner® credit card account.
- "Cardmember Agreement" means the agreement that establishes the terms of your Card Account with Barclays that is linked to the Program.
- "Good Standing" means your Card Account is not in default under your Cardmember Agreement.
- "Net Purchases" means purchases made less credits, returns and adjustments.
- "Program" means the Wyndham Rewards Program from Wyndham Rewards, Inc., an indirect subsidiary of Wyndham Hotel Group, LLC, which may be referred to as Wyndham.
- "Reward Rules" means this document which is an agreement between you and Barclays.
- "You", "Your" or "Primary Cardmember" means the person who is responsible for the Card Account and complying with the Reward Rules.
- "Points" are the Program rewards currency earned for transactions made with your Card Account.
- "Wyndham Rewards Member Account" means a Wyndham Rewards Program account as established by Wyndham.

Any terms used within this document that are associated directly with Wyndham and not defined above can be found at WyndhamRewards.com/terms.

Wyndham is solely responsible for establishing the terms and conditions of your participation, Points accumulation, administration, maintenance and redemption in the Program. Terms and conditions of the Program are separate from these Reward Rules and are published by Wyndham at WyndhamRewards.com/terms. Wyndham reserves the right to change the Program, including its terms and conditions, at any time with or without prior notice, including by providing additional terms and conditions in connection with promotional activity related to the Program.

### CARD ACCOUNT REWARD RULES ADMINISTRATION

The Reward Rules are administered by Barclays. We reserve the right to modify, amend or terminate the Reward Rules at any time with or without notice. You can review current Reward Rules any time by logging in to your Card Account at BarclaysUS.com.

Docusign Envelope ID: 75D4FFCE-104S-486B-9584-00608C6C8004

To maintain your eligibility for participation in the Program through the use of your Card Account:

- You must maintain an open Card Account that is in Good Standing.
- You must be an individual and use your Card Account only for personal, family or household expenses (corporations, partnerships, and other entities may not participate).
- If your Wyndham Rewards Member Account is closed, for any reason, your Card Account may be closed.

## PROGRAM MEMBERSHIP

- If your existing Wyndham Rewards Member Account number was included in the application, you are already enrolled in the Program. Points earned through the Card Account will be credited to your Wyndham Rewards Member Account.
- If the Wyndham Rewards Member Account number that you provided is found to be invalid, or you did not provide us with the Wyndham Rewards Member Account number, you consent to and will be enrolled in the Program and a new Wyndham Rewards Member Account number will be assigned to you.
- Only one Wyndham Rewards Member Account number will be applied per Card Account.

## IMPORTANT INFORMATION ABOUT POINTS

- As long as the Program continues and your Card Account is open and in Good Standing, there is no limit to the total Points you can earn using your Card Account.
- You may not earn Points through the use of your Card Account during any period in which your Card Account is past due.
- All Points earned through the use of your Card Account will be transferred to the Primary Cardmember's Wyndham Rewards Member Account after the close of each Card Account billing statement.
- Your Wyndham Rewards Member Account is subject to the Program terms and conditions, published on com/terms, which includes their expiration and forfeiture policies.
- If you do not receive credit for Points earned via purchases made with your Card Account, please contact customer service using the number on the back of your Card.
- You have no property rights or other legal interest in Points. Points earned through the use of your Card Account and not yet transferred to Wyndham, have no cash value or value of any kind. After Points are transferred to Wyndham, please refer to the Program terms and conditions at com/terms for details on the value of Points.
- You are responsible for any tax liability related to Points earned.
- Participation in the Program through the use of your Card Account is subject to all applicable laws and regulations. The sale or barter of any Points offered through the Program, other than by us or Wyndham is expressly prohibited.
- You can view a summary of your Points earned through the use of your Card Account during the billing cycle on your monthly Card Account statement or by logging in to BarclaysUS.com. Your total Points balance is available for review by logging in to your Wyndham Rewards Member Account at com or by calling 866-WYN-RWDS (866-996-7937).
- Barclays is not responsible for adding the Points to your Wyndham Rewards Member Account, for arranging or providing for any goods or services related to the use of Points, for any delay, failure, or refusal by Wyndham to add or redeem Points, or for any decision by Wyndham to revoke or cancel Points or membership in the Program. Once we transfer Points earned through the use of your Card Account after the close of each Card Account billing cycle, Wyndham is responsible for adding the Points to your Wyndham Rewards Member Account.

## EARNING POINTS

You earn Points for Net Purchases made by you and/or any authorized user(s) of your Card Account as follows:

### 5x on Participating Hotels by Wyndham and Gas Purchases

- You earn 5 Points for every $1 spent on eligible Net Purchases made with your Card Account at participating Hotels by Wyndham ("Hotels by Wyndham") (e.g., those purchases that appear on your folio for the stay). Echo Suites℠ Extended Stay by Wyndham hotels do not participate in the Wyndham Rewards Program; stays and purchases made at such hotels are ineligible for the benefits described in this advertisement. For more information, please call Wyndham Rewards Member Services at 866-WYN-RWDS (866-996-7937).
- You earn 5 Points for every $1 spent on eligible Net Purchases made with your Card Account on gas. Qualifying gas purchases are defined as automated fuel dispensers and service stations, as identified by the merchant category codes.

DocuSign Envelope ID: 76D4FFCE-1049-4668-95BA-9C608C5C3094

## 2x on Wyndham Destinations, Dining and Grocery Store Purchases

- You earn 2 Points for every $1 spent on eligible Net Purchases made with your Card Account at participating Club Wyndham®, WorldMark® by Wyndham and Shell Vacations Club® properties (e.g., those purchases that appear on your folio for the stay); on eligible maintenance fee payments related to Club Wyndham, WorldMark by Wyndham and Shell Vacations Club accounts; and on eligible timeshare loan payments to Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Shell Vacations, LLC, and related developer affiliates and partners. For more information on Wyndham Destinations, including an overview of resorts, please visit WyndhamDestinations.com.

- You earn 2 Points for every $1 spent on eligible Net Purchases made with your Card Account on dining and grocery stores (excluding Target® and Walmart®). Qualifying dining purchases are defined as: Restaurants and Fast Food restaurants, as identified by the merchant category codes. Qualifying grocery store purchases are defined as grocery stores, as identified by the merchant category codes, excluding Target® and Walmart®. Please note some merchants that sell grocery items are not included in this category. For example, warehouse clubs, drug stores, discount stores and merchants that sell a limited number of grocery items are not included.

## 1x on all other Purchases

- You earn 1 Point for every $1 spent on all other Net Purchases made with your Card Account (excluding timeshare down payment purchases to Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Shell Vacations, LLC, and related developer affiliates and partners).

Points earned on Net Purchases will be posted to the Primary Cardmember's Wyndham Rewards Member Account 4-6 weeks following earning activity.

Purchases must be submitted by merchants using the merchant category codes (and merchant identifiers) for purchases in the above-specified categories to qualify for the additional Points. Barclays and Wyndham Rewards Inc. are not responsible for incorrectly coded purchases. Additional Points may not be earned if the merchant submits the purchase using a mobile or wireless card reader or if you use a mobile or digital wallet to pay for the purchase. Additionally, purchases made through third parties, including online marketplaces and resellers, or using a third-party payment account will not earn additional Points.

Balance transfers, cash advances (including cash equivalent transactions such as, but not limited to, the use of your Card Account to obtain money orders, traveler's checks, foreign currency, peer to peer payment app transactions and lottery tickets), fees, interest charges and unauthorized/fraudulent purchases are not considered Net Purchases and do not earn Points.

## BONUS OFFER

From time to time, we may offer bonuses of Points or other incentives to cardmembers. You will be provided details when offered. Bonus offer details become part of your Reward Rules.

## INTRODUCTORY BONUS OFFER

Your credit offer may contain additional information about qualifying events, exclusions, and restrictions. That information can be found by logging in to your Card Account online and visiting the Rewards and Benefits section or calling the number on the back of your Card. These bonuses and/or incentives are intended for applicants who are not and have not previously been Wyndham Rewards Earner® cardmembers. You understand and agree that you may no longer be eligible for any bonuses and/or incentives in connection with a new Wyndham Rewards Earner® Card Account after this Card Account is opened. If you receive a bonus or incentive for which you are not eligible due to your status as a current or former Wyndham Rewards Earner® cardmember, we may revoke the bonus or incentive, or reduce your Points by the amount of the bonus or incentive or charge your Card Account for the fair value of the bonus or incentive, at our sole discretion.

## POINTS REDEMPTIONS

Wyndham manages the Program including redemption. You can obtain information regarding the redemption options available by calling 866-WYN-RWDS (866-996-7937) or online at WyndhamRewards.com.

Docusign Envelope ID: 7904FFCE-1049-456B-9584-8C6000C9C1091

## POINTS FORFEITURE

If your Card Account is closed for any of the following reasons, your Points earned during that billing cycle but not yet transferred to Wyndham will be forfeited and/or we may request that Wyndham make corresponding adjustments to or invalidate Points earned through the use of your Card Account and transferred to your Wyndham Rewards Member Account if based upon:

- You or any authorized user(s) on the Card Account engage in any fraudulent or illegal activity through the use of your Card Account, as determined by us at our sole discretion.
- You or any authorized user(s) on the Card Account engage in any activity that is deemed to be abusive or gaming conduct, as determined by us at our sole discretion. Abusive or gaming activity includes, but is not limited to, obtaining or using a Card Account to maximize rewards earned in a manner that is not consistent with typical consumer activity and/or multiple credit card account applications/openings, as determined by us at our sole discretion.
- Your history of Card Account usage.

## ADDITIONAL BENEFITS OF YOUR CARD ACCOUNT

### Wyndham Membership Level Benefits

The Primary Cardmember will receive Wyndham Rewards Gold Level in his or her Wyndham Rewards Program membership. This benefit is not available to authorized users through the Wyndham Rewards Earner® Card. Please allow 2-8 weeks after Card Account opening for this update to be made to the Primary Cardmember's Wyndham Rewards Program membership. Subject to the Wyndham Rewards Terms & Conditions, the Primary Cardmember will continue to receive Wyndham Rewards Gold Level through the Wyndham Rewards Earner® Card as long as the Card Account is open and in Good Standing. You can achieve other Wyndham Rewards Program levels by meeting Wyndham Rewards Program eligibility requirements. Wyndham reserves the right to change or cancel the member level program and benefits at any time with or without notice. For details on the Terms and Conditions of the Wyndham Rewards Program levels and benefits, please visit WyndhamRewards.com/levels.

### Anniversary Bonus Points

You will earn 7,500 bonus Points if you spend $15,000 in Net Purchases (excluding timeshare down payment purchases to Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Shell Vacations, LLC, and related developer affiliates and partners) each anniversary year. The bonus will be reflected on the billing cycle date of the month after your Card Account anniversary month. Please allow 8-12 weeks for bonus Points to be added into your Program account after the qualifying purchase(s) have posted to your Card Account. Each year, your spend will start over and will go through and include your cycle following your anniversary month. This offer may be canceled at any time without notice.

This benefit may not be achievable based on the assigned credit line and ability to maintain that credit line.

### Cardmember Redemption Discount

You will receive a 10% redemption discount when redeeming Wyndham Rewards Points for Go Free® Award Nights. For more information on this redemption discount, visit WyndhamRewards.com/terms/cardmembergofree for additional details.

### Wyndham Rewards Cardmember Rate

You will receive an additional discount when booking the Wyndham Rewards Member Rate at participating properties. For more information, please visit WyndhamRewards.com/terms/cardmemberrate for additional details.

## RESPONSIBILITY OF THE PARTIES/INFORMATION SHARING/PRIVACY POLICY

Barclays has no authority regarding the Program and is not responsible for any goods or services offered by Wyndham. You authorize Barclays to share information about your Card Account with Wyndham and its affiliates and authorize Wyndham to share information about your Program membership, to the extent needed to administer the Program and your Card Account. You also agree that Barclays may share Card Account information as set forth in Barclays Privacy Policy. The Privacy Policy for Barclays is available online at BarclaysUS.com. Wyndham is not a party to the Cardmember Agreement between you and Barclays, does not participate in any extension of credit, has no authority regarding your Card Account and is not responsible for any goods or services offered by Barclays. For details on how Wyndham may use your information, please see the terms and conditions of the Program at WyndhamRewards.com/terms.

## LIMITATION AND RELEASE OF LIABILITY

By participating in the Program through the use of your Card Account and accepting and using Points , and other benefits earned through the use of your Card Account, you (on your behalf and on behalf of any person to whom you give the benefits from the Program through the use of your Card Account) release, discharge and hold harmless

Docusign Envelope ID: 79D4FFCE-1049-485B-9684-9D80SC5C6094

Barclays, Wyndham and their respective parent companies, subsidiaries, affiliates, agents, administrators, employees, officers, directors, successors and assignees from all claims, damages or liability including, but not limited to, physical injury or death, arising out of participation in the Program through the use of your Card Account or travel taken or use of products purchased in connection with the Program through the use of your Card Account. Barclays has no liability in case of disagreement over issuance of Points, items received through redemptions, or a cardmember's right to redeem or possess Points..

## IMPORTANT GENERAL DISCLOSURES

Barclays reserves the right to correct inaccurate Points values represented on statements, our website and/or our mobile app, at our sole discretion. We may, at our sole discretion, cancel, modify, restrict, or terminate the Card Account Reward Rules or any aspects or features of the Card Account Reward Rules at any time without prior notice. All interpretations of the Card Account Reward Rules shall be at our sole discretion. Other significant terms may apply. All trademarks and service marks belong to their respective owners. Barclays is not responsible for typographical errors or omissions in this document, website, mobile app, or any marketing materials. Points earned through the use of your Card Account cannot be combined with other discounts or reward programs unless specifically authorized by us or Wyndham.

Wyndham, Wyndham Rewards Earner® Card and Wyndham Rewards Program are trademarks of Wyndham Hotels & Resorts, Inc. The Wyndham Rewards Earner® Card is issued by Barclays Bank Delaware pursuant to a license by Visa U.S.A. Inc. Visa is a registered trademark under license from Visa U.S.A. Inc.

## CUSTOMER SERVICE

If you have any questions about your Card Account, please contact customer service using the phone number on the back of your Card.

©2024 Barclays Bank Delaware. Member FDIC.

WYD-10/2023

BAR-9464-5

FDIC

Close

Docusign Envelope ID: 79D4FFCE-104E-488B-96B4-6C80SC5C9094



### Wyndham Rewards Earner Credit Card Approval Response

*Application Date & Time:*
08/17/2024 03:54 PM EDT

*ACS ID:*
14854477

*Barclay's Application ID:*
300000097844557

*Approved Credit Limit Amount:*
$23,000

*Response:*
Approved

**Customer Information**

*First Name:*
Sandra

*Last Name:*
Leslie

*Street Address:*
425 crossbow dr

*City:*
Maineville

*State:*
Ohio

*Zip Code:*
45039

**Merchant Information**

*Entity Name:*
Wyndham Vacation Resorts

*Location:*
00291 PIGEON FORGE THE ISLAND

Docusign Envelope ID: 79D4FFCE-1040-488B-95B4-9C809C5C6094

### Credit Card Cardmember Account Summary Initial Disclosure

The Credit Card Cardmember Agreement with full Terms and Conditions will arrive with your Wyndham Rewards Earner Card.

Communications are generally available only in English unless otherwise specifically noted. Spanish-speaking customer service is available.

| Interest Rates and Interest Charges | |
|---|---|
| Annual Percentage Rate (APR) for Purchases | **20.99%**<br><br>This APR will vary with the market based on the Prime Rate.<br><br>For your Initial Qualifying Wyndham Timeshare Purchase[1] (see below) that posts to your account within 30 days of account opening, **0%** introductory APR for the first 9 billing cycles from the transaction date. After that, your APR will be **20.99%**. This APR will vary with the market based on the Prime Rate. For any Qualifying Wyndham Timeshare Purchases[1] (see below) that post to your account after the first 30 days of account opening, **0%** promotional APR for 8 billing cycles from the transaction date. After that, your APR will be **20.99%**. This APR will vary with the market based on the Prime Rate. |
| APR for Balance Transfers | 0% introductory APR for the first fifteen billing cycles following each balance transfer that posts to your account within 45 days of account opening.<br><br>After that, (and for balance transfers that do not post within 45 days of account opening) your APR will be **20.99%**. This APR will vary with the market based on the Prime Rate. |
| APR for Cash Advances | 29.99%<br><br>This APR will vary with the market based on the Prime Rate. |
| Paying Interest | Your due date is at least 23 days after the close of each billing cycle. We will not charge you interest on purchases if you pay your entire balance by the due date each month. We will begin charging interest on balance transfers and cash advances on the transactional date. |
| Minimum Interest Charge | If you are charged interest, the charge will be no less than $0.50 |
| For Credit Card Tips from the Consumer Financial Protection Bureau | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore. |

Docusign Envelope ID: 73D4FFCE-1049-4B5B-95B4-9C609C9C6094

| Fees | |
|---|---|
| Annual Fee | $0 |
| Transaction Fees: | |
| • Balance Transfer | Either $5 or 5% of the amount of each transfer, whichever is greater. |
| • Cash Advance | Either $10 or 5% of the amount of each cash advance, whichever is greater. |
| • Foreign Transaction | 0% of each transaction in U.S. dollars. |
| Penalty Fees: | |
| • Late Payment | Up to $40 |
| • Returned Payment | Up to $40 |

**How We Will Calculate Your Balance:** We use a method called "daily balance (including new purchases)". See your Cardmember Agreement for more details.

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided in your Cardmember Agreement.

CARDMEMBER AGREEMENT

Introduction.

This Agreement and your Cardmember Agreement establish the terms of your credit card Account ("Account") with Barclays Bank Delaware, Wilmington, Delaware. Please review all such documents carefully and keep with your records. All extensions of credit in connection with your Account are being made by Barclays Bank Delaware in Wilmington, Delaware.

Using Your Account/Acceptance of These Terms.

You do not need to accept the Account and this Agreement and none of the fees on this Account (except as otherwise provided herein) will apply unless you use the Account. If your Account has an Annual Fee (see the Account Summary Table to determine if this Account has an Annual Fee) and provided that you have not otherwise used the Account to

DocuSign Envelope ID: 7E34FFC5-104A-4BE3-8384-9D605C8C8994

make a Purchase, Balance Transfer or Cash Advance or paid the Annual Fee, you may close the Account within thirty days after Account opening by contacting us at the number on the back of your Card, and if you do, you will not be responsible for paying the Annual Fee. By signing, keeping, using or otherwise accepting your Card or Account, you agree to the terms and conditions of this Agreement. You may obtain credit in the form of Purchases, Balance Transfers and Cash Advances by using your Card, your account number, Checks, or other credit devices. You agree that we may credit your Account rather than issue cash refunds when you reverse transactions that were originally charged to your Account. You agree that you will not use your Card or Account in connection with any transaction that is prohibited or unenforceable and that if you do engage in such a transaction you waive any claim that the charge is uncollectible on the grounds the transaction was prohibited or unenforceable. The Card must be returned to us upon request. We may replace your Card with another Card at anytime.

### Definitions.

If we use a capitalized term in this document but we do not define the term in this document, the term has the meaning as used in your monthly statement.

"You" and "your" refer to each person who has applied for, accepted, or used the Account and each person who has agreed to be responsible for the Account.

"We", "us" and "our" refer to Barclays Bank Delaware ("Barclays")

¹Qualifying Wyndham Timeshare Purchase means all Wyndham timeshare down payment purchases made with this credit card account as determined by the merchant identification number provided by Wyndham.

### Easy Pay Promotional Offers.

From time to time we may, at our option, make certain special promotional offers available for certain types of Purchases ("Easy Pay Offers"). Details of the APR and the promotional repayment terms for any available Easy Pay Offer will be described in the specific offer. For Easy Pay Offers, the minimum payments during the Easy Pay Offer term are designed to pay the promotional balance in full at the end of the promotional repayment term if on-time payments are made. Payments are calculated by adding the promotional Purchase balance at the time the Purchase is enrolled in the Easy Pay Offer (each an "Easy Pay Balance") and the amount of projected interest that would accrue on the Easy Pay Balance during the promotional repayment term at the applicable APR if only on-time minimum payments are made. This amount is then divided by the number of months in the promotional period and rounded up to the next dollar (each an "Easy Pay Payment Amount").

Enrollment of the eligible Purchase in the Easy Pay Offer may take up to 24 to 72 hours after you have accepted the Easy Pay Offer. Prior to enrollment the then current non-promotional APR may be applied to the applicable purchase from the transaction date until the actual enrollment date if in that billing cycle you incur interest charges on Purchases.

If you do not make each required Easy Pay Payment Amount on time during the repayment period and/or there is a remaining Easy Pay Balance at the end of the promotional term, this remaining balance will become part of the Principal Balance and will (i) become subject to the then current non-promotional APR for Purchases on the Account and (ii) be subject to the non-Easy Pay Offer Minimum Payment Due calculation applicable to the Principal Balance described in "Your Minimum Payment Each Month". The then current non-promotional APR will be applied to the remaining Easy Pay Balance amount on the first day of the next billing cycle after expiration of the Easy Pay promotion on any remaining balance. If you accept an Easy Pay Offer, you acknowledge and agree that the specific terms of the Easy Pay Offer will modify and become part of this Agreement, and all other terms and conditions of this Agreement will apply to the Easy Pay Offer.

### Variable Rate Information

The standard Annual Percentage Rates (APRs) on your Account that are used to determine the amount of interest he

Docusign Envelope ID: 79D4FPCE-1M3-4888-3EB4-8C6c6CSO604

be charged for Purchases, Balance Transfers, and Cash Advances are variable rates. The APRs on your Account correspond to daily periodic rates ("DPR") and are calculated by multiplying the applicable DPR by 365. The DPRs on your Account equal 1/365th of the sum of 1) the applicable Prime Rate, 2) plus 12.49% for Purchases (Maximum APR 29.99%), plus 12.49% for Balance Transfers (Maximum APR 29.99%); and plus 22.99% for Cash Advances (Maximum APR 29.99%). The "Prime Rate" used in determining the APRs in each billing cycle will be the highest rate published in the Money Rates column of *The Wall Street Journal* on the last business day of each month. An increase or decrease in the Prime Rate will cause a corresponding increase or decrease to your variable rates on the first day of the billing cycle that begins in the same month in which the applicable Prime Rate is published. Any such increase or decrease will cause a corresponding increase or decrease in the amount of interest assessed and possibly in the amount of the Minimum Payment Due. If *The Wall Street Journal* does not publish the U.S. Prime Rate, or if it changes the definition of the U.S. Prime Rate, we may substitute another index.

**The current rates on your Account.**

The DPR for all Wyndham Timeshare Purchases during its introductory period is 0.00% (which corresponds to an introductory APR of 0%). See below for the DPR and APR that will apply to any outstanding remaining Wyndham Timeshare Purchases balance at the end of the introductory period (see above for the term of the introductory period).

As of 08/28/2024 the Prime Rate was 8.5%. The DPR for all other Purchases (and the DPR for the Wyndham Timeshare Purchases at the end of the introductory period), would have been 0.0575% (which corresponds to an APR of 20.99%). The DPR for Balance Transfers would have been 0.0575% (which corresponds to an APR of 20.99%). The DPR for Cash Advances would have been 0.0822% (which corresponds to an APR of 29.99%).

**Military Lending Act Protections.**

Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: The costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account). To receive this information and a description of your payment obligation orally, please call 866-540-9074.

If you are covered by the Military Lending Act, then notwithstanding anything to the contrary in this agreement, to the extent required by the Military Lending Act, nothing in this agreement will be deemed a waiver of the right to legal recourse under any otherwise applicable provision of state or federal law.

**How We Will Calculate Interest.**

We use a method called "daily balance (including new purchases)." We calculate interest separately for each "Balance Subject to Interest Rate." These include for example, Purchases at the current rate, Balance Transfers at the current rate, Cash Advances at the current rate, and different promotional balances. Your monthly billing statement shows each "Balance Subject to Interest Rate."

Docusign Envelope ID: 78D4FFC4-104V-4BE0-95B4-8C4C5C9C6254

To calculate interest, we first calculate a daily balance for each Balance Subject to Interest Rate. We start with the balance for that Balance Subject to Interest Rate, as of the end of the previous day. We add any interest calculated on the previous day's balance. (This means interest is compounded daily). We add any new Purchases, Balance Transfers or Cash Advances to the appropriate balance, subtract any new payments or credits from the appropriate balance, and make other adjustments. A credit balance is treated as a balance of zero. We then multiply each daily balance by the applicable DPR. We do this for each day in the billing period. That gives us the daily interest. We add up all the daily interest for all of the daily balances to get the total interest for the billing period.

### Accrual of Interest and How to Avoid Paying Interest on Purchases.

On Purchases, interest begins to accrue as of the transaction date. However, you can avoid paying interest on Purchases in any given billing cycle if you pay your Statement Balance in full by the Payment Due Date. For Balance Transfers, interest will accrue from the transaction date which generally will be the day we send the Balance Transfer to the payee. For Checks, interest will accrue from the transaction date which generally will be the day the payee accepts the Check. For Cash Advances, interest will accrue from the transaction date which generally will be the day you take the Cash Advance. If you are charged interest in a billing cycle, we will charge a Minimum Interest Charge (or "Minimum Charge") on your Account if the total interest charge in that billing cycle is less than the amount of the Minimum Interest Charge that is disclosed in the Account Summary Table.

If you have a promotional APR offer(s) on your Account, you can avoid paying interest on non-promotional Purchases if you pay, by the Payment Due Date, the amount that equals your Easy Pay Payment Amount(s) plus your Statement Balance, minus any promotional Balance Transfer balance or special category Purchase (such as an Easy Pay Balance) with a reduced APR, and minus any Deferred Financing Purchase during all but the last billing period of the promotional period. If one or more of the balances on your Account is subject to one of these promotional APR offers, this will be more fully explained on your monthly Statement.

### Transaction Fees.

If you use your Card or Account to obtain a Cash Advance, we will charge a Cash Advance Fee for each such Cash Advance. If you use your Card or Account to make a Balance Transfer, we will charge a Balance Transfer Fee for each such Balance Transfer. If you use your Card or Account to purchase Cash Equivalents, we will charge a Cash Advance Fee (sometimes we may refer to this as a Cash Equivalent Fee) for each such transaction. If you use your Card or Account for a Foreign Transaction, we will charge a Foreign Transaction Fee for each such transaction. Balance Transfer Checks and Cash Advance Checks are subject to the same Transaction Fees as Balance Transfers and Cash Advances, respectively. The present amounts of those charges are stated in the Account Summary Table.

### Account Fees.

In addition to the fees listed in the Account Summary Table, we may also assess the Account Fees listed below.

### Annual Fee.

If your Account has an Annual Fee, generally it will be billed at account opening and every twelve months thereafter. The amount of the Annual Fee, if there is one on your Account, is listed in the Account Summary Table.

### Late Payment Fee – If we do not receive a payment from you in at least the amount of your Minimum Payment Due by the Payment Due Date shown on your monthly statement, we may charge you a Late Payment Fee. The amount of the Late Payment Fee will be determined in accordance with applicable law. Thus, the fee generally will not exceed the amount of the applicable Minimum Payment Due. In addition, this fee will not exceed $40. If you have not been assessed a late fee in the 6 preceding billing cycles, this fee will not exceed $29.

Document Envelope ID: 790417CE-1041-4605-95D4-5C365CC23064

**Returned Payment Fee** – If your bank does not honor a check or direct debit you deliver to us, or we must return a check because it is not signed or is otherwise irregular, we may charge you a Returned Payment Fee. The amount of the Returned Payment Fee will be determined in accordance with applicable law. Thus, the fee generally will not exceed the amount of the applicable Minimum Payment Due. In addition, this fee will not exceed $40. If you have not been assessed a returned payment fee in the 6 preceding billing cycles, this fee will not exceed $29.

**Returned Check Fee** – If we return a Convenience Check (which includes a Balance Transfer Check or Cash Advance Check) unpaid because it exceeds your available credit line or the time it is processed, your Account is closed or otherwise does not have charging privileges, you did not comply with our instructions regarding the Check or your Account is past due, we may charge you a Returned Check Fee. The amount of the Returned Check Fee will be determined in accordance with applicable law. Thus, the fee generally will not exceed the amount of the returned Convenience Check. In addition, this fee will not exceed $40. If you have not been assessed a returned check fee in the 6 preceding billing cycles, this fee will not exceed $29.

**Check Stop Payment Fee**–If we stop payment on a Convenience Check at your request, we may charge you a Check Stop Payment Fee of $39.95.

## ARBITRATION.
### THIS ARBITRATION PROVISION DOES NOT APPLY TO YOU IF YOU ARE SUBJECT TO THE PROTECTIONS OF THE MILITARY LENDING ACT.

This arbitration provision provides for binding arbitration of all Claims by either you or us against the other if either you or we choose to refer the Claim to arbitration. The terms "you," "we," and "us" are defined below for purposes of this arbitration provision. A "Claim" covered by this provision is any claim, dispute or controversy by either you or us against the other, arising from or relating in any way to this Agreement, your Account, any transaction or activity on your Account, our relationship, products or services provided by us or a third party in connection with this Agreement or your Account, including (without limitation) claims, disputes, or controversies based on contract, tort (including intentional torts), fraud, agency, negligence, statutory or regulatory provisions or any other source of law and (except as otherwise specifically provided in this Agreement). All issues shall be for the arbitrator to decide, except issues related to the scope, enforceability, interpretation, or formation of this arbitration agreement, which shall be for the court to decide. For purposes of this arbitration provision, "you" includes yourself, any authorized user on the Account and any of your agents, beneficiaries or assigns, or anyone acting on behalf of the foregoing, and "we" or "us" includes our employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns, and to the extent included in a proceeding in which Barclays is a party, Barclays' service providers and marketing partners.

In arbitration, a neutral arbitrator—not a judge or a jury—decides whether to award relief. Procedures are also simpler in arbitration than in court. For example, discovery is more limited. Review of the arbitrator's decision by appeal is also limited (as described below in this arbitration provision). You and we agree that all Claims must be arbitrated on an individual basis between you and us, and not on a class, representative, or any other kind of collective basis. As a result, class actions and other representative or collective basis proceedings are not available for resolution of Claims. Apart from Claims arising from the same Account, no claims may be joined together in the arbitration. The arbitrator shall not have any authority to entertain a claim, or to award any relief, on behalf of or against anyone other than a named party to the arbitration proceeding.

**TO BE CLEAR, ARBITRATION WITH RESPECT TO A CLAIM IS BINDING AND NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT. IN ARBITRATION YOU AND WE WILL NOT HAVE THE RIGHTS THAT ARE PROVIDED IN COURT INCLUDING THE RIGHT TO A TRIAL BY JUDGE OR JURY AND THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN PROCEEDINGS BROUGHT BY OTHERS SUCH AS CLASS ACTIONS OR SIMILAR PROCEEDINGS. IN ADDITION, THE RIGHT TO DISCOVERY AND THE RIGHT TO APPEAL ARE ALSO LIMITED OR ELIMINATED BY ARBITRATION. ALL OF THESE RIGHTS ARE WAIVED AND ALL CLAIMS MUST BE RESOLVED THROUGH ARBITRATION.**

If any Claim is advanced in a court, arbitration may be elected under this provision instead, and the right to elect arbitration shall not be deemed to have been waived if the election is made at any time before commencement of trial. Alternatively, you or we may pursue a Claim within the jurisdiction of the Justice of the Peace Court in Delaware, or the

Docusign Envelope ID: 78D4F9CE-1D49-4869-2854-8C005C0C8394

equivalent court in your home jurisdiction, provided that the action remains in that court, is made on behalf of or against you only and is not made part of a class action, private attorney general action or other representative or collective action. You and we agree to honor a request by the other to remove an action to these small claims courts (i.e., Justice of the Peace Court in Delaware or the equivalent court in your home jurisdiction), provided that the opposing party receives the request within forty-five days of the notice of commencement of arbitration. Any arbitration proceeding shall be stayed pending determinations by the small claims court, including determination of its jurisdiction to address the Claim.

The arbitration shall be administered by the American Arbitration Association, www.adr.org, 950 Warren Avenue, East Providence, Rhode Island, 02914, 1-866-293-4053 (the "Administrator"). The Administrator provides information about arbitration, its arbitration rules and procedures, fee schedule and claims forms at its web site or by mail as set forth above. The arbitration hearing may be conducted in person, by telephone, or based on documents, as appropriate. The Administrator will apply the rules and procedures in effect and applicable to the claim at the time the arbitration is filed. The Claim will be heard before a single arbitrator. The arbitration will not be consolidated with any other arbitration proceedings. The Administrator shall resolve each dispute in accordance with applicable law.

If you commence arbitration, you must provide us the notice required by the Administrator's rules and procedures. The notice may be sent to us at Barclays Bank Delaware, P.O. Box 8801, Wilmington, DE 19899-8801. If we commence arbitration, we will provide you notice at your last known billing address. Any in-person arbitration hearing at which you appear will take place at a location within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16. No class actions, joinder or consolidation of any Claim with a Claim of any other person or entity shall be allowable in arbitration, without the written consent of both you and us. In the event that there is a dispute about whether limiting arbitration of the parties' dispute to non-class proceedings is enforceable under applicable law, then that question shall be resolved by litigation in a court rather than by the arbitrator; and to the extent it is determined that resolution of a Claim shall proceed on a class basis, it shall so proceed in a court of competent jurisdiction rather than in arbitration.

A party can appeal an arbitrator's award pursuant to the AAA's Optional Appellate Arbitration Rules ("Appellate Rules") within 30 days of the date of the issuance of the arbitrator's award issuance. As specified in the Appellate Rules, a party may appeal on the grounds that the arbitrator's award is based on an error of law that is material and prejudicial or that the award is based on determinations of fact that are clearly erroneous. As further specified in the Appellate Rules, the decision by the appellate tribunal shall become the final award for purposes of judicial enforcement proceedings. Any final arbitration award will be binding on the named parties and enforceable by any court having jurisdiction. Judgment upon any arbitration award may be entered in any court having jurisdiction. We will pay, or reimburse you for, all fees or costs to the extent required by law or the rules of the arbitration Administrator. Whether or not required by law or such rules, if you prevail at arbitration on any Claim against us, we will reimburse you for any fees paid to the Administrator in connection with the arbitration proceedings. Under no circumstances will we seek from you payment of reimbursement of any fees that we incur in connection with arbitration. If you are required to advance any fees or costs to the arbitration Administrator, but you ask us to do so in your stead, we will consider and respond to your request.

This arbitration agreement applies to all Claims now in existence or that may arise in the future, and it survives the assignment or termination of the Cardmember Agreement and the Account relationship, including your payment in full and your filing of bankruptcy or obtaining a discharge in bankruptcy. Nothing in this Agreement shall be construed to prevent any party's use of (or advancement of any claims, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or property interests for contractual debts now or hereafter owed by either party to the other under this Agreement.

### Foreign Currency Conversion.

For Mastercard Cards, we and Mastercard (or their affiliates) will convert transactions in foreign currencies into U.S. Dollars. Mastercard will use their currency conversion procedures that are current at the time of the transaction. Currently, Mastercard selects a rate from the range of rates available in the wholesale currency markets for the applicable central processing date, which rate may vary from the rate Mastercard itself receives, or the government mandated rate in effect for the applicable central processing date. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your Card or Account.

Docusign Envelope ID: 75D4FFCE-1049-466B-85B4-2C605C5C6094

**For Visa Cards**, we and Visa (or their affiliates) will convert transactions in foreign currencies into U.S. Dollars. Visa will use its currency conversion procedures that are current at the time of the transaction. Currently, Visa selects a rate from the range of rates available in the wholesale currency markets for the applicable central processing date, which rate may vary from the rate Visa itself receives, or the government mandated rate in effect for the applicable central processing date. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your Card or Account.

**GOVERNING LAW.**

THIS AGREEMENT AND YOUR ACCOUNT WILL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE AND, AS APPLICABLE, FEDERAL LAW.

## YOUR BILLING RIGHTS

*Your Billing Rights: Keep this Document for Future Use*

This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.

### What To Do If You Find A Mistake On Your Statement

If you think there is an error on your statement, write to us at:

Card Services

P.O. Box 8802

Wilmington, DE 19899-8802.

In your letter, give us the following information:

- *Account information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors *in writing*. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

### What Will Happen After We Receive Your Letter

When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.

Docusign Envelope ID: 79D4FFCE-1049-486B-9B84-9C605C6C6094

2.   Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

While we investigate whether or not there has been an error:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

After we finish our investigation, one of two things will happen:

- *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe there was a mistake:* You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within *10 days* telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

### *Your Rights if You Are Dissatisfied With Your Credit Card Purchases*

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services).
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at:

DocuSign Envelope ID: 75D47FCE-1049-4885-92B4-4C600C5C00M1

Card Services
P.O. Box 8802
Wilmington, DE 19899-8802.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

### Information That We Collect & Share About You.

Barclays' Privacy Policy is available online at www.BarclaysUS.com. You agree that Wyndham and Barclays may share information about you and your account to administer the Wyndham Rewards Program in conjunction with the Wyndham Rewards Earner® Card.

### Introductory Bonus Offer:

Earn a $50 statement credit after your first Wyndham timeshare maintenance fee or timeshare loan payment purchase, less credits, returns, and adjustments, within the first 90 days after account open date. The statement credit will be reflected on the billing statement after you have qualified to earn the bonus.

IBCr1077

# WYNDHAM REWARDS EARNER® CARD REWARD RULES

This document describes how the Wyndham Rewards Earner® Card Account rewards work and is an agreement between you and Barclays Bank Delaware. You agree that use of your Card Account indicates your acceptance of these Reward Rules. In this document, the following words have special meanings.

- "Barclays", "we", "us", or "our" means Barclays Bank Delaware.
- "Card" means any credit card or account number used to access your Card Account.
- "Card Account" means your Wyndham Rewards Earner® credit card account.
- "Cardmember Agreement" means the agreement that establishes the terms of your Card Account with Barclays that is linked to the Program.
- "Good Standing" means your Card Account is not in default under your Cardmember Agreement.
- "Net Purchases" means purchases made less credits, returns and adjustments.
- "Program" means the Wyndham Rewards Program from Wyndham Rewards, Inc., an indirect subsidiary of Wyndham Hotel Group, LLC, which may be referred to as Wyndham.
- "Reward Rules" means this document which is an agreement between you and Barclays.
- "You", "Your" or "Primary Cardmember" means the person who is responsible for the Card Account and complying with the Reward Rules.
- "Points" are the Program rewards currency earned for transactions made with your Card Account.
- "Wyndham Rewards Member Account" means a Wyndham Rewards Program account as established by Wyndham.

Any terms used within this document that are associated directly with Wyndham and not defined above can be found at WyndhamRewards.com/terms.

Wyndham is solely responsible for establishing the terms and conditions of your participation, Points accumulation, administration, maintenance and redemption in the Program. Terms and conditions of the Program are separate from these Reward Rules and are published by Wyndham at WyndhamRewards.com/terms. Wyndham reserves the right to change the Program, including its terms and conditions, at any time with or without prior notice, including by providing additional terms and conditions in connection with promotional activity related to the Program.

### CARD ACCOUNT REWARD RULES ADMINISTRATION

The Reward Rules are administered by Barclays. We reserve the right to modify, amend or terminate the Reward Rules at any time with or without notice. You can review current Reward Rules any time by logging in to your Card Account at BarclaysUS.com.

Docusign Envelope ID: 79D4FFCE-1048-4668-8584-9C003C1C609A

To maintain your eligibility for participation in the Program through the use of your Card Account:

- You must maintain an open Card Account that is in Good Standing.
- You must be an individual and use your Card Account only for personal, family or household expenses (corporations, partnerships, and other entities may not participate).
- If your Wyndham Rewards Member Account is closed, for any reason, your Card Account may be closed.

## PROGRAM MEMBERSHIP

- If your existing Wyndham Rewards Member Account number was included in the application, you are already enrolled in the Program. Points earned through the Card Account will be credited to your Wyndham Rewards Member Account.
- If the Wyndham Rewards Member Account number that you provided is found to be invalid, or you did not provide us with the Wyndham Rewards Member Account number, you consent to and will be enrolled in the Program and a new Wyndham Rewards Member Account number will be assigned to you.
- Only one Wyndham Rewards Member Account number will be applied per Card Account.

## IMPORTANT INFORMATION ABOUT POINTS

- As long as the Program continues and your Card Account is open and in Good Standing, there is no limit to the total Points you can earn using your Card Account.
- You may not earn Points through the use of your Card Account during any period in which your Card Account is past due.
- All Points earned through the use of your Card Account will be transferred to the Primary Cardmember's Wyndham Rewards Member Account after the close of each Card Account billing statement.
- Your Wyndham Rewards Member Account is subject to the Program terms and conditions, published at com/terms, which includes their expiration and forfeiture policies.
- If you do not receive credit for Points earned via purchases made with your Card Account, please contact customer service using the number on the back of your Card.
- You have no property rights or other legal interest in Points. Points earned through the use of your Card Account and not yet transferred to Wyndham, have no cash value or value of any kind. After Points are transferred to Wyndham, please refer to the Program terms and conditions at com/terms for details on the value of Points.
- You are responsible for any tax liability related to Points earned.
- Participation in the Program through the use of your Card Account is subject to all applicable laws and regulations. The sale or barter of any Points offered through the Program, other than by us or Wyndham is expressly prohibited.
- You can view a summary of your Points earned through the use of your Card Account during the billing cycle on your monthly Card Account statement or by logging in to BarclaysUS.com. Your total Points balance is available for review by logging in to your Wyndham Rewards Member Account at com or by calling 866-WYN-RWDS (866-996-7937).
- Barclays is not responsible for adding the Points in your Wyndham Rewards Member Account, for arranging or providing for any goods or services related to the use of Points, for any delay, failure, or refusal by Wyndham to add or redeem Points, or for any decision by Wyndham to revoke or cancel Points or membership in the Program. Once we transfer Points earned through the use of your Card Account after the close of each Card Account billing cycle, Wyndham is responsible for adding the Points to your Wyndham Rewards Member Account.

## EARNING POINTS

You earn Points for Net Purchases made by you and/or any authorized user(s) of your Card Account as follows:

## 5x on Participating Hotels by Wyndham and Gas Purchases

- You earn 5 Points for every $1 spent on eligible Net Purchases made with your Card Account at participating Hotels by Wyndham ("Hotels by Wyndham") (e.g., those purchases that appear on your folio for the stay). Echo Suites℠ Extended Stay by Wyndham hotels do not participate in the Wyndham Rewards Program; stays and purchases made at such hotels are ineligible for the benefits described in this advertisement. For more information, please call Wyndham Rewards Member Services at 866-WYN-RWDS (866-996-7937).
- You earn 5 Points for every $1 spent on eligible Net Purchases made with your Card Account on gas. Qualifying gas purchases are defined as automated fuel dispensers and service stations, as identified by the merchant category codes.

DocuSign Envelope ID: 79D4FPC5-1D48-4853-6D84-9CVI0C5C8084

### 2x on Wyndham Destinations, Dining and Grocery Store Purchases

- You earn 2 Points for every $1 spent on eligible Net Purchases made with your Card Account at participating Club Wyndham®, WorldMark® by Wyndham and Shell Vacations Club® properties (e.g., those purchases that appear on your folio for the stay); on eligible maintenance fee payments related to Club Wyndham, WorldMark by Wyndham and Shell Vacations Club accounts; and on eligible timeshare loan payments to Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Shell Vacations, LLC, and related developer affiliates and partners. For more information on Wyndham Destinations, including an overview of resorts, please visit WyndhamDestinations.com.

- You earn 2 Points for every $1 spent on eligible Net Purchases made with your Card Account on dining and grocery stores (excluding Target® and Walmart®). Qualifying dining purchases are defined as: Restaurants and Fast Food restaurants, as identified by the merchant category codes. Qualifying grocery store purchases are defined as grocery stores, as identified by the merchant category codes, excluding Target® and Walmart®. Please note some merchants that sell grocery items are not included in this category. For example, warehouse clubs, drug stores, discount stores and merchants that sell a limited number of grocery items are not included.

### 1x on all other Purchases

- You earn 1 Point for every $1 spent on all other Net Purchases made with your Card Account (excluding timeshare down payment purchases to Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Shell Vacations, LLC, and related developer affiliates and partners).

Points earned on Net Purchases will be posted to the Primary Cardmember's Wyndham Rewards Member Account 4-6 weeks following earning activity.

Purchases must be submitted by merchants using the merchant category codes (and merchant identifiers) for purchases in the above-specified categories to qualify for the additional Points. Barclays and Wyndham Rewards Inc. are not responsible for incorrectly coded purchases. Additional Points may not be earned if the merchant submits the purchase using a mobile or wireless card reader or if you use a mobile or digital wallet to pay for the purchase. Additionally, purchases made through third parties, including online marketplaces and resellers, or using a third-party payment account will not earn additional Points.

Balance transfers, cash advances (including cash equivalent transactions such as, but not limited to, the use of your Card Account to obtain money orders, traveler's checks, foreign currency, peer to peer payment app transactions and lottery tickets), fees, interest charges and unauthorized/fraudulent purchases are not considered Net Purchases and do not earn Points.

### BONUS OFFER

From time to time, we may offer bonuses of Points or other incentives to cardmembers. You will be provided details when offered. Bonus offer details become part of your Reward Rules.

### INTRODUCTORY BONUS OFFER

Your credit offer may contain additional information about qualifying events, exclusions, and restrictions. That information can be found by logging in to your Card Account online and visiting the Rewards and Benefits section or calling the number on the back of your Card. These bonuses and/or incentives are intended for applicants who are not and have not previously been Wyndham Rewards Earner™ cardmembers. You understand and agree that you may no longer be eligible for any bonuses and/or incentives in connection with a new Wyndham Rewards Earner® Card Account after this Card Account is opened. If you receive a bonus or incentive for which you are not eligible due to your status as a current or former Wyndham Rewards Earner® cardmember, we may revoke the bonus or incentive, or reduce your Points by the amount of the bonus or incentive or charge your Card Account for the fair value of the bonus or incentive, at our sole discretion.

### POINTS REDEMPTIONS

Wyndham manages the Program including redemption. You can obtain information regarding the redemption options available by calling 866-WYN-RWDS (866-996-7937) or online at WyndhamRewards.com.

Docusign Envelope ID: 78D4FFCE-1CA9-4845-8584-3D505CEC8094

## POINTS FORFEITURE

If your Card Account is closed for any of the following reasons, your Points earned during that billing cycle but not yet transferred to Wyndham will be forfeited and/or we may request that Wyndham make corresponding adjustments to or invalidate Points earned through the use of your Card Account and transferred to your Wyndham Rewards Member Account if/based upon:

- You or any authorized user(s) on the Card Account engage in any fraudulent or illegal activity through the use of your Card Account, as determined by us at our sole discretion.
- You or any authorized user(s) on the Card Account engage in any activity that is deemed to be abusive or gaming conduct, as determined by us at our sole discretion. Abusive or gaming activity includes, but is not limited to, obtaining or using a Card Account to maximize rewards earned in a manner that is not consistent with typical consumer activity and/or multiple credit card account applications/openings, as determined by us at our sole discretion.
- Your history of Card Account usage.

## ADDITIONAL BENEFITS OF YOUR CARD ACCOUNT

### Wyndham Membership Level Benefits

The Primary Cardmember will receive Wyndham Rewards Gold Level in his or her Wyndham Rewards Program membership. This benefit is not available to authorized users through the Wyndham Rewards Earner® Card. Please allow 2-8 weeks after Card Account opening for this update to be made to the Primary Cardmember's Wyndham Rewards Program membership. Subject to the Wyndham Rewards Terms & Conditions, the Primary Cardmember will continue to receive Wyndham Rewards Gold Level through the Wyndham Rewards Earner® Card as long as the Card Account is open and in Good Standing. You can achieve other Wyndham Rewards Program levels by meeting Wyndham Rewards Program eligibility requirements. Wyndham reserves the right to change or cancel the member level program and benefits at any time with or without notice. For details on the Terms and Conditions of the Wyndham Rewards Program levels and benefits, please visit WyndhamRewards.com/levels.

### Anniversary Bonus Points

You will earn 7,500 bonus Points if you spend $15,000 in Net Purchases (excluding timeshare down payment purchases to Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Shell Vacations, LLC, and related developer affiliates and partners) each anniversary year. The bonus will be reflected on the billing cycle date of the month after your Card Account anniversary month. Please allow 8-12 weeks for bonus Points to be added into your Program account after the qualifying purchase(s) have posted to your Card Account. Each year, your spend will start over and will go through and include your cycle following your anniversary month. This offer may be cancelled at any time without notice.

This benefit may not be achievable based on the assigned credit line and ability to maintain that credit line.

### Cardmember Redemption Discount

You will receive a 10% redemption discount when redeeming Wyndham Rewards Points for Go Free™ Award Nights. For more information on this redemption discount, visit WyndhamRewards.com/terms/cardmembergofree for additional details.

### Wyndham Rewards Cardmember Rate

You will receive an additional discount when booking the Wyndham Rewards Member Rate at participating properties, for more information, please visit WyndhamRewards.com/terms/cardmemberrate for additional details.

## RESPONSIBILITY OF THE PARTIES/INFORMATION SHARING/PRIVACY POLICY

Barclays has no authority regarding the Program and is not responsible for any goods or services offered by Wyndham. You authorize Barclays to share information about your Card Account with Wyndham and its affiliates and authorize Wyndham to share information about your Program membership, to the extent needed to administer the Program and your Card Account. You also agree that Barclays may share Card Account information as set forth in Barclays Privacy Policy. The Privacy Policy for Barclays is available online at BarclaysUS.com. Wyndham is not a party to the Cardmember Agreement between you and Barclays, does not participate in any extension of credit, has no authority regarding your Card Account and is not responsible for any goods or services offered by Barclays. For details on how Wyndham may use your information, please see the terms and conditions of the Program at WyndhamRewards.com/terms.

## LIMITATION AND RELEASE OF LIABILITY

By participating in the Program through the use of your Card Account and accepting and using Points, and other benefits earned through the use of your Card Account, you (on your behalf and on behalf of any person to whom you give the benefits from the Program through the use of your Card Account) release, discharge and hold harmless

Docusign Envelope ID: 79D4FFCE-1048-488B-95B4-9C605C5C6094

Barclays, Wyndham and their respective parent companies, subsidiaries, affiliates, agents, administrators, employees, officers, directors, successors and assignees from all claims, damages or liability including, but not limited to, physical injury or death, arising out of participation in the Program through the use of your Card Account or travel taken or use of products purchased in connection with the Program through the use of your Card Account. Barclays has no liability in case of disagreement over issuance of Points, items received through redemptions, or a cardmember's right to redeem or possess Points..

## IMPORTANT GENERAL DISCLOSURES

Barclays reserves the right to correct inaccurate Points values represented on statements, our website and/or our mobile app, at our sole discretion. We may, at our sole discretion, cancel, modify, restrict, or terminate the Card Account Reward Rules or any aspects or features of the Card Account Reward Rules at any time without prior notice. All interpretations of the Card Account Reward Rules shall be at our sole discretion. Other significant terms may apply. All trademarks and service marks belong to their respective owners. Barclays is not responsible for typographical errors or omissions in this document, website, mobile app, or any marketing materials. Points earned through the use of your Card Account cannot be combined with other discounts or reward programs unless specifically authorized by us or Wyndham.

Wyndham, Wyndham Rewards Earner® Card and Wyndham Rewards Program are trademarks of Wyndham Hotels & Resorts, Inc. The Wyndham Rewards Earner® Card is issued by Barclays Bank Delaware pursuant to a license by Visa U.S.A. Inc. Visa is a registered trademark under license from Visa U.S.A. Inc.

## CUSTOMER SERVICE

If you have any questions about your Card Account, please contact customer service using the phone number on the back of your Card.

©2024 Barclays Bank Delaware, Member FDIC.

WYD-10/2023

BAR-9464-5

FDIC

Electronic Record and Signature Disclosure created on: 10/6/2020 1:47:49 PM
Parties agreed to: Kyle Cates, In Person Signer: SANDRA LESLIE, In Person Signer: DONALD WILL

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Wyndham Destinations (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wyndham Destinations:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: WVRFinancialInquiry@wyn.com

**To advise Wyndham Destinations of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at WVRFinancialInquiry@wyn.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Wyndham Destinations**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to WVRFinancialInquiry@wyn.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Wyndham Destinations**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

> ii. send us an e-mail to WVRFinancialInquiry@wyn.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| | |
|---|---|
| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |

Enabled Security
Settings:   Allow per session cookies

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Wyndham Destinations as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Wyndham Destinations during the course of my relationship with you.

# EXHIBIT
# 2

Extremely Urgent ... ... use with the following services: UP
UP
UP

**Visit ups.com® or call 1-800-PICK-UPS® (1-800-742-5877) to schedule a pickup or find a drop off location near you.**

**Domestic Shipments**

To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shi**

The UPS Expres
value. Certain
ups.com/impo

To qualify for th
UPS Express En

1 OF 1

1 LBS

OH 451 9-05

UPS GROUND

TRACKING #: 1Z 67E 30W 03 9348 4489

BILLING: P/P

cost centers: 814-55207-002

SHIP TO:
SANDRA LESLIE
425 CROSSBOW DR
MAINEVILLE OH 45039-8508

TINA HERMAN
8000 US 27 40
WVO SANDY OFFICE
8911 SANDY PARKWAY
SANDY UT 84070



Windo

SANDRA LESLIE
425 CROSSBOW DR
MAINEVILLE OH 45039

P-RED

for more thai
United Par

International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

RCI
6277 Sea Harbor Dr.
Orlando, FL 32821

11-14-24



**RCI | CLUB WYNDHAM**

# WELCOME TO MORE

**Sandra & Donald,**

Congratulations on your Club Wyndham ownership! As part of your purchase, you've received a complimentary RCI membership, and we're excited to welcome you to our vacation community.

Get ready to travel beyond Club Wyndham when you use your Points with RCI. Your member cards are enclosed, and a new member booklet will come your way in just a few weeks. This booklet includes insider tips for Exchange vacations, exciting member benefit details, travel inspiration, and much more.

In the meantime, why not explore all that RCI offers? Log in using your Club Wyndham username and password and search the directory to get inspired for your next trip, or visit the Member Resource Center at **rci.com/clubwyndhambenefits** for great information about your membership. Plus, knowledgeable RCI Travel Guides are always a phone call away to provide inspiration, answer questions, help book vacations, and more.

As you begin to plan your travels, we're here for you every step of the way.

Thank you,
RCI, Your Vacation Partner

**25% OFF**
**YOUR FIRST**
**EXCHANGE FEE***
BOOK IN FIRST
6 MONTHS

**New Member Offer**
Log in today to take advantage of
your exclusive offer.

Docusign Envelope ID: 75000882-1C0C-446E-B96D-796FA8474F15

# CLUB WYNDHAM

# WYNDHAM REWARDS®

Contract Number:  310

Member Number:  046

## Wyndham Rewards® Points/Maintenance Fee Reference Guide for New Cardholders

### How You Earn

| Wyndham Rewards Earning Examples |
| --- |
| Wyndham Rewards® hotel stays<br>10 Wyndham Rewards Points per $1 spent<br>*Minimum of 1000 points per night stay |
| Wyndham Rewards® Earner Card<br>Earn 5 Wyndham Rewards points per $1 on Hotels by Wyndham and gas purchases. |
| Earn 2 Wyndham Rewards Points per $1 spent on eligible purchases made at Wyndham Timeshare resorts (including maintenance fee and loan payments) and on eligible dining and grocery purchases (excluding Target® and Wal-mart®). |
| 1 Wyndham Rewards point per $1 spent on purchases using the Wyndham Rewards Visa Card everywhere else (excluding Wyndham Timeshare down payments) |
| Avis® or Budget® 1-day car rental<br>100 Wyndham Rewards points per Day |

| Wyndham Rewards Points Earned | The amount of CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees) that can be paid from converting Wyndham Rewards Points |
| --- | --- |
| Wyndham Rewards Points | CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees) |
| 40,000 | $200 |
| 80,000 | $400 |
| 120,000 | $600 |
| 200,000 | $1,000 |

1,000 CLUB WYNDHAM Points equals 400 Wyndham Rewards Points. CLUB WYNDHAM Plus Points to Wyndham Rewards Conversion Rates subject to change and conversion fee of $99.00 per conversion applies.

10,000 Wyndham Rewards Points equals $50 towards CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees). Redemption Levels are subject to change and are maintained exclusively by Wyndham Rewards.

Docusign Envelope ID: 75000882-1C0C-446E-B86D-796FA8474F15





Contract Number:        810
Member Number:         146

## ACKNOWLEDGMENT AND DISCLOSURE STATEMENT
### Club Wyndham® Plus/Wyndham Rewards® Program

1. The CLUB WYNDHAM Plus/Wyndham Rewards Program as more fully described by the Program Rules herein.

2. Use and participation in the CLUB WYNDHAM Plus/Wyndham Rewards Program is completely voluntary and the payment of any fee or other cost is only required upon such use or participation.

3. The CLUB WYNDHAM Plus/Wyndham Rewards Program is not assignable or otherwise transferable

4. If all or a portion of the CLUB WYNDHAM Plus/Wyndham Rewards Program becomes unavailable the offering of this program may be terminated

5. The continued availability of the CLUB WYNDHAM Plus/Wyndham Rewards Program is not necessary for a purchaser's use and enjoyment of any accommodations in the timeshare plan purchased.

6. If you cancel your purchase contract within the stated cancellation period, the CLUB WYNDHAM Plus/Wyndham Rewards Program will not be available

## Club Wyndham® Plus/Wyndham Rewards ® Program Rules

The CLUB WYNDHAM Plus/Wyndham Rewards Program Rules (*"Rules"*) are promulgated this 20th day of July, 2009, by Wyndham Fulfillment Group, LLC (***"Wyndham Fulfillment Group"***) for the benefit of CLUB WYNDHAM Plus Members. The Rules are as follows:

### Program Rules

a. The CLUB WYNDHAM Plus/Wyndham Rewards Program (***"Program"***) means that program offered by Wyndham Fulfillment Group in which CLUB WYNDHAM Plus Members may trade Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points. All terms used herein shall have the same meaning given to them in the documents creating the CLUB WYNDHAM Plus program, as amended from time to time.

b. The Wyndham Rewards Program is offered by Wyndham Rewards, Inc., a subsidiary of Wyndham Hotel Group, LLC, its successors and assigns, for use by guests of participating Wyndham hotel and resort properties whereby such guests can accumulate points redeemable for, among other things, hotel rooms at participating Wyndham hotels and resorts worldwide, car rentals, travel activities, and purchases from participating merchants or service providers. The rules for the Wyndham Rewards Program will be distributed separately from this document, and are incorporated herein by reference as if fully set forth (See current Wyndham Rewards Membership Guide).

c. Neither Wyndham Fulfillment Group nor Wyndham Vacation Ownership, Inc., or its subsidiaries guarantee that a CLUB WYNDHAM Plus Member utilizing the Wyndham Rewards Program will be able to stay at a particular participating Wyndham hotel or resort during any specific time or will be able to redeem Wyndham Rewards points for any particular activity or service.

d. Wyndham Fulfillment Group reserves the right to modify, alter, delete or add new terms and conditions to the Program Rules at any time without notice. Wyndham Fulfillment Group may terminate the Program at any time by providing written notice to CLUB WYNDHAM Plus Members. In that event, the right to trade Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points will end. Wyndham Rewards, Inc. may terminate the Wyndham Rewards Program at any time as described in the current Wyndham Rewards Membership Guide.

e. Wyndham Rewards, Inc. reserves the right to modify, alter, delete or add new terms and conditions to the Wyndham Rewards Program at any time without notice. This includes modifying, altering, adding or deleting Wyndham Rewards point values, redemption levels, conversion ratios, conditions for active status, rewards, "Earning Participants" or "Rewards Participants" to the Wyndham Rewards Program at any time without notice. In addition, Wyndham Rewards, Inc. may convert the Wyndham Rewards Program and members points into different awards programs having different point values at any time without notice. This means that the number of Wyndham Rewards points needed to reach a rewards level may be increased, the time for earning them reduced, or the rewards changed, so you may not be able to obtain.

Docusign Envelope ID: 75D00882-IC0G-446E-B96D-796FA8474F15

This is a copy, viewing the communicative Contract

Contract Number       810

Member Number:       )46

earn or claim certain rewards no matter how long you participate in the Wyndham Rewards Program. To view or obtain the most up to date terms and conditions for the Wyndham Rewards Program, visit wyndhamrewards.com or call 1-866-996-7937.

f.  All redemption of Wyndham Rewards points will be in accordance with the procedures outlined in the Wyndham Rewards Membership Guide. A Wyndham Rewards account may be maintained in the name of each CLUB WYNDHAM Plus Member, however, Wyndham Rewards points will be credited to only one Wyndham Rewards account, not multiple accounts, based upon direction received by CLUB WYNDHAM Plus from the member where the CLUB WYNDHAM Plus membership is held by more than one individual.

g.  CLUB WYNDHAM Plus Members may request to trade all or part of their regular use year Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points during the twelve (12) month period prior to their use year start date. A minimum of 1,000 Qualified CLUB WYNDHAM Plus Points may be traded for Wyndham Rewards points. Requests to trade for Wyndham Rewards points are non-reversible and are considered a final transaction. Multiple requests are permitted provided they are submitted prior to the CLUB WYNDHAM Plus Member's use year start date.

h.  "Qualified CLUB WYNDHAM Plus Points" means those CLUB WYNDHAM Plus Points associated with ownership interests purchased directly through Wyndham Vacation Resorts, Inc. or its affiliates, such ownership interests acquired by will or intestate succession, or such ownership interests acquired by an "Immediate Relative" of the CLUB WYNDHAM Plus Member. "Immediate Relative" includes parents, spouses, domestic partners, siblings, children and grandchildren. Wyndham Fulfillment Group, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of persons eligible to participate in the Program at any time in the future.

i.  Subject to Paragraphs (g) and (h) above, the following CLUB WYNDHAM Plus Points are not eligible to be traded for Wyndham Rewards points: CLUB WYNDHAM Plus Points which are not acquired through Wyndham Vacation Resorts, Inc. or its affiliates, CLUB WYNDHAM Plus Points acquired through a non-Wyndham affiliated broker, Bonus Points, PIC Points, Borrowed CLUB WYNDHAM Plus Points, Rented CLUB WYNDHAM Plus Points, Transferred CLUB WYNDHAM Plus Points, Discovery Program Points and Pool Credits. Wyndham Fulfillment Group, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of eligible CLUB WYNDHAM Plus Points which may be traded for Wyndham Rewards points.

j.  Participation in the Program, which includes the ability to request a trade for Wyndham Rewards points and the depositing of Wyndham Rewards points in a CLUB WYNDHAM Plus Members Wyndham Rewards account, will not be allowed if the CLUB WYNDHAM Plus Member is delinquent in the payment of any applicable maintenance fees, taxes, special assessments, or CLUB WYNDHAM Plus Program Fees. Participation will also not be allowed by CLUB WYNDHAM Plus Members with delinquent mortgage payments to Wyndham Vacation Ownership, Inc., or a subsidiary thereof, or who are otherwise in default under their sales contract, if any. In addition, a CLUB WYNDHAM Plus Member will not be permitted to request a trade for Wyndham Rewards points if their vacation ownership account is pending an upgrade transaction.

k.  CLUB WYNDHAM Plus Members may trade for Wyndham Rewards points every calendar year. Each request to trade will require a separate transaction fee.

l.  The fee to trade for Wyndham Rewards points is payable at the time each request to trade for Wyndham Rewards points is made. The current fee is $99.00, is non-refundable, and is subject to change without notice.

m.  Upon requesting a trade of Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points, the Qualified CLUB WYNDHAM Plus Points traded through the Program will be assigned to Wyndham Fulfillment Group for its own purposes including, but not limited to, renting accommodations to the public.

n.  Wyndham Rewards points will become available to the CLUB WYNDHAM Plus Member for use at the start of the use year corresponding with the Qualified CLUB WYNDHAM Plus Points that are traded.

o.  The Wyndham Rewards points which may be received when trading Qualified CLUB WYNDHAM Plus Points is based on the following formula: 400 Wyndham Rewards points for each 1,000 Qualified CLUB WYNDHAM Plus Points traded. Wyndham Fulfillment Group reserves the right to change the above formula at any time without notice.

p.  Questions relating to the Program or trading Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points should be directed to the Vacation Planning Center (1-800-251-8736 Option 1).

Docusign Envelope ID: 75000882-1C0C-446E-B96D-796FA8474F15

# Ownership Certificate

## CLUBWYNDHAM®Access Vacation Ownership Plan

This Ownership Certificate is issued by the PTVO Owners Association, Inc. (*"Association"*) and signifies the below owner(s) as a member(s) of the Association with the right to participate in the CLUBWYNDHAM Access Vacation Ownership Plan.

Owner(s): __Sandra A Leslie and Donald Wall Joint Tenants With The Right Of Survivorship__

Issued this Day of_____ **October 28th, 2024**

*Contract Number:_____ **810**

Annual Or Biennial: **Annual**

Number of Points _____ **300,000**

*This Ownership Certificate supersedes any previously issued Ownership Certificates for the above contract number.



**CLUB WYNDHAM**

No. 2064/Rev. 05-22

Docusign Envelope ID: 75000882-1C0C-446E-B96D-796FA8474F15



# CLUB WYNDHAM

| | |
|---|---|
| Contract Number | 310 |
| Date of Sale | 10-28-2024 |

## Guaranteed Discount

## Valid for One Year from Today's Purchase

Should you elect to upgrade with Wyndham within one year of today's purchase you will be eligible for a discount off the gross price per thousand points.

### Gross Purchase Price per Thousand $316

### Guaranteed Discount -$28

### Guaranteed Gross Purchase Price per Thousand $288

Eligibility:

- To be eligible, you must be in good standing as a Club WYNDHAM Member and must be current in all fees and expenses.

Terms and Conditions:

- Your Discount Offer will expire within one year from the date on which your purchase agreement is fully executed.

- The discount offer is off of the current gross price at the time of your upgrade purchase.

- This discount offer may not be combined with any other purchase incentives or discounts.

- Based on inventory availability.

- Equity trades are not eligible.

Contract Number: 810

| FACTS | WHAT DOES WYNDHAM VACATION OWNERSHIP, INC. DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Credit scores and payment history<br>• Purchase history and account transactions |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Wyndham Vacation Ownership, Inc. chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Wyndham Vacation Ownership, Inc. share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes - such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes - To offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | Yes | No |
| For our affiliates' everyday business purposes - information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes - information about your creditworthiness | Yes | Yes |
| For our affiliates to market to you | Yes | Yes |
| For nonaffiliates to market to you | Yes | Yes |

| To limit our sharing | • Mail in the form below<br><br>Please note:<br><br>If you are a new customer, we can begin sharing your information 30 days from the date we sent this notice. When you are no longer our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | Call (WVO)   800-251-8736 |
|---|---|

**Mail-In Form**

| If you have a joint account, your choice(s) will apply to everyone on your account unless you mark below.<br><br>___ Apply my choices only to me | Mark any/all you want to limit:<br><br>___ Do not share my personal information with nonaffiliates to market their products and services to me.<br><br>___ Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br><br>___ Do not allow affiliates to use my personal information to market to me. |
|---|---|
| | Name |
| | Address |
| | |
| | City, State Zip |
| | Member / Contract # |
| Mail To: | Member Privacy Wyndham Vacation Ownership, Inc.<br>P.O. Box 98944 Las Vegas, Nevada 89193-8944 |

No. 3507/Rev. 8-15

Contract Number: 310

Page 2



| Who we are | |
|---|---|
| Who is providing this notice? | Wyndham Vacation Ownership, Inc. |
| **What we do** | |
| How does Wyndham Vacation Ownership protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does Wyndham Vacation Ownership collect my personal information? | We collect your personal information, for example, when you<br>• Apply for financing or give us your income information<br>• Provide account information or provide employment information<br>• Give us your contact information<br>We also collect your information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account unless you tell us otherwise. |
| **Definitions** | |
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• Our affiliates include companies with a Wyndham name including, Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Wyndham Consumer Finance, Inc. |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• Nonaffiliates we may share with may include other developers, financial institutions and services companies, associations and exchanges, and other companies. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• Our joint marketing partners may include other developers, financial institutions, financial services companies, and other companies |

**Other important information**

VT: Accounts with a Vermont mailing address are automatically treated as if they have limited the sharing as described on page 1. For joint marketing we will only disclose your name, contact information and information about your transactions.

CA: Accounts with a California mailing address are automatically treated as if they have limited the sharing with nonaffiliates as described on page 1. You may receive a separate notice regarding your rights and additional choices.

Docusign Envelope ID: 75000882-1C0C-446E-B96D-796FA8474F15

THIS IS A COPY
This is a copy view of the Authorizer's Copy as
by the designated custodian

Contract No. 1810

## ASSOCIATION BUDGET NOTICE

The Association Budget copy provided in the Disclosure Statement/Public Offering Statement may not reflect the most current maintenance fees. For your convenience, we have provided an updated Association Budget reflecting the **2024** maintenance fees of the timeshare interest being purchased.

Form 3458 Rev.12-23

Docusign Envelope ID: 75000882-1C0C-446E-B96D-796FA8474F15

THIS IS A COPY
This is a copy view of the Authoritative Copy
by the designated or assignor

# *Wyndham Vacation Resorts, Inc.*

## Deedback Control Sheet

**Contract Number:** 810
**User:** Rachel Nielson
**User ID:** 327
**Selling Site:** SALT LAKE II
**Date:** 10/28/2024
**Inventory Location:** CLUB WYNDHAM ACCESS

Please note this Deedback Control Sheet along with the Deedback and/or Termination of Contract must be returned to: Title Services Inventory Recovery, c/o Wyndham Vacation Resorts, Inc., 6277 Sea Harbor Drive, Orlando, FL 32821

| CONTRACT TRADED | PRIMARY OWNER | PO MEMBER NUMBER | DEEDBACK /TOC | STATUS |
|---|---|---|---|---|
| 021 | SANDRA LESLIE | 046 | N/A | No Deedback required for ClubWyndham Prefer product |

DocuSign Envelope ID: 75000882-1C0C-446E-B96D-796FA8474F15

THIS IS A COPY
This is a copy view of the Authoritative Copy h...
by the designated Custodian

PTVO Owners Association, Inc.
January 1, 2024 through December 31, 2024

2024

| | Total Club Costs | Cost per 1,000 Pts |
|---|---|---|
| **Revenues** | | |
| Maintenance Fee Revenue | 395,567,221 | 7.65 |
| Housekeeping Revenue | 2,050,559 | 0.04 |
| Interest Income | 689,798 | 0.01 |
| **Total Club Revenues** | **398,307,577** | **7.7** |
| | | |
| **Expenses** | | |
| Maintenance Fee Expense | 311,961,796 | 6.03 |
| Whole Unit Expenses | 40,691,104 | 0.79 |
| Special Assessments | - | - |
| Bad Debt Expense | 28,362,170 | 0.55 |
| Reservations and Inventory Management | 1,477,339 | 0.03 |
| Management Fee | 3,159,819 | 0.06 |
| Accounting & Data Processing | 749,263 | 0.01 |
| Annual Meeting, Election and Corresponde | 145,004 | 0 |
| Trustees Fee | 129,750 | 0 |
| Income Tax Expense | 144,857 | 0 |
| Licenses/Taxes/Other | 180,400 | 0 |
| Audit Fees | 93,402 | 0 |
| Insurance (D&O) | 191,957 | 0 |
| **Subtotal - Expenses** | **387,286,860** | **7.49** |
| | | |
| **Reserves** | | |
| Replacements | 11,020,717 | 0.21 |
| **Subtotal - Reserves** | **11,020,717** | **0.21** |
| | | |
| Less all Other Revenues | -2,740,356 | -0.05 |
| | | |
| **Total Maintenance Fee** | **395,567,221** | **7.65** |

The budget, including all expense and revenue projections, is based on and prepared in accordance with the information available at the time of preparation, including without limitation, historical records, forecasted data and other sources believed to be reliable, but which are not guaranteed. Normal budgetary assumptions are that costs will increase with inflation. If expenses during the year exceed the estimates used in preparation of the budget, or if unforeseen events occur, the Association may have to increase the budget during the year, levy a special assessment or a combination thereof. Further, all revenue projections included herein are being furnished for informational purposes and remain subject to market fluctuations, Acts of God or other extrinsic and uncontrollable factors.

DocuSign Envelope ID: 75000882-1C0C-446E-B96D-796FA8474F15

This is a copy view of the Authoritative Copy h
by the designated custodian

# Payment Receipt

Contract Type: ___CWA___

Date: _10/28/2024_

Sales location: ___219___

Entity: ___WVR___

Name: ___DONALD WALL___

Contract No. _____810____

Payment Method: ___CC___

Amount $ _____

Last 4 digits of the Credit Card: ___4611___

Amount $ ___2,705.29___

Last 4 digits of the Credit Card: _____

Amount $ _____

Last 4 digits of the Credit Card: _____

Amount $ _____

Last 4 digits of the Credit Card: _____

Amount $ _____

Total Payments: $ ___2,705.29___

X _SANDRA L LESLIE_                     10/28/2024
    —E57FBE15CAAD4C6—
Owner                                   Date Signed

X _DONALD WALL_                        10/28/2024
    —E57FBE15CAAD4C6—
Owner                                   Date Signed

WVO 0006 Rev. 8-16

## Credit Authorization/Owner Information

I/We authorize Wyndham Vacation Ownership, Inc., its parent, subsidiaries, affiliates, and their service providers (collectively "WVO") to obtain credit reports, credit scores, and other credit history and financial information regarding me/us from multiple sources, including credit reporting agencies, creditors and financial institutions (collectively "Credit Information"). WVO may use Credit Information: to evaluate my/our eligibility for credit; for collections related to my vacation ownership, membership, homeowner association and similar obligations; to identify and market products and services that may be of interest to me/us; for WVO's ownership, membership and association portfolio analysis and management; and, for such other uses as permitted or required by law. WVO may share my Credit Information with third parties who may offer credit in connection with my/our purchase of products or services from or through WVO. Any reproduction of this Purchaser Information and Credit Authorization made by reliable means, including photocopy and facsimile, shall be considered as valid as the original. This authorization shall remain in effect during my ownership or use of a WVO product or service.

Applicant initials:

**SAL**  I authorize WVO to obtain my Credit Information.

_____  I **do not** authorize WVO to obtain my Credit Information.

Applicant initials:

_____  I authorize WVO to obtain my Credit Information.

**DW**  I **do not** authorize WVO to obtain my Credit Information.

| PRIMARY To be completed by Applicant/Purchaser | SECONDARY To be completed by Applicant/Purchaser |
|---|---|
| **Name:** SANDRA A LESLIE | **Name:** DONALD WALL |
| Maiden Name (if applicable): | Maiden Name (if applicable): |
| Social Security Number:            Date of Birth: | Social Security Number:            Date of Birth: |
| **Present Address:** 425 CROSSBOW DR  (Street) MAINVILLE , OH 45039 | **Present Address:** (Street)  (City, State and ZIP) |
| Email Address: | Email Address: |

**Total Annual Income:** $ 90,000
Please include all of your sources of income, including income from assets that you would like considered as a basis for repaying this obligation.

Do you (Circle One): Own Rent, If Rent, what is your monthly rent?
$ OWN

**Total Annual Income:** $ 90,000
Please include all of your sources of income, including income from assets that you would like considered as a basis for repaying this obligation.

Do you (Circle One): Own Rent, If Rent, what is your monthly rent?
$ OWN

| Former address if residing at present address less than six months: | Former address if residing at present address less than six months: |
|---|---|
| (Street)  (City, State and ZIP) | (Street)  (City, State and ZIP) |
| **Employer:** (Name)  (Street)  (City, State and ZIP)  (Phone, including area code) | **Employer:** (Name)  (Street)  (City, State and ZIP)  (Phone, including area code) |
| **Closest relative not living with you:** (Name)  (Street)  (City, State and ZIP)  (Phone, including area code) | **Closest relative not living with you:** (Name)  (Street)  (City, State and ZIP)  (Phone, including area code) |

I/We hereby certify that all information provided for purposes of obtaining my/our information is true and correct.

**SANDRA A LESLIE**
Signature
SANDRA A LESLIE

Print Name (Legal name as appears on valid identification)

10/28/2024
Date

**DONALD WALL**
Signature
DONALD WALL

Print Name (Legal name as appears on valid identification)

10/28/2024
Date

| Owner Number: 046 | FOR OFFICE USE ONLY | Contract Number: 810 |
|---|---|---|

**For Verbal Authorizations:**
I acknowledge that I earned granted verbal permission to obtain credit information and that disclosures were read and agreed upon prior to obtaining credit information.

Sales Associate's Printed Name: PARKER JONES       Signature: _____

DocuSign Envelope ID: 75000882-1C0C-446E-B96D-796FA8474F15

THIS IS A COPY
It is a true copy of the Administrative Copy
by the designated custodian

810

Timeshare Purchase Contract Number: _____

# Wyndham Vacation Resorts, Inc.
## First Time Purchaser Rebate

By purchasing a timeshare interest through Wyndham Vacation Resorts today, Owner is entitled to receive $1,000 ("the Benefit") subject to the First Time Purchaser Rebate Terms and Conditions set forth below.

## First Time Purchaser Rebate Terms and Conditions

1.  The Owner's CLUB WYNDHAM Plus account, including loan payments (if applicable), must be current and in good standing to be eligible to receive the Benefit. The Benefit will not be paid if the Owner's CLUB WYNDHAM Plus Assessment Fees and loan payments (if applicable) are not paid when due.

2.  If the Owner cancels their Timeshare Purchase Contract referenced above during the applicable cancellation period, the right to the Benefit will be cancelled automatically without notice, penalty or obligation.

3.  The Owner should not rely upon any representations other than those contained in these First Time Purchaser Rebate Terms and Conditions.

4.  If these First Time Purchaser Rebate Terms and Conditions are met, the Benefit will be mailed to the Owner in the form of a check within 90 days from the last date signed below.

5.  The right to receive the Benefit cannot be sold, assigned or transferred.

6.  The Benefit is offered by Wyndham Vacation Resorts, Inc., 6277 Sea Harbor Drive, Orlando, Florida 32821

Signature of Owner(s):

Sign Here: _____ SANDRA A LESLIE _____     Date: _____ 10/28/2024 _____

Sign Here: _____ DONALD WALL _____     Date: _____ 10/28/2024 _____

Sign here: _____ PARKER JONES _____     Date: _____ 10/28/2024 _____
Authorized Wyndham Representative

Form2851/Rev 8-14

**DocuSign**

## Certificate Of Completion

Envelope Id: 750008821C0C446EB96D796FA8474F15          Status: Completed
Subject: Vacation Awaits! LESLIE 002192400810_CWA Contract
Contract Number:          810
Member Number:          046
Selling Site: SALT LAKE II
Owner's Last Name: LESLIE
Ownership Type: CWA
Entity: WVR
Site: 2Utah Tele
Membership Type: Existing
Inventory: CWA
Source Envelope:
Document Pages: 47          Signatures: 36          Envelope Originator:
Certificate Pages: 6          Initials: 37          Rachel Nielson
AutoNav: Enabled          6277 Sea Harbor Drive
Enveloped Stamping: Enabled          Orlando, FL 32821
Time Zone: (UTC-08:00) Pacific Time (US & Canada)          Rachel.Nielson@wyn.com
IP Address: 136.226.122.176

## Record Tracking

Status: Original          Holder: Rachel Nielson          Location: DocuSign
   10/28/2024 5:34:26 PM             Rachel.Nielson@wyn.com
Status: Authoritative Copy (5 of 5 documents)          Holder: Rachel Nielson          Location: DocuSign
   10/28/2024 6:45:54 PM             Rachel.Nielson@wyn.com
Status: Receipt Confirmed          Holder: Rachel Nielson          Location: Wyndham Destinations
   10/28/2024 6:46:53 PM             Rachel.Nielson@wyn.com

## Signer Events          Signature          Timestamp

Rachel Nielson          Sent: 10/28/2024 5:44:54 PM
Rachel.Nielson@wyn.com          Viewed: 10/28/2024 5:46:23 PM
Signing Group: Salt Lake Telesales Mountain          Signed: 10/28/2024 5:46:31 PM
Security Level: Email, Account Authentication
(None)

Signature Adoption: Pre-selected Style
Using IP Address: 165.225.10.238

Electronic Record and Signature Disclosure:
   Not Offered via DocuSign

PARKER JONES          Sent: 10/28/2024 5:48:34 PM
parker.jones@wyn.com          Viewed: 10/28/2024 5:49:02 PM
Parker          Signed: 10/28/2024 5:49:13 PM
Security Level: Email, Account Authentication
(None)

Signature Adoption: Pre-selected Style
Using IP Address: 165.225.10.251

Electronic Record and Signature Disclosure:
   Accepted: 10/28/2024 5:49:02 PM
   ID: 14ca0980-2111-4a7b-9622-403f64ed37f6

SANDRA A LESLIE          Sent: 10/28/2024 5:49:16 PM
SANDYNOEL3@GMAIL.COM          Viewed: 10/28/2024 5:52:35 PM
Security Level: Email, Account Authentication          Signed: 10/28/2024 6:17:46 PM
(None)

Signature Adoption: Pre-selected Style
Using IP Address: 192.181.164.158

Electronic Record and Signature Disclosure:

| Signer Events | Signature | Timestamp |
|---|---|---|
| Accepted: 10/28/2024 5:52:35 PM<br>ID: fda7e7d9-455e-4dfe-82d2-856be0170b05 | | |
| DONALD WALL<br>SANDYNOEL3@GMAIL.COM<br>Security Level: Email, Account Authentication<br>(None) | Signed by:<br>DONALD WALL<br>E57FBB15CAA04C0...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 192.181.164.158 | Sent: 10/28/2024 5:49:16 PM<br>Viewed: 10/28/2024 6:20:53 PM<br>Signed: 10/28/2024 6:25:37 PM |
| Electronic Record and Signature Disclosure:<br>Accepted: 10/28/2024 6:20:53 PM<br>ID: 04207f60-a72f-429c-9ae9-f87ab4b4c4eb | | |
| PARKER JONES<br>parker.jones@wyn.com<br>Parker<br>Security Level: Email, Account Authentication<br>(None) | DocuSigned by:<br>PARKER JONES<br>F34C7FC6F44D46A...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 165.225.10.251 | Sent: 10/28/2024 6:25:40 PM<br>Viewed: 10/28/2024 6:26:06 PM<br>Signed: 10/28/2024 6:27:05 PM |
| Electronic Record and Signature Disclosure:<br>Accepted: 10/28/2024 6:26:06 PM<br>ID: c48e5e63-d585-415a-a91d-2ea6afe5ed5b | | |
| TINA HERMAN<br>TINA.HERMAN@wyn.com<br>Bus Ops Sup.<br>Signing Group: Salt Lake Telesales Mountain<br>Security Level: Email, Account Authentication<br>(None) | TH<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 136.226.86.248 | Sent: 10/28/2024 6:27:09 PM<br>Viewed: 10/28/2024 6:39:52 PM<br>Signed: 10/28/2024 6:45:50 PM |
| Electronic Record and Signature Disclosure:<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/28/2024 5:44:56 PM |
| Envelope Updated | Security Checked | 10/28/2024 5:46:08 PM |
| Envelope Updated | Security Checked | 10/28/2024 5:46:08 PM |
| Certified Delivered | Security Checked | 10/28/2024 6:39:52 PM |
| Signing Complete | Security Checked | 10/28/2024 6:45:50 PM |
| Completed | Security Checked | 10/28/2024 6:45:50 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 10/6/2020 1:47:49 PM
Parties agreed to: PARKER JONES, SANDRA A LESLIE, DONALD WALL, PARKER JONES

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Wyndham Destinations (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wyndham Destinations:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: WVRFinancialInquiry@wyn.com

**To advise Wyndham Destinations of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at WVRFinancialInquiry@wyn.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Wyndham Destinations**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to WVRFinancialInquiry@wyn.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Wyndham Destinations**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

      i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

      ii. send us an e-mail to WVRFinancialInquiry@wyn.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |

| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Wyndham Destinations as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Wyndham Destinations during the course of my relationship with you.

# EXHIBIT 3

## Ownership Review Summary

| | | | | |
|---|---|---|---|---|
| New points purchased today: | 105,000 | | Today's Purchase Price: | $25,200.00 |
| Use year / Deposit frequency | Oct 01 - Sep 30 / Annual | | Today's Processing Fee: | $349.00 |
| Inventory purchased: | CLUB WYNDHAM ACCESS | | Today's Closing Costs: | $25.00 |
| | | | Today's Total: | $25,574.00 |

### Other Memberships and Enrollments

| | | | |
|---|---|---|---|
| External exchange company | RCI | **VIP by Wyndham Status** | |
| Internal exchange company | Club Wyndham Plus | Permanent VIP Level: | Bronze |
| Travel Up by T.H.L | Yes | Temporary VIP Level | Silver |
| Plus Partners (CW Travel Agency) | Yes | | |
| Vacation Surelock | Yes | **ClubWyndham.com** | |
| Wyndham Rewards | Yes | VIP Vacation Services: 888-884-4321 | |
| Club Pass | Yes | Club Wyndham Travel Agency: 1-833-760-0457 | |
| | | Vacation Planning: 888-251-3706 | |

| | |
|---|---|
| Today's Incentive: | CWA EQUITY TRADE, TEMP VIP SILVER & 105,000 WYNDHAM REWARDS POINTS!!! |

### Entering ownership - Points Summary

| | Contract # | Points | Home Resort | Usage |
|---|---|---|---|---|
| Contract(s) not being traded: | | | | |
| Contract(s) traded today: | 510 | 300,000 | Manual CLUB WYNDHAM ACCESS | Oct 01 - Sep 30 |
| Bonus Point Contract(s): | 415 | 145,000 | Bonus Point Contract Expiration Date: 09-30-2026 | |
| PIC Contract(s): | | | | |
| Total Wyndham Points eligible to make reservations (Odd years including PIC Plus and Bonus Points):* | | | 551,000 | |
| Total Wyndham Points eligible to make reservations (Even years including PIC Plus and Bonus Points):* | | | 551,000 | |
| Points valid for Permanent VIP status (including PIC Plus): | | | 400,000 | |
| Points valid for Temporary VIP status (including PIC Plus, PIC Express and Bonus Points):* | | | 651,000 | |

### Your Financial Deposit Today

| | | | |
|---|---|---|---|
| Equity trade (contract(s) traded today: | | | $5,460.56 |
| Additional deposits made today (and method of payment): | | New Wyndham Rewards CC | $7,096.95 |
| | Closing Costs | New Wyndham Rewards CC | 25.00 |
| Total applied to contract today: | | | $12,582.51 |

### Owner Onboarding Specialists Only

| Loan Summary | | CURRENT | NEW |
|---|---|---|---|
| Loan balance with Wyndham for this contract:*** | | | $62,679.49 |
| Loan balance with Wyndham for new contract today** | | $43,489.38 | $62,679.49 |
| Loan payment amount for this contract:*** | | | $961.50 |
| Total loan payments for all contracts** | | $661.73 | $961.50 |
| Auto Pay: Yes    Auto Pay method: New Wyn Rew CC | | | |
| First loan payment date for THIS CONTRACT: 01/21/2025 | | | |

| | | CURRENT | NEW |
|---|---|---|---|
| CLUB WYNDHAM Plus Assessment Summary (Maintenance Fee) | | bi-monthly | bi-monthly |
| Monthly assessment for this contract: | | | $901.50 |
| Monthly assessment for all contract(s) | | $221.75 | $283.50 |
| Auto Pay: Yes    Auto Pay method: New Wyn Rew CC | | | |
| Next assessment payment date: 01/21/2025 | | | |

New Wyndham Rewards Credit Cards Downpayment Today $2,121.95

I have reviewed and agree with the information noted above.
I agree that I will be a member of the programs noted above under "Your Other Memberships and Enrollments" (Certain programs may carry additional enrollment and annual fees. Please refer to the applicable documents for additional information.)
I have reviewed and understand the above noted Buyer's Acknowledgment
I agree that I will be a member of CLUB WYNDHAM Plus and that I have reviewed and agree to the terms of the applicable Assessment Agreement and Use Restriction.
I have reviewed and agree to abide by the terms and conditions of the Assessment Agreement.

| | | | |
|---|---|---|---|
| Signed by: | | Docusigned by: | |
| SANDRA ALICE LESLIE | 12/17/2024 | Roger Miller | 12/17/2024 |
| Owner's Signature | | Wyndham Owner Onboarding Signature | |
| DONALD L. HALL | 12/17/2024 | Roger Miller | 12/17/2024 |
| Owner's Signature | | Wyndham Owner Onboarding Print Name | |
| | 12/17/2024 | | 12/17/2024 |
| Owner's Signature | | Owner's Signature | |

*CLUB Express Membership is effective for five (5) years and becomes effective upon verification of the Qualified Week being enrolled per the verification below.
**The actual amount may be lower if today's purchase is added to membership with existing contracts and traded.
***Amount figures shown will decrease any existing loan balances with any relief upon completion and/or trade of today's purchase.
(i.e. Wyndham Rewards Credit Cards)

WYNDHAM

Contract number:

**Ownership Review Summary**

| | | | |
|---|---|---|---|
| New points purchased today* | 105,000 | Today's Purchase Price: | $25,206.00 |
| Use year / Deposit frequency | Oct 01 - Sep 30 / Annual | Today's Processing Fee: | $345.00 |
| Inventory purchased: | CLUB WYNDHAM ACCESS | Today's Closing Costs* | $19.00 |
| | | Today's Total: | $25,574.00 |

**Other # memberships and Enrollments**

| | | | |
|---|---|---|---|
| External exchange company | RCI | **VIP by Wyndham Status** | |
| Internal exchange company | Club Wyndham Plus | **Permanent VIP Level:** | Bronze |
| Travel Up by F+L: | Nos | Temporary VIP Level | Silver |
| Plus Partners (Old Travel Agreement) | Yes | | |
| Vacation Sideshow | Nos | **ClubWyndham.com** | |
| Wyndham Rewards: | Yes | VIP Vacation Services: 888-884-4321 | |
| Club Pass: | Yes | Club Wyndham Travel Agency: 1-800-765-5667 | |
| | | Vacation Planning: 800-251-8736 | |

| Today's Incentive: | CWA EQUITY TRADE, TEMP VIP SILVER & 105,000 WYNDHAM REWARDS POINTS!! |
|---|---|

**Existing ownership - Points Summary**

| | Contract # | Points | Home Report | Usage |
|---|---|---|---|---|
| Contract(s) not being traded: | | | | |
| Contract(s) traded today: | 810 | 300,000 | Annual CLUB WYNDHAM ACCESS | Oct 01 - Sep 30 |
| Bonus Point Contract(s): | 418 | 248,000 | Bonus Point Contract Expiration Date 06 30 2026 | |
| PIC Contract(s): | | | | |
| Total Wyndham Points eligible to make reservations (Odd years including PIC Plus and Bonus Points)** | | | 651,000 | |
| Total Wyndham Points eligible to make reservations (Even years including PIC Plus and Bonus Points)** | | | 651,000 | |
| Points valid for Permanent VIP status (including PIC Plus): | | | 405,000 | |
| Points valid for Temporary VIP status (including PIC Plus, PIC Express, and Bonus Points)* | | | 651,000 | |

**Your Financial Report Today**

| | | | |
|---|---|---|---|
| Equity from contract(s) traded today: | | | $5,460.00 |
| Additional deposits made today (and methods of payment): | | New Wyndham Rewards CC | $7,286.65 |
| | Closing Costs | New Wyndham Rewards CC | $19.00 |
| Total applied to contract today: | | | $12,387.51 |

**Owner Onboarding Specialist Only**

| Loan Summary | CURRENT | NEW: |
|---|---|---|
| Loan balance with Wyndham for this contract **** | | $99,679.49 |
| Loan balance with Wyndham for new contract today** | $43,468.39 | $62,679.49 |
| | | |
| Loan payment amount for this contract*** | | $861.58 |
| Total loan payments for all contracts** | $652.23 | $861.56 |
| Auto Pay: Yes       Auto Pay method: New Wyn Rew CC | | |
| Final loan payment date for THIS CONTRACT 01/31/2035 | | |

| | CURRENT | NEW: |
|---|---|---|
| CLUB WYNDHAM Plus assessment Summary (Maintenance Fee) | | Monthly |
| Monthly assessment for this contract | | $79.69 |
| Monthly assessment for all contract(s): | $221.95 | $283.50 |
| Auto Pay: Yes       Auto Pay method: New Wyn Rew CC | | |
| Next assessment payment date: 01/31/2025 | | |

New Wyndham Rewards Credit Card: Downpayment Today $7,121.95
Interest Free Financing: 0% interest for the first 6 months (New Credit Card) (Today's down payment only).

I have reviewed and agree with the Information noted above
I agree that I will be a member of the programs noted above (enter "Club Other Membership") and "Enrollments". (Certain programs may carry additional enrollment and renewal fees. Please refer to the disclosures for additional information.)
I have reviewed and understand the attached Buyer's Acknowledgement
I agree that I will be a member of the RCI (WYNDHAM) Plus and that I have reviewed and agree to the terms of the standard Exchange Agreement and Use Restriction
I have reviewed and agree to abide by the terms and conditions of the Enrollment Agreement

— Signed by:
SANDRA ALICE LESLIE       12/17/2024
Owner Signature
DONALD L DALL       12/17/2024
Owner's Signature
       12/17/2024
Owner's Signature

— DocuSigned by:
Roger Miller       12/17/2024
Wyndham Owner Onboarding Signature
Roger Miller
Wyndham Owner Onboarding Print Name       12/17/2024
Owner's Signature       12/17/2024

*PIC Express Membership is effective for five (5) years and terminates thereafter upon termination of the Qualified Week being serviced per the Vacation terms.
**The actual amount may be lower if today's purchase is subject to overfinancing with existing contracts are traded.
***Financed loan top out (As any existing loan balances with any third party companies consist of today's purchase)
(i.e. Wyndham Rewards Credit Card)

# RETAIL INSTALLMENT CONTRACT

## CLUBWYNDHAM® ACCESS VACATION OWNERSHIP PLAN
### (Security Agreement - Tennessee)

### Wyndham's Information

| Seller/Creditor Name | Address/Principal Place of Business | Telephone Number |
|---|---|---|
| Wyndham Vacation Resorts, Inc. (**"Wyndham"**) | 6277 Sea Harbor Drive, Orlando, FL 32821 | 407-626-5200 |

### Principal Contact's Information

Owner Name
**Sandra Alice Leslie**

Address
**425 Crossbow Dr, , Maineville, OH 45039**

Email Address

| Home Phone No. | Work Phone No. | Cell Phone No. |
|---|---|---|

### Second Owner's Information

Owner Name
**Donald L Wall**

Address
**425 Crossbow Dr, , Mainville, OH 45039**

Email Address

| Home Phone No. | Work Phone No. | Cell Phone No. |
|---|---|---|

### Other Agreement Information

| Member Number | Contract Number | Contract Date | Purchase Price |
|---|---|---|---|
| )46 | 735 | 12-17-2024 | $74,888.00 |

*[Remainder of page intentionally left blank.]*

ClubTN

1

No.3396/Rev.02-24

Contract Number 735

**THIS RETAIL INSTALLMENT CONTRACT** (this *"Agreement"*) is between you and Wyndham and governs the terms of your purchase of an Ownership (defined below) on credit from Wyndham. Capitalized words used but not defined in this Agreement have the meanings given them in the Second Amended and Restated Declaration of Covenants, Conditions and Restrictions and Grant and Reservation of Easements for ClubWyndham Access Vacation Ownership Plan (as amended, *"Declaration"*). You and Wyndham are sometimes referred to in this Agreement individually as a (*"Party"*) and collectively as the (*"Parties"*), and the words (*"Buyer"*, *"you"*, *"your"* and *"yours"*) mean the person(s) identified as the Owner(s) above.

Wyndham agrees to sell to you, and you agree to purchase from Wyndham, an Ownership interest (*"Ownership"*) in the PTVO Owners Association, Inc., a non-stock, non-profit Delaware corporation (*"Association"*). This Ownership consists of the right to participate in the multisite timeshare plan known as ClubWyndham Access Vacation Ownership Plan (*"Club"*), and the right to use and occupy Club Accommodations, as set forth below.

| Number of Perpetual Points: | Annual X | First Use Year: | First Use Year's Assessments (estimated): |
|---|---|---|---|
| 405,000 | Biennial _____ | October 1st through September 30th | $ 3,098.25 |

**SECTION 18 CONTAINS AN ARBITRATION PROVISION THAT MAY SUBSTANTIALLY AFFECT YOUR RIGHTS IF A DISPUTE ARISES BETWEEN YOU AND WYNDHAM. YOU HAVE THE RIGHT TO REJECT THE ARBITRATION PROVISION AS SET FORTH IN THE ARBITRATION PROVISION.**

*[Remainder of page intentionally left blank.]*

735

## TRUTH IN LENDING ACT DISCLOSURE STATEMENT

| ANNUAL PERCENTAGE RATE:<br><br>The cost of your credit as a yearly rate. | FINANCE CHARGE:<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total Of Payments:<br><br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price:<br><br>The total cost of your purchase on credit, including your down payment of **$12,557.51** |
|---|---|---|---|---|
| 13.56% | $52,707.71 | $62,679.49 | $115,387.20 | $127,944.71 |

### Payment Schedule:

| Number of Payments | Payment Amount | When Payments Are Due |
|---|---|---|
| 120 | $961.56 | Monthly, beginning on 01-31-2025 |

Trade Contract(s)    810

**Late Charge:** If you do not make all or any part of a scheduled payment on or before the 10th day after its Payment Due Date, you will be charged a late charge of $5.

**Prepayment:** You will not have to pay a penalty if you pay all or part of the Principal Amount early

**Security Interest:** You are giving to Wyndham a security interest in the Ownership and, if you so elected, the Pre-Authorized Auto Pay Plan (**"APP"**)

**Variable Rate:** Did you enroll in the APP using your checking or savings account?    Yes ___    No _X_

If "Yes" is checked, then the Annual Percentage Rate shown above is a reduction of 1/2% (**"Reduction"**) from the Annual Percentage Rate that would otherwise apply. The Annual Percentage Rate will automatically increase by the amount of the Reduction if: (a) you stop participating in the APP; (b) your financial institution is unable or unwilling to participate in the APP; or (c) Wyndham stops your participation in the APP for reasonable cause. An increase in the Annual Percentage Rate will take the form of higher payment amounts. For example, if your Principal Amount was for $10,000.00 at 17.49% for 7 years and the rate increased to 17.99%, your regular payment would increase by approximately $5.00 per month.

**More Information:** See the Additional Terms below for additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment

---

### Itemization of the Amount Financed

**A. Purchase Price**

| | | |
|---|---|---|
| 1. Gross Purchase Price | $ | 128,000.00 |
| 2. Other Credits/Discounts (if any) | - $ | 53,112.00 |
| 3. Net Purchase Price (1-2) | = $ | 74,888.00 |
| 4. Processing Fee (paid to Wyndham) | + $ | 349.00 |
| 5. Total Cash Price (3+4) | = $ | 75,237.00 |

**B. Down Payment**

| | | |
|---|---|---|
| 6. Down Payment | $ | 7,096.95 |
| 7. Trade-In Down Payment Credit | + $ | 5,460.56 |
| 8. Total Down Payment (Lines 6+7) | = $ | 12,557.51 |

**C. Total Amount Financed (5-8)**     $     62,679.49

---

Closing Fee $25
The Closing Fee is the separate non-refundable fee paid in cash to Escrow Agent for closing-related services regardless of whether the purchase is financed.

735

## ADDITIONAL TERMS

### Your Acknowledgments

By signing this Agreement, you acknowledge and promise that:

- **PERSONAL USE:** You are purchasing the Ownership for your own use and enjoyment. You are not purchasing the Ownership as an investment or for financial returns of any other kind, including through resale, rental, or tax purposes. Wyndham has not made any promises to you about such matters.

- **ALTERNATIVE OPTIONS:** Wyndham makes no representation that you will be able to participate in any buyback, resale, or rental program that may be offered now or in the future. Furthermore, you are not purchasing the Ownership in anticipation of or in reliance upon any such a program being offered now or in the future or the strength of a secondary market for the resale of the Ownership.

- **COMMERCIAL USE:** You cannot use the Club Accommodations for any commercial purpose (including commercial rental activities) that is not expressly authorized by the Association, Wyndham, or one of their affiliates. Commercial rental activities include using the internet or other media to advertise rental opportunities.

- **FINANCING TERMS:** All information you submit to Wyndham to receive financing is complete and accurate

- **LEGAL AUTHORITY:** You are legally able and authorized to sign this Agreement;

- **CREDITWORTHINESS:** Wyndham has signed this Agreement in consideration of and reliance on your creditworthiness and reliability.

- **BANKRUPTCY:** You are not in bankruptcy, have no current intention to file in bankruptcy, and have not consulted an attorney regarding a possible bankruptcy filing within the past 6 months

- **CLUB INSTRUMENTS:** You agree to all of the obligations, covenants, requirements, and benefits of being an Owner or owning an Ownership that are in the Declaration and other Club Instruments as they may be amended from time to time.

1. **Promise to Pay; Payments; Finance Charges.** By signing this Agreement, you are purchasing the Ownership on credit in accordance with this Agreement. In addition to any Down Payment that is set forth in the Itemization of the Amount Financed above, you agree to pay the principal amount of **$62,679.49** (*"Principal Amount"*). The Principal Amount includes the Processing Fee set forth in the Itemization of Amount Financed, together with any finance charges (calculated as described in the paragraph below) on the unpaid balance of the Principal Amount and any other fees or charges due under this Agreement. You must make payments on or before the due dates and in the amounts set forth in the Payment Schedule above (each due date is a *"Payment Due Date"*). Payments will be applied first to any fees, then to finance charges, and then to the outstanding Principal Amount.

Beginning on the day after the Contract Date (or beginning on the day after you pay your final Pick-up Payment, if you are deferring a portion of the Down Payment as described in Section 11(b) below), finance charges on the unpaid Principal Amount will accrue at a daily rate of **0.0372%** (which corresponds to an annual rate of **13.56%** in a year with 365 days) and, subject to applicable law, ending on the earlier of the day you pay all amounts owed under this Agreement in full. The finance charge described as interest herein constitutes a time-price differential under Tennessee law.

2. **Description of the Ownership and Club.** Your Ownership is a perpetual, non-deeded, "right-to-use" timeshare interest. Title to the Club Accommodations are held in trust by the Association (or a Trustee, as the case may be) for the benefit of the Association, free and clear of blanket liens or with a non-disturbance agreement in place. Under Section 7.5 of the Declaration and by your entry into the Club Ownership Register, you grant to the Association and Wyndham a power of attorney to give direction to a Trustee. Your Ownership grants you access and use rights on a first-come, first-served, space-available basis to all existing and future Club Accommodations and the right to participate in governance of the Association, as further described in the Club Instruments. Points are your currency within the Club and allow you to make reservations at the Club Accommodations. You must be current on all payments to Wyndham and the Association when you make a reservation and when you use a Club Accommodation. Please refer to the Club Instruments and the Club's Public Offering Statement for additional important information about your Ownership and the Club.

3. **Assessments.** You must pay Regular Assessments to the Association annually as a condition of your Ownership. Regular Assessments are determined by the Association and the amount that you pay is based on the number of Points that you own. Regular Assessments are used to pay for the Club Costs described in the Declaration, which include maintaining the Club Accommodations and operating the Association. You may also be required to pay Special Assessments from time to time. If you do not timely pay Assessments then you will be subject to the penalties described in the Club Instruments and applicable law. These penalties include late fees, the inability to reserve or use Club Accommodations, suspension of voting privileges, and even the termination of your Ownership. The Club Instruments also describe non-Assessment charges (including Individual Charges) that may be imposed on you for various reasons.

735

4. **Exchange Program Membership.** You may voluntarily enroll in the Club Wyndham Plus Program (*"Club Wyndham Plus"*), which is an exchange program managed by Wyndham. If you choose to enroll in Club Wyndham Plus you will be responsible for paying an annual Program Fee that is separate from your other costs under or described in this Agreement. Please refer to the Club's Public Offering Statement, the Club Wyndham Plus Member's Directory, and any other related materials provided to you for more information about Club Wyndham Plus. Wyndham reserves the right to change, add, or remove Club Wyndham Plus (or other exchange programs) at any time without your consent. Should you choose to join Club Wyndham Plus, your Member Number will also be your Club Wyndham Plus Member Number.

5. **Security Interest.** To secure payment and performance of your obligations under this Agreement and the Club Instruments, you grant to Wyndham a security interest and lien in and to all of your interest and rights in the Ownership and all related proceeds, all proceeds from the sale of the Ownership (if any), and (if you have chosen to make automatic payments) the APP (collectively, this is the *"Security Interest"*). You authorize Wyndham, as a secured party, to file any documents and take any other actions necessary to perfect, preserve, and protect the Security Interest. You also agree to cooperate by signing documents or taking any other action Wyndham may request you to take for Wyndham to perfect, preserve, and protect the Security Interest. As further described in Article 11 and elsewhere in the Declaration, the Association also has a security interest in the Ownership to secure your obligations under the Declaration.

6. **Prepayment.** You may prepay the unpaid Principal Amount in whole or in part at any time, without penalty. If a partial prepayment is less than the amount of the next scheduled payment, then you must pay the difference on or before the corresponding Payment Due Date. You cannot rely on an excess payment made on or before one Payment Due Date to satisfy the payment obligation associated with the next Payment Due Date. Wyndham may deposit any check or other payment you provide to Wyndham for less than your total outstanding balance that is marked "payment in full" or with any similar language without such deposit effecting a satisfaction of your total outstanding balance.

7. **Transfer of Your Ownership.** If you want to transfer your Ownership (including some or all of your Points) to someone else, then you must follow the transfer requirements set forth in the Declaration. These requirements include obtaining the Association's consent for the transfer, maintaining the Minimum Point Requirement following the transfer (if you only transfer a portion of your Points), being current on all Assessments, and paying any transfer fee required by the Association and/or Wyndham. In addition, the Declaration grants Wyndham the right of first refusal upon your sale of an Ownership (*"ROFR"*). This means that before you sell the Ownership to a third-party purchaser and for so long as Wyndham sells Ownerships to the public, you must notify Wyndham of your proposed sale and give Wyndham a copy of the offer of sale. Once Wyndham receives this notice from you, Wyndham has 30 days during which to exercise the ROFR. If Wyndham chooses to exercise the ROFR, then Wyndham will purchase the Ownership from you under the same terms that you offered to the third-party purchaser. If Wyndham chooses not to exercise the ROFR or does not respond to your request, then you will then have 60 days to complete the sale to the third-party purchaser. If the sale is not completed within the 60-day period or if the terms of the sale change, then Wyndham's ROFR would again apply to the Ownership. The ROFR does not apply if you transfer the Ownership by will, or as a gift or conveyance for less than $100. Please refer to Sections 9.1 and 9.5 of the Declaration for more information about transfers in general and the ROFR in particular.

8. **Relinquished Timeshares.** If you relinquish a timeshare interest in any other timeshare resort or program (*"Relinquished Timeshare"*) in connection with your purchase of an Ownership, you agree to cooperate and sign and deliver a deed or other instrument acceptable to Wyndham (or Wyndham's designee) to clear title and convey all of your interest in the Relinquished Timeshare to Wyndham or the party designated by Wyndham, free and clear of any debt not specifically approved by Wyndham (*"Deed-transfer"*). Wyndham or the designated party may record the Deed-transfer at Closing. Until Closing occurs, you are responsible for all obligations related to the Relinquished Timeshare, including paying assessments and fees (*"Relinquished Timeshare Obligations"*). If Closing does not occur, then the Deed-transfer will be cancelled and the Relinquished Timeshare returned to you, and you will remain responsible for the Relinquished Timeshare Obligations.

9. **Communications With You.** You authorize the Messaging Parties to provide Ownership Communications to you via the Communication Methods. This authorization constitutes a bargained-for exchange for value and is express and valuable consideration for Wyndham's decision to enter into this Agreement with you, and Wyndham does not intend it to be revocable. However, to the extent you have the right under applicable law to revoke this authorization, you agree you may do so only by mailing notice to Wyndham at the Notice Address or by emailing Wyndham at WyndhamConsumerFinance@wyn.com.

You understand and agree that:

a. You may incur a charge for the Ownership Communications which the Messaging Parties may send to you.

b. the Messaging Parties are not liable to you for any fee, inconvenience, annoyance, or loss of privacy in connection with the Ownership Communications.

c. Anyone with access to your telephone or email account may listen to or read the Ownership Communications, even though the Messaging Parties will try to communicate only with you.

For purposes of this Section 9, (*"Messaging Parties"*) means, collectively and without limitation: (i) Wyndham and its affiliates, (ii) the Association and its affiliates, and (iii) the assignees, successors, agents, servicers, service providers, and representatives of the entities set forth in (i) and (ii); (*"Ownership Communications"*) means servicing and other Ownership-related communications about scheduled payments, fees, missed payments, and other important information regarding this Agreement, the Ownership, or your relationship with any of the Messaging Parties; and (*"Communication Methods"*) means automated telephone dialing, text messaging, push notifications, in-app messaging, artificial or prerecorded voice message systems, "ringless" voicemail, and email.

10. **Credit Reporting; Identity Theft.** Wyndham may report information about your purchase on credit or this Agreement to other creditors, financial institutions, and credit bureaus. **Late payments, missed payments or other defaults under this Agreement may be reflected in your credit report.** If you believe that Wyndham has furnished any inaccurate information about your performance under this Agreement to a consumer reporting agency, or if you believe that you have been the victim of identity theft in connection with this Agreement, write to Wyndham at the Notice Address, Attn. Credit Report. In your letter: (1) provide your name and the date of this Agreement; (2) identify the specific information that is being disputed; (3) explain the basis for the dispute; and (4) provide any documentation you have in support of your dispute. If you believe that you have been the victim of identity theft, submit an identity theft affidavit or identity theft report.

11. **Closing.** (*"Closing"*) is the date when all of the following events have occurred (unless waived by Wyndham):

   a. Any applicable cancellation period has expired and you have not exercised your right to cancel this Agreement.

   b. You paid to Wyndham the Down Payment in immediately available funds. Under certain circumstances, you may be able to defer a portion of the Down Payment into one or more payments (*"Pick-up Payments"*). You will be given a separate Truth in Lending Disclosure Statement and may be required to sign other documents that indicates the amounts and dates of each of these Pick-up Payments and obligates you to pay the Pick-up Payments. If you so elect, you must pay by the applicable due date the amount of each Pick-up Payment to Wyndham Consumer Finance, Attention: Account Servicing Operations, 6277 Sea Harbor Drive, Orlando Florida 32821 (telephone number 1-877-337-4355) by debit card, credit card, personal check, cashier's check, or any other method which Wyndham authorizes. Wyndham does not impose finance charges on the Pick-up Payments. If you have elected to defer a portion of the Down Payment, this means that you owe $ _N/A_ today and that the remaining portion of the Down Payment must be paid in _N/A_ monthly installments of $ _N/A_ each, as further described in the separate Truth in Lending Disclosure Statement and other related documents you may receive.

   c. You and Wyndham have signed this Agreement and all other documents which Wyndham deems necessary to transfer the Ownership to you.

Upon Closing, the Association will issue you an Ownership Certificate and your name will be entered in the Club Ownership Register. If Closing has not happened within one year after the Contract Date then Wyndham will refund any funds held on your behalf (without interest) to you.

12. **Default.** Wyndham may declare you to be in default under this Agreement if you:

   a. Do not make any payment in full on the Payment Due Date or other date such payment is due (including all payments due in connection with all or a portion of the Down Payment or other payments due in order to effect the Closing), whether such failure to pay is due to insufficient funds, Owner charge-back, administrative action, or otherwise.

   b. Do not fulfill any agreement or obligation contained in any of the Club Instruments. However, Wyndham will give you any notice and right to cure, if required.

   c. Become bankrupt or insolvent.

   d. Provide false or misleading information in this Agreement or in writing to Wyndham or the Association.

13. **Wyndham's Rights if You Default Before Closing.** If Wyndham declares you in default before Closing and you do not cure this default on or before Closing, then to the extent allowed by applicable law Wyndham may immediately terminate this Agreement and all of your rights under this Agreement (including any rights to use and occupy Club Accommodations) without further notice. After this termination, Wyndham may keep all money you have paid under this Agreement as liquidated damages and not as a penalty, and Wyndham reserves the right to seek payment of any additional amounts you owe to Wyndham under the Agreement. If you have paid any Assessments to the Association before Closing, then those amounts will be retained by the Association.

14. **Wyndham's Rights if You Default After Closing.** If Wyndham declares you in default after Closing, then to the extent allowed by applicable law and subject to any applicable notice or cure period, Wyndham may:

   a. Suspend or cause to be suspended the reservation and use rights and other privileges under your Ownership.

   b. Give you written notice that your Ownership will be terminated within 30 days of the notice. Wyndham may keep all money you have paid under this Agreement as liquidated damages and not as a penalty. If you have paid any Assessments to the Association, then those amounts will be retained by the Association.

735

   c.  Initiate a collection lawsuit against you to collect any unpaid amounts under this Agreement.

   d.  Declare as immediately due and payable the entire outstanding balance of the Principal Amount, plus accrued and unpaid finance charges and any other amounts due under this Agreement.

   e.  Enforce the Security Interest set forth in Section 5 above according to Article 9 of the Uniform Commercial Code or other applicable law.

   f.  Exercise any other right or remedy allowed by law and this Agreement.

**15.  Your Rights if Wyndham Defaults.** By entering into this Agreement, you expressly agree that in no event shall Wyndham, its parent companies, subsidiaries, affiliates, successors, or assigns, and all of their and Wyndham's employees, agents, officers, and directors, be liable to you for consequential, indirect, incidental, special, exemplary, punitive, or other enhanced damages arising out of, relating to, or in connection with this Agreement (including a breach thereof) or the marketing, sale, purchase, or use of your Ownership. **WYNDHAM'S MAXIMUM LIABILITY TO YOU ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT (INCLUDING A BREACH THEREOF) OR THE MARKETING, SALE, PURCHASE, OR USE OF YOUR OWNERSHIP, WHETHER FOR BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, SHALL BE THE TOTAL AMOUNT PAID TO WYNDHAM UNDER THIS AGREEMENT (REDUCED BY THE PROPORTION (I.E., VALUE) OF ANY BENEFITS YOU RECEIVED UNDER THIS AGREEMENT).** You expressly waive any right to seek relief in excess of the limitation of liability specified in this Section 15.

**16.  Refund Upon Your Cancellation.** If you cancel this Agreement during the cancellation period set forth on the signature page, Wyndham will refund to you the total amount of all payments you made under this Agreement, reduced by the proportion of any benefits which you have actually received under the Agreement prior to the effective date of your cancellation unless prohibited by law. This means that if you have used or occupied the Club Accommodations using Points purchased under this Agreement, Wyndham may subtract from your refund a reasonable charge to cover the length of your stay. This refund will be made by Wyndham as required by applicable law.

**17.  Court Costs; Attorney's Fees.** You agree to pay any court costs and disbursements which Wyndham incurs in collecting outstanding amounts under this Agreement. If an outstanding amount is referred for collection to an attorney that is not employed by Wyndham, you agree to pay attorney's fees as permitted by applicable law.

18.  Arbitration Provision (**"Arbitration Provision"** or **"Provision"**).

Scope of Arbitration Provision

| Question | Short Answer | Governing Language |
|---|---|---|
| What is arbitration? | An alternative to court | In arbitration, a neutral third-party arbitrator (**"arbitrator"**) resolves Claims in an informal hearing on an individual basis. |
| Is it different from court and jury trials? | Yes | The hearing is private. There is no court or jury. It is usually less formal, faster and less expensive than a court lawsuit. Pre-hearing fact finding is limited. Appeals are limited. Courts rarely overturn arbitration awards. |
| Can you reject (i.e., opt out of) this Provision so it does not apply? | Yes, within 60 days | Send a signed written (not electronic) notice within 60 days after you sign your Agreement to Wyndham Vacation Resorts, Inc., 6277 Sea Harbor Drive, Orlando, Florida 32821, Attention: Legal Department/Account Servicing Operations. Include your name, address and Contract Number and state that you "opt out" of the Provision. Opting out will not affect the rest of this Agreement. The opt out will apply only to this Agreement. |
| What is this Provision? | An agreement to arbitrate Claims | Unless you opt out, either you or Wyndham may elect to arbitrate any (**"Claim"** defined below) on an individual basis. |
| Who does the Provision cover? | You, Wyndham, and certain third parties | In addition to you and Wyndham, this Provision can be enforced by, or against (a) Wyndham's parent companies, subsidiaries, affiliates, successors, and assigns, and all of their and Wyndham's employees, agents, officers and directors; (b) any other person or entity you sue in a Claim you bring against Wyndham; (c) your heirs, successors and assigns; and (d) any other person or entity to which your Ownership is subsequently resold, conveyed, or transferred. |
| What "Claims" does the Provision cover? | All Claims (with certain exceptions described in the next section) | (**"Claims"**) broadly includes all past, present or future disputes between you and Wyndham arising out of or relating to: (a) this Agreement, including any breach, termination, default, or cancellation under this Agreement; (b) the Club Accommodations and Club Properties; (c) the Club; (d) your Ownership; (e) the Association; (f) Points, reservations (or cancellations), exchange programs, or rewards programs; (g) personal information, data breach, identity theft, and privacy; (h) marketing or sales solicitations, representations, advertisements, promotions, or |

| | | |
|---|---|---|
| | | disclosures; (i) collection of delinquent amounts and the manner of collection; (j) Assessments or Fees; (k) Club Wyndham Plus; (l) communications with or concerning you, including Ownership Communications and Communication Methods; (m) credit reporting; or (n) the relationships between you and Wyndham resulting from any of the foregoing. "Claims" includes disputes based on statute, regulation, ordinance, constitution, Uniform Commercial Code, equity or common law (contracts, torts, negligence, fraud or other intentional wrongs) and claims seeking damages and/or injunctive, declaratory or other equitable relief on an individual basis. |
| What disputes are not covered by this Provision? | Disputes about this Provision; small claims; self-help remedies | Disputes not subject to this Provision include: (i) disputes about the validity, enforceability, coverage, or scope of this Provision or any part thereof, which are for a court to decide (but disputes about the validity or enforceability of the Agreement as a whole are for the arbitrator to decide); (ii) any individual action by you or Wyndham in small claims or an equivalent court, unless that action is transferred, removed or appealed to a different court; (iii) your or Wyndham's use of lawful self-help remedies, including set-off, repossession or the sale of collateral, and remedies that do not seek money damages, including pre-judgment seizure, injunctions or equitable relief; and (iv) bringing an individual action in court that is limited to preventing the other Party from using a self-help or non-judicial remedy and that does not involve a request for damages or monetary relief. |
| Who handles the arbitration? | Usually AAA or JAMS | Arbitrations are conducted under this Provision and the applicable rules of the Arbitration Administrator in effect when the arbitration is started. The ("*Arbitration Administrator*") is either: <br> • The American Arbitration Association ("*AAA*"), 120 Broadway, 21st Floor, New York, NY 10271, www.adr.org, 1-800-778-7879. <br> • Judicial Arbitration and Mediation Services, Inc. ("*JAMS*"), 620 Eighth Avenue, 34th Floor, New York, NY 10018, www.jamsadr.com, 1-800-352-5267; or <br> • Any other company or arbitrator picked by agreement of the Parties. <br> If none of these options is available, a court with jurisdiction will pick the Arbitration Administrator or arbitrator, who must agree to abide by this Provision. A single neutral arbitrator will be appointed who must be a lawyer with at least ten years of experience or a retired judge unless the Parties otherwise agree. |
| Can Claims be litigated? | Sometimes | In addition to disputes not covered by this Provision (see above), either Party may bring a lawsuit if the other Party does not demand arbitration. Even if all Parties have opted to litigate a Claim in court, any Party may elect arbitration of a Claim made by a new Party or any Claim later asserted by a Party in that or any related or unrelated lawsuit (including a Claim initially asserted on an individual basis but modified to be asserted on a class, representative or multi-party basis). |
| Are you and Wyndham giving up any rights? | Yes, Jury Trial Waiver and Class Action Waiver | For Claims that are arbitrated, you and Wyndham give up the rights to: <br> 1. Have juries decide Claims. <br> 2. Have courts (other than small-claims courts) decide Claims. <br> 3. Participate in a class or collective action in court or in arbitration, either as a class representative or class member. <br> 4. Serve as a private attorney general or in a representative capacity in court or in arbitration. <br> 5. Join or consolidate Claims with Claims of others unless all Parties otherwise agree. <br> (Numbers 3, 4 and 5 collectively are the "*Class Action Waiver*"). The arbitrator will not conduct any arbitration inconsistent with this section or issue any relief that applies to any person or entity except you or Wyndham individually. |
| What happens if a part of this Provision cannot be enforced? | It depends | If any portion of this Provision is held to be invalid or unenforceable, the remaining portions will nevertheless remain in force, subject to two exceptions: (i) if a determination is made that the Class Action Waiver is unenforceable, and that determination is not reversed on appeal, then this Provision (except for this sentence) will be void in its entirety; and (ii) if a court determines that a public injunctive relief Claim may proceed notwithstanding the Class Action Waiver, and that determination is not reversed on appeal, then the public injunctive relief Claim will be decided by a court, any individual Claims will be arbitrated, and the Parties will ask the court to stay the public injunctive relief Claim until the other Claims have been finally concluded. |

| What law applies? | The FAA | This Agreement involves interstate commerce. Thus, the Federal Arbitration Act (*"FAA"*) governs this Provision. The arbitrator must apply applicable substantive law consistent with the FAA and must honor statutes of limitation and privilege rights. If this Provision conflicts with the Arbitration Administrator's rules or this Agreement, this Provision will govern. |
| Will this Provision continue to govern? | Yes | The Provision shall continue to stay in force even if (a) the Agreement is rescinded, cancelled, terminated, amended or fully performed, (b) there is a breach, default, renewal, prepayment, or payment, (c) you transfer or otherwise relinquish an Ownership, (d) your Agreement is discharged through bankruptcy, or (e) there is a sale, transfer or assignment of a Party's interest. |

**Process**

| How does an arbitration start? | By initiating or demanding arbitration | The complaining Party may commence a lawsuit or an arbitration, subject to the terms of this Provision. To start an arbitration, the complaining Party selects the Arbitration Administrator and follows the Arbitration Administrator's rules. If one Party begins or threatens a lawsuit, the other Party can demand arbitration. This demand can be made in court papers, such as a motion to compel arbitration. |
| Will any hearing be held nearby? | Yes | The Parties may decide that an in-person hearing is unnecessary and that the arbitrator can resolve a Claim based on written filings or a conference call. However, any Party may request an in-person arbitration hearing, which will take place either in Orlando, Florida; Las Vegas, Nevada; or in the location where you purchased the Ownership (if in person). |
| What is the legal effect of an award?<br><br>Are there appeal rights? | It binds the Parties<br><br>Very limited | The arbitrator's award will be final and binding, except for appeal rights under the FAA, which are very limited. No finding, award or judgment from any other arbitration will impact the arbitration of any Claim, and no finding, award or judgment from this arbitration will impact any other arbitration. Any court with jurisdiction may enter judgment on the arbitrator's award. |

**Arbitration Fees and Awards**

| Who bears arbitration fees? | Payment is determined by the rules | The payment of filing, administrative and arbitrator fees shall be governed by the Arbitration Administrator's rules and applicable law, unless otherwise stated in this Agreement. |
| Can you recover your legal fees and costs? | Only if permitted by applicable law | The Parties shall bear their own legal fees and expenses for any arbitration proceeding unless applicable law provides otherwise. |
| Will you ever owe us for arbitration or attorney's fees? | For bad faith | The arbitrator can require a Party to pay the other Party's fees and costs if: (1) the arbitrator finds the Party has acted in bad faith (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), and (2) this power does not make this Provision invalid. |
| Can an award be explained? | Yes | A Party may request details from the arbitrator within 14 days of the ruling. The arbitrator will determine whether to grant such request. |

**19. Remaining Provisions.**

| Governing Law; Waiver of Jury Trial and Class Action | Except as otherwise set forth in the Arbitration Provision, this Agreement and all related disputes are governed by the State of Tennessee, without regard to Tennessee's choice of law rules. EXCEPT AS OTHERWISE PROVIDED BY APPLICABLE LAW, YOU WAIVE YOUR RIGHT TO A TRIAL BY JURY OR A CLASS OR COLLECTIVE ACTION FOR A LEGAL CLAIM ARISING UNDER THIS AGREEMENT. |
| Severability | Except as provided in the Arbitration Provision, if any provision of this Agreement is determined to be void or unenforceable under any applicable law, rule, or regulation, all other provisions of this Agreement will remain valid and enforceable. |
| No Waiver | Wyndham can waive or delay enforcing any of its rights under this Agreement without losing them. If there is more than one Owner signing this Agreement, Wyndham can waive or delay enforcing a right as to one Owner, without waiving it as to any other Owner. |
| Final and Entire Binding Agreement | This Agreement (and all other documents signed at the same time as this Agreement) and the Club Instruments (together, the *"Binding Documents"*) constitute the entire and final expression of the agreement between you and Wyndham. The Binding Documents may not be contradicted by evidence of any alleged oral agreement and no Party is liable or can be bound to the other Party in any manner by any representations, warranties, covenants, or agreements except as set forth in the Binding Documents. The Binding Documents are binding upon and inure to the benefit of the heirs, executors, administrators, successors, and assigns of you and Wyndham. |

| Amendment | The terms of this Agreement may only be changed by a writing signed by you and Wyndham. No change to this Agreement will release any Party from liability unless specifically stated in writing. Wyndham may make clerical or typographical corrections in any documents relating to this Agreement, and may change the Club Instruments to correct errors or to effect or implement the purposes of the Club and Ownership. |
|---|---|
| Rights Cumulative | Wyndham's exercise of all rights and remedies under this Agreement is cumulative. The exercise of one right or remedy does not prevent Wyndham from exercising any other right or remedy available. |
| Joint and Several Liability | If more than one Owner signs this Agreement, the liability of each Owner under this Agreement is joint and several. |
| Assignment | Wyndham and each direct and indirect successive transferee may transfer or assign this Agreement and any or all of Wyndham's rights or obligations under this Agreement at any time without your consent. No such transfer or assignment will change your rights and obligations under this Agreement. You may not transfer or assign your obligations under this Agreement without Wyndham's consent. Furthermore, you may not transfer your Ownership to an individual or entity that is a known or suspected fraudulent person or is delinquent in the payment of any Assessments or fees to Wyndham or to the Association. |
| Warranties | Wyndham makes no express or implied representation or warranty about the Club Accommodations, including any warranties (statutory or otherwise) of habitability, merchantability, fitness for a particular purpose, or availability of reservations for accommodations except as specifically required by law as of the Contract Date or as contained in or required by the Club Instruments. Wyndham expressly disclaims, and you irrevocably waive, each of these warranties except as specifically required by law as of the Contract Date or as contained in or required by the Club Instruments. |
| Notices | You must give all notices to Wyndham in writing. Notices to you may be made in person or by telephone, email, or writing. Written notices may be delivered, emailed, or mailed to the applicable address shown on Page 1, or other address provided ("Notice Address"). For clarity, the Notice Address for Wyndham is 6277 Sea Harbor Drive, Orlando, FL 32821. A written notice is considered given and received when delivered or emailed, or 3 business days after it is deposited into the mail, properly addressed. If multiple individuals own this Ownership, notice to one of you is considered notice to all of you. If you are a corporation or entity, notice to you may be made to any corporate officer or general partner.<br><br>If you move or change your physical or email address or telephone number, you must promptly notify Wyndham of your new contact information. |
| Further Assurances | If there is any error or omission in this Agreement (or this Agreement is lost), you and Wyndham agree to sign and deliver such documents (including this Agreement) and take such actions as the other Party may reasonably request to correct the error or omission. |
| Assumption of Liability | You agree that you and your family and guests assume all risks of loss or damage to persons or property in using the Club Accommodations and the Club Properties in which they are located (except in cases of gross negligence of Wyndham, Manager, or the Association or as otherwise may be required by law). |
| Monitoring of Communications | Wyndham may monitor and record your phone conversations with any of Wyndham's representatives for training, quality control, evidentiary, or any other purpose. However, Wyndham is not under any obligation to monitor, record, retain or reproduce such recordings, unless required by applicable law. |
| Contract Date; Receipt of Documents | This Agreement is signed to be effective as of the Contract Date. By signing this Agreement, you confirm that you have received a completed copy of this entire Agreement, along with the Club's Public Offering Statement and the Club Instruments. |
| Purchase Money Protection | All payments you make to Wyndham from the Contract Date until Closing will be protected by a surety bond held by First American Title Insurance Company ("Escrow Agent"), which is located at 400 International Parkway, Suite 380, Lake Mary, Florida 32746. |
| Inadvertent Excessive Charges or Collections of Payments | If a law which applies to this Agreement and which sets maximum charges is finally interpreted so that any fees or other charges collected or to be collected under this Agreement exceed the permitted limits, then (1) any such fees or other charges collected will automatically be reduced to the maximum permitted limit, retroactively effective as of the Contract Date, and as though this Agreement originally provided for the reduced fees or other charges; and (2) any sums already collected from you which exceeded permitted limits will be credited or refunded to you. Also, if Wyndham inadvertently collect more payments than permitted by this Agreement, Wyndham will credit or refund to you any such excess payments. |
| Electronic Signatures and Copies | This Agreement, together with all related documents and instruments to be signed by you and Wyndham, may be signed electronically or manually. Signing may be completed in counterparts (including both counterparts that are signed on paper and counterparts that are electronic records and signed electronically), which together constitute a single agreement. As between you and Wyndham, any copy of this Agreement (including a copy printed from an image of this Agreement that has been stored electronically) has the same legal effect as an original. |

## STATUTORY NOTICES AND RIGHT OF CANCELLATION

To the extent that any terms or provisions below modify or conflict with any terms or provisions of this Agreement, the terms and provisions below control.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER(S) OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

### NOTICE TO THE BUYER

a. DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES.

b. YOU ARE ENTITLED TO AN EXACT COPY OF THE CONTRACT YOU SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS.

BY SIGNING THIS AGREEMENT BELOW, EACH BUYER CONFIRMS THAT THE BUYER HAS RECEIVED A FULLY COMPLETED COPY OF THIS AGREEMENT AND AGREES TO THE TERMS OF THIS AGREEMENT.

### RIGHT OF CANCELLATION

YOU MAY CANCEL A CONTRACT TO PURCHASE A TIME-SHARE INTERVAL WITHIN TEN (10) DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT, WHERE YOU HAVE MADE AN ON-SITE INSPECTION OF THE TIME-SHARE PROJECT BEFORE SIGNING THE CONTRACT, AND, IF YOU HAVE NOT MADE SUCH AN INSPECTION, WITHIN FIFTEEN (15) DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT. IF YOU ELECT TO CANCEL, YOU MAY DO SO BY:

(a) HAND DELIVERING NOTICE OF CANCELLATION TO THE OTHER PARTY AT WYNDHAM VACATION RESORTS, INC., ATTENTION: RESCISSIONS DEPARTMENT, 6277 SEA HARBOR DRIVE, ORLANDO, FLORIDA 32821, WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT; OR

(b) MAILING NOTICE OF CANCELLATION BY PREPAID UNITED STATES MAIL AT WYNDHAM VACATION RESORTS, INC., ATTENTION: RESCISSIONS DEPARTMENT, 6277 SEA HARBOR DRIVE, ORLANDO, FLORIDA 32821, POSTMARKED ANYTIME WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT, TO THE OTHER PARTY OR TO THE OTHER PARTY'S AGENT FOR SERVICE OF PROCESS; OR

(c) SENDING NOTICE OF CANCELLATION VIA ELECTRONIC MAIL AT RESCISSIONS.WVR@WYN.COM, TIME STAMPED WITHIN THE DESIGNATED PERIOD FOR VOIDING THE CONTRACT, TO THE OTHER PARTY.

You:

SANDRA ALICE LESLIE      12/17/2024

Buyer Sandra Alice Leslie      Date Signed

DONALD L WALL      12/17/2024

Buyer Donald L Wall      Date Signed

Buyer      Date Signed

Buyer      Date Signed

Wyndham:

Wyndham Vacation Resorts, Inc.,
a Delaware corporation

By: Roger Miller

     Authorized Representative      QA

Printed Name: Roger Miller

     12/17/2024
Date:

Sales Agent: DIANA ERNST

VACATION OWNERSHIP ASSIGNMENT AGREEMENT AND USE RESTRICTION

THIS VACATION OWNERSHIP ASSIGNMENT AGREEMENT AND USE RESTRICTION ("*Agreement*") is made this 17th day of December, 2024, by and between Wyndham Vacation Resorts, Inc., a Delaware Corporation, whose address is 6277 Sea Harbor Dr, Orlando, FL 32821 ("*Plan Manager*"), and Sandra Alice Leslie and Donald L Wall Joint Tenants With The Right Of Survivorship ("*Owner*").

WHEREAS, the Second Amended and Restated FairShare Vacation Plan Use Management Trust Agreement effective March 14, 2008, recorded in the Office of the Circuit Clerk in Cleburne County, Arkansas and other various jurisdictions, which document is incorporated herein by reference, as amended from time to time ("*Trust Agreement*") sets forth the terms, restrictions and conditions of the FairShare Vacation Plan ("*Plan*") described therein as well as the obligations of the Plan Manager to those owners who have subjected their property to the Trust Agreement by assigning the use, occupancy and possessory rights in such property to the FairShare Vacation Plan Use Management Trust ("*Trust*") or who acquire property which has been previously subjected to the Trust Agreement and whose use, occupancy and possessory rights have previously been assigned to the Trust ("*Assignment*"), all in accordance with the terms and conditions of the Plan; and

WHEREAS, Owner is the purchaser of an ownership interest ("*Ownership*") in the ClubWyndham Access Vacation Ownership Plan (the "*Club*") which entitles Owner to use Owner's points to reserve the use of accommodations in the Club as described in the ClubWyndham Access Vacation Ownership Plan Retail Installment Contract Purchase and Security Agreement ("*Contract*") #        735; and

WHEREAS, Owner desires to subject the Ownership to the Trust Agreement and assign the use, occupancy and possessory rights in the Ownership to the Trust, all in accordance with the Trust Agreement.

NOW THEREFORE, in consideration of a Fee Waived, paid by Owner to Plan Manager, and the mutual promises contained herein and in furtherance of the Assignment, the parties agree as follows:

1. Definitions. Except as otherwise provided herein, capitalized terms shall have the same definition as set forth in the Trust Agreement. This Agreement, as well as the interest of the Trustee set forth herein, shall be subject to the prior rights in the Contract of any mortgagee or secured party. Nothing contained herein shall contravene the obligation of Owner under the Contract or security agreement executed in connection with Owner's purchase of the Ownership.

2. Assignment. Owner hereby subjects the Ownership to the Trust Agreement and assigns the use, occupancy and possessory rights in the Ownership to the Trust, to be administered in accordance with the Trust Agreement, and agrees that Owner's Use Rights shall be governed by the Trust Agreement.

3. Points. Plan Manager shall assign Owner 405,000 Points which shall be used through the Club Wyndham Plus Program to reserve accommodations subjected to the Trust in accordance with the Trust Agreement. Points are symbolic of the value of Owner's Use Rights and are to be used in each full year.

4. Voting Rights. Notwithstanding the Assignment, Owner shall retain Owner's voting right in the PTVO Owners Association ("*HOA*").

5. Club Wyndham Plus Assessment. Owner agrees to pay an annual Club Wyndham Plus Assessment ("*Assessment*") to the Trust for certain expenses of the Plan in accordance with the Trust Agreement, which Assessment shall include Owner's share of the expenses associated with the operation and maintenance of the Plan and may include Owner's proportionate share of Owner's regular assessment attributable to the Ownership ("*HOA Fees*"). The Assessment shall be payable annually in advance in either one installment or in monthly installments pursuant to an approved auto pay plan. The Plan Manager shall cause the HOA Fee portion of the Assessment to be deposited into a Club Wyndham Plus escrow account ("*Escrow Account*") until such funds become due and are delivered to the HOA. Owner authorizes the Trustee or its assignees to withdraw the HOA Fee from and out of the Escrow Account and pay same over to the HOA so long as said Ownership is subjected to the Plan.

6. Association. Pursuant to the Assignment, Owner becomes a Member of the FairShare Vacation Owners Association ("*Association*") and as such agrees to abide by all requirements set forth in the Articles and Bylaws of the Association. Owner also has the right to vote Owner's interest as a Member of the Association.

7. Use and Occupancy Rights. Owner hereby assigns Owner's use and occupancy rights in the Ownership to the Trust for the period of time this Agreement is effective and accordingly grants to the Trustee and the Plan Manager the right to assign the possession and Use Rights of the Ownership on an annual basis or biennial basis, if applicable, to other Members in the Plan in return for Owner's Use Rights to utilize the Club Wyndham Plus Program or exchange in accordance with the Trust Agreement.

8. Effective Date. This Agreement shall become effective on the date first written above.

9. Termination. This Agreement and all rights granted hereunder may be terminated by Owner, or by Owner's successors or assigns, at any time, however, any such termination shall be subject to any outstanding reservations. Election to terminate will be noted but all reservations existing as of the termination date will be honored. No new reservations will be accepted on or after the termination date. If this Agreement is terminated, future access to the Plan will require approval of the Plan Manager and include a conversion fee. If not terminated sooner, termination will occur on the earlier of the following dates: (a) termination of the Club; (b) termination of the Plan; or (c) termination by Trustee in accordance with the Trust Agreement. Upon termination, Owner's Points will be extinguished and Owner will no longer have the right to make reservations in accommodations subjected to the Trust Agreement and all use, occupancy and possessory rights in the Ownership shall automatically revert to Owner.

10. Binding Agreement. This Agreement and the terms and conditions of the Trust Agreement shall be binding upon Owner, Owner's heirs, successors and assigns, provided, however, the application of this covenant on the Ownership may be terminated in accordance with paragraph 9 above, or shall terminate automatically if and when the Ownership shall be held by Wyndham Vacation Resorts, Inc. ("*Wyndham*") subsequent to conveyance to Owner.

Contract or security agreement resulting in the termination of the Contract or the acquisition of the Ownership by Owner's secured party, this Agreement shall be deemed terminated and cancelled and all rights of Owner hereunder shall cease. Upon such termination Plan Manager shall cause the use, occupancy and possessory rights in the Ownership to be re-assigned back to Owner or the acquiring secured party, subject to any Owner commitments or confirmed reservations by another Plan participant which may have been made pursuant to the Plan. Any fees due the Trust by Owner shall be deducted at the date of termination from the Assessments paid by Owner. Upon such termination, all benefits and obligations of Owner under the Contract or security agreement shall continue in force and effect.

12. <u>Club Wyndham Plus VIP Program.</u> The Club Wyndham Plus VIP Program (*"VIP Program"*) and its accompanying benefits are made available by Wyndham to Club Wyndham Plus Members who have achieved certain eligibility criteria as set forth in the Club Wyndham Plus Member's Directory (*"Member's Directory"*). Owner should refer to the Member's Directory for the terms and conditions of the VIP Program.

13. <u>Miscellaneous.</u>  The parties hereto agree to execute any additional instruments which may be necessary or convenient to carry out the intent and purpose of this Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the day and year first above written.

OWNER: _Sandra Alice Leslie_

WYNDHAM VACATION RESORTS, INC., PLAN MANAGER

PRINT NAME: Sandra Alice Leslie

By _Regis Miller_

Authorized Representative

OWNER: _Donald L Wall_

PRINT NAME: Donald L Wall

OWNER: _____

PRINT NAME: _____

OWNER: _____

PRINT NAME: _____

Contract Number **735**

# Trade Agreement

This Trade Agreement (*"Agreement"*) is entered into as of **12-17-2024** by and between **Sandra Alice Leslie and Donald L Wall** (*"you"*) and Wyndham Vacation Resorts, Inc., (*"Wyndham"*) related to the purchase of the timeshare interest identified as **CLUBWYNDHAM ACCESS VACATION OWNERSHIP PLAN** Contract Number **735** (*"NEW TIMESHARE"*). All references to Wyndham in this Agreement apply, as applicable, to any designee of Wyndham.

You agree to relinquish and convey to Wyndham that certain timeshare interest identified by Contract Number(s) **810**, etc (whether one or more, *"RELINQUISHED TIMESHARE"*), and Wyndham agrees to accept from you the RELINQUISHED TIMESHARE and to apply the value of your interest in the RELINQUISHED TIMESHARE (*"TRADE-IN CREDIT"*) toward the purchase of the NEW TIMESHARE. The Trade-in Credit is reflected in the purchase agreement related to the NEW TIMESHARE. You agree to execute and deliver all documents required to complete the trade-in within 60 days of purchasing the NEW TIMESHARE. When possible, such documents will be prepared and delivered at the time of purchase of the NEW TIMESHARE for you to execute. If not available at that time or if additional documentation is required, Wyndham will provide documents to you for execution when they are ready or notify you in writing that additional documents are needed. You understand and agree that you will be unable to make reservations for the NEW TIMESHARE unless and until such documents are delivered to Wyndham. You further understand and agree that you will continue to be bound by the terms of the RELINQUISHED TIMESHARE until you complete the trade-in of the RELINQUISHED TIMESHARE. In addition, if you are subject to any outstanding financial obligations related to the RELINQUISHED TIMESHARE at the time the purchase agreement related to the NEW TIMESHARE is executed, including but not limited to program fees, maintenance fees, taxes, special assessments, and any other fees or charges (the *"Relinquished Timeshare Obligations"*), you understand and agree that after you finalize the purchase of the NEW TIMESHARE you shall continue to be responsible for any Relinquished Timeshare Obligations until you have paid the Relinquished Timeshare Obligations in full.

You acknowledge that if any usage of the CLUB WYNDHAM Plus points (*"Points"*) allocated to the RELINQUISHED TIMESHARE has occurred for the current Use Year or future Use Years, then an equal amount of Points will be deducted from the corresponding Use Years of the NEW TIMESHARE. Therefore, existing reservations and Points transactions will not be affected.

For various reasons (such as an unreleased lien, transfer restriction, or unpaid Relinquished Timeshare Obligations), it may not be possible for you to trade in your RELINQUISHED TIMESHARE. If this happens, or if you cancel your purchase of the NEW TIMESHARE or closing does not occur for any other reason, then you will retain ownership of the Relinquished Timeshare and will not receive the Trade-in Credit.

Contract Number: 735

Points Transaction Detail:

Points allocated to the RELINQUISHED TIMESHARE:      **300,000**

Total Points allocated to the NEW TIMESHARE:      **405,000**

**You:**                                                        **Wyndham:**

| | | Wyndham Vacation Resorts, Inc., |
|---|---|---|
| Signature: *SANDRA ALICE LESLIE* | Signature: *DONALD L WALL* | By: *Roger Miller* |
| Printed Name: **Sandra Alice Leslie** | Printed Name: **Donald L Wall** | Authorized Representative |
| Date: 12/17/2024 | Date: 12/17/2024 | Print Name: Roger Miller |
| | | Date: 12/17/2024 |
| Signature: | Signature: | |
| Printed Name: | Printed Name: | |
| Date: | Date: | |

No. 3453/11-22

**OWNER INFORMATION**

Contract Number: 735
Member Number: 146

| MONTHLY PAYMENT UNDER CONTRACT | ____ Enroll ____ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 01-31-2025 | Frequency: Monthly | | Amount: $961.58 |
| *BANK INFORMATION* | | *CREDIT CARD INFORMATION* | |
| ____ Checking* ____ Savings* | | Credit Card Type: Visa** | |
| Routing: | | Credit Card #: | |
| Bank Account #: | | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX529B | |
| Name on Account: | | Name on Card: Sandra Leslie | |
| Name of Bank: | | (As it appears on card) | |

| CLUB WYNDHAM® PLUS (INCLUDES PAYMENT OF CWA ASSESSMENTS) | ____ Enroll ____ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 02-01-2025 | Frequency: Monthly | | Amount: $283.50 |
| *BANK INFORMATION* | | *CREDIT CARD INFORMATION* | |
| ____ Checking* ____ Savings* | | Credit Card Type: VISA** | |
| Routing: | | Credit Card #: | |
| Bank Account #: | | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX389A | |
| Name on Account: | | Name on Card: Sandra Leslie | |
| Name of Bank: | | (As it appears on card) | |

| Vacation Sidekick™ | ____ Enroll ____ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 01-01-2026 | Frequency: Annually | | Amount***: $59.95 |
| *BANK INFORMATION* | | *CREDIT CARD INFORMATION* | |
| ____ Checking* ____ Savings* | | Credit Card Type: Visa** | |
| Routing: | | Credit Card #: | |
| Bank Account #: | | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX389A | |
| Name on Account: | | Name on Card: Sandra Leslie | |
| Name of Bank: | | (As it appears on card) | |

\* If your checking or savings account is with a foreign bank, please complete the Credit Card Information section.
\*\* At this time, Discover Cards can be used for US accounts only.
\*\*\* Vacation Sidekick membership fees may vary. Refer to our Vacation Sidekick Membership Agreement for more details.
All funds in US Dollars unless noted.

**AUTHORIZATION FOR PAYMENT**

Under this Pre-authorized Auto Pay Plan Set-up Form ("Authorization"), Wyndham Vacation Resorts, Inc., together with its affiliates, successors, assigns, agents, and service providers (collectively, "Wyndham") is authorized to initiate ACH debits from my bank account(s) or charges to my credit card account(s) indicated above. These debits or charges will be in the amounts (and on or after the dates) listed above for each agreement and/or membership for which I have provided payment information in this Authorization. Amounts due for assessments and charges may increase due to changes in assessments and charges as provided in my vacation ownership's governing documents, and Wyndham may adjust the payment amounts due accordingly and to electronically debit or charge to my bank account(s) or credit card account(s) the adjusted amount. Payment amounts authorized above may vary for various reasons, including early payments or late payments (and interest that may accrue on late payments). I have the right to receive written notice if a debit or charge will vary, and Wyndham will generally provide at least ten (10) days' advance written notice of any such variance. However, Wyndham need not provide written notice if the amount of the debit or charge is less than the amount authorized above or no more than ten percent (10%) in excess of this amount.

If Wyndham makes an error in processing a debit or charge, Wyndham may correct the error by initiating an electronic credit or debit. If I make a typographical or similar error in providing Wyndham with relevant information, Wyndham may correct the error upon receiving corrected information from me or my financial institution.

If the payment due date(s) authorized above falls on a weekend or holiday, the payment may be executed on the next business day. Because this is an electronic transaction, these funds may be withdrawn from my account or charged to my credit card each period as soon as the above noted transaction date occurs. Any ACH transaction rejected for Non-Sufficient Funds (NSF) will be subject to a fee of up to $50 (as permitted by law) initiated as a separate transaction. If the amount due is not timely paid, late fees and interest may be charged as provided in the agreement(s) and membership(s) described above. Wyndham may at its discretion attempt to process any rejected or unsuccessful debit or charge again within ten (10) days.

I may choose to revoke this Authorization: (i) by telephone at 1-866-418-3800; or (ii) in writing by mail to Wyndham Consumer Finance, P.O. Box 98944, Las Vegas, Nevada 89193-8944. This Authorization in no way limits any right I may have under federal law to stop payment by contacting my financial institution. I must notify Wyndham in writing of any changes to my bank account(s) or credit card account(s), or termination of this Authorization, at least five (5) days before the next billing date. Wyndham may update my bank account and/or credit card account details with information received from any card or account updating services.

This Authorization is subject to applicable law and network rules. Wyndham reserves the right to terminate this Authorization at any time and for any reason, including excessive returned payments. If this Authorization is cancelled by either me or Wyndham, my obligation to repay my underlying obligations to Wyndham remains in effect and I will be responsible for making my payments by another payment method.

This Authorization cannot be used to change my existing due date(s). This Authorization becomes effective for the next scheduled payment on the Payment Plan referenced. I understand this Authorization and its terms are subject to acceptance by the Servicer. As used in this Authorization, "I" and "my" in the singular include the plural if more than one individual signs below.

My signature below confirms that I understand, acknowledge, and agree to this Authorization.

Authorized Signature on Payment Plan: _____  Print Name: _____  Date: _____

Signature: SANDRA ALICE LESLIE  Print Name: **Sandra Alice Leslie**  Date: 12/17/2024

Signature: DONALD L WALL  Print Name: **Donald L Wall**  Date: 12/17/2024

Signature: _____  Print Name: _____  Date: _____

Signature: _____  Print Name: _____  Date: _____

Mail Form to: P.O. Box 98944, Las Vegas, Nevada 89193-8944    For Inquiries: 1-866-418-3809

Enroll Online: www.myclubwyndham.com/payments

# CASH PAYMENT RECEIPT

| | |
|---|---|
| Contract Type: **UDI** | Date: **12-17-2024** |
| Sales location: **WYNDHAM SMOKY MOUNTAINS** | Entity: **WVR** |
| Member Name(s): **SANDRA ALICE LESLIE and DONALD L WALL JOINT TENANTS WITH THE RIGHT OF SURVIVORSHIP** | Contract Number: **735** |

| | Amount: | **$ 7,096.95** |
|---|---|---|

Total Cash Payments: **$ 7,096.95**

WVO0006/Rev. 05-22

Contract Number **735**

## SUPPLEMENT TO DISCLOSURES
## AND PURCHASE DOCUMENTS

Purchaser(s) acknowledges that effective September 30, 2024, Wyndham Vacation Ownership, Inc., changed its name to Travel + Leisure Resort Development, Inc. Purchaser(s) agree that the documents governing the provisions for purchase and sale of the ownership interest are enforceable according to their terms notwithstanding this change.

Travel + Leisure Resort Development, Inc. is a direct, wholly-owned subsidiary of Travel + Leisure Co. ("T+L Co."). T+L Co. has properly notified the relevant state agencies of this change and is filing revisions to the public reports and disclosure statements with those agencies.

The foregoing acknowledgements and agreements shall be deemed to be incorporated into and made a part of each of the Purchase Documents.

| | |
|---|---|
| **Sandra Alice Leslie** | |
| Purchaser's Printed Name | Purchaser's Printed Name |
| *SANDRA ALICE LESLIE* | |
| Signature | Signature |
| 12/17/2024 | |
| Date | Date |
| **Donald L Wall** | |
| Purchaser's Printed Name | Purchaser's Printed Name |
| *DONALD L WALL* | |
| Signature | Signature |
| 12/17/2024 | |
| Date | Date |

No. 3628/9-24

Contract Number **2735**

## ELECTRONIC DELIVERY OF CONSUMER DOCUMENTS

_____ The undersigned purchaser(s) hereby expressly acknowledge that they have chosen **not** documentation related to this purchase electronically, and therefore will receive a **printed hard copy** of all consumer documentation.

_____ The undersigned purchaser(s) hereby expressly elect(s) to receive **all\*** consumer documentation related to this purchase **electronically** via DocuSign.

DocuSign can be accessed utilizing supported browsers, which include Chrome, Firefox, Safari, and Microsoft Edge via https://www.docusign.com on most modern computer systems. DocuSign can also be accessed on mobile platforms by downloading the mobile application from either the Apple App Store or the Google Play Store.

An invitation with instructions to access this platform will be provided via email.

**DIGITAL COPIES SHOULD NOT BE ELECTED UNLESS THE DOCUMENTATION CAN BE VIEWED PRIOR TO THE CANCELLATION PERIOD. REFER TO STATE SPECIFIC DISCLOSURE DOCUMENTS AND CONTRACT FOR STATE SPECIFIC CANCELLATION RIGHTS WHICH ARE AFFORDED TO YOU.**

**\*FOR ALL SALES IN FLORIDA OR TEXAS, OR SALES TO TEXAS RESIDENTS IN ANY STATE**, purchaser(s) **WILL BE** provided an executed paper copy of the contract document.

Sandra Alice Leslie
Purchaser's Printed Name

SANDRA ALICE LESLIE
Signature

12/17/2024
Date

Print Name

Signature

Date

Donald L Wall
Purchaser's Printed Name

DONALD L WALL
Signature

12/17/2024
Date

Print Name

Signature

Date

No. 3356/Rev.12-23

Contract Number 2735

## ELECTRONIC DELIVERY OF CONSUMER DOCUMENTS

_____ The undersigned purchaser(s) hereby expressly acknowledge that they have chosen **not** documentation related to this purchase electronically, and therefore will receive a **printed hard copy** of all consumer documentation.

X
_____ The undersigned purchaser(s) hereby expressly elect(s) to receive **all\*** consumer documentation related to this purchase **electronically** via DocuSign.

DocuSign can be accessed utilizing supported browsers, which include Chrome, Firefox, Safari, and Microsoft Edge via https://www.docusign.com on most modern computer systems. DocuSign can also be accessed on mobile platforms by downloading the mobile application from either the Apple App Store or the Google Play Store.

An invitation with instructions to access this platform will be provided via email.

**DIGITAL COPIES SHOULD NOT BE ELECTED UNLESS THE DOCUMENTATION CAN BE VIEWED PRIOR TO THE CANCELLATION PERIOD. REFER TO STATE SPECIFIC DISCLOSURE DOCUMENTS AND CONTRACT FOR STATE SPECIFIC CANCELLATION RIGHTS WHICH ARE AFFORDED TO YOU.**

**\*FOR ALL SALES IN FLORIDA OR TEXAS, OR SALES TO TEXAS RESIDENTS IN ANY STATE,** purchaser(s) **WILL BE** provided an executed paper copy of the contract document.

| | |
|---|---|
| Sandra Alice Leslie | Donald L Wall |
| Purchaser's Printed Name | Purchaser's Printed Name |
| SANDRA ALICE LESLIE | DONALD L WALL |
| Signature | Signature |
| 12/17/2024 | 12/17/2024 |
| Date | Date |
| | |
| Print Name | Print Name |
| | |
| Signature | Signature |
| | |
| Date | Date |

No. 3358/Rev.12-23

Contract Number: **735**

THE STATE OF TENNESSEE

PUBLIC OFFERING STATEMENT
RECEIPT

NAME OF TIME-SHARE PROJECT: **CLUBWYNDHAM® ACCESS VACATION OWNERSHIP PLAN**

NAME OF SUBDIVIDER: WYNDHAM VACATION RESORTS, INC.

PURCHASERS ACKNOWLEDGEMENT OF RECEIVING THE TENNESSEE TIME-SHARE
PUBLIC OFFERING STATEMENT DATED: MARCH 13, 2024

This Tennessee Public Offering Statement consists of 904 pages, which have been filed with the
Tennessee Real Estate Commission.

I have received a copy of the Tennessee Public Offering Statement required by the Tennessee
Real Estate Commission pursuant to the Tennessee Time-Share Act.

PURCHASER CANCELLATION:

YOU MAY CANCEL A CONTRACT TO PURCHASE A TIME-SHARE INTERVAL WITHIN TEN (10)
DAYS FROM THE DATE OF THE SIGNING OF THE CONTRACT, WHERE YOU HAVE MADE AN
ON-SITE INSPECTION OF THE TIME-SHARE PROJECT BEFORE SIGNING THE CONTRACT, AND,
IF YOU HAVE NOT MADE SUCH AN INSPECTION, WITHIN FIFTEEN (15) DAYS FROM THE DATE
OF THE SIGNING OF THE CONTRACT. IF YOU ELECT TO CANCEL, YOU MAY DO SO BY:

(A) HAND DELIVERING NOTICE OF CANCELLATION TO THE OTHER PARTY AT WYNDHAM
VACATION RESORTS, INC., ATTENTION: RESCISSIONS DEPARTMENT, 6277 SEA HARBOR
DRIVE, ORLANDO, FLORIDA 32821, WITHIN THE DESIGNATED PERIOD FOR VOIDING THE
CONTRACT; OR

(B) MAILING NOTICE OF CANCELLATION BY PREPAID UNITED STATES MAIL AT WYNDHAM
VACATION RESORTS, INC., ATTENTION: RESCISSIONS DEPARTMENT, 6277 SEA HARBOR
DRIVE, ORLANDO, FLORIDA 32821, POSTMARKED ANYTIME WITHIN THE DESIGNATED PERIOD
FOR VOIDING THE CONTRACT, TO THE OTHER PARTY OR TO THE OTHER PARTY'S AGENT
FOR SERVICE OF PROCESS; OR

(C) SENDING NOTICE OF CANCELLATION VIA ELECTRONIC MAIL AT
RESCISSIONS.WVR@WYN.COM, TIME STAMPED WITHIN THE DESIGNATED PERIOD FOR
VOIDING THE CONTRACT, TO THE OTHER PARTY.

| 12/17/2024 | | *Sandra Alice Leslie* |
| --- | --- | --- |
| DATE | | PURCHASER  Sandra Alice Leslie |
| 12/17/2024 | | *Donald L Wall* |
| DATE | | PURCHASER  Donald L Wall |
| | | |
| DATE | | PURCHASER |
| | | |
| DATE | | PURCHASER |

(CWATN-NP) No. 3028



Contract Number: ( 2735

## Acknowledgement Receipt
### for Documents and Disclosures

Owner(s) hereby acknowledges that Owner has received copies of the documents and disclosures listed below prior to execution of the Retail Installment Contract and CLUB WYNDHAM Plus Vacation Ownership Assignment Agreement and Use Restriction.

- Governing Documents

- Trust Agreement and Accompanying Documents

- CLUB WYNDHAM Plus Program Summary

- WYNDHAM CLUB PASS, LLC - Disclosure Summary for Wyndham Club Pass Program

- CLUB WYNDHAM Plus Member's Directory

- Enrollment Agreement

- Wyndham Vacation Ownership - Financial Privacy Policy

- Acknowledgment and Disclosure Statement for CLUB WYNDHAM Plus/Wyndham Rewards Program

- Ownership Certificate

_SANDRA ALICE LESLIE_       12/17/2024

Owner **Sandra Alice Leslie**       Date

_DONALD L WALL_       12/17/2024

Owner **Donald L Wall**       Date

Owner       Date

Owner       Date

CWA       No. 2932/Rev. 9-22



# CLUB WYNDHAM

## Enrollment Agreement

Date: 12-17-2024　　　　　　Member Number: I　　346　　　Contract Number:　　:735

Member Name: **Sandra Alice  Leslie**

Member Name: **Donald L Wall**

Member Name:

Member Name:

Street Address: **425 Crossbow Dr**

City: **Maineville**　　　　　　State: **OH**　　　　　　　Zip Code: **45039**

Country: **USA**　　　　　　　Email Address:

Home Phone:　　　　　　　　Work Phone:

### RCI Enrollment

- RCI Member
- RCI PlusPartners Member

### Vacation Sidekick™

Vacation Sidekick is a unique entertainment, recreation, vacation and travel program offering a wide variety of benefits and privileges to its Members on an annual basis. Vacation Sidekick membership entitles the Member's family, including up to two adults and their dependent children up to age 21, to all benefits, discounts and other privileges as provided in the terms and conditions.

**INITIAL ANNUAL MEMBERSHIP FEE $ _____ Complimentary _____**

Initial Annual Membership Fee includes annual membership for first term of twelve (12) months.

**ANNUAL MEMBERSHIP FEE BASED ON MEMBERSHIP TYPE:**

| Membership Type | Annual Membership Fee |
|---|---|
| CLUB WYNDHAM | $59.95 |
| CLUB WYNDHAM Bronze | $59.95 |
| CLUB WYNDHAM Silver | $59.95 |
| CLUB WYNDHAM Gold | $0 |
| CLUB WYNDHAM Platinum | $0 |
| CLUB WYNDHAM Founders | $0 |

# Enrollment Agreement Terms and Conditions

## RCI Exchange

RCI and Wyndham Vacation Resorts, Inc. are both subsidiaries of Travel + Leisure Co., but operate as independent companies.

Wyndham Vacation Resorts will enroll and pay your initial annual RCI membership fee. Renewal fees are part of annual CLUB WYNDHAM Plus Assessment. Confirming a reservation through RCI requires an exchange fee, which is listed in the RCI Disclosure Guide and is subject to change.

## Vacation Sidekick Membership

Vacation Sidekick provides various travel-related benefits and privileges to its Members. You become a Member of Vacation Sidekick by submitting this Vacation Sidekick Membership Agreement (**"Agreement"**) and by payment of applicable membership fees. This Agreement, when signed by Member and a Vacation Sidekick representative, forms a legally binding contract between Member and Wyndham Vacation Resorts, Inc. (**"Sponsor"**), subject to the following terms and conditions:

**1. Membership.** Membership in Vacation Sidekick is available to individuals and their immediate families only. Membership in Vacation Sidekick is non-transferable and may not be sold.

**2. Vacation Sidekick Programs and Benefits.** Programs and benefits offered to Vacation Sidekick Members are described and depicted in the Member's kit, a copy of which has been provided to Member along with this Membership Agreement. Their programs and benefits are subject to separate terms and conditions of suppliers of these benefits and are subject to change at any time. Vacation Sidekick benefits may be changed or eliminated without prior notice to Members. Sponsor accepts no responsibility for acts or omissions of any persons providing such programs or benefits directly to Members. There may be certain additional costs, fees and expenses associated with certain Vacation Sidekick programs or benefits currently available or added by Sponsor from time to time and such additional costs, if any, shall be borne solely by Member. Any fees required are disclosed in the materials for the specific benefit.

**3. Personal Expenses.** Member is responsible for payment of any personal expenses incurred while utilizing any Vacation Sidekick program or benefit. Use of or participation in Vacation Sidekick is completely voluntary, and payment of any fee or other cost associated with Vacation Sidekick is required only upon that use or participation.

**4. Membership Suspension and Termination.** This Agreement, together with Member status, may be suspended or terminated by Sponsor without further obligation if Member fails to comply with these terms and conditions or the terms of the various programs and benefits of Vacation Sidekick or if the Member becomes delinquent on any amounts owed to Sponsor and/or its affiliates. Further, Membership may be terminated for any misuse of the Vacation Sidekick program, violation of any federal, state or local law or regulation in connection with use, failure to pay for charges associated with a Vacation Sidekick program or benefit or for any other reason. Membership in Vacation Sidekick will automatically terminate if Member is no longer a CLUB WYNDHAM Plus Owner.

**5. Program Changes.** Terms and conditions of this Agreement and of Vacation Sidekick programs and benefits may be changed from time to time at sole discretion of Sponsor. **Sponsor reserves its right to increase the annual fee or future fees from time to time.** Members shall be notified of any information regarding such changes in Vacation Sidekick from publications or by written correspondence. Current editions of these publications supersede prior editions with respect to terms and conditions of membership and Vacation Sidekick programs and benefits. Sponsor is bound only by representations that it makes concerning terms and conditions of its programs and benefits set forth in its official publications or written correspondence and is not responsible for contrary or conflicting representations made by any other person.



**TRAVEL+ LEISURE**

### Trade: Reference # 14796368-1 Selected

Tour Number: 63624626-A

**Name: SANDRA A LESLIE**
Member Number: | 046

Customer Initials SAL   Customer Initials DLW

Address:
425 Crossbow DR
MAINEVILLE, OH 45039
UNITED STATES

Home Phone:
Alternate Phone
Mobile Phone:
Date of Birth: |
Gender:
Email: |

**SSN:**

#### Co-owners List

| Name | SSN | DOB | Home Phone | City | ST | Post Code | Email |
|------|-----|-----|-----------|------|-----|----------|-------|
| WALL, DONALD L | | | | MAINVILLE | OH | 45039 | CON |

#### Contracts Being Traded

| Contract # | Member # | Primary Owner | Type | Points | Net Price | Equity Available | Balance | Split |
|-----------|----------|---------------|------|--------|-----------|------------------|---------|-------|
| 1810 | 346 | | UDI-CWA | 300,000 | $49,688.00 | $5,460.58 | $43,469.28 | |
| | | Traded Contracts Totals | | 300,000 | $49,688.00 | $5,460.58 | $43,469.39 | |

#### Summary

Selected Member: 00203952046

**Selected Inventory**
Club Wyndham Access
CWA
00128-03-01

#### Loan Information

**Developer Price** $128,000.00
**Total Discount** $53,112.00
**Net Purchase Price** $74,888.00
Incremental Net Price $25,200.00
Traded Contract Net Price $49,688.00
Processing Fee $349.00
Processing Fee Collected $96.94
Down Payment $7,000.00
Down Payment Collected $7,096.94
CC - VISA $7,096.95

Traded Contract Equity $5,460.58
Closing Costs $25.00
**Total Down Payment** $12,582.50
(including closing costs & equity)
**ARDA-ROC Contribution Today:**
$0.00

Promotional Rate None
Interest Rate 13.56%
Amount Financed $62,679.50
Term Options 120
**Monthly Payment** $961.56
1st Payment Due 01/31/2025
Total Monthly Payment $1,245.06

#### Club Wyndham Plus Information

**Total Points** 405,000

New Incremental Points 105,000

**Purchase Incentive** CW Wyndham
Rewards Incentive - 105,000

Wyndham Rewards Member Number

Exchange ID RCI Partners
Gross Price / 1000 Pts: $316.00
Today's Price / 1000 Pts: $185.00
Club Wyndham Plus Fee Monthly
$283.50
Calculated Monthly Credit $0.00
Next Fee Payment Date 01/31/2025
Use Year 9/30
VIP Level Silver

#### Perks by Club Wyndham Information

Perks Annual Renewal Fee: $59.95

#### Associate Information

**Sales Associate**
572482 - DIANA ERNST

**Team Manager**
685323 - MINDY UNDERWOOD

**T.O.**
685323 - MINDY UNDERWOOD

**Presenter Non-Podium**
504505 MARK TURNER

**Manager 1**
665323 MINDY UNDERWOOD

Contract Entry Use

Inventory 00128-03-01
TRF-0
A/D 758.05
**Actual COS** 12.90%
**Budget COS** 0.00%
**COS Var** 12.90

**SD** 0.00
**AutoPay** Credit Card
**ARDA Contribution Today** No
**ARDA Contribution AutoPay** No

**Title** Joint Tenants with the Right of
Survivorship

**Tour Number** 63624626
**ATSL State** OH
**Marketed Package** Yes
**Reservation Code**
**Line Mailout** No

**Worksheet #** 14796368
**Created:** 12/17/2024
Proposal subject to change.

Copyright © 2024 Wyndham Worldwide. All rights reserved. usfitcr5.wst.corproot.com 12/17/24 3:01:54 PM

# Wyndham Vacation Resorts, Inc.

## SalePoint Cover Sheet

**Customer Name:** SANDRA ALICE LESLIE
**Customer Address:** 425 CROSSBOW DR , MAINEVILLE, OH
**Customer Phone:**
**Contract Number:** 735   **Member No:** 046
**Salesman:** DIANA ERNST
**User:** 608942
**Printer:**
**Site:** WYNDHAM SMOKY MOUNTAINS

| FORMS PRINTED | KEYED | VLO | PROCESSED | LAS VEGAS COMPLIANCE |
|---|---|---|---|---|
| FORMNO3029 | | | | |
| FORMNO3420 | | | | |
| FORMNO3396 | | | | |
| FORMNO2703 | | | | |
| FORMNO3151 | | | | |
| FORMNO2009 | | | | |
| FORMNO3453 | | | | |
| FORMNO2201 | | | | |
| WVO0006 | | | | |
| FORMNO3628 | | | | |
| FORMNO3356CWA_1223 | | | | |
| FORMNO3356M_1223 | | | | |
| FORMNO3028 | | | | |
| FORMNO3182 | | | | |
| FORMNO2932 | | | | |
| FORMNO2692DRP | | | | |
| FORMNO3337 | | | | |
| FORMNO2857 | | | | |
| FORMNO2242 | | | | |
| FORMNO2064 | | | | |
| FORMNO3142 | | | | |
| FORMNO2537 | | | | |
| FORMNO2816 | | | | |



**CLUB WYNDHAM**

Contract Number: '35

## VIDEO AND SOUND RECORDING CONSENT FORM

I/we, **SANDRA ALICE LESLIE and DONALD L WALL JOINT TENANTS WITH THE RIGHT OF SURVIVORSHIP**, authorize Wyndham Vacation Ownership (**"Wyndham"**) to take and use video and sound recordings of the vacation ownership purchase document review.

I/we understand that the video and sound recordings (**"Recordings"**) may be used for quality assurance training or monitoring purposes, as well as to ensure compliance with industry regulations and for other business purposes.

I/we understand and agree to the conditions outlined in this video and sound recording consent form.

I/we understand that the Recordings are the property of Wyndham and I will not be given a copy of either recording, nor will the Recordings be part of any agreement or contract I enter into with Wyndham.

I/we acknowledge that I am fully aware of the contents of this consent form and am under no disability, duress, or undue influence at the time of my signing this consent form.

X _SANDRA ALICE LESLIE_      12/17/2024

Owner **Sandra Alice Leslie**      Date Signed

X _DONALD L WALL_      12/17/2024

Owner **Donald L Wall**      Date Signed

X

Owner      Date Signed

X

Owner      Date Signed

No. 3029/Rev. 3-17

**TRAVEL+**
**LEISURE**

## Trade: Reference # 14796368-1 Selected

Tour Number: 63524526-A

**Name: SANDRA A LESLIE**
Member Number:       146

Customer Initials: SAL    Customer Initials: DLW

Address:
425 Crossbow DR
MAINEVILLE , OH 45039
UNITED STATES

Home Phone: (
Alternate Phone:
Mobile Phone:
Date of Birth:
Gender:
Email:
SSN:

Co-owners List

| Name | SSN | DOB | Home Phone | City | ST | Post Code | Email |
|------|-----|-----|-----------|------|----|-----------|----|
| WALL, DONALD L | | | | # MAINVILLE | OH | 45039 | |

Contracts Being Traded

| Contract # | Member # | Primary Owner | Type | Points | Net Price | Equity Available | Balance | Split |
|-----------|----------|---------------|------|--------|-----------|-----------------|---------|-------|
| 002192400810 | 046 | | UDI-CWA | 300,000 | $49,688.00 | $5,460.68 | $43,469.00 | |
| | | Traded Contracts Totals | | 300,000 | $49,688.00 | $5,460.56 | $43,469.88 | |

Summary

Selected Member: 00203952046

**Selected Inventory**

Club Wyndham Access
CWA
00128-03-01

**Loan Information**

**Developer Price** $128,000.00

**Total Discount** $53,112.00

**Net Purchase Price** $74,888.00

Incremental Net Price $25,200.00
Traded Contract Net Price $49,688.00
Processing Fee $349.00
Processing Fee Collected $98.94
Down Payment $7,000.00
Down Payment Collected $7,096.94
CC - VISA $7,096.95

Traded Contract Equity $5,460.56
Closing Costs $25.00
**Total Down Payment** $12,582.50
(including closing costs & equity)
**ARDA-ROC Contribution Today:**
$0.00

Perks by Club Wyndham Information

Perks Annual Renewal Fee: $59.95

Promotional Rate None
Interest Rate 13.56%
Amount Financed $62,679.50
Term Options 120

**Monthly Payment** $961.56

1st Payment Due 01/31/2025
Total Monthly Payment $1,245.06

**Club Wyndham Plus Information**

**Total Points** 405,000

New Incremental Points 105,000

Purchase Incentive CW Wyndham
Rewards Incentive - 105,000
Wyndham Rewards Member Number
Exchange ID RCI Partners
Gross Price / 1000 Pts: $316.00
Today's Price / 1000 Pts: $185.00
Club Wyndham Plus Fee Monthly
$283.50
Calculated Monthly Credit $0.00
Next Fee Payment Date 01/31/2025
Use Year 9/30
VIP Level Silver

Associate Information

Sales Associate
572482 - DIANA ERNST

Team Manager
665323 - MINDY UNDERWOOD

T.O.
665323 - MINDY UNDERWOOD

Presenter Non-Podium
564505 MARK TURNER

Manager 1
965323 MINDY UNDERWOOD

Contract Entry Use

Inventory 00128-03-01
TRF-0
A/D 758.05
**Actual COS** 12.90%
**Budget COS** 0.00%
**COS Var** 12.90

**SD** 0.00
**AutoPay** Credit Card
**ARDA Contribution Today** No
**ARDA Contribution AutoPay** No

**Title** Joint Tenants with the Right of Survivorship

**Tour Number** 63624626
**ATSL State** OH
**Marketed Package** Yes
**Reservation Code**
**Line Mailout** No

**Worksheet #** 14796368
**Created:** 12/17/2024
Proposal subject to change.

Copyright © 2024 Wyndham Worldwide. All rights reserved. usfltcr5.wst.corproot.com 12/17/24 3:01:54 PM



WYNDHAM

Contract Number. _____ '35

## AGENCY DISCLOSURE
### AS REQUIRED BY TENNESSEE LAW

Every real estate licensee is required to disclose his or her agency status in a real estate transaction to any buyer or seller who is not represented by an agent and with whom the licensee is working directly in the transaction. The purpose of this Agency Disclosure is to acknowledge that this disclosure occurred. A copy of this Agency Disclosure must be provided to anyone who signs it.

**Notice is hereby given that the agency status of this Licensee in this transaction is as follows:**

**Licensee is the Agent for the Seller.**

As required by law, this Agency Disclosure is delivered to you, as an unrepresented buyer, in writing prior to the preparation of any offer to purchase.

Buyer confirms that the Licensee's Agency status was communicated orally before any real estate services were provided.

This Agency Disclosure does not constitute an agency contract or establish an agency relationship between you and the Licensee.

Any complaints alleging a violation by the Licensee of the Tennessee Code Annotated 62-13-312 must be filed within the applicable statute of limitations for the violation set out in 62-13-313(e). The Tennessee Real Estate Commission is located at 500 James Robertson Pkwy, Nashville, TN 37243-1151 and its telephone number is (800) 342.4031.

_____     12/17/24
Signature of Licensee                Date

I acknowledge and confirm the above disclosure of agency status by Licensee.

_____     12/17/24
Signature of Buyer                   Date

_____     12-17-24
Signature of Buyer                   Date

No. 1964-NP/Rev. 8/22

Contract Number:

730

# OWNER'S ACKNOWLEDGMENT

## ClubWyndham® Access Vacation Ownership Plan

Welcome to ClubWyndham Access! We want to make sure that you understand the important details of your Ownership that you are purchasing. Capitalized terms that are not defined in this Acknowledgment have the meanings given them in your Agreement and in the Club Instruments.

Please initial where indicated to confirm that you understand and acknowledge the following:

1. **Ownership Description.** My Ownership grants me membership in the Association and Points, which provide access to Club Accommodations. The Club is a multisite timeshare program and title to all of the Club Accommodations is held by either the Association or an independent Trustee. This means that I will not receive a deed.

2. **Points Availability.** I will receive an Ownership Certificate on the date of sale that sets forth how many Points I am purchasing. I may begin using my Points when my first Use Year begins. My Use Year is set forth on the first page of the Agreement, and my annual allotment of Points will expire at the end of each Use Year. Unless I am a member of Club Wyndham Plus, I cannot bank or borrow my Points.

3. **Assessments.** I must be current on all Assessments to reserve and use Club Accommodations. My obligation to pay Assessments is separate from, and in addition to, my obligation to pay for my Ownership under the Agreement. The Association determines Assessments annually and I must pay my Assessment on a **Monthly** basis unless otherwise stated. My first monthly Assessments are estimated to be **$283.50** and are due on **02-01-2025**. I must pay Assessments even if I do not use my Points.

4. **Reservations.** All reservations are on a first-come, first-served, space-available basis. Under the ClubWyndham Access rules, I may make a reservation in a Club Accommodation up to 13 months before check-in. Different reservation windows and requirements will apply if I am a member of Club Wyndham Plus. I must cancel a reservation at least 15 days before check-in for my Points to be returned to my account. If I cancel a reservation fewer than 15 days before check-in I will forfeit all of my Points used to make the reservation.

5. **Club Wyndham Plus.** I may choose to enroll in Club Wyndham Plus, which is an exchange program operated by Wyndham. If I do, I will assign the use rights and benefits in my Ownership to the trust associated with Club Wyndham Plus in exchange for annually receiving **405,000 Points**. I may use these Points in Club Wyndham Plus so long as I am current on all Assessments, fees, and payments under both my Ownership and Club Wyndham Plus. Wyndham may change, add, or remove benefits and resorts from Club Wyndham Plus at any time without notice and in its sole discretion.

If I am a member of Club Wyndham Plus, I will be governed by the Club Wyndham Plus rules. This means that my reservation rights, the fees that I pay, the benefits that I receive, and other important matters may differ from, or be in addition to, what is described in this Acknowledgment. I understand that I should consult the Club Wyndham Plus rules and membership materials for more information.

As a member of Club Wyndham Plus, I will also receive a membership in RCI. My annual membership fee for RCI is currently included in the fee I pay for Club Wyndham Plus. I may be subject to separate exchange or service fees if I choose to exchange through RCI. I received exchange program documents that describe the benefits and obligations of membership in Club Wyndham Plus and RCI in greater detail.

## Club Wyndham Plus Monthly Maintenance Dues

| Total Points - Today's Contract | | 405,000 | | |
|---|---|---|---|---|
| **Points Based Assessment** | | | Auto Pay | Yes |
| Club Wyndham Plus Program Fee | $ | 25.31 | First Payment Date | 02-01-2025 |
| Assessment Fee and Real Estate Taxes | $ | 258.19 | | |
| **Total Assessment Amount** | $ | 283.50 | | |
| Frequency | | Monthly | | |

6. _[initials]_ _[initials]_ **Personal Use and Enjoyment.** I am purchasing my Ownership for my own use and enjoyment, and not as an investment or for financial returns of any other kind (including through resale, rental, tax benefits, or the offsetting of Assessments). I am not purchasing my Ownership in anticipation of or in reliance upon any buyback, resale, or rental program which Wyndham may offer now or in the future or the strength of a secondary market for the resale of my Ownership. I cannot use the Club Accommodations for any commercial purpose (including commercial rental activities) that is not expressly authorized by the Association, Wyndham, or one of their affiliates.

7. _[initials]_ _[initials]_ **Transfer of Ownership.** I must pay a transfer fee of $399 for an approved transfer of my Ownership. The Association may deny my attempt to transfer my Ownership to an individual or entity that is a known or suspected fraudulent person or is delinquent in the payment of Assessments or fees to Wyndham or the Association. If I transfer a portion of my Points, both the transferee and I must have at least 63,000 Points after the transfer.

8. _[initials]_ _[initials]_ **Marketing Consent.** By initialing this Section 8, I authorize Wyndham and Wyndham's affiliates, successors, and representatives (**"Wyndham Parties"**) to contact me for promotional and marketing purposes at my physical address, email address, and telephone number provided below, regardless of any prior election to the contrary. This contact may be by autodialed calls, texts, prerecorded messages, and other methods. I do not have to initial this Section or give my consent to purchase my Ownership. I may withdraw my consent at any time by mailing Wyndham at 6277 Sea Harbor Drive, Orlando, Florida 32821. Attention: Account Servicing Operations or by emailing Wyndham at WyndhamConsumerFinance@wyn.com  I may also text "STOP" to any text message to withdraw my consent for text messages only.

9. _[initials]_ _[initials]_ **Account Servicing Consent.** By initialing this Section 9, I authorize Wyndham Parties to contact me by text message for ownership-related communications about servicing, scheduled payments, missed payments, account status, and other important information regarding my Ownership, or my relationship with any of the Wyndham Parties. This contact may include texts, SMS, MMS, push notifications, in-app messaging, or other similar messages (including those using an automated dialing system) at any cell phone number I have provided. Message frequency will vary, for example, based on the transactions at issue or account status. Message and data rates may apply.  To stop receiving text messages, reply STOP to the text message, or call 1-800-739-4031. After opting out, one additional text message confirming that the request has been received and processed may be sent.  For help related to the text message, reply "HELP."  Please visit www.clubwyndham.wyndhamdestinations.com for the complete Terms of Use and Privacy Notice.

10. _[initials]_ _[initials]_ **No Pathway Program Eligibility.** Purchaser understands that the purchase made today is not eligible for the Pathway by Club Wyndham program. Only Purchaser's qualified points purchased prior to December 31, 2014 will be eligible for said program.

[Remainder of Page Intentionally Left Blank]

**By initialing and signing this Acknowledgment I confirm that I have read and understand this Acknowledgment and my Agreement with Wyndham. I have been given as much time as I need to review all of the documents in connection with my purchase of an Ownership. I have also been given the opportunity to ask my Owner Onboarding Representative any questions I may have before signing any document.**

Owner: *SANDRA ALICE LESLIE*

Date: 12/17/2024

**Sandra Alice Leslie**

Address: 425 Crossbow Dr, , Maineville, OH 45039

Email Address

Telephone Nur

Owner: *DONALD L WALL*

Date: 12/17/2024

**Donald L Wall**

Address: 425 Crossbow Dr, , Mainville, OH 45039

Email Address:

Telephone Nun

Owner:

Date:

Address:, , ,

Email Address:

Telephone Number:

Owner:

Date:

Address:, , ,

Email Address:

Telephone Number:

6. **Limitation of Liability and Release.** Sponsor, its subsidiaries, officers, directors, employees and agents, including without limitation, its advertising agencies, printers and other suppliers, shall not be liable for and expressly disclaim any and all liability for any injury, liability, expense, cost, damage, penalty or loss of any kind incurred or caused by a Member, their family, or their guests (i) in connection with the utilization of or participation in any Vacation Sidekick program or benefit, or (ii) resulting from any acts or omissions of any individual or entity providing a product, benefit or service in Vacation Sidekick program. Sponsor's liability for any other loss or damage incurred by a Member through use of the Vacation Sidekick programs or benefits is limited to membership fees paid by such Member. Member hereby agrees to release and hold harmless Sponsor, its subsidiaries, successors and assigns, its and their advertising agencies, printers and other suppliers, as well as its officers, directors, employees and agents for any injury, liability, expense, cost, damage, penalty or loss of any kind incurred by Member, the Member's family or guest during any trip or utilization of any Vacation Sidekick program or benefit and for any related damage, theft or loss caused or incurred by the Member, the Member's family or guest.

7. **Effective Date and Activation.** This Agreement is effective when signed by the Member and the Sponsor's Vacation Sidekick Representative. Member must activate Vacation Sidekick Membership as indicated on the Vacation Sidekick Savings Card before commencing use. If Member delays activation of the Vacation Sidekick Savings Card, the period of time between the effective date and the activation date shall be lost.

8. **Effect of Termination.** Termination of Membership in Vacation Sidekick will have no effect on such Member's vacation ownership contractual obligations or agreements and will not result in termination of an ownership interest which a Member may have in real estate, including but not limited to a timeshare, lot, home, condominium, townhouse or undivided interest. Membership in Vacation Sidekick is not additional consideration for the purchase of a vacation ownership interest. Cancellation of Membership in Vacation Sidekick shall in no way relieve a Member of their obligation under any other contract or agreement.

9. **Availability of Programs and Benefits.** As Vacation Sidekick depends on services and programs offered by unrelated third party suppliers, Sponsor cannot guarantee continued availability of all programs and benefits. If a Vacation Sidekick program or benefit becomes unavailable for any reason whatsoever, Member waives any and all claims against Sponsor resulting from unavailability of such program or benefit.

10. **Miscellaneous Disclosures.** Continued availability of Vacation Sidekick is not necessary for use and enjoyment of any accommodation within Member's timeshare plan. No costs of acquisition, operation, maintenance, or repair of Vacation Sidekick are passed on to purchasers of a vacation ownership interest in a timeshare plan as a common expense.

I acknowledge receipt of the "Enrollment Agreement Terms and Conditions" document and agree to abide by these terms and conditions.

# TRAVEL UP
## BY TRAVEL + LEISURE™

**ACKNOWLEDGMENT AND DISCLOSURE STATEMENT**
**WITH RESPECT TO INCIDENTAL BENEFIT**
**Travel Up by Travel + Leisure**

1. Travel Up by Travel + Leisure as more fully described by the rules which are attached hereto as Exhibit "A" (*"Rules"*), and also incorporated herein by reference is subject to the user fees and costs and the restrictions upon use and availability as set forth in the attached Rules.

2. Use and participation in the incidental benefit described in this statement (*"Incidental Benefit"*) is completely voluntary and the payment of any fee or other cost is only required upon such use or participation.

3. No costs of acquisition, operation, maintenance, or repair of the Incidental Benefit are passed on to purchasers of the timeshare plan as common expenses of the timeshare plan (*"Purchaser(s)"*), or as common expenses of a component site of a multisite timeshare plan.

4. The Incidental Benefit described in this statement is not assignable or otherwise transferable.

5. The continued availability of the Incidental Benefit is not necessary in order for any accommodation or facility of the timeshare plan to be available for use by purchasers of the timeshare plan in a manner consistent in all material respects with the manner portrayed by any promotional material, advertising, or purchaser public offering statement.

6. The continued availability to purchasers of timeshare plan accommodations on no greater than a one-to-one use right to use night requirement ratio is not dependent upon continued availability of the Incidental Benefit.

7. The initial term of the incidental benefit will be for a period of one (1) year after the first date that the timeshare plan is available for use by the Purchaser. This benefit will auto-renew each year unless you are notified that the program is changing or expiring. Nothing herein shall prevent the renewal or extension of the availability of an incidental benefit.

The undersigned Purchaser(s) acknowledge that he/she/they have read the foregoing document and the attached Exhibit "A".

| | |
|---|---|
| *Sandra Alice Leslie* | 12/17/2024 |
| PURCHASER  Sandra Alice Leslie | DATE |
| *Donald L Wall* | 12/17/2024 |
| PURCHASER  Donald L Wall | DATE |
| | |
| PURCHASER | DATE |
| | |
| PURCHASER | DATE |

EXHIBIT A

The Travel Up by Travel + Leisure Rules ("Rules") are promulgated this May 20th, 2021, by Wyndham Vacation Ownership Inc. or a subsidiary thereof (collectively, "Wyndham", "WVO", "We" or "Our") for the benefit of recipients of the Travel Up by Travel + Leisure ("Member" or "You"). The Rules are as follows:

## Membership Rules

a. Travel Up by Travel + Leisure provides eligible Owners (as defined below) a membership ("Membership"), to book ancillary travel products such as car rentals, hotels, activities, flights, and cruises ("Bookings") for cash at Member pricing. Bookings can be completed on www.clubwyndham.com.

b. The Membership is available to eligible Club Wyndham members that purchased a new or incremental vacation ownership interest ("Vacation Ownership Interest") after May 20th, 2021 directly from Wyndham or an authorized reseller ("Owners").

c. If an Owner cancels the purchase of this Vacation Ownership Interest during the applicable cancellation period, this offer will become void automatically without notice, penalty, or obligation.

d. Travel Up by Travel + Leisure membership is non-transferable. In the event an Owner upgrades or trades the new or incremental Vacation Ownership Interest for an additional Vacation Ownership Interest from Wyndham, the Owner's Membership at the time of the upgrade or trade will continue to be active.

e. All products and services offered through Travel Up by Travel + Leisure are available for cash purchase for Travel Up by Travel + Leisure members only. All offers are based on availability and travel products are not guaranteed until confirmation is received from the travel provider or supplier through Travel Up by Travel + Leisure.

f. Travel product rates and prices are based on availability and subject to change without notice. We do not guarantee travel for specific dates, locations, or special events.

g. Members will be charged applicable taxes and fees to their payment method at time of Booking. Taxes and fees include an estimated total that will be paid to the travel provider or supplier for taxes and government fees it owes in connection with the Member's Booking, including but not limited to, sales and use tax, occupancy tax, room tax, excise tax, value added tax, and other applicable taxes ("Taxes and Fees").

h. The charge for Taxes and Fees varies based on a number of factors including, without limitation, the amount owed to the travel provider and the location where a Member travels.

i. Depending on the type of Booking a Member makes through Travel Up by Travel + Leisure, they may be charged additional fees by suppliers, including, but not limited to: Certain mandatory hotel specific service fees including but not limited to resort fees, energy surcharges, newspaper delivery fees, in-room safe fees, tourism fees, security deposits and/or housekeeping fees; Certain optional incidental fees, including but not limited to: parking charges, minibar charges, phone use charges, room service charges and/or movie rentals; and port expenses, specialty dining, snow fees, drink package costs, and/or additional activity costs ("Additional Fees"). Payment of these Additional Fees is the sole responsibility of the Member.

j. Owners with access to Travel Up by Travel + Leisure have no obligation to pay any membership, subscription, or annual fees to access the membership benefits. Any use or participation in Travel Up by Travel + Leisure is completely voluntary and the payment for any products and services is only required upon such use or participation.

k. Membership purchases, benefits and transactions may not be used for any commercial purpose, sold, bartered, or exchanged for any other consideration. Any unauthorized commercial use including but not limited of any transfer of any rights or benefits conferred pursuant to any subscription agreement is grounds for immediate termination and closure of your Membership without (a) refund or (b) any further duty, obligation or liability to the Member.

l. Access to the Travel Up by Travel + Leisure membership, will not be allowed if the Member is delinquent in the payment of any applicable Club maintenance fees, taxes, special assessments, or Club program fees. Participation will also not be allowed by Club Wyndham members with delinquent mortgage payments to Wyndham Vacation Ownership, Inc., or a subsidiary thereof, or who are otherwise in default under their sales contract, if any.

m. Each travel provider has specific cancellation policies and penalties separate and apart from Travel Up by Travel + Leisure which can include forfeiture. Travel provider policies may treat name changes and departure date changes as cancellations.

n. In the event Members must cancel any travel Booking, please contact Travel Up by Travel + Leisure customer service immediately at 888-318-6280 , or in writing at the following address:

Travel Up by Travel + Leisure
Attn: Cancellations
9998 Michigan Rd
Carmel, IN 46032

o. Cancellations will be effective as of the date of receipt of the request by Travel Up by Travel + Leisure ("Cancellation Date"). It is Members' responsibility to ensure cancellation requests are properly received by Travel Up by Travel + Leisure. Refunds may take up to eight (8) weeks from the Cancellation Date.

p. By purchasing products and services through Travel Up by Travel + Leisure, Member acknowledges and agrees to be bound by Club Wyndham's Terms and Conditions and the terms and conditions of the Travel Up by Travel + Leisure Membership, as well as any applicable terms and conditions subject to the third party travel providers and Member accepts all terms and conditions on the behalf of any traveling companion(s), and/or guests (including minors) (collectively "Guests"). From time to time, Travel Up by Travel + Leisure, products and services may be fulfilled by a third party provider, under contract with Resort Rental LLC or its affiliates. In that instance, the terms and conditions of such third party provider shall apply to the member.

q. All terms and conditions are subject to change at any time at the sole discretion of Travel Up by Travel + Leisure without prior notice to Members. By purchasing products and services through Travel Up by Travel + Leisure, Member acknowledges and agrees to be bound by any posted revisions to these Terms and Conditions.

r. FOR A FULL LIST OF TRAVEL UP BY TRAVEL + LEISURE TERMS AND CONDITIONS VISIT:
https://www.travelup.wyndhamdestinations.com/travel-up-by-travel-and-leisure-terms-and-conditions

# CLUB WYNDHAM

# WYNDHAM REWARDS

Contract Number:     735
Member Number:     046

## Wyndham Rewards® Points/Maintenance Fee Reference Guide for New Cardholders

### How You Earn

| Wyndham Rewards Earning Examples |
| --- |
| **Wyndham Rewards® hotel stays**<br>10 Wyndham Rewards Points per $1 spent<br>*Minimum of 1000 points per night stay |
| **Wyndham Rewards® Earner Card**<br>Earn 5 Wyndham Rewards points per $1 on Hotels by Wyndham and gas purchases. |
| Earn 2 Wyndham Rewards Points per $1 spent on eligible purchases made at Wyndham Timeshare resorts (including maintenance fee and loan payments) and on eligible dining and grocery purchases (excluding Target® and Wal-mart®). |
| 1 Wyndham Rewards point per $1 spent on purchases using the Wyndham Rewards Visa Card everywhere else (excluding Wyndham Timeshare down payments) |
| **Avis® or Budget® 1-day car rental**<br>100 Wyndham Rewards points per Day |

| Wyndham Rewards Points Earned | The amount of CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees) that can be paid from converting Wyndham Rewards Points |
| --- | --- |
| Wyndham Rewards Points | CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees) |
| 40,000 | $200 |
| 80,000 | $400 |
| 120,000 | $600 |
| 200,000 | $1,000 |

1,000 CLUB WYNDHAM Points equals 400 Wyndham Rewards Points. CLUB WYNDHAM Plus Points to Wyndham Rewards Conversion Rates subject to change and conversion fee of $99.00 per conversion applies.

10,000 Wyndham Rewards Points equals $50 towards CLUB WYNDHAM Plus Assessment Fees (including POA Maintenance Fees). Redemption Levels are subject to change and are maintained exclusively by Wyndham Rewards.

# CLUB WYNDHAM

# WYNDHAM REWARDS

Contract Number: 735
Member Number: 046

## ACKNOWLEDGMENT AND DISCLOSURE STATEMENT
### Club Wyndham® Plus/Wyndham Rewards® Program

1. The CLUB WYNDHAM Plus/Wyndham Rewards Program as more fully described by the Program Rules herein.

2. Use and participation in the CLUB WYNDHAM Plus/Wyndham Rewards Program is completely voluntary and the payment of any fee or other cost is only required upon such use or participation.

3. The CLUB WYNDHAM Plus/Wyndham Rewards Program is not assignable or otherwise transferable.

4. If all or a portion of the CLUB WYNDHAM Plus/Wyndham Rewards Program becomes unavailable the offering of this program may be terminated.

5. The continued availability of the CLUB WYNDHAM Plus/Wyndham Rewards Program is not necessary for a purchaser's use and enjoyment of any accommodations in the timeshare plan purchased.

6. If you cancel your purchase contract within the stated cancellation period, the CLUB WYNDHAM Plus/Wyndham Rewards Program will not be available.

## Club Wyndham® Plus/Wyndham Rewards® Program Rules

The CLUB WYNDHAM Plus/Wyndham Rewards Program Rules ("**Rules**") are promulgated this 20th day of July, 2009, by Wyndham Fulfillment Group, LLC ("**Wyndham Fulfillment Group**") for the benefit of CLUB WYNDHAM Plus Members. The Rules are as follows:

### Program Rules

a. The CLUB WYNDHAM Plus/Wyndham Rewards Program (**"Program"**) means that program offered by Wyndham Fulfillment Group in which CLUB WYNDHAM Plus Members may trade Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points. All terms used herein shall have the same meaning given to them in the documents creating the CLUB WYNDHAM Plus program, as amended from time to time.

b. The Wyndham Rewards Program is offered by Wyndham Rewards, Inc., a subsidiary of Wyndham Hotel Group, LLC, its successors and assigns, for use by guests of participating Wyndham hotel and resort properties whereby such guests can accumulate points redeemable for, among other things, hotel rooms at participating Wyndham hotels and resorts worldwide, car rentals, travel activities, and purchases from participating merchants or service providers. The rules for the Wyndham Rewards Program will be distributed separately from this document, and are incorporated herein by reference as if fully set forth. (See current Wyndham Rewards Membership Guide).

c. Neither Wyndham Fulfillment Group nor Wyndham Vacation Ownership, Inc., or its subsidiaries guarantee that a CLUB WYNDHAM Plus Member utilizing the Wyndham Rewards Program will be able to stay at a particular participating Wyndham hotel or resort during any specific time or will be able to redeem Wyndham Rewards points for any particular activity or service.

d. Wyndham Fulfillment Group reserves the right to modify, alter, delete or add new terms and conditions to the Program Rules at any time without notice. Wyndham Fulfillment Group may terminate the Program at any time by providing written notice to CLUB WYNDHAM Plus Members. In that event, the right to trade Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points will end. Wyndham Rewards, Inc. may terminate the Wyndham Rewards Program at any time as described in the current Wyndham Rewards Membership Guide.

e. Wyndham Rewards, Inc. reserves the right to modify, alter, delete or add new terms and conditions to the Wyndham Rewards Program at any time without notice. This includes modifying, altering, adding or deleting Wyndham Rewards point values, redemption levels, conversion ratios, conditions for active status, rewards, "Earning Participants" or "Rewards Participants" to the Wyndham Rewards Program at any time without notice. In addition, Wyndham Rewards, Inc. may convert the Wyndham Rewards Program and members points into different awards programs having different point values at any time without notice. This means that the number of Wyndham Rewards points needed to reach a rewards level may be increased, the time for earning them reduced, or the rewards changed, so you may not be able to obtain.

No. 2242/Rev.11-23

earn or claim certain rewards no matter how long you participate in the Wyndham Rewards Program. To view or obtain the most up to date terms and conditions for the Wyndham Rewards Program, visit wyndhamrewards.com or call 1-866-996-7937.

f. All redemption of Wyndham Rewards points will be in accordance with the procedures outlined in the Wyndham Rewards Membership Guide. A Wyndham Rewards account may be maintained in the name of each CLUB WYNDHAM Plus Member, however, Wyndham Rewards points will be credited to only one Wyndham Rewards account, not multiple accounts, based upon direction received by CLUB WYNDHAM Plus from the member where the CLUB WYNDHAM Plus membership is held by more than one individual.

g. CLUB WYNDHAM Plus Members may request to trade all or part of their regular use year Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points during the twelve (12) month period prior to their use year start date. A minimum of 1,000 Qualified CLUB WYNDHAM Plus Points may be traded for Wyndham Rewards points. Requests to trade for Wyndham Rewards points are non-reversible and are considered a final transaction. Multiple requests are permitted provided they are submitted prior to the CLUB WYNDHAM Plus Member's use year start date.

h. "Qualified CLUB WYNDHAM Plus Points" means those CLUB WYNDHAM Plus Points associated with ownership interests purchased directly through Wyndham Vacation Resorts, Inc. or its affiliates, such ownership interests acquired by will or intestate succession, or such ownership interests acquired by an "Immediate Relative" of the CLUB WYNDHAM Plus Member. "Immediate Relative" includes parents, spouses, domestic partners, siblings, children and grandchildren. Wyndham Fulfillment Group, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of persons eligible to participate in the Program at any time in the future.

i. Subject to Paragraphs (g) and (h) above, the following CLUB WYNDHAM Plus Points are not eligible to be traded for Wyndham Rewards points: CLUB WYNDHAM Plus Points which are not acquired through Wyndham Vacation Resorts, Inc. or its affiliates, CLUB WYNDHAM Plus Points acquired through a non-Wyndham affiliated broker, Bonus Points, PIC Points, Borrowed CLUB WYNDHAM Plus Points, Rented CLUB WYNDHAM Plus Points, Transferred CLUB WYNDHAM Plus Points, Discovery Program Points and Pool Credits. Wyndham Fulfillment Group, in its sole discretion, with or without prior notice, has the unilateral right to expand or contract the list of eligible CLUB WYNDHAM Plus Points which may be traded for Wyndham Rewards points.

j. Participation in the Program, which includes the ability to request a trade for Wyndham Rewards points and the depositing of Wyndham Rewards points in a CLUB WYNDHAM Plus Members Wyndham Rewards account, will not be allowed if the CLUB WYNDHAM Plus Member is delinquent in the payment of any applicable maintenance fees, taxes, special assessments, or CLUB WYNDHAM Plus Program Fees. Participation will also not be allowed by CLUB WYNDHAM Plus Members with delinquent mortgage payments to Wyndham Vacation Ownership, Inc., or a subsidiary thereof, or who are otherwise in default under their sales contract, if any. In addition, a CLUB WYNDHAM Plus Member will not be permitted to request a trade for Wyndham Rewards points if their vacation ownership account is pending an upgrade transaction.

k. CLUB WYNDHAM Plus Members may trade for Wyndham Rewards points every calendar year. Each request to trade will require a separate transaction fee.

l. The fee to trade for Wyndham Rewards points is payable at the time each request to trade for Wyndham Rewards points is made. The current fee is $99.00, is non-refundable, and is subject to change without notice.

m. Upon requesting a trade of Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points, the Qualified CLUB WYNDHAM Plus Points traded through the Program will be assigned to Wyndham Fulfillment Group for its own purposes including, but not limited to, renting accommodations to the public.

n. Wyndham Rewards points will become available to the CLUB WYNDHAM Plus Member for use at the start of the use year corresponding with the Qualified CLUB WYNDHAM Plus Points that are traded.

o. The Wyndham Rewards points which may be received when trading Qualified CLUB WYNDHAM Plus Points is based on the following formula: 400 Wyndham Rewards points for each 1,000 Qualified CLUB WYNDHAM Plus Points traded. Wyndham Fulfillment Group reserves the right to change the above formula at any time without notice.

p. Questions relating to the Program or trading Qualified CLUB WYNDHAM Plus Points for Wyndham Rewards points should be directed to the Vacation Planning Center (1-800-251-8736 Option 1).

No. 2242/Rev.11-23

# Ownership Certificate

## CLUBWYNDHAM®Access Vacation Ownership Plan

This Ownership Certificate is issued by the PTVO Owners Association, Inc. (**"Association"**) and signifies the below owner(s) as a member(s) of the Association with the right to participate in the CLUBWYNDHAM Access Vacation Ownership Plan.

Owner(s): **Sandra Alice Leslie and Donald L Wall Joint Tenants With The Right Of Survivorship**

Issued this Day of _____ **December 17th, 2024**

*Contract Number: _____ **735**

Annual Or Biennial: _____ **Annual**

Number of Points _____ **405,000**

*This Ownership Certificate supersedes any previously issued Ownership Certificates for the above contract number.



**CLUB WYNDHAM**

No. 2064/Rev. 05-22



**CLUB WYNDHAM**

| | |
|---|---|
| Contract Number | **735** |
| Date of Sale | **12-17-2024** |

## Guaranteed Discount

## Valid for One Year from Today's Purchase

Should you elect to upgrade with Wyndham within one year of today's purchase you will be eligible for a discount off the gross price per thousand points.

### Gross Purchase Price per Thousand $316

### Guaranteed Discount -$28

### Guaranteed Gross Purchase Price per Thousand $288

Eligibility:

- To be eligible, you must be in good standing as a Club WYNDHAM Member and must be current in all fees and expenses.

Terms and Conditions:

- Your Discount Offer will expire within one year from the date on which your purchase agreement is fully executed.

- The discount offer is off of the current gross price at the time of your upgrade purchase.

- This discount offer may not be combined with any other purchase incentives or discounts.

- Based on inventory availability.

- Equity trades are not eligible.

Contract Number: 736

## FACTS | WHAT DOES WYNDHAM VACATION OWNERSHIP, INC. DO WITH YOUR PERSONAL INFORMATION?

| | |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• Credit scores and payment history<br>• Purchase history and account transactions |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Wyndham Vacation Ownership, Inc. chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Wyndham Vacation Ownership, Inc. share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes - such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes - To offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | Yes | No |
| For our affiliates' everyday business purposes – Information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes - Information about your creditworthiness | Yes | Yes |
| For our affiliates to market to you | Yes | Yes |
| For nonaffiliates to market to you | Yes | Yes |

| | |
|---|---|
| **To limit our sharing** | • Mail in the form below<br><br>Please note:<br><br>If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |

| | |
|---|---|
| **Questions?** | Call (WVO) 800-251-8736 |

---

| **Mail-in Form** | |
|---|---|
| If you have a joint account, your choice(s) will apply to everyone on your account unless you mark below.<br>___ Apply my choices only to me | Mark any/all you want to limit:<br><br>___ Do not share my personal information with nonaffiliates to market their products and services to me.<br><br>___ Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br><br>___ Do not allow affiliates to use my personal information to market to me. |
| | Name<br>Address<br><br>City, State Zip<br>Member / Contract # |
| **Mail To:** | Member Privacy Wyndham Vacation Ownership, Inc.<br>P.O. Box 98944 Las Vegas, Nevada 89193-8944 |

| Who we are | |
|---|---|
| Who is providing this notice? | **Wyndham Vacation Ownership, Inc.** |

| What we do | |
|---|---|
| How does Wyndham Vacation Ownership protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does Wyndham Vacation Ownership collect my personal information? | We collect your personal information, for example, when you<br>• Apply for financing or give us your income information<br>• Provide account information or provide employment information<br>• Give us your contact information<br>We also collect your information from others, such as credit bureaus, affiliates, or other companies |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account unless you tell us otherwise. |

| Definitions | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Our affiliates include companies with a Wyndham name including, Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, Wyndham Consumer Finance, Inc.* |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Nonaffiliates we may share with may include other developers, financial institutions and services companies, associations and exchanges, and other companies.* |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• *Our joint marketing partners may include other developers, financial institutions, financial services companies, and other companies.* |

| Other important information | |
|---|---|

VT: Accounts with a Vermont mailing address are automatically treated as if they have limited the sharing as described on page 1. For joint marketing we will only disclose your name, contact information and information about your transactions.

CA: Accounts with a California mailing address are automatically treated as if they have limited the sharing with nonaffiliates as described on page 1. You may receive a separate notice regarding your rights and additional choices.

No. 2537/Rev 8-19

## FACTS — WHAT DOES WYNDHAM VACATION OWNERSHIP DO WITH YOUR PERSONAL INFORMATION?

| Why? | Financial companies share your personal information in certain circumstances. Applicable law gives consumers the right to limit certain sharing of personal information. Applicable law also requires us to tell you how we collect, use, disclose, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|

| What? | The types of personal information we collect and share depend on the product and/or service we provide to you. This information can include:<br>• Contract information<br>• Social Security number and income<br>• Credit scores and payment history<br>• Purchase history and account transactions |
|---|---|

| How? | All financial companies must share customers' personal information to operate their regular business. In the section below, we list the reasons financial companies may share customers' personal information; the reasons Wyndham Vacation Ownership chooses to share; and whether you can limit such sharing. |
|---|---|

| Reasons we can share your personal information | Does Wyndham Vacation Ownership share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes – Such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes – To offer our products and services to you | Yes | Yes |
| For joint marketing with other financial companies | Yes | Yes |
| For our affiliates' everyday business purposes – Information about your transactions and experiences | Yes | Yes |
| For our affiliates' everyday business purposes – Information about your creditworthiness | Yes | Yes |
| For our affiliates to market to you | Yes | Yes |
| For non-affiliates to market to you | Yes | Yes |

| To limit our sharing | • Mail the form below<br><br>Please note:<br><br>If you are a new customer, we can begin sharing your information from the date you provide us your express or implied consent. When you are no longer our customer, we continue to share your information as described in this notice.<br><br>However, you can contact us at any time to limit our sharing. |
|---|---|

| Questions? | Call (WVR) | 800-251-8736 | or go to | www.wyndhamvacationresorts.com |
|---|---|---|---|---|
| | Call (WBW) | 888-648-7363 | or go to | www.worldmarkbywyndham.com |
| | Call (MGVC) | 866-645-4775 | or go to | www.mymargaritavillevacationclub.com |

### Mail-in Form

| If you have a joint account, your choice(s) will apply to everyone on your account unless you mark below.<br><br>___ Apply my choices only to me | Mark any/all you want to limit:<br>___ Do not use my personal information for your marketing purposes.<br>___ Do not use my personal information for joint marketing with other financial companies.<br>___ Do not share my personal information with non-affiliates to market their products and services to me.<br>___ Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br>___ Do not allow affiliates to use my personal information to market to me.<br>___ Do not share my personal information after I have ceased being a customer. |
|---|---|
| | Name<br>Address<br>City  Province  Postal Code<br>Member / Contract # |

| Mail To: | Member Privacy (identify Wyndham Vacation Resorts, WRDC/WorldMark by Wyndham, or other)<br>P.O. Box 98944 Las Vegas, Nevada 89193-8944 |
|---|---|

| Who we are | |
|---|---|
| Who is providing this notice? | Wyndham Vacation Ownership (Wyndham Vacation Resorts, Wyndham Resort Development Corp, Wyndham Consumer Finance) |

| What we do | |
|---|---|
| How does Wyndham Vacation Ownership protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with applicable law. These measures include limited access, computer safeguards and secured files and buildings. |
| How does Wyndham Vacation Ownership collect my personal information? | We collect your personal information, for example, when you<br>• Apply for or purchase our product or services<br>• Apply for financing or give us your income information<br>• Provide account information or provide employment information<br>• Give us your contact information<br>We also collect your information from others, such as credit bureaus, affiliates, or other companies |
| Why can't I limit all sharing? | Applicable law gives you the right to cancel or change your consent by giving us reasonable notice, as long as doing so does not break a legal duty or promise you owe us. For example, where we need your personal information in connection with providing you financing, you cannot cancel or change your consent. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your account unless you tell us otherwise. |

| Definitions | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Our affiliates include companies with a Wyndham name including, Wyndham Vacation Resorts, Wyndham Resort Development Corp., Wyndham Consumer Finance.* |
| Non-affiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Non-affiliates we may share with may include other developers, financial institutions and services companies, associations and exchanges, and other companies.* |
| Joint marketing | A formal agreement between non-affiliated financial companies that together market financial products or services to you.<br>• *Our joint marketing partners may include other developers, financial institutions, financial services companies, and other companies* |

| Other important information | |
|---|---|

If you wish to enquire about your personal information we have collected, confirm our use or disclosure of your personal information, correct your personal information, limit use or disclosure of your personal information or otherwise enquire about our privacy policies, or our collection, use or disclosure or your personal information, you can contact our Privacy Officer at:

- Address: 6277 Sea Harbor Drive, Orlando, FL 32821
- Fax Number: (407) 626-5193
- Email: WVOPrivacy@wyn.com
- Website: www.wyndhamvacationresorts.com

Generally, our responses to your enquiries may take up to 30 days and may be subject to a fee.

# *Wyndham Vacation Resorts, Inc.*
## Deedback Control Sheet

**Contract Number:** 735
**User:** Richard Burge
**User ID:** 608942
**Selling Site:** WYNDHAM SMOKY MOUNTAINS
**Date:** 12/17/2024
**Inventory Location:** CLUB WYNDHAM ACCESS

Please note this Deedback Control Sheet along with the Deedback and/or Termination of Contract must be returned to: Title Services Inventory Recovery, c/o Wyndham Vacation Resorts, Inc., 6277 Sea Harbor Drive, Orlando, FL 32821

| CONTRACT TRADED | PRIMARY OWNER | PO MEMBER NUMBER | DEEDBACK /TOC | STATUS |
|---|---|---|---|---|
| 810 | SANDRA LESLIE | 2046 | N/A | No Deedback required for ClubWyndham Access product |

**DocuSign**

## Certificate Of Completion

Envelope Id: 72E7601D-4DA6-4F4E-8FB7-A3C47486D59A
Subject: Vacation Awaits! LESLIE 000442402735 CWA Contract
Contract Number:     2735
Member Number:     2046
Selling Site: WYNDHAM SMOKY MOUNTAINS
Owner's Last Name: LESLIE
Ownership Type: CWA
Entity: WVR
Site: 2Smoky
Membership Type: Existing
Inventory: CWA
Source Envelope:
Document Pages: 47
Certificate Pages: 6
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Completed

Signatures: 30
Initials: 22

Envelope Originator:
Richard Burge
8277 Sea Harbor Drive
Orlando, FL 32821
Richard.Burge@wyn.com
IP Address: 136.226.122.208

## Record Tracking

Status: Original
        12/17/2024 12:17:23 PM
Status: Authoritative Copy (4 of 4 documents)
        12/19/2024 10:05:32 AM
Status: Receipt Confirmed
        12/18/2024 10:06:32 AM

Holder: Richard Burge
        Richard.Burge@wyn.com
Holder: Richard Burge
        Richard.Burge@wyn.com
Holder: Richard Burge
        Richard.Burge@wyn.com

Location: DocuSign

Location: DocuSign

Location: Wyndham Destinations

## Signer Events

Roger Miller
roger.miller@wyn.com
QA
Wyndham Vacation Ownership
Security Level: Email, Account Authentication
(None)

Electronic Record and Signature Disclosure:
    Not Offered via DocuSign

**Signature**

*Roger Miller*
E7C8EC4FF8D5439...

Signature Adoption: Pre-selected Style
Using IP Address: 136.226.59.17

**Timestamp**

Sent: 12/17/2024 1:32:40 PM
Viewed: 12/17/2024 1:48:21 PM
Signed: 12/17/2024 1:48:40 PM

## In Person Signer Events

In Person Signing Host:
    Roger Miller
    roger.miller@wyn.com
In Person Signer:
    SANDRA ALICE LESLIE
Security Level: In Person, Please enter the Driver's
License that will be used to verify signer's identity. –
RP150517

Electronic Record and Signature Disclosure:
    Accepted: 12/17/2024 1:29:04 PM
    ID: d4d709b5-0478-4aa4-837f-fe8eaa4684b3

**Signature**

*SANDRA ALICE LESLIE*
576F721E05363A...

Signature Adoption: Pre-selected Style
Using IP Address: 136.226.59.17

**Timestamp**

Sent: 12/17/2024 1:15:42 PM
Viewed: 12/17/2024 1:29:04 PM
Signed: 12/17/2024 1:30:41 PM

**In Person Signer Events**

In Person Signing Host:
Roger Miller
roger.miller@wyn.com

In Person Signer:
DONALD L WALL

Security Level: In Person, Please enter the Driver's License that will be used to verify signer's identity. - RU174707

Electronic Record and Signature Disclosure:
Accepted: 12/17/2024 1:31:33 PM
ID: e002c559-4ae4-42ef-91cb-f053f39e963e

**Signature**

Signed by:
DONALD L WALL
1U4AIG/6HF112

Signature Adoption: Pre-selected Style
Using IP Address: 136.226.59.17

**Timestamp**

Sent: 12/17/2024 1:30:44 PM
Viewed: 12/17/2024 1:31:33 PM
Signed: 12/17/2024 1:32:36 PM

---

**Editor Delivery Events**

Richard Burge
richard.burge@wyn.com
Wyndham Destinations
Security Level: Email, Account Authentication (None)

Electronic Record and Signature Disclosure:
Not Offered via DocuSign

**Status**

VIEWED

Using IP Address: 136.226.122.171

**Timestamp**

Sent: 12/17/2024 1:48:46 PM
Viewed: 12/18/2024 10:05:21 AM
Completed: 12/18/2024 10:05:27 AM

---

**Agent Delivery Events**

**Status**

**Timestamp**

---

**Intermediary Delivery Events**

**Status**

**Timestamp**

---

**Certified Delivery Events**

Roger Miller
roger.miller@wyn.com
QA
Wyndham Vacation Ownership
Security Level: Email, Account Authentication (None)

Electronic Record and Signature Disclosure:
Not Offered via DocuSign

**Status**

VIEWED

Using IP Address: 136.226.59.17

**Timestamp**

Sent: 12/17/2024 12:33:10 PM
Viewed: 12/17/2024 1:15:41 PM

---

**Carbon Copy Events**

0-44 SmokyMountains
esig.smokymountains@wyn.com
Wyndham Vacation Ownership
Security Level: Email, Account Authentication (None)

Electronic Record and Signature Disclosure:
Not Offered via DocuSign

**Status**

COPIED

**Timestamp**

Sent: 12/18/2024 10:05:28 AM

---

SANDRA ALICE LESLIE

Security Level: Email, Account Authentication (None)

Electronic Record and Signature Disclosure:
Not Offered via DocuSign

COPIED

Sent: 12/18/2024 10:05:28 AM
Viewed: 12/27/2024 2:23:53 PM

---

**Witness Events**

**Signature**

**Timestamp**

---

**Notary Events**

**Signature**

**Timestamp**

---

**Envelope Summary Events**

Envelope Sent
Certified Delivered

**Status**

Hashed/Encrypted
Security Checked

**Timestamps**

12/17/2024 12:33:11 PM
12/18/2024 10:05:21 AM

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Signing Complete | Security Checked | 12/18/2024 10:05:27 AM |
| Completed | Security Checked | 12/18/2024 10:05:28 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Wyndham Destinations (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

## How to contact Wyndham Destinations:

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: WVRFinancialInquiry@wyn.com

## To advise Wyndham Destinations of your new e-mail address

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at WVRFinancialInquiry@wyn.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

## To request paper copies from Wyndham Destinations

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to WVRFinancialInquiry@wyn.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

## To withdraw your consent with Wyndham Destinations

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

    i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

    ii. send us an e-mail to WVRFinancialInquiry@wyn.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

## Required hardware and software

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |

| Enabled Security Settings: | Allow per session cookies |
|---|---|

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Wyndham Destinations as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Wyndham Destinations during the course of my relationship with you.

# EXHIBIT
# 4

Docusign Envelope ID: 36F3B458-310C-4C0A-9097-3DA96FEEC79B

CLUB WYNDHAM

Owner name: WALL & ESTE

Date: 1/28/2025
Member number: 666
Contract number:
Wyndham Rewards Member Number:

**Ownership Review Summary**

| | | | |
|---|---|---|---|
| New points purchased today*: | 161,000 | Today's Purchase Price: | $28,000.00 |
| Use year / Deposit frequency: | Oct 01 - Sep 30 / Annual | Today's Processing Fee: | $349.00 |
| Inventory purchased: | WYNDHAM BONNET CREEK RESORT | Today's Closing Costs: | $308.53 |
| | | Today's Total: | $28,657.53 |

**Other Memberships and Enrollments**

| | | | |
|---|---|---|---|
| External exchange company: | RCI | | VIP by Wyndham Status |
| Internal exchange company: | Club Wyndham Plus | Permanent VIP Level: | Silver |
| Travel up by RHL: | Yes | Temporary VIP Level: | Gold |
| Plus Partners (CW Travel Agency): | Yes | | ClubWyndham.com |
| Vacation Sidekick: | Yes | | VIP Vacation Services: 866-[illegible]-4321 |
| Wyndham Rewards: | Yes | | Club Wyndham travel Agency: 1-[illegible] |
| Club Pass: | Yes | | Vacation Planning: [illegible] |

Today's Incentive:

**Existing ownership - Points Summary**

| | Contract # | Points | Home Resort | Usage |
|---|---|---|---|---|
| Contract(s) not being traded: | 35 | 405,000 | Annual CLUB WYNDHAM ACCESS | Oct 01 - Sep 30 |
| Contract(s) traded today: | | | | |
| Bonus Point Contract(s): | 916 | 248,000 | Bonus Point Contract Expiration Date: 09-30-2026 | |
| | New Bonus Points | 105,000 | Bonus Point Contract Expiration Date: 09-30-2026 | |

PIC Contract(s):

| | |
|---|---|
| Total Wyndham Points eligible to make reservations (Odd years including PIC Plus and Bonus Points):* | 661,000 |
| Total Wyndham Points eligible to make reservations (Even years including PIC Plus and Bonus Points):* | 661,000 |
| Points valid for Permanent VIP status (including PIC Plus): | 510,000 |
| Points valid for Temporary VIP status (including PIC Plus, PIC Express and Bonus Points):* | 661,000 |

**Your Financial Deposit Today**

| | | | |
|---|---|---|---|
| Today's deposits (and methods of payment): | | Existing Wyn. Rew. CC | $11,035.86 |
| | Closing Costs | Existing Wyn. Rew. CC | 338.53 |
| Total applied to carry at today: | | | $11,374.39 |

**Owner Onboarding Specialist Only**

| Loan Summary | CURRENT | NEW |
|---|---|---|
| Loan balance with Wyndham for contracts not traded today *** | | $62,079.49 |
| Loan balance with Wyndham for this contract*** | | $17,313.14 |
| Total loan balance with Wyndham for all contracts*** | $62,079.49 | $79,392.63 |
| Total loan payment amount for contract(s) not traded today*** | | $981.56 |
| Loan payment amount for this contract*** | | $281.06 |
| Total loan payments for all contracts*** | $981.56 | $1,262.62 |

Auto Pay: Yes Auto Pay method: Existing Wyn. Rew. CC

First loan payment date for THIS CONTRACT: 03/14/2025

| CLUB WYNDHAM Plus Assessment Summary (Maintenance Fee) | CURRENT | NEW Monthly |
|---|---|---|
| Monthly assessment for contract(s) not traded today | | $299.70 |
| Monthly assessment for** this contract | | $54.67 |
| Monthly assessment for all contract(s) | $299.70 | $334.67 |

Auto Pay: Yes Auto Pay method: Existing Wyn. Rew. CC

Next assessment payment date: 03/01/2025

**Existing Wyndham Rewards Credit Card: Downpayment Today $11,374.39**
Interest Free Financing: 0% Interest for the first 0 months (Existing Credit Card) (Today's down payment only)

I have reviewed and agree with the information noted above.
I agree that I will be a member of the programs noted above under "Your Other Memberships and Enrollments." (Certain programs may carry additional enrollment and renewal fees. Please refer to the disclosure documents for additional information.)
I have reviewed and understand the attached Buyer's Acknowledgment.
I agree that I will be a member of CLUB WYNDHAM Plus and that I have reviewed and agreed to the terms of the attached Assignment Agreement and Use Restriction.
I have reviewed and agree to abide by the terms and conditions of the Enrollment Agreement.

| | | | |
|---|---|---|---|
| [signature] | 1/28/2025 | [signature] | 1/28/2025 |
| Owner's eSignature | | Wyndham Owner Onboarding Signature | |
| [signature] | 1/28/2025 | Milena Mateus | 1/28/2025 |
| Owner's eSignature | | Wyndham Owner Onboarding Print Name | |
| | 1/28/2025 | | 1/28/2025 |
| Owner's eSignature | | Owner's eSignature | |

*PIC Express Membership is effective for five (5) years and becomes effective upon verification of the Qualified Week being enrolled per the verification terms.
**The actual amount may be lower if today's purchase is added to membership with existing contracts [illegible] traded.
***Amount financed does not include any existing loan balances with any third party conveyance outside of today's purchase.
e.g. Wyndham Rewards Credit Card.

Docusign Envelope ID: 38F06406-310C-4D8A-9097-3DA46FEEC70E

Contract Number: **559**

## SUPPLEMENT TO DISCLOSURES
## AND PURCHASE DOCUMENTS

Purchaser(s) acknowledges that effective September 30, 2024, Wyndham Vacation Ownership, Inc., changed its name to Travel + Leisure Resort Development, Inc. Purchaser(s) agree that the documents governing the provisions for purchase and sale of the ownership interest are enforceable according to their terms notwithstanding this change.

Travel + Leisure Resort Development, Inc. is a direct, wholly-owned subsidiary of Travel + Leisure Co. ("T+L Co."). T+L Co. has properly notified the relevant state agencies of this change and is filing revisions to the public reports and disclosure statements with those agencies.

The foregoing acknowledgements and agreements shall be deemed to be incorporated into and made a part of each of the Purchase Documents.

**Sandra Alice Leslie**
Purchaser's Printed Name     Purchaser's Printed Name

*Sandra Alice Leslie*
Signature         Signature

1/28/2025
Date          Date

**Donald L Wall**
Purchaser's Printed Name     Purchaser's Printed Name

*Donald L Wall*
Signature         Signature

1/28/2025
Date          Date

Docusign Envelope ID: 3CF08458-519C-4D8A-9067-3DA48FEEC70E



# CLUB WYNDHAM

Contract Number:          459

## VIDEO AND SOUND RECORDING CONSENT FORM

I/we, **SANDRA ALICE LESLIE and DONALD L WALL JOINT TENANTS WITH THE RIGHT OF SURVIVORSHIP**, authorize Travel + Leisure Resort Development, Inc. (**"T+L"**) to take and use video and sound recordings of the vacation ownership purchase document review.

I/we understand that the video and sound recordings (**"Recordings"**) may be used for quality assurance training or monitoring purposes, as well as to ensure compliance with industry regulations and for other business purposes.

I/we understand and agree to the conditions outlined in this video and sound recording consent form.

I/we understand that the Recordings are the property of T+L and I will not be given a copy of either recording, nor will the Recordings be part of any agreement or contract I enter into with T+L.

I/we acknowledge that I am fully aware of the contents of this consent form and am under no disability, duress, or undue influence at the time of my signing this consent form.

X _Sandra Alice Leslie_                                    1/28/2025

Owner **Sandra Alice Leslie**                             Date Signed

X _Donald L Wall_                                         1/28/2025

Owner **Donald L Wall**                                   Date Signed

X

Owner                                                     Date Signed

X

Owner                                                     Date Signed

DocuSign Envelope ID: 3BF08A66-3100-4D8A-0087-20A40FEEC70E

## EXHIBIT to OWNERSHIP REVIEW
### BUYER'S ACKNOWLEDGMENT

Contract Number                     6559

Purchaser(s): SANDRA ALICE LESLIE and DONALD L WALL

To ensure Purchaser(s) understands the benefits of the timeshare purchase with **FAIRFIELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM** (*"Developer"*) whose address is 9560 Via Encinas, Orlando, FL 328300000 and understands membership in the CLUB WYNDHAM® Plus Program (*"CLUB WYNDHAM Plus"*), it is important for Purchaser(s) to review each of the following:

1. Timeshare Purchase. Purchaser acknowledges the purchase of a timeshare interest (*"Ownership Interest"*) at **FAIRFIELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM** whose address is 9560 Via Encinas, Orlando, FL 328300000.

2. Assignment to CLUB WYNDHAM Plus. Purchaser understands the use rights in the Ownership Interest are being assigned to CLUB WYNDHAM Plus. In exchange, Purchaser will be allocated 105,000 CLUB WYNDHAM Plus Points annually based on the use rights stated in Purchaser's contract and that the Use Year is **OCTOBER 1ST** through **SEPTEMBER 30TH.**

3. Future CLUB WYNDHAM Plus Changes. Purchaser(s) acknowledges that the current CLUB WYNDHAM Plus Program features and benefits are described in the written program directories and disclosure materials provided with the purchase and that such features and benefits can change or be eliminated in the future. Purchaser(s) further acknowledges that no promises or guarantees were made to Purchaser(s) either verbally or in writing of any future program enhancements or resort amenity additions or benefits.

4. Personal Use and Enjoyment. Subject to certain strict eligibility requirements, limited resale, rental, and buy-back options may be currently available through Developer or related affiliates. Please contact Developer - Attention: Certified Exit at 1-855-312-9040 for further details on eligibility requirements and available options.

   **There is no assurance that Purchaser(s) may resell a timeshare for a certain price or on particular terms. Purchaser(s) acknowledges that this purchase is (i) for personal use and enjoyment and not for commercial or investment purposes and (ii) not being made based upon any representation that the timeshare interest has any future market value or resale potential.**

5. No Expectation of Tax Benefit or Profit. Purchaser(s) acknowledges that the purchase of the Ownership Interest was not made with any expectation of the deductibility under federal or state tax laws or deductibility of other expenses relating to the purchase or with any expectation of deriving any profit or tax advantage, including from:

   Resale Assistance        Rental Income        Investment        Tax Benefit

6. Not Buying for Maintenance Fee Offset. Purchaser(s) understands that Wyndham Vacation Resorts Inc. may present various programs from time to time that may provide Purchaser(s) with opportunities to offset a portion of the maintenance fee obligation associated with Purchaser's Ownership Interest. Purchaser(s) acknowledges the purchase made today was not made based on any of these programs and has no expectation that Purchaser's participation in these programs will fully or continuously offset any or all of the maintenance fee obligation.

7. No Pets. Purchaser(s) understands that pets are not allowed at any resort property, except for service animals which have been trained to work or perform tasks for the benefit of an individual with a disability.

8. No Pathway Program Eligibility. Purchaser(s) understands that the purchase made today is not eligible for the Pathway by Club Wyndham program. Only Purchaser's qualified points purchased prior to December 31, 2014 will be eligible for this program.

Docusign Envelope ID: 28F0D490-11DC-4D5A-9D77-3DA4EFEECT0E

## SalePoint Owner Information Sheet

| Contract Number | 359 | Date of Sale: 01-28-2025 | Points Purchased: 105,000 |
|---|---|---|---|

Inventory Purchased: FAIRFIELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM

| Primary Owner Information | |
|---|---|
| Name: | Sandra Alice Leslie |
| Address: | 425 Crossbow Dr , Maineville, OH 45039 |
| Phone number(s): | |
| Email address: | |
| Marital Status: | |
| Spouse Name: | |
| Title to be taken as: | |

| Secondary Owner Information | |
|---|---|
| Name: | Donald L Wall |
| Address: | 425 Crossbow Dr , Maineville, OH 45039 |
| Phone number(s): | |
| Email address: | |
| Marital Status: | |
| Spouse Name: | |
| Title to be taken as: | Joint Tenants With The Right Of Survivorship |

Travel – Leisure Resort Development, Inc., and its parents, subsidiaries, and affiliates (collectively "T+L") have my/our express written permission to send me/us advertising or telemarketing calls, texts, or other messages (including, but not limited to, SMS/MMS, push notifications, and in-app messaging) using an automated telephone dialing system or artificial or pre-recorded voice message at any cell phone or phone number I/we have provided above.

Additionally, I/we understand that T+L will share my/our cell phone or phone number(s) with T+L's affiliates and third-party service providers, including, but not limited to, billing or collection companies that T+L has contracted with to provide these types of services on its behalf. T+L, its affiliates, and third-party service providers have my/our express permission to send me/us calls, texts or other messages (including, but not limited to, SMS/MMS/push notifications and in-app messaging) using an automated dialing system or artificial or pre-recorded voice message at any cell phone or phone number I/we have provided, or at any number T+L or its affiliates and third-party service providers may obtain for the following purposes: (a) to resolve an issue or dispute regarding my/our purchase of property and/or services from T+L, (b) in connection with payment processing, including payment confirmations and account status, (c) to collect on a debt, or (d) as necessary regarding my/our purchase or property and/or services from T+L.

By granting this consent, I/we understand that it is not a condition of my/our purchase of property and/or services from T+L or its parents or subsidiaries and I/we have the right to refuse to give such consent.

| _Sandra Alice Leslie_ | 1/28/2025 | _Donald L Wall_ | 1/28/2025 |
|---|---|---|---|
| Signature  Sandra Alice Leslie | Date | Signature  Donald L Wall | Date |

| | | | |
|---|---|---|---|
| Signature | Date | Signature | Date |

| Contract Number: | 359 | Page 1 of 2 | No. 3528/Rev 12-24 |
|---|---|---|---|

Docusign Envelope ID: 38F00456-010C-4D8A-9097-3DA46FEEC70E

☐ I/we authorize T+L to send text or other messages regarding the above account, including but not limited to SMS, MMS, push notifications, and in-app messaging at the cell phone number(s) provided herein.

*Message and data rates may apply.*

Message frequency will vary, for example, based on the transactions you engage in or your account status. To stop receiving text messages, you agree to reply **"STOP"** to the text message, or to call 1-800-739-4031. After opting out, you may receive one additional text message confirming that your request has been received and processed. For help related to the text message, reply **"HELP."**

Please visit www.clubwyndham.wyndhamdestinations.com for the complete Terms of Use and Privacy Notice.

STANDARD      **PURCHASE AND SALE AGREEMENT**      389

CONTRACT NUMBER

THIS PURCHASE AND SALE AGREEMENT ("*Agreement*") is executed this 28th day of January, 2025, between WYNDHAM VACATION RESORTS, INC., a Delaware corporation, whose address is 6277 Sea Harbor Dr., Orlando, FL 32821 ("*We*" or "*Us*", with the possessive "*Our*"), and SANDRA ALICE LESLIE and DONALD I WALT, JOINT TENANTS WITH THE RIGHT OF SURVIVORSHIP Member Number ____ 345 Telephone Number ____ of 425 Crossbow Dr Maineville, OH 41039, ("*You*" or "*Yours*"). You and We may hereinafter be referred to collectively as the ("*Parties*") or individually as a ("*Party*")

**Arbitration Notice: PARAGRAPH 9 OF THIS AGREEMENT IS AN ARBITRATION PROVISION THAT WILL APPLY TO YOU UNLESS YOU REJECT THE ARBITRATION PROVISION AS PROVIDED IN PARAGRAPH 9(J). IF APPLICABLE, THE ARBITRATION PROVISION WILL SIGNIFICANTLY AFFECT YOUR RIGHTS IF A DISPUTE ARISES BETWEEN YOU AND SELLER. FOR EXAMPLE, YOU WILL NOT BE ABLE TO HAVE A JURY TRIAL OR BRING OR PARTICIPATE IN A CLASS ACTION RELATING TO MATTERS ARISING UNDER THIS AGREEMENT.**

### 1  AGREEMENT TO BUY AND SELL

We agree to sell and You agree to buy for the price of $28,000.00, together with interest and closing costs as provided in this Agreement, a 105,000/613,176,000 undivided tenant-in-common interest in ____ Units 547-532,554-562,647-652,747-752,754-762,846-852, 854-860,949,950,954-956,959,960, Building 3, Phase III having a Floating Use Right ("*Property*") at FAIRFIELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM ("*Condominium*"), together with all appurtenances thereto, located at 9560 Vic Encinas, Lake Buena Vista, Florida 32830. The Property and Condominium are both subject to the Declaration of Condominium for Fairfield Orlando at Bonnet Creek Resort, A Condominium ("*Declaration*"), which has been recorded in Official Records Book 7475, Page 881 in the Public Records of Orange County, Florida, including all amendments and supplements, if any.

You have delivered to Us this date the sum of $11,035.86, which includes $135.86 of a processing fee of $349.00, as a good faith deposit (the "*Deposit*") toward the purchase price of the Property. You agree to pay the remaining balance of the purchase price either by payment in full of the remaining balance of the purchase price in cash or by certified check or by executing a promissory note (the "*Note*") on a form supplied by Us and delivered to You with this Agreement. The Note shall be secured by a mortgage and/or Mortgage Deed (the "*Mortgage*") encumbering the Property on a form supplied by Us.

You understand and agree to pay Us a processing fee of $349.00, which is charged to all buyers, whether paying in cash or buying on credit. You pay this fee to Us, who as processer, performs various processing services related to the sale, including administration and preparation of various documents related to the sale. These services are separate and distinct from the services that We perform as settlement agent.

Capitalized terms not defined herein are defined as set forth in the Declaration.

### 2  CONVEYANCE OF TITLE

We will give You, within 180 days after closing, a Special Warranty Deed ("*Deed*") conveying title free and clear of all encumbrances, subject to mineral reservations, covenants, restrictions, easements and other matters of record at the time of closing (including the matters as set forth in the condominium drawings ("*Condominium Drawings*") and the Declaration. At closing, We will convey title to an Ownership Interest in the Property with occupancy rights in every resort year ("*VOI*").

### TITLE TO BE TAKEN:  Joint Tenants With The Right Of Survivorship

WE ACKNOWLEDGE RECEIPT OF YOUR DEPOSIT IN THE AMOUNT OF $11,035.86 (WHICH INCLUDES $135.86 OF THE PROCESSING FEE) AND ALSO FILING FEES TO BE PAID BY YOU IN THE AMOUNT OF $338.53. You may obtain title insurance coverage on Your VOI, but You are not obligated to do so.

You hereby ____ elect ☒ do not elect to purchase title insurance coverage. If You want title insurance, THE AMOUNT OF $0.00 MUST BE PAID BY YOU FOR THE TITLE INSURANCE PREMIUM AND ASSOCIATED COSTS EITHER UPON THE SIGNING OF THIS AGREEMENT OR PRIOR TO DELIVERY OF THE TITLE POLICY. No title insurance commitment will be issued. Title insurance coverage will be underwritten by a title insurance company through which We have negotiated a competitive rate. If You paid for title insurance, We will send You the policy within 180 days following recordation of the Deed. The Deed will not be held in escrow prior to issuance of the title policy. You have the right to obtain a title insurance policy from any other title insurance provider You choose; however, You will have to arrange for it and pay its costs. However, if You do not notify Us in writing within fourteen (14) days after the date of execution of this Agreement as to the identity of the title insurance company chosen by You, We shall have the right to select a title insurance company, and You will be deemed to have irrevocably chosen the title insurance company selected by Us

The estimated date of closing is within 6 months from the date of this contract.

### 3.  VACATION OWNERSHIP INTERESTS

The VOI is a fee simple real property undivided interest as a tenant-in-common with other owners in the Property. The VOI is expressed as a fraction in which the numerator relates to the number of Points allocated to You pursuant to the provisions of the Declaration creating the Vacation Ownership Plan. The Vacation Ownership Plan is perpetual unless terminated as provided in the Declaration.

### 4.  USE AND OCCUPANCY

The use, occupancy and possessory rights of Your VOI are subject to and are governed by the Declaration. You are assigned 105,000 Points. Points are symbolic and are to be used by You in reserving occupancy in Your Floating Use Right as designated in the Declaration. A reservation for occupancy of a timeshare Unit shall be confirmed by following the Reservation System Rules and Regulations for the Plan of Bonnet Creek Resort Vacation Condominium Association, Inc. ("*Association*")

### 5.  FEES

You understand and agree that from and after closing You will be a member of the Association and therefore shall be responsible for Your share of Condominium Fees, Vacation Fees, annual recurring use charges and any and all other expenses incurred in the operation of the Condominium under the terms of the Declaration. All amounts payable by You to the Association shall be paid by You in one annual POA Fee (defined in the Declaration). The current POA Fee is $700.35. You also have to pay real property taxes on Your VOI each year, which will be billed separately by the managing entity to You. The annual ad valorem taxes for the current year are estimated at $111.30.

**For the purpose of ad valorem assessment, taxation and special assessments, the managing entity will be considered the taxpayer as Your agent pursuant to Section 192.037, Florida Statutes.**

Contract Number    559

PROPERTY TAX DISCLOSURE SUMMARY. YOU SHOULD NOT RELY ON OUR CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT YOU MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

The POA Fees, the amount, manner of payment, and the payment due date(s) are subject to change and will be determined annually by the Association's board of directors.

### 6.  DEPOSITS

Pursuant to the Escrow Agreement (*"Escrow Agreement"*), the designated escrow agent is First Title of VA, Inc. 1901 West Colonial Drive, Orlando, Florida 32804 (*"Escrow Agent"*). All Deposits made hereunder (i) shall be paid to Us and secured by a surety bond held by Escrow Agent in accordance with the Escrow Agreement and Section 721.08(5), Florida Statutes, or if the aggregate of the Deposits so secured exceeds the amount of the surety bond, then such deposits (ii) shall be held by Escrow Agent until the expiration of the cancellation period as provided above and provided You have not elected to exercise his/her cancellation rights thereunder. The Deposit shall consist of 100% of all funds or other property received from or on behalf of You and shall be secured by the surety bond or held by Escrow Agent in accordance with the preceding sentence until presentation of an affidavit by Us to Escrow Agent stating that the cancellation period has expired, construction is completed, and closing has occurred, at which time either (i) the surety bond shall cease to secure the deposit, or (ii) the Escrow Agent shall transfer the deposit to Us. Interest earned on the Deposits shall be paid to Us. All notices and claims of Yours with respect to this Paragraph shall be sent to Escrow Agent at the address set forth above.

### 7.  BUYER'S REPRESENTATIONS

You represent that You are of legal age, that You have received a copy of this Agreement, and that You understand the conditions of this Agreement. YOU FURTHER AGREE THAT THE PROPERTY WILL NOT BE USED AS YOUR PRINCIPAL RESIDENCE. You acknowledge, warrant and represent to Us that (a) the purchase of the VOI is based upon its value as a vacation experience or for spending leisure time, and not for investment purposes or with an expectation that the VOI may be resold; (b) You represent that You are purchasing a VOI for the purpose of recreational and social use, and not for financial profit. You acknowledge that the Points assigned to Your VOI are symbolic of the VOI and the Points have no intrinsic value.

We have submitted or will submit the Property to condominium ownership under the terms of the Declaration. The Declaration and its exhibits describe the unit(s) of the Condominium and Your VOI and specifies Your voting rights, obligations to pay POA Fees and taxes, and other obligations as an Owner of an interest in the Condominium. You understand and agree that You will be a member of the Association and You agree to be bound by the rules and provisions of the Governing Documents (as defined in the Declaration)

You understand that Your VOI will be determined for all purposes by referring to the Condominium Drawings and the Declaration. You understand and agree that the Declaration grants to the Association's board of directors the right to place liens upon Your VOI if You are in default or fail to pay POA Fees when due. You further acknowledge that Your use of the units of the Condominium and Your VOI is subject to the terms and conditions of the Declaration.

### 8.  DEFAULT

Time is of the essence except where otherwise provided in this Agreement. If You breach any term or condition of this Agreement, You expressly waive notice of default or breach of any term of this Agreement. Upon Your default, or breach for a term of thirty (30) days of any term or condition of this Agreement, all sums paid hereunder by You may be retained by Us as liquidated and agreed damages for breach of this Agreement, or We may at Our option declare the entire remaining unpaid balance of purchase price plus accrued interest thereon due and payable; and We shall be entitled to reasonable attorney's fees and all costs of collection including court costs incurred in connection with Your default to the extent allowable by law. You will defend and indemnify Us against all claims of real estate brokers and salesmen (other than brokers or salesmen We employ) due to acts of You or Your representatives.

Upon Our breach of any term or condition of this Agreement, You may seek specific performance or elect to receive the return of Your Deposit(s) without thereby waiving any action for damages resulting from Our breach; provided, however that You shall not be entitled to an award of consequential or special damages resulting from any such breach.

### 9.  ARBITRATION PROVISION (*"Provision"*).

A.  Arbitration is an Alternative to a Court.  In arbitration, a neutral third Party (*"Arbitrator"*) resolves legal disputes in a hearing (*"hearing"*). The hearing is private and confidential. There is no judge or jury, it is usually faster, less formal and less expensive than a lawsuit. Pre-hearing fact finding (called *"discovery"*) is limited. Appeals are limited. Courts rarely overturn arbitration awards.

Unless You reject this Provision by following the procedures described in Subparagraph 9(J) below. When You or Seller may elect (choose) to require individual arbitration of any Claim, as defined and illustrated in Subparagraphs 9(B , 9(F) and 9(G). This means that if one Party demands that the Claim be arbitrated, an arbitrator will decide the dispute, rather than a judge or a jury, even if the other Party wants to stay in court.

For Claims that are arbitrated under this Provision, You and Seller waive (give up) our right to: (a) have juries decide the Claims, (b) have courts, other than small claims courts, decide the Claims; (c) bring or be a class member in a class action or class arbitration  (d) serve as a private attorney general or in a representative capacity; and (e) join a Claim with Claims of others not covered by this Provision.

B.  Election of Arbitration Administration.  Any dispute, controversy or claim (*"Claim"*) between you and Seller, whether past, present or future, arising from or relating to this Agreement or the relationships between You and Seller resulting from this Agreement shall, at the election of either Party, be arbitrated on an individual basis before the American Arbitration Association (*"AAA"*) or Judicial Arbitration and Mediation Services, Inc. (*"JAMS"*) pursuant to their applicable Rules, or before any other provider of arbitration services (*"other provider"*) to which You and Seller mutually agree in writing (provided such other provider adheres to the terms of this Provision). For more information about AAA and its Rules, You can look at its website, www.adr.org, or call AAA toll-free at 1-800-778-7879. For more information about JAMS and its Rules, You can look at its website, www.jamsadr.com, or call JAMS toll-free at 1-800-352-5267. A single neutral arbitrator shall be appointed. The arbitrator must be a practicing attorney with ten or more years of experience in the subject area of the dispute or a retired judge.

To start an arbitration proceeding, the complaining Party files an arbitration Demand as explained in the AAA and JAMS Rules or the rules of the other provider. If one Party begins or threatens a lawsuit concerning a Claim, the other Party can file a motion to compel arbitration with the court. If the court grants the motion, the Claim must be resolved in arbitration and the Party asserting the Claim must commence the arbitration. If AAA and JAMS cannot serve and the parties cannot agree on a substitute, a court will select the arbitrator. No company may serve as administrator, without the consent of all parties, if it adopts or has in place any formal or informal policy that is inconsistent with and purports to override the terms of the Class Action Waiver in this Provision (Subparagraph 9(H) below). Even if all parties have opted to litigate a claim in court, You or We may elect arbitration with respect to any Claim made by a new Party, or any Claim later asserted by an existing Party, in that lawsuit or in any related or unrelated lawsuit. If a Party initially asserts a Claim on an individual basis and modifies it to be asserted on a class, representative or multi-party basis the other Party may elect arbitration. Nothing in that litigation shall constitute a waiver of any rights under this Provision.

Case: 1:25-cv-00627-MWM Doc #: 1-1 Filed: 08/26/25 Page: 193 of 266 PAGEID #: 199

C. What Law Applies. The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 _, et seq., shall govern the interpretation and enforcement of this Provision. The arbitrator shall follow applicable substantive law consistent with the FAA, apply applicable statutes of limitations, honor valid claims of privilege, and issue a written reasoned decision (the "Award"). The arbitrator may award all remedies that would apply in an individual court action, including, without limitation, punitive damages (which shall be governed by the Constitutional standards employed by the courts) and injunctive, equitable and declaratory relief (but only in favor of the individual Party seeking relief and only to the extent necessary to provide relief warranted by that Party's individual claim). The arbitrator will have the authority to award fees and costs of attorneys, witnesses and experts to the extent permitted by the Agreement, the administrator's rules or applicable law. The Award will be final and binding except for any appeal rights under the FAA.

D. Place of Hearing; Arbitration Costs; Attorney's Fees. The arbitrator and the parties may agree that an in-person hearing is unnecessary and that the Claim can be resolved based on written filings and/or a conference call. However, if there is an in-person hearing, it will be held in a location reasonably convenient to both You and Seller, such as the state and county in which this Agreement was signed, unless otherwise agreed by the parties in writing or ordered by the arbitrator. Filing, administrative and arbitrator fees shall be paid by the Parties in accordance with the administrator's rules. The Parties are responsible for the fees and costs of their own lawyers, witnesses and experts. However, if a statute or other applicable law or agreement permits a Party to recover such fees and costs from the other Party, the arbitrator is authorized to apply that law.

E. Other Parties Covered by this Provision. Solely for purposes of this Provision, ("Seller" also means, Seller's parent companies, subsidiaries, affiliates, successors and assigns; all of the employees, officers and directors of Seller and the foregoing entities; and any other person or entity named as a defendant or respondent in a Claim asserted by You against Seller. ("You") also means your heirs, successors and assigns and any other person or entity to which your membership is subsequently resold or otherwise conveyed or transferred.

F. Examples of Claims Subject to Arbitration. The term ("Claim") shall be broadly construed. It includes, without limitation, disputes concerning: the Agreement, purchase, financing, ownership or occupancy (breach, termination, cancellation or default), the Association, Your membership, the Condominium property, reservations; points or rewards programs; applications and personal information; privacy; marketing or sales solicitations, representations, advertisements, promotions or disclosures; reservations; exchanges; assessments and fees; data breach or privacy claims arising from or relating directly or indirectly to the disclosure by us of any non-public personal information about You; and collection of delinquent amounts and the manner of collection. In addition, the term Claim includes claims arising out of contracts between the parties that were entered into prior to this Agreement. The term Claim also includes claims of every other kind and nature, including, but not limited to initial claims, counterclaims, cross-claims and third-party claims and disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, Uniform Commercial Code, regulation, ordinance, common law and equity.

G. Disputes Not Covered by this Provision. Notwithstanding the foregoing, the term Claim does not include:

(i) disputes about the validity, enforceability, coverage or scope of this Provision or any part thereof, which are for a court to decide (but disputes about the validity or enforceability of the Agreement as a whole are for the arbitrator to decide);

(ii) any individual action by You or Us in small claims or an equivalent court, unless that action is transferred, removed or appealed to a different court;

(iii) Seller's use of judicial or non-judicial relief to enforce a security agreement relating to the Agreement. The institution and maintenance of any such action shall not waive any Party's right to compel arbitration of any other Claim subject to arbitration, including, without limitation the filing of a counterclaim in a suit brought by Seller. In any such action commenced by Seller, you may assert any cognizable defense permitted by applicable law which does not seek any form of affirmative relief from Seller, including without limitation, damages; or

(iv) bringing an individual action in court that is limited to preventing the other Party from using a self-help or non-judicial remedy and that does not involve a request for damages or monetary relief of any kind.

H. Class Action Waiver. If a Claim is arbitrated, neither you nor Seller will have the right to (i) participate in a class action in court or in arbitration, either as a class representative or class member; (ii) act as a private attorney general in court or in arbitration, or (iii) join or consolidate Claim(s) with claims of any other person or entity. The arbitrator shall have no authority to conduct any class, private attorney general or multiple-party proceeding (as to issue any relief that applies to any person or entity except you and Seller individually. This means that the Arbitrator is not allowed to handle any Claim on a class, representative or consolidated basis. All Claims subject to this Provision must be decided in an individual arbitration (solely between you and Seller and the other parties described in Subparagraph 9(E) above). (Special procedures apply to a class seeking public injunctive relief, as set forth in Subparagraph 9(I) below).

I. Enforcement; Survival; Conflicts; Severance. An arbitration award may be entered in any court with jurisdiction. No arbitration award involving the parties will have any preclusive effect as to issues or claims in any dispute involving anyone who is not a Party to the arbitration, nor will an arbitration award in prior disputes involving other parties have preclusive effect in an arbitration between the parties to this Provision

This Provision shall survive (stay in force after) the breach, cancellation, default, termination or rescission of the Agreement, resale or other conveyance or transfer of the membership, and any bankruptcy to the extent permitted by law. This Provision governs if it conflicts with the Agreement or the arbitration rules.

If any term or provision of this Provision is held to be unenforceable or invalid, the remaining provisions shall be enforced without regard to such unenforceable or invalid term or provision, except that (i) if the Class Action Waiver is limited, voided or found unenforceable in a proceeding involving you and us with respect to a Claim that does not seek public injunctive relief and that determination becomes final after all appeals have been exhausted, then this Provision (except for this sentence) shall be null and void in its entirety with respect to such proceeding, and (ii) if a Claim is brought seeking public injunctive relief and a court determines that the restrictions in the Class Action Waiver or elsewhere in this Provision prohibiting the arbitrator from awarding relief on behalf of third parties are unenforceable with respect to such claim, and that determination becomes final after all appeals have been exhausted, then the claim for public injunctive relief will be determined in court and any individual claim/s seeking monetary relief will be arbitrated. In such a case, the parties will request that the court stay the claim seeking public injunctive relief until the arbitration award pertaining to individual relief has been entered in court. The parties acknowledge and agree that under no circumstances will a class action or a claim for public injunctive relief be arbitrated.

J. Right to Reject Arbitration Provision. You may reject this Provision by sending Seller a written notice which gives your name and Agreement number and states that you reject the Arbitration Provision. The rejection notice must be sent by certified mail, return receipt requested, to Wyndham Vacation Resorts, Inc., 6277 Sea Harbor Drive, Orlando, Florida 32821, Attention: Legal Department/Account Servicing Operations. A rejection notice must be signed by You and received by Seller within sixty (60) days after the date of this Agreement. Rejection of arbitration will not affect any other term of this Agreement.

**You have read, understand and voluntarily agree to this Arbitration Provision and acknowledge that if a Claim is arbitrated, there will be no right to have a court or jury trial or participate in a class action.**

**10. GOVERNING LAW**

This Agreement will be governed by the laws of the State of Florida, except that the ARBITRATION PROVISION will be governed by the Federal Arbitration Act ("FAA"). Any dispute arising out of this Agreement will be subject to the ARBITRATION PROVISION

### 11. LIMITATION OF LIABILITY

OWNER EXPRESSLY AGREES THAT IN NO EVENT SHALL SELLER, ITS PARENT, SUBSIDIARIES, AFFILIATES, SUCCESSORS, OR ASSIGNS BE LIABLE TO OWNER FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES ARISING OUT OF, RELATING TO, AND/OR IN CONNECTION WITH THE MARKETING PROCESS, SALES PROCESS, PURCHASE OF THE OWNERSHIP, USE OF THE OWNERSHIP, AND/OR ANY BREACH OF THIS AGREEMENT. THE MAXIMUM LIABILITY TO OWNER ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, SHALL BE THE TOTAL AMOUNT PAID TO SELLER UNDER THIS AGREEMENT. OWNER EXPRESSLY WAIVES ANY RIGHT TO SEEK RELIEF IN EXCESS OF THE LIMITATION OF LIABILITY SPECIFIED IN THIS PARAGRAPH.

### 12. COMMUNICATIONS WITH OWNER

You hereby expressly consent and agree that We (inclusive of Our parent, subsidiaries, affiliates, successors, and assigns) and the Association may use written, electronic or verbal means to contact You. This consent includes, but is not limited to, contact by manual calling methods, prerecorded or artificial voice messages, text messages, emails and/or automatic telephone dialing systems. Additionally, You hereby agree that We (inclusive of Our parent, subsidiaries, affiliates, successors, and assigns) and the Association may use any email address or any telephone number You provide, now or in the future, including a number for a cellular phone or other wireless device, regardless of whether You incur charges as a result.

### 13. NO WARRANTIES

We make no warranties, express or implied, concerning the Property, the units of the Condominium, personal property, common elements or the limited common elements, except as provided by Chapter 718, Florida Statutes.

### 14. RADON GAS

Pursuant to Section 404.056(6), Florida Statutes, all sellers of buildings in Florida are required to give the following notice "Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from Your county health department."

### 15. INSULATION DISCLOSURE

Pursuant to 16 CFR 460.16, promulgated by the Federal Trade Commission, the Developer hereby discloses the following information concerning the insulation installed in the Property

1. Type of Insulation: Roof - Rigid Insulation on 8" concrete slab; Exterior Walls - Batt/Blanket Thermal Insulation.
2. Thickness: Roof - 3.5" minimum average thickness; Exterior Walls - 8" batt/blanket.
3. R-Value: Roof - R-15 average value; Exterior Walls - R-15.

### 16. FLORIDA BUILDING ENERGY-EFFICIENCY RATING ACT

Pursuant to the Florida Building Energy-Efficiency Rating Act, Part VIII, Chapter 553, Florida Statutes, You may have the energy efficiency rating of the Units subject to this Agreement determined. The cost for obtaining this rating is Your responsibility.

### 17. COMPLETION OF CONSTRUCTION

Construction is complete.

### 18. MODIFICATIONS AND CHANGES

Notwithstanding Paragraph 23. We reserve the right to make changes in the Declaration for the purpose of correcting errors in the preparation and filing of all documents relating to the Condominium where necessary to establish the validity and enforceability of the Declaration. We reserve the right to add additional phases to the Condominium as provided therein. Notwithstanding Paragraph 23 of this Agreement. We further reserve the right to make clerical or typographical corrections in any documents related to this Agreement.

### 19. FURNISHINGS

The timeshare Units will have furniture, appliances, equipment and accent furnishings substantially similar to, or of equal quality to, those shown or used in the models. Furnishings are common elements of the Condominium. Each owner is responsible for maintaining and replacing such furnishings as part of the POA Fees.

### 20. REFUND

In the event of cancellation during the ten (10) day cancellation period, We will refund to You all payments made under this Agreement, reduced by the proportion of any contract benefits You have actually received under this Agreement prior to the effective date of the cancellation, within twenty (20) days after receipt of notice of cancellation, or within five (5) days after receipt of funds from Your cleared check, whichever is later.

### 21. RESALE DISCLOSURE

**Any resale of this timeshare interest must be accompanied by certain disclosures in accordance with Section 721.065, Florida Statutes.**

### 22. TERMINATION OF AGREEMENT WITH BLOCKED PERSONS

Under United States Presidential Executive Order 13224 (the **"Executive Order"**). We are required to ensure that We do not transact business with persons or entities determined to have committed, or pose a risk of committing or supporting, terrorist acts and those identified on the list of Specially Designated Nationals and Blocked Persons (the **"List"**), generated by the Office of Foreign Assets Control of the U.S. Department of the Treasury. The names or aliases of these persons or entities ("**Blocked Persons**") are updated from time to time. In the event We learn that Your name appears on the List, We reserve the right to delay the closing pending Our investigation into the matter. If We are advised and/or determine that You are a Blocked Person, We reserve the right to terminate this Agreement and/or to take all other actions necessary to comply with the requirements of the Executive Order. The provisions of this Paragraph will survive closing and/or termination of this Agreement.

### 23. BINDING EFFECT

This Agreement is binding upon the Parties hereto and their heirs, legal representatives, successors and assigns. This Agreement supersedes any and all understandings and agreements between You and Us, and You and We mutually agree that this Agreement represents the entire Agreement between You and Us.

### 24. SEVERABILITY

If any clause or provision of this Agreement shall be held invalid by court order or otherwise, the invalidity of such clause or provision shall not affect the validity of the remainder of this Agreement. The remaining provisions of this Agreement will continue to be fully enforceable in accordance with the terms hereof.

### 25. ADDITIONAL DOCUMENTS

You and We agree to execute any additional documents which may be needed to carry out the intent and purposes of the Parties to this Agreement.

Contract Number: 559

**26. GENDER AND TENSE**

In this Agreement, the singular shall be deemed to refer to the plural and the plural to the singular, and pronouns of masculine, feminine and neuter gender shall be deemed to include either, both or all of the other genders.

**27. CHOICE OF LAW**

This Agreement shall be governed and construed in accordance with the laws of the State of Florida.

**28. ASSIGNMENT**

You may not assign this Agreement, however, We may assign this Agreement.

If You have used or occupied the Property using any VOI purchased pursuant to this Agreement, Wyndham Vacation Resorts, Inc. may subtract from Your refund a reasonable charge to cover the length of stay plus the cost of damages to the Property directly attributable to You or any member of Your party. The charge shall be deemed reasonable if it does not exceed the amount of the POA Fees attributable to the Points used to cover the length of stay.

Receipt of a completed copy of this Agreement is hereby acknowledged by You.

IN WITNESS WHEREOF, the Parties have hereunto set their respective hands and seals on the day and year first above written.

The Bonnet Creek Community Development District may impose and levy taxes or assessments, or both taxes and assessments, on this Property. These taxes and assessments pay the construction, operation, and maintenance costs of certain public facilities and services of the District and are set annually by the governing board of the District. These taxes and assessments are in addition to county and other local governmental taxes and assessments and all other taxes and assessments provided for by law.

You may cancel this Agreement without any penalty or obligation within ten (10) calendar days after the date You sign this Agreement or the date on which You receive the last of all documents required to be given to You pursuant to Section 721.07(6), Florida Statutes, whichever is later.

If You decide to cancel this Agreement, You must notify* Us in writing of Your intent to cancel. Your notice of cancellation shall be effective upon the date sent and shall be sent to Wyndham Vacation Resorts, Inc., Attention: Rescissions Department at 6277 Sea Harbor Drive, Orlando, Florida 32821.

Any attempt to obtain a waiver of Your cancelation right is void and of no effect. While You may execute all closing documents in advance, the closing, as evidenced by delivery of the Deed or other document, before expiration of Your 10-day cancellation period, is prohibited.

Any attempt to obtain a waiver of Your cancellation right is void and of no effect. While You may execute all closing documents in advance, the closing, as evidenced by delivery of the Deed or other document, before expiration of Your 10-day cancellation period, is prohibited.

| Sandra Alice Leslie | 1/28/2025 |
| --- | --- |
| Owner Sandra Alice Leslie | Date Signed |

| Donald L Wall | 1/28/2025 |
| --- | --- |
| Owner Donald L. Wall | Date Signed |

| | |
| --- | --- |
| Owner | Date Signed |

| | |
| --- | --- |
| Owner | Date Signed |

SELLER: WYNDHAM VACATION RESORTS, INC.

| | |
| --- | --- |
| BY | |
| AUTHORIZED REPRESENTATIVE OF SELLER | 20 |

*"Notify" shall mean that a written notice of cancellation is delivered, by any means which may include certified mail return receipt requested, to WYNDHAM VACATION RESORTS, INC. Any notice of cancellation shall be considered given on the date postmarked if mailed, or when transmitted from the place of origin if telegraphed. If given by means of a writing transmitted other than by mail or telegraph, the notice of cancellation shall be considered given at the time of delivery at the place of business of the developer.

No. 1(h3)Rev. 11.24

## PROMISSORY NOTE

$17,313.14

Contract Number:                359

Dated: 01-28-2025

1. OBLIGATION. For value received, SANDRA ALICE LESLIE and DONALD L WALL JOINT TENANTS WITH THE RIGHT OF SURVIVORSHIP (the "MAKER"), hereby promises to pay to WYNDHAM VACATION RESORTS, INC., a Delaware corporation (the "HOLDER"), or other, in lawful money of the United States, the principal sum of SEVENTEEN THOUSAND THREE HUNDRED THIRTEEN DOLLARS AND FOURTEEN CENTS Dollars ($17,313.14), together with interest on the unpaid balance from 01-28-2025 until paid in full, at the rate of FOURTEEN 99/100 percent (14.99%) per annum. Payments of principal and interest are due in installments of TWO HUNDRED EIGHTY ONE DOLLARS AND SIX CENTS Dollars ($281.06), or more, beginning 03-14-2025 and continuing on the 14th day of each calendar month thereafter until the entire unpaid principal balance of this Note, together with any accrued but unpaid interest thereon, shall have been paid. Interest will begin to accrue on the day after date hereof.

2. APPLICATION OF PAYMENTS. The interest Maker owes will be calculated on a daily interest factor basis using the foregoing interest rate and the actual number of days between payments and the actual number of days in the year. If Maker makes the required installment payments prior to their due dates, the "FINANCE CHARGE", Maker pays will be less than expected by Holder since interest is being applied on a daily basis. If, however, Maker makes any installment payments after they are due, Maker understands that Maker's delay in making the payment will necessarily increase the total amount of the "FINANCE CHARGE", even if there are no late charges assessed pursuant to this Note. Maker's payments are applied first to interest then to any unpaid costs or expenses payable by Maker under this Note, and then to reduce the principal balance due. Interest will be charged on a daily basis starting the day after date hereof, which is before Maker's first (1st) installment payment is due. Maker's final payment may be adjusted for the amount of principal and interest then owed as computed by use of the daily interest factor, actual receipt of payments and/or the charging of costs or expenses under this Note which are charged to Maker's installment payments. Interest shall cease upon the principal so credited. Should interest not be on paid it shall thereafter bear like interest as the principle, but such unpaid interest so compounded shall not exceed an amount equal to simple interest on the unpaid principal at the maximum rate permitted by law.

3. SECURED NOTE. Payment of this Note is secured by a Mortgage, of even date herewith, given by MAKER for the benefit of HOLDER, encumbering MAKER'S Vacation Ownership Interest in FAIRFIELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM, also referred to as the "Property", as described in the Contract for Purchase and Sale or Purchase and Sale Agreement ("Contract") and the fixtures, furnishings, and equipment located thereon situated in Orange County, Florida, as more particularly described in the Mortgage. MAKER'S interest in the Property is that of an "Owner" as such term is defined in that certain Declaration for the Property recorded or to be recorded in the Public Records of the county named above. Unless specified herein to the contrary, all capitalized terms used herein shall have the same meaning as given to such terms in the Declaration.

4. PREPAYMENT. MAKER may, at its option, prepay all or any part of the principal amount of this Note and at any time and from time to time without premium, bonus or penalty and interest shall cease on the principal so paid. All prepayments of principal shall be applied to the last maturing installments herein; the making of a prepayment shall not relieve MAKER from his obligations to pay each and every installment due hereunder until all principal and accrued interest have been paid in full.

5. LOAN CHARGES. If a law, which applies to this Note and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this Note exceed the permitted limits, then: (i) any interest and/or other loan charges will automatically be reduced by the amount necessary to reduce the interest rate and/or charges to the permitted limit, retroactively effective as of the date of this Note, and as though this Note originally provided for the reduced interest rate and/or loan charge, as the case may be; and (ii) any sums already collected from Maker which exceeded permitted limits will be refunded to Maker by either reducing the principal Maker owes under this Note or by making a direct payment to Maker. If Maker's election. If a refund reduces principal, the reduction will be treated as a partial prepayment.

6. LATE CHARGE. Should default in the payment of any amount due hereunder continue beyond ten (10) days from the due date of such payment, MAKER shall pay a late charge to compensate HOLDER for the added expense and inconvenience incurred by HOLDER and caused by such delay in payment. It is acknowledged by MAKER and HOLDER that the actual amount necessary to adequately compensate HOLDER in such case would be impractical and extremely difficult to calculate. MAKER and HOLDER therefore agree that the amount of such late charge shall be a minimum of $10.00 or 1% of the amount that is late, whichever is greater. LATE CHARGES NOT APPLICABLE TO: (a) if the delinquency is due to late fees or charges assessed on an earlier payment, and the current payment is otherwise a full payment for the applicable period and is paid on its due date or within any applicable grace period; or (b) if after signing this Note MAKER becomes an active member of the uniformed services, as discussed below, and MAKER's ability to perform any obligation under this Note is materially affected by such military service.

7. ACTIVE MEMBERS OF THE UNIFORMED SERVICES. MAKER understands that if at any time after executing this Note MAKER becomes an active member of the Uniformed Services, as defined in section 101(a)(5) of Title 10, United States Code, that the maximum rate of interest that Borrower may be charged during any period of Military Service as defined pursuant to the Service Members Civil Relief Act), is the lesser of the MAKER's current rate under this Note or 6% per year. MAKER further understands that if at any time after executing this Note MAKER becomes an active member of the Uniformed Services, as defined in section 101(a)(5) of Title 10, United States Code, MAKER will immediately notify HOLDER of MAKER'S status.

8. EVENTS OF DEFAULT. All payments shall be made on or before the due date at the office of HOLDER in Orlando, Florida or at such other place and to such authorized agent as HOLDER may designate. If MAKER shall be in default for a period of thirty (30) days in the payment of any monthly installment (45 days if MAKER has paid more than 90% of the principal amount of the Note) HOLDER shall have the following options:

(a) In the event a deed for the Property has not been delivered to the MAKER, to terminate the Contract upon giving thirty (30) days notice in writing to MAKER at his last known address of HOLDER's intention to cancel the Contract. All monies theretofore paid and whatever interest in said real estate acquired thereunder, if any, together with any and all improvements thereon shall be forfeited and shall remain the Property of HOLDER as liquidated damages for breach of the Contract and as reasonable rent for the Property contracted to be purchased by MAKER and that upon such forfeiture and termination of the Contract, HOLDER shall be entitled to immediate possession of said Property. The failure and omission of the HOLDER to declare this Note and Contract forfeited on any breach hereof shall not constitute a waiver of any future breach, and shall not operate to bar, abridge or destroy the right of HOLDER to declare same forfeited upon any subsequent breach.

No 3/0/Rev 1-97

Contract No.                559

(b) In the event a deed for the Property has been recorded, to foreclose the lien of HOLDER securing the Note in accordance with the terms of the Contract and Mortgage and seek whatever additional remedies may be available and to which HOLDER shall be entitled under Florida law. In such event the MAKER agrees to indemnify and repay HOLDER, its successors or assigns, attorney's fees and costs incurred by HOLDER, its successors or assigns, to the extent allowable by law.

9. ACCELERATION. If an event of default of a monetary nature shall occur, or within forty (30) days after receipt of written notice of the occurrence of any event of default of non-monetary nature, the entire unpaid balance of this Note and all interest accrued thereon shall become immediately due and payable at the election of HOLDER.

10. SALE OR FURTHER ENCUMBRANCE. Upon MAKER'S sale, transfer, hypothecation, assignment or further encumbrance, whether voluntary, involuntary or by operation of law, of all or any part of the Property, or any interest therein (excluding an assignment of rights to use Property in accordance with the provisions of the Declaration and the Rules and Regulations), HOLDER may, at its sole option, by written notice to MAKER, declare all obligations under this Note immediately due and payable. MAKER shall notify HOLDER promptly in writing of any transaction or event which may give rise to a right of acceleration under this Paragraph 9. In addition to other damages and costs resulting from MAKER'S breach of MAKER'S obligations under this paragraph, MAKER acknowledges that MAKER'S failure to give such notice may damage HOLDER in an amount equal to not less than the difference between the interest payable on the obligation hereunder and the interest which HOLDER would have been able to obtain on said sum on the date when the event which gave rise to the right of acceleration occurred.

11. ATTORNEY'S FEES. In the event that any action is instituted on this Note or under the mortgage or any action is instituted with respect to any event of default hereunder or under the Mortgage, the court in such action shall award a reasonable sum as attorney's fees to the party who, in light of the issues litigated and the court's decision on those issues, was more successful in the action. The more successful party need not be the party who recovers a judgment in the action. If a party voluntarily dismisses an action, a reasonable sum as attorney's fees shall be awarded to the other party.

12. SET-OFF; COUNTERCLAIM. MAKER hereby waives all rights of set-off and counterclaim with respect to this Note including such rights of set-off and counterclaim which may arise from claims hereto unknown to MAKER.

13. INVALIDITY. In the event any one or more of the provisions contained in this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note.

14. WAIVERS. Except as otherwise provided herein, MAKER waives presentment and demand for payment, protest and notice of protest and nonpayment, and agrees that MAKER'S liability under this Note shall not be affected by any renewal of extension in time of the payment hereunder or by a release or change of any security for the payment of this Note. No waiver of any right or remedy of HOLDER hereunder at any time shall constitute a waiver of any other right or remedy of HOLDER or of the same right or remedy at any subsequent time.

15. SUCCESSORS AND ASSIGNS. All covenants and agreements herein shall be binding upon MAKER and its successors and assigns, whether so expressed or not, and all such covenants and agreements shall inure to the benefit of HOLDER and its nominees, successors and assigns.

16. NOTICE. All notices required or permitted to be given to HOLDER or MAKER hereunder shall be in writing and shall be deemed to have been duly given if either delivered personally or mailed, by registered or certified mail, return receipt requested, postage prepaid and addressed to such party at the address set forth below, provided that either MAKER or HOLDER may change such address from time to time by written notice similarly given to the other.

              If to HOLDER:                          If to MAKER:

         WYNDHAM VACATION RESORTS, INC.         SANDRA ALICE LESLIE and DONALD L WALL JOINT
         6277 Sea Harbor Dr.                    TENANTS WITH THE RIGHT OF SURVIVORSHIP
         Orlando, FL 32821                      425 Crossbow Dr
                                                Maineville, OH 45033 USA

Any notice so given shall be deemed to have been delivered on the day of personal delivery or, if given by United States mail, on the fifth business day after the same is deposited in the United States mail as provided above.

17. GENDER AND TENSE. Wherever appropriate in this Note, the singular shall be deemed to refer to the plural and the plural to the singular, and pronouns of masculine, feminine and neuter gender shall be deemed to include either, both or all of the other genders.

18. CHOICE OF LAW. Florida state law governs the rights and obligations of Maker and the Holder under this Note, except to the extent applicable United States federal law, now in existence or hereafter enacted, permits a higher interest rate in which case this applicable federal law shall govern the interest rate, and in no event will the interest rate and the aggregate of all interest or any item deemed interest exceed under any circumstance the maximum nonusurious amount permitted by applicable law.

IN WITNESS WHEREOF, MAKER has duly executed this Note as of the date first written above.

MAKER                                           MAKER

Sandra Alice Leslie                             Donald L Wall

_____                         _____
Sandra Alice Leslie                             Donald L Wall

Final
VOI

**EXHIBIT to OWNERSHIP REVIEW**

Club Wyndham® Plus

**VACATION OWNERSHIP ASSIGNMENT AGREEMENT**

**AND USE RESTRICTION**

589
Contract Number

THIS VACATION OWNERSHIP ASSIGNMENT AGREEMENT AND USE RESTRICTION ("*Agreement*") is made this 28th day of January, 2025, by and between Wyndham Vacation Resorts, Inc., a Delaware Corporation located at 6277 Sea Harbor Dr. Orlando, FL 32821 ("*Plan Manager*"), and Sandra Alice Leslie and Donald L Wall ("*Owner*").

WHEREAS, the Second Amended and Restated FairShare Vacation Plan Use Management Trust Agreement effective March 14, 2004, recorded in the Office of the Circuit Clerk in Cleburne County, Arkansas and other various jurisdictions, which document is incorporated herein by reference, as amended from time to time ("*Trust Agreement*"), sets forth the terms, restrictions and conditions of the FairShare Vacation Plan ("*Plan*") described therein as well as the obligations of the Plan Manager to those owners who have subjected their property to the Trust Agreement by assigning the use, occupancy and possessory rights in such property to the FairShare Vacation Plan Use Management Trust ("*Trust*") or who acquire property which has been previously subjected to the Trust Agreement and whose use, occupancy and possessory rights have previously been assigned to the Trust ("*Agreement*") all in accordance with the terms and conditions of the Plan; and

WHEREAS, Owner is the buyer of a Vacation Ownership Interest ("*Property*") consisting of an undivided fee simple Interest in FAIRFELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM ("*Home Resort*") located in Orlando, FL together with Floating Use Rights and the allocation to Owner of symbolic Points ("*Points*") described in the Purchase and Sale Agreement ("*Contract*") # 159 between the Owner and WYNDHAM VACATION RESORTS, INC ("*SELLER*").

WHEREAS, Owner desires to subject the Property to the Trust Agreement and assign the use, occupancy and possessory rights in the Property to the Trust, all in accordance with the Trust Agreement.

NOW THEREFORE, in consideration of $Fee Waived paid by Owner to Plan Manager and the mutual promises contained herein and in furtherance of the Assignment, the parties agree as follows:

1. **Definitions.** Except as otherwise provided herein, capitalized terms shall have the same definition as set forth in the Trust Agreement. This Agreement, as well as the interest of the Trustee set forth herein, shall be subject to the prior rights in the Contract and/or Property of any mortgagee or secured party. Nothing contained herein shall contravene the obligation of Owner under the Contract or security agreement executed in connection with Owner's purchase of the Property.

2. **Assignment.** Owner hereby subjects the Property to the Trust Agreement and assigns the use, occupancy and possessory rights in the Property to the Trust, to be administered in accordance with Trust Agreement, and agrees that Owner's Use Rights shall be governed by the Trust Agreement. The foregoing assignment shall be effective even if the Home Resort has not yet been completed and available for occupancy. In such event, Owner shall nevertheless have the ability to use Owner's Points in accordance with the Plan to reserve alternate accommodations or other benefits ("*Alternate Usage*"), which Alternate Usage shall terminate when the Home Resort is available for occupancy.

3. **Points.** Plan Manager shall assign Owner 105,000 Points, which Points shall be used through the Club Wyndham Plus Program to reserve use of accommodations subjected to the Trust in accordance with the Trust Agreement. Points are symbolic of the value of Owner's Use Rights in the property and are to be used in each full year.

4. **Voting Rights.** Notwithstanding the Assignment, Owner shall retain Owner's voting rights in the home owners association ("*HOA*").

5. **Club Wyndham Plus Assessment.** Owner agrees to pay an annual Club Wyndham Plus Assessment ("*Assessment*") to the Trust for certain expenses of the Plan and the Owner's HOA in accordance with the Trust Agreement, which Assessment shall include Owner's share of the expenses associated with the operation and maintenance of the Plan, and may include Owner's proportionate share of Owner's HOA maintenance fees and common expenses attributable to the Property ("*HOA Fee*") or, if the Property is not complete and the Owner is not obligated to pay Owner's proportionate share of HOA Fee, an Alternate Usage Fee (as discussed in Paragraph 10 below) equal in amount to the Owner's proportionate share of HOA Fee. The Assessment shall be payable annually in advance in either one installment or in monthly installments pursuant to an approved auto pay plan. The Plan Manager shall cause the HOA Fee portion of the Assessment to be deposited into a Club Wyndham Plus escrow account ("*Escrow Account*") until such funds become due and are delivered to the HOA. Owner authorizes the Trustee or its assignees to withdraw the HOA Fee from and out of the Escrow Account and pay same over to the HOA so long as said Property is subjected to the Plan.

6. **Association.** Pursuant to the Assignment, Owner becomes a Member of the Fairshare Vacation Owners Association ("*Association*") and as such agrees to abide by all requirements set forth in the Articles and Bylaws of the Association. Owner also has the right to vote Owner's interest the Association.

7. **Use and Occupancy Rights.** Owner hereby assigns Owner's use and occupancy rights in the Property to the Trust for the period of time this Agreement, is effective and accordingly grants to the Plan Manager the right to assign the possession and Use Rights the Property on an annual basis or biennial basis, if applicable, to Members in the Plan in return for Owner's right to utilize the Club Wyndham Plus Program of exchange in accordance with the Trust Agreement, and subject to any rights reserved to the developer under the Governing Instruments to which the Property is also subject.

8. **Home Resort.** Owner shall have priority reservation rights at the Home Resort where the Property is located. Owner's priority reservation rights shall not be eliminated by the Trustee so long as this Agreement shall remain in effect.

9. **Effective Date.** This agreement shall become effective on the date first written above.

10. Alternative Usage Fee. If the Property is not complete as of the date of this Agreement and Owner is allowed usage of Owner's Points in the Plan to make reservations for other accommodations or benefits, then the Plan Manager shall cause the HOA Fee portion of the Assessment to be delivered to the Plan Manager as an Alternate Usage Fee in consideration of such usage by Owner. When the construction of the Property is complete, the Plan Manager shall cause the HOA Fee portion of the Assessment to be deposited into the Escrow Account and then delivered to the HOA, as provided above.

11. Termination. This Agreement and all rights granted hereunder may be terminated by Owner, or by Owner's successors or assigns, at any time; however, any such termination shall be subject to any outstanding reservations against the Property. Election to terminate will be noted but all reservations existing as of the termination date will be honored. No new reservations will be accepted on or after the termination date. If this Agreement is terminated, future access to the Plan will require approval of the Plan Manager and include a conversion fee. If not terminated sooner, termination will occur on the earlier of the following dates: (a) termination of the timeshare or condominium regime(s) in which the Property is located; (b) termination of the Plan; or (c) termination by Trustee in accordance with the Trust Agreement. Upon termination, Owner's Points will be extinguished and Owner will no longer have the right to make reservations in properties subjected to the Trust Agreement and all use, occupancy, and possessory rights in the Property shall automatically revert to the Owner.

12. Default. Upon termination of this Agreement or in the event Owner defaults on Owner's obligation under the Contract resulting in the termination of the Contract or the acquisition of the Property Owner's secured party, this Agreement shall be deemed terminated and cancelled and all rights of Owner hereunder shall cease. Upon such termination, Plan Manager shall cause the use, occupancy and possessory rights in the Property to be re-assigned back to Owner or the acquiring secured party, subject to any Owner commitments or confirmed reservations in the Property in favor of another Member which may have been made pursuant to the Plan. Any fees due the Trust by Owner shall be deducted at date of termination from the Assessment paid by Owner. Upon such termination, all benefits and obligations of Owner under the Contract or security agreement shall continue in force and effect.

13. Club Wyndham Plus VIP Program. The Club Wyndham Plus VIP Program ("VIP Program") and its accompanying benefits are made available to Club Wyndham Plus Members who have achieved certain eligibility criteria as set forth in the Club Wyndham Plus Member's Directory ("Member's Directory"). Owner should refer to the Member's Directory for the terms and conditions of the VIP Program.

14. Miscellaneous. The parties hereto agree to execute any additional instruments which may be necessary or convenient to carry out the intent and purpose of this Agreement. The terms and conditions of this Agreement shall survive deeding of the Property to Owner.



CLUB
WYNDHAM

# Financial Review Summary

| | | | |
|---|---|---|---|
| Name(s): | Sandra Alice Leslie and Donald L Wall | Contract #: | 559 |
| Address: | 425 Crossbow Dr | Member #: | 046 |
| | Maineville, OH 45039 USA | Date: 01-28-2025 | |
| Phone Number: | | Email Address: | |
| Bonus Points | 105,000 | | |
| End Date of Bonus Points | 09-30-2026 | | |

Inventory Name: FAIRFIELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM

## New Purchase Financial Details

| | | |
|---|---|---|
| Gross Purchase Price: | $ | 33,206.00 |
| Discount: | $ | 5,206.00 |
| Net Purchase Price: | $ | 28,000.00 |
| Closing Cost: | $ | 338.53 |
| Processing Fee: | $ | 349.00 |
| Total Purchase Price: | $ | 28,687.53 |
| Down Payment Today: | $ | 11,374.39 |
| Loan Payment Amount | $ | 281.06 |
| Loan Payment Date: | | 03-14-2025 |
| Term: | | 120 |
| Interest Rate: | | 14.98% |
| Interest Rate Variable Non-PAC: * | | 14.98% |
| Amount Financed | $ | 17,313.14 |

Loan and Dues are subject to a billing charge if not paid through the approved Auto Pay Plan

* No auto-pay or credit card auto-pay

## Payments Made In Full Over The Full Term

| | | | | | |
|---|---|---|---|---|---|
| Finance Charge Total: | $ | 16,503.46 | | | |
| Total Sales Price (Down Payment + Total Payments) | $ | 44,763.06 | Total of Payments with Interest | $ | 33,816.60 |

No. 3161/Rev 2-22

# Financial Review Summary

## Club Wyndham Plus Monthly Maintenance Dues

| | | | |
|---|---|---|---|
| Total Points – Today's Contract | 105,000 | | |

| | | | | |
|---|---|---|---|---|
| **Points Based Assessment** | | | Auto Pay | Yes |
| Club Wyndham Plus Program Fee | $ | 17.33 | First Payment Date | 03-01-2025 |
| HCA Fee and Real Estate Taxes | $ | 67.64 | | |
| **Total Assessment Amount** | $ | 84.97 | | |
| Frequency | | Monthly | | |

I have reviewed and agree with the information noted above. This includes, but is not limited to, my understanding and agreement of all financial terms including our initial deposit, monthly loan payments, total loan balance, and monthly maintenance fee assessments.

| | | | |
|---|---|---|---|
| _Sandra Alice Leslie_ | 1/28/2025 | _Donald L. Wall_ | 1/28/2025 |
| Owner's Signature Sandra Alice Leslie | Date | Owner's Signature: Donald L. Wall | Date |

| | | | |
|---|---|---|---|
| Owner's Signature | Date | Owner's Signature: | Date |

Wyndham Vacation Resorts, Inc.

By: _____ 00

Authorized Representative of Seller

DocuSign Envelope ID 56FD8488-316C-4D8A-8937-3DA4EFEEC70E
6277 Sea Harbor Dr.
Orlando, Fl. 32821

# Closing Disclosure

This form is a statement of final loan terms and closing costs. Compare this document with your Loan Estimate.

## Closing Information

| | |
|---|---|
| Date Issued | 01-28-2025 |
| Closing Date | 0 -28-2025 |
| Disbursement Date | 01-28-2025 |
| Settlement Agent | WYNDHAM VACATION RESORTS, INC |
| File # | |
| Property | 9660 VIA ENCINAS ORLANDO, FL 32830XXXX |
| Sales Price | $98,000.00 |

## Transaction Information

**Borrower** SANDRA ALICE LESLIE AND DONALD L. WALL
425 CROSSBOW DR
MAINEVILLE, OH 45039 USA

**Seller** WYNDHAM VACATION RESORTS, INC
6277 SEA HARBOR DR.
ORLANDO, FL 32821

**Lender** WYNDHAM VACATION RESORTS, INC
6277 SEA HARBOR DR
ORLANDO, FL 32821

## Loan Information

| | |
|---|---|
| Loan Term | 10 years |
| Purpose | Purchase |
| Product | Variable Rate |
| Loan Type | ☒ Conventional ☐ FHA ☐ VA ☐ _____ |
| Loan ID # | 00064-2900588 |
| MIC# | |

## Loan Terms

| | | Can this amount increase after closing? |
|---|---|---|
| Loan Amount | $17,313.14 | No |
| Interest Rate | 14.99% | No |
| Monthly Principal & Interest<br>*See Projected Payments below for your Estimated Total Monthly Payment* | $281.06 | No |
| | | **Does the loan have these features?** |
| Prepayment Penalty | | No |
| Balloon Payment | | No |

## Projected Payments

| Payment Calculation | 10 years |
|---|---|
| Principal & Interest | $281.06 |
| Mortgage Insurance | |
| Estimated Escrow<br>*Amount can increase over time* | |
| **Estimated Total Monthly Payment** | **$281.06** |

| | | This estimate includes | In escrow? |
|---|---|---|---|
| Estimated Taxes, Insurance & Assessments<br>*Amount can increase over time*<br>*See page 4 for details* | $67.84<br>a month | ☒ Property Taxes<br>☒ Homeowner's Insurance<br>☒ Other: Annual Maintenance Fee / Annual Dues<br>*See Escrow Account on page 4 for details. You must pay for other property costs separately.* | No<br>No<br>No |

## Costs at Closing

| | | |
|---|---|---|
| Closing Costs | $338.53 | Includes $0.00 in Loan Costs + $338.53 in Other Costs – $0.00 in Lender Credits. See page 2 for details. |
| Cash to Close | $11,374.39 | Includes Closing Costs. See Calculating Cash to Close on page 3 for details |

Docusign Envelope ID: 38F06456-3?0C-4D8A-9037-9DA46FEEC70E

## Closing Cost Details

| Loan Costs | Borrower-Paid | | Seller-Paid | | Paid by Others |
|---|---|---|---|---|---|
| | At Closing | Before Closing | At Closing | Before Closing | |
| **A. Origination Charges** | | | | | |
| 01. % of Loan Amount (Points) | | | | | |
| 02. | | | | | |
| 03. | | | | | |
| 04. | | | | | |
| 05. | | | | | |
| 06. | | | | | |
| 07. | | | | | |
| 08. | | | | | |
| **B. Services Borrower Did Not Shop For** | | | | | |
| 01. | | | | | |
| 02. | | | | | |
| 03. | | | | | |
| 04. | | | | | |
| 05. | | | | | |
| 06. | | | | | |
| 07. | | | | | |
| 08. | | | | | |
| 09. | | | | | |
| 10. | | | | | |
| **C. Services Borrower Did Shop For** | | | | | |
| 01. | | | | | |
| 02. | | | | | |
| 03. | | | | | |
| 04. | | | | | |
| 05. | | | | | |
| 06. | | | | | |
| 07. | | | | | |
| 08. | | | | | |
| **D. TOTAL LOAN COSTS (Borrower-Paid)** | | | | | |
| Loan Costs Subtotals (A + B + C) | | | | | |

| Other Costs | | | | | |
|---|---|---|---|---|---|
| **E. Taxes and Other Government Fees** | | | | | |
| 01. Recording Fees Deed $ 18.50 Mortgage $ 18.50 Release $ 10.00 | $47.00 | | | | |
| 02. State tax/Stamps Deed $ 190.00 Mortgage $ 60.90 | $255.90 | | | | |
| 03. Excise tax $ | | | | | |
| 04. Intangible tax $ 34.63 | $34.63 | | | | |
| **F. Prepaids** | | | | | |
| 01. Homeowner's Insurance Premium ( mo.) | | | | | |
| 02. Mortgage Insurance Premium ( mo.) | | | | | |
| 03. Prepaid Interest ( per day from to ) | | | | | |
| 04. Property Taxes ( mo.) | | | | | |
| 05. | | | | | |
| **G. Initial Escrow Payment at Closing** | | | | | |
| 01. Homeowner's Insurance per month for mo. | | | | | |
| 02. Mortgage Insurance per month for mo. | | | | | |
| 03. Property Taxes per month for mo. | | | | | |
| 04. | | | | | |
| 05. | | | | | |
| 06. | | | | | |
| 07. Aggregate Adjustment | | | | | |
| **H. Other** | | | | | |
| 01. Closing Fee (Paid to Eck, Conley, & Richardson) | | | | | |
| 02. | | | | | |
| 03. Government Surcharge (Paid to Title Insurer) | | | | | |
| 04. Owner's Title Policy (Optional) | | | | | |
| 05. Settlement Fee | $0.00 | | | | |
| **I. TOTAL OTHER COSTS (Borrower-Paid)** | $338.53 | | | | |
| Other Costs Subtotals (E + F + G + H) | $338.53 | | | | |
| **J. TOTAL CLOSING COSTS (Borrower-Paid)** | $338.53 | | | | |
| Closing Costs Subtotals (D + I) | $338.53 | | | | |
| Lender Credits | | | | | |

Docusign Envelope ID: 38F06456-013C-4D8A-8097-3DA48FEEC70E

## Calculating Cash to Close — Use this table to see what has changed from your Loan Estimate.

| | Loan Estimate | Final | Did this change? |
|---|---|---|---|
| Total Closing Costs (J) | $0.00 | $338.53 | Yes, see Total Closing Cost in Section J |
| Closing Costs Paid Before Closing | $0.00 | $0.00 | No |
| Closing Costs Financed (Paid from your Loan Amount) | $0.00 | $0.00 | No |
| Down Payment/Funds from Borrower | $0.00 | $11,035.88 | Yes, see Cash To Close |
| Deposit | $0.00 | $0.00 | No |
| Funds for Borrower | $0.00 | $0.00 | No |
| Seller Credits | $0.00 | $0.00 | No |
| Adjustments and Other Credits | $0.00 | $0.00 | No |
| Cash to Close | $0.00 | $11,374.39 | |

## Summaries of Transactions — Use this table to see a summary of your transaction.

### BORROWER'S TRANSACTION

| | |
|---|---|
| K. Due from Borrower at Closing | $29,697.53 |
| Sale Price of Property | $28,000.00 |
| Sale Price of Any Personal Property Included in Sale | |
| Closing Costs Paid at Closing (J) | $338.53 |
| **Adjustments** | |
| Processing Fee | $348.00 |

**Adjustments for Items Paid by seller in Advance**

| | | |
|---|---|---|
| City/Town Taxes | to | |
| County Taxes | to | |
| Assessments | to | |

| | |
|---|---|
| L. Paid Already by or on Behalf of Borrower at Closing | $(17,313.14) |
| Deposit | |
| Loan Amount | $17,313.14 |
| Existing Loan(s) Assumed or Taken Subject to | |
| Seller Credit | |
| **Other Credits** | |
| Traded Equity | $0.00 |
| **Adjustments** | |

**Adjustments for Items Unpaid by Seller**

| | | |
|---|---|---|
| City/Town Taxes | to | |
| County Taxes | to | |
| Assessments | to | |

**CALCULATION**

| | |
|---|---|
| Total Due from Borrower at Closing (K) | $28,667.53 |
| Total Paid Already by or on Behalf of Borrower at Closing (L) | $(17,313.14) |
| Cash to Close ☒ From ☐ To Borrower | $11,374.39 |

CLOSING DISCLOSURE

### SELLER'S TRANSACTION

| | |
|---|---|
| M. Due to Seller at Closing | $28,349.00 |
| Sale Price of Property | $28,000.00 |
| Sale Price of Any Personal Property Included in Sale | |
| Processing Fee | $349.00 |

**Adjustments for Items Paid by Seller in Advance**

| | | |
|---|---|---|
| City/Town Taxes | to | |
| County Taxes | to | |
| Assessments | to | |

| | |
|---|---|
| N. Due from Seller at Closing | |
| Excess Deposit | |
| Closing Costs Paid at Closing (J) | |
| Existing Loan(s) Assumed or Taken Subject to | |
| Payoff of First Mortgage Loan | |
| Payoff of Second Mortgage Loan | |
| Seller Credit | |

**Adjustments for Items Unpaid by Seller**

| | | |
|---|---|---|
| City/Town Taxes | to | |
| County Taxes | to | |
| Assessments | to | |

**CALCULATION**

| | |
|---|---|
| Total Due to Seller at Closing (M) | $28,349.00 |
| Total Due from Seller at Closing (N) | |
| Cash ☐ From ☒ To Seller | $11,035.88 |

No. 2000/3.15     PAGE 3 OF 5 • LOAN ID #:     I9

DocuSign Envelope ID: 3BFD8490-310C-408A-9097-30A4BFEEE7DE

## Additional Information About This Loan

### Loan Disclosures

**Assumption**

If you sell or transfer this property to another person, your lender
☐ will allow, under certain conditions, this person to assume this loan on the original terms.
☒ will not allow assumption of this loan on the original terms.

**Demand Feature**

Your loan
☐ has a demand feature, which permits your lender to require early repayment of the loan. You should review your note for details.
☒ does not have a demand feature.

**Late Payment**

If your payment is more than 10 days late, your lender will charge a late fee of $10.00 or 1% of the amount that is late, whichever is greater.

**Negative Amortization (Increase in Loan Amount)**

Under your loan terms, you
☐ are scheduled to make monthly payments that do not pay all of the interest due that month. As a result, your loan amount will increase (negatively amortize), and your loan amount will likely become larger than your original loan amount. Increases in your loan amount lower the equity you have in the property.
☐ may have monthly payments that do not pay all of the interest due that month. If you do, your loan amount will increase (negatively amortize), and, as a result, your loan amount may become larger than your original loan amount. Increases in your loan amount lower the equity you have in this property.
☒ do not have a negative amortization feature.

**Partial Payments**

Your lender
☒ may accept payments that are less than the full amount due (partial payments) and apply them to your loan.
☐ may hold them in a separate account until you pay the rest of the payment, and then apply the full payment to your loan.
☐ does not accept any partial payments.
If this loan is sold, your new lender may have a different policy.

**Security Interest**

You are granting a security interest in FAIRFIELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM, located at 9840 Via Encinas, Orlando FL 328360000.

You may lose this property if you do not make your payments or satisfy other obligations for this loan.

**Escrow Account**

*For now, your loan*

☐ will have an escrow account (also called an "impound" or "trust" account) to pay the property costs listed below. Without an escrow account, you would pay them directly, possibly in one or two large payments a year. Your lender may be liable for penalties and interest for failing to make a payment.

| Escrow | | |
|---|---|---|
| Escrowed Property Costs over Year 1 | | estimated total amount over year 1 for your escrowed property costs. |
| Non-Escrowed Property Costs over Year 1 | | estimated total amount over year 1 for your non-escrowed property costs. You may have other property costs. |
| Initial Escrow Payment | | A cushion for the escrow account you pay at closing. See Section G on page 2 |
| Monthly Escrow Payment | | The amount included in your total monthly payment. |

☒ will not have an escrow account because ☐ you declined it ☐ your lender does not offer one. You must directly pay your property costs, such as taxes and homeowner's insurance. Contact your lender to ask if your loan can have an escrow account.

| No Escrow | | |
|---|---|---|
| Estimated Property Costs over Year 1 | $811.66 | Estimated total amount over Year 1. You must pay these costs directly, possibly in one or two large payments a year. |
| Escrow Waiver Fee | | |

**In the future,**

Your property costs may change and, as a result, your escrow payment may change. You may be able to cancel your escrow account, but if you do, you must pay your property costs directly. If you fail to pay your property taxes, your state or local government may (1) impose fines and penalties or (2) place a tax lien on this property. If you fail to pay any of your property costs, your lender may (1) add the amounts to your loan balance, (2) add an escrow account to your loan, or (3) require you to pay for property insurance that the lender buys on your behalf, which likely would cost more and provide fewer benefits than what you could buy on your own.

Dccusign Envelope ID: 38F00456-110E-4D6A-9097-3DA46FEEC70E

## Loan Calculations

| | |
|---|---|
| **Total of Payments** Total you will have paid after you make all payments of principal, interest, mortgage insurance, and loan costs, as scheduled. | $533,816.60 |
| **Finance Charge.** The dollar amount the loan will cost you. | $16,503.46 |
| **Amount Financed.** The loan amount available after paying your upfront finance charge. | $17,313.14 |
| **Annual Percentage Rate (APR).** Your costs over the loan term expressed as a rate. This is not your interest rate. | 16.310% |
| **Total Interest Percentage (TIP).** The total amount of interest that you will pay over the loan term as a percentage of your loan amount. | 94.81% |

**Questions?** If you have questions about the loan terms or costs on this form, use the contact information below. To get more information or make a complaint, contact the Consumer Financial Protection Bureau at www.consumerfinance.gov/mortgage-closing

## Other Disclosures

### Appraisal
If the property was appraised for your loan, your lender is required to give you a copy at no additional cost at least 3 days before closing. If you have not yet received it, please contact your lender at the information listed below.

### Contract Details
See your note and security instrument for information about:
- what happens if you fail to make your payments.
- what is a default on the loan.
- situations in which your lender can require early repayment of the loan, and
- the rules for making payments before they are due.

### Liability after Foreclosure
If your lender forecloses on this property and the foreclosure does not cover the amount of unpaid balance on this loan,

☒ state law may protect you from liability for the unpaid balance. If you refinance or take on any additional debt on this property, you may lose this protection and have to pay any debt remaining even after foreclosure. You may want to consult a lawyer for more information.

☐ state law does not protect you from liability for the unpaid balance.

### Loan Acceptance
You do not have to accept the loan because you have received this form or signed a loan application.

### Refinance
Refinancing this loan will depend on your future financial situation, the property value, and market conditions. You may not be able to refinance this loan.

### Tax Deductions
If you borrow more than this property is worth, the interest on the loan amount above this property's fair market value is not deductible from your federal income taxes. You should consult a tax advisor for more information.

## Contact Information

| | Lender | Mortgage Broker | Real Estate Broker (B) | Real Estate Broker (S) | Settlement Agent |
|---|---|---|---|---|---|
| **Name** | WYNDHAM VACATION RESORTS, INC. | | | | WYNDHAM VACATION RESORTS, INC |
| **Address** | 6277 Sea Harbor Dr. Orlando, FL 32821 | | | | 6277 Sea Harbor Dr. Orlando, FL 32821 |
| **NMLS ID** | | | | | |
| **__ License ID** | | | | | |
| **Contact** | | | | | |
| **Contact NMLS ID** | | | | | |
| **Contact __ License ID** | | | | | |
| **Email** | | | | | |
| **Phone** | (800) 251-8736 | | | | (800) 251-8736 |

CLOSING DISCLOSURE        No. 78883-15    PAGE 5 OF 5 • LOAN ID #

Pre-authorized Auto Pay Plan Set-up Form

## OWNER INFORMATION

Owner Name(s): Sandra Alice Leslie and Donald L Wall

Contract Number: 559

Member Number: 046

| MONTHLY PAYMENT UNDER CONTRACT | ___ Enroll ___ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 03-14-2025 | | Frequency: Monthly | Amount: $281.05 |

| BANK INFORMATION | CREDIT CARD INFORMATION |
|---|---|
| ___ Checking* ___ Savings* | Credit Card Type: Visa** |
| Routing | Credit Card #: |
| Bank Account # | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX389A |
| Name on Account: | Name on Card: Sandra Leslie |
| Name of Bank: | (As it appears on card) |

| CLUB WYNDHAM® PLUS (INCLUDES PAYMENT OF CWA ASSESSMENTS) | ___ Enroll ___ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 03-01-2025 | | Frequency: Monthly | Amount: $84.97 |

| BANK INFORMATION | CREDIT CARD INFORMATION |
|---|---|
| ___ Checking* ___ Savings* | Credit Card Type: VISA** |
| Routing | Credit Card #: |
| Bank Account #: | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX389A |
| Name on Account: | Name on Card: Sandra Leslie |
| Name of Bank: | (As it appears on card) |

| Vacation Sidekick™ | ___ Enroll ___ Update | | |
|---|---|---|---|
| Auto Pay Due Date: 02-01-2026 | | Frequency: Annually | Amount***: $59.95 |

| BANK INFORMATION | CREDIT CARD INFORMATION |
|---|---|
| ___ Checking* ___ Savings* | Credit Card Type: Visa* |
| Routing | Credit Card #: |
| Bank Account # | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX349A |
| Name on Account: | Name on Card: Sandra Leslie |
| Name of Bank: | (As it appears on card) |

\* If your checking or savings account is with a foreign bank, please complete the Credit Card Information section.
\*\* At this time, Discover Cards can be used for US accounts only.
\*\*\* Vacation Sidekick membership fees may vary. Refer to our Vacation Sidekick Membership Agreement for more details.
All funds in US Dollars unless noted.

## AUTHORIZATION FOR PAYMENT

Under this Pre-authorized Auto Pay Plan Set-up Form ("*Authorization*"), Wyndham Vacation Resorts, Inc., together with its affiliates, successors, assigns, agents, and service providers (collectively, "*Wyndham*") is authorized to initiate ACH debits from my bank account(s) or charges to my credit card account(s) indicated above. These debits or charges will be in the amounts (and on or after the dates) listed above for each agreement and/or membership for which I have provided payment information in this Authorization. Amounts due for assessments and charges may increase due to changes in assessments and charges as provided in my vacation ownership's governing documents, and Wyndham may adjust the payment amounts due accordingly and to electronically debit or charge to my bank account(s) or credit card account(s) the adjusted amount. Payment amounts authorized above may vary for various reasons, including early payments or late payments (and interest that may accrue on late payments). I have the right to receive written notice if a debit or charge will vary, and Wyndham will generally provide at least ten (10) days' advance written notice of any such variance. However, Wyndham need not provide written notice if the amount of the debit or charge is less than the amount authorized above or no more than ten percent (10%) in excess of this amount.

If Wyndham makes an error in processing a debit or charge, Wyndham may correct the error by initiating an electronic credit or debit. If I make a typographical or similar error in providing Wyndham with relevant information, Wyndham may correct the error upon receiving corrected information from me or my financial institution.

If the payment due date(s) authorized above falls on a weekend or holiday, the payment may be executed on the next business day. Because this is an electronic transaction, these funds may be withdrawn from my account or charged to my credit card each period as soon as the above noted transaction date occurs. Any ACH transaction rejected for Non-Sufficient Funds (NSF) will be subject to a fee of up to $50 (as permitted by law) initiated as a separate transaction. If the amount due is not timely paid, late fees and interest may be charged as provided in the agreement(s) and membership(s) described above. Wyndham may at its discretion attempt to process any rejected or unsuccessful debit or charge again within ten (10) days.

I may choose to revoke this Authorization: (i) by telephone at 1-866-418-3809, or (ii) in writing by mail to Wyndham Consumer Finance, P.O. Box 98944 Las Vegas, Nevada 89193-8944. This Authorization in no way limits any right I may have under federal law to stop payment by contacting my financial institution. I must notify Wyndham in writing of any changes to my bank account(s) or credit card account(s), or termination of this Authorization, at least five (5) days before the next billing date. Wyndham may update my bank account and/or credit card account details with information received from any card or account updating services.

This Authorization is subject to applicable law and network rules. Wyndham reserves the right to terminate this Authorization at any time and for any reason, including excessive returned payments. If this Authorization is cancelled by either me or Wyndham, my obligation to repay my underlying obligations to Wyndham remains in effect and I will be responsible for making my payments by another payment method.

Contract Number: 7559

This Authorization cannot be used to change my existing due date(s). This Authorization becomes effective for the next scheduled payment upon receipt of the signed Authorization (but please allow up to seven (7) business days for processing). References in this Authorization to "I" and "my" in the singular include the plural if more than one individual signs below.

My signature below confirms that I understand, acknowledge, and agree to this Authorization.

Authorized Signature on Payment Plan.  Print Name  Date

Signature: *Sandra Alice Leslie*  Print Name: Sandra Alice Leslie  Date: 1/28/2025

Signature: *Donald L Wall*  Print Name: Donald L Wall  Date: 1/28/2025

Signature:  Print Name:  Date:

Signature:  Print Name:  Date:

Mail Form to: P.O. Box 98944, Las Vegas, Nevada 89193-8944  For Inquiries: 1-866-418-3809

Enroll Online: www.myclubwyndham.com/payments

No. 2201/Rev. 12-22

Docusign Envelope ID: 38F08456-310C-4D8A-9097-3DA48FEEC70E

Contract Number        559

## ELECTRONIC DELIVERY OF CONSUMER DOCUMENTS

_____ The undersigned purchaser(s) hereby expressly acknowledge that they have chosen **not** to receive documentation related to this purchase electronically, and therefore will receive a printed hard copy of all consumer documentation.

__X__ The undersigned purchaser(s) hereby expressly elect(s) to receive all* consumer documentation related to this purchase electronically via DocuSign.

DocuSign can be accessed utilizing supported browsers, which include Chrome, Firefox, Safari, and Microsoft Edge via https://www.docusign.com on most modern computer systems. DocuSign can also be accessed on mobile platforms by downloading the mobile application from either the Apple App Store or the Google Play Store.

An invitation with instructions to access this platform will be provided via email.

DIGITAL COPIES SHOULD NOT BE ELECTED UNLESS THE DOCUMENTATION CAN BE VIEWED PRIOR TO THE CANCELLATION PERIOD.

UNDER FLORIDA LAW A PURCHASER IS ENTITLED TO A TEN* CALENDAR DAY RIGHT OF RESCISSION OF ANY TIMESHARE SALES CONTRACT. PURCHASERS SHOULD READ THE PUBLIC OFFERING STATEMENT BEFORE THE TEN* DAY RIGHT OF RESCISSION PERIOD EXPIRES.

*FOR ALL SALES IN FLORIDA OR TEXAS, OR SALES TO TEXAS RESIDENTS IN ANY STATE, purchaser(s) WILL BE provided an executed paper copy of the contract document.

| | |
|---|---|
| Sandra Alice Leslie | Donald L Wall |
| Purchaser's Printed Name | Purchaser's Printed Name |
| *Sandra Alice Leslie* | *Donald L Wall* |
| Signature | Signature |
| 1/28/2025 | 1/28/2025 |
| Date | Date |
| | |
| Print Name | Print Name |
| | |
| Signature | Signature |
| | |
| Date | Date |

No. 3356/Rev 12-23

Document Envelope ID: 58F06456-3-0C-409A-9987-5DA86FEEC7UE

Contract Number: 1559

## RECEIPT FOR TIMESHARE DOCUMENTS

The undersigned acknowledges that the items listed below have been received and that timeshare plans and specifications have been made available for inspection.

Name of Plan:   FAIRFIELD ORLANDO AT BONNET CREEK RESORT, A CONDOMINIUM

Address of Plan:   9560 Via Encinas, Lake Buena Vista, Florida 32830

## DOCUMENTS

Public Offering Statement Text
Rules and Regulations for the Use of Accommodations and Facilities
Amended Site Reservation System Rules and Regulations
Rules and Regulations for Presidential Reserve Lounge
Amended & Restated Amendment to Rules and Regulations-Mobility Devices
Declaration of Condominium
Receipt for Timeshare Documents and Summary of Documents Not Delivered to Purchasers
List of Documents Not Provided to Purchasers

Association Articles of Incorporation
Association By-Laws
Estimated Operating Budget
Description of Instruments of Record to which the Condominium is Subject
List and Description of Entities Having Limited Governance Rights on the Condominium Property
Declaration of Use Rights and Reservation of Easement
Declaration and Cost-Sharing Allocation
Electronic Delivery of Consumer Documents
Executed Purchase and Sale Agreement

TO THE PURCHASER: You may cancel Your Contract without any penalty or obligation within ten (10) calendar days after the date You sign Your Contract or the date on which You receive the last of all documents required to be provided to You pursuant to Section 721.07(6) Florida Statutes, whichever is later. If the Developer has made a material and adverse change to the Public Offering Statement prior to Your closing, You may cancel Your Contract within ten (10) calendar days after Your receipt of such changes to the Public Offering Statement.

If You decide to cancel Your Contract, You must notify the Developer in writing of Your intent to cancel. Your notice of cancellation shall be effective upon the date sent and shall be sent to: Wyndham Vacation Resorts, Inc., Attention: Rescissions Department at 6277 Sea Harbor Drive, Orlando, Florida 32821.

Any attempt to obtain a waiver of Your cancelation right is void and of no effect. While You may execute all closing documents in advance, the closing, as evidenced by delivery of the Deed or other document, before the expiration of Your 10-day cancellation period, is prohibited.

Executed this 28th day of January, 2025.

_Sandra Alice Leslie_

PURCHASER Sandra Alice Leslie

_Donald L Wall_

PURCHASER Donald L Wall

PURCHASER

PURCHASER

The documents listed in this receipt and received by the purchaser constitute a subset of the Public Offering Statement filed with the Division of Florida Condominiums, Timeshares, and Mobile Homes, in accordance with Chapter 721, Florida statutes.

No. 106W/Rev. 11-23

Docusign Envelope ID: 30F00450-310C-4D8A-908F-3D846FEEC7GE



## Acknowledgement Receipt
### for Disclosure Documents

Contract No.          1559

Owner(s) hereby acknowledges that Owner has received copies of the documents and disclosures listed below prior to execution of the Purchase and Sale Agreement and Club Wyndham Plus Vacation Ownership Assignment Agreement and Use Restriction.

- Home Loan Toolkit Brochure
- Trust Agreement and Accompanying Documents
- Club Wyndham Plus Program Summary
- Wyndham Club Pass, LLC - Disclosure Summary for Wyndham Club Pass Program
- Club Wyndham Plus Member's Directory
- Acknowledgment and Disclosure Statement for Club Wyndham Plus/Wyndham Rewards Program
- Club Wyndham Financial Privacy Policy
- Servicing Disclosure Statement

| | |
|---|---|
| *Sandra Alice Leslie* | 1/28/2025 |
| Owner **Sandra Alice Leslie** | Date |
| *Donald L. Wall* | 1/28/2025 |
| Owner **Donald L Wall** | Date |
| | |
| Owner | Date |
| | |
| Owner | Date |

VOI                     Page 1 of 1                     No. 2925/Rev.12-24

DocuSign Envelope ID: 38F06488-9E0C~D5A-809?~9DA4BEEEE70E


**CLUB WYNDHAM**

Contract Number    4539
Bonus Contract Number    823

## Incentive Acknowledgment Disclosure

### CLUB WYNDHAM® PLUS BONUS POINTS
### Wyndham Vacation Resorts, Inc.

By purchasing a timeshare interest through Wyndham Vacation Resorts, Inc. (*"Wyndham"*), Buyer has the option to select:

CLUB WYNDHAM® PLUS BONUS POINTS

### BONUS POINTS:

Buyer will receive **105,000** CLUB WYNDHAM Plus Bonus Points (*"Bonus Points"*).

Bonus Points Use Period      Start Date: **02-01-2025**
                                 End Date: **09-30-2026**

Buyer will also be eligible for CLUB WYNDHAM Plus VIP status through Bonus Points End Date: Yes _____ ˣNo _____

### Terms and Conditions

#### GENERAL:

1. Buyer may receive temporary CLUB WYNDHAM Plus VIP status depending upon the number of Bonus Points awarded combined with the number of points purchased. CLUB WYNDHAM Plus VIP status will remain in effect through the Bonus Points Use Period End Date, if applicable.

2. If Buyer cancels the timeshare purchase contract during the applicable cancellation period, the right to receive Bonus Points or the Bonus Play Vacation Package will be automatically cancelled without notice, penalty or obligation.

3. This benefit is not assignable or otherwise transferable by the Buyer.

4. Individuals should not purchase a vacation ownership interest in reliance upon the continued availability of this benefit. If all or a portion of the benefit described in the statement becomes unavailable as the result of events beyond the control of the Developer, the offering of such benefit may be terminated.

5. Buyer should not rely upon any representations other than those contained in this document, in the CLUB WYNDHAM Plus Program Guidelines, and the Bonus Play Vacation Package Terms and Conditions.

6. Wyndham Vacation Resorts, Inc., 6277 Sea Harbor Drive, Orlando, Florida 32821.

#### BONUS POINTS:

1. Bonus Points will be automatically awarded to the Buyer unless otherwise selected.

2. The Buyer's CLUB WYNDHAM Plus Membership must be in good standing in order to use Bonus Points.

3. Bonus Points entitle Buyer to reserve accommodations through the CLUB WYNDHAM Plus program between the Bonus Points Use Period Start Date and End Date. Reservations utilizing Bonus Points may not result in check-in occurring prior to the Use Period Start Date. Bonus Points cannot be renewed or extended beyond the Use Period End Date.

4. Bonus Points are subject to the terms and conditions of the CLUB WYNDHAM Plus Program Guidelines located in the CLUB WYNDHAM Plus Member's Directory (*"Directory"*). Buyer will also receive Housekeeping Credits and Reservation Transactions as described in the Directory. Bonus Points cannot be used for Advance Reservation Priority reservations.

No. 3073/Rev. 6-17

Docusign Envelope ID: 38F06456-310C-4D8A-9087-3DA46FEEC7UE



## CLUB WYNDHAM

## Enrollment Agreement

Date: 01-28-2025

Member Number:　　046　　Contract Number:　　59

Member Name: **Sandra Alice Leslie**

Member Name: **Donald L Walf**

Member Name:

Member Name:

Street Address: **425 Crossbow Dr**

City: **Maineville**　　　　State: **OH**　　　　Zip Code: **45039**

Country: **USA**　　　　Email Address:

Home Phone:　　　　Work Phone:

### RCI Enrollment

- RCI Member
- RCI PlusPartners Member

### Vacation Sidekick™

Vacation Sidekick is a unique entertainment, recreation, vacation and travel program offering a wide variety of benefits and privileges to its Members on an annual basis. Vacation Sidekick membership entitles the Member's family, including up to two adults and their dependent children up to age 21, to all benefits, discounts and other privileges as provided in the terms and conditions.

INITIAL ANNUAL MEMBERSHIP FEE $ _____ Complimentary

　Initial Annual Membership Fee includes annual membership for first term of twelve (12) months.

ANNUAL MEMBERSHIP FEE BASED ON MEMBERSHIP TYPE:

| Membership Type | Annual Membership Fee |
| --- | --- |
| CLUB WYNDHAM | $59.95 |
| CLUB WYNDHAM Bronze | $59.95 |
| CLUB WYNDHAM Silver | $59.95 |
| CLUB WYNDHAM Gold | $0 |
| CLUB WYNDHAM Platinum | $0 |
| CLUB WYNDHAM Founders | $0 |

No. 2692/Rev. 6-21

Docusign Envelope ID: 38F06450-210C-4D8A-8087-3DBA6FEEL7EE

Contract Number: 559

# Enrollment Agreement Terms and Conditions

### RCI Exchange

RCI and Wyndham Vacation Resorts, Inc. are both subsidiaries of Travel + Leisure Co., but operate as independent companies.

Wyndham Vacation Resorts will enroll and pay your initial annual RCI membership fee. Renewal fees are part of annual CLUB WYNDHAM Plus Assessment. Confirming a reservation through RCI requires an exchange fee, which is listed in the RCI Disclosure Guide and is subject to change.

### Vacation Sidekick Membership

Vacation Sidekick provides various travel-related benefits and privileges to its Members. You become a Member of Vacation Sidekick by submitting this Vacation Sidekick Membership Agreement ("**Agreement**") and by payment of applicable membership fees. This Agreement, when signed by Member and a Vacation Sidekick representative, forms a legally binding contract between Member and Wyndham Vacation Resorts, Inc. ("**Sponsor**"), subject to the following terms and conditions:

1. **Membership.** Membership in Vacation Sidekick is available to individuals and their immediate families only. Membership in Vacation Sidekick is non-transferable and may not be sold.

2. **Vacation Sidekick Programs and Benefits.** Programs and benefits offered to Vacation Sidekick Members are described and depicted in the Member's kit, a copy of which has been provided to Member along with this Membership Agreement. Their programs and benefits are subject to separate terms and conditions of suppliers of these benefits and are subject to change at any time. Vacation Sidekick benefits may be changed or eliminated without prior notice to Members. Sponsor accepts no responsibility for acts or omissions of any persons providing such programs or benefits directly to Members. There may be certain additional costs, fees and expenses associated with certain Vacation Sidekick programs or benefits currently available or added by Sponsor from time to time and such additional costs, if any, shall be borne solely by Member. Any fees required are disclosed in the materials for the specific benefit.

3. **Personal Expenses.** Member is responsible for payment of any personal expenses incurred while utilizing any Vacation Sidekick program or benefit. Use of or participation in Vacation Sidekick is completely voluntary, and payment of any fee or other cost associated with Vacation Sidekick is required only upon that use or participation.

4. **Membership Suspension and Termination.** This Agreement, together with Member status, may be suspended or terminated by Sponsor without further obligation if Member fails to comply with these terms and conditions or the terms of the various programs and benefits of Vacation Sidekick or if the Member becomes delinquent on any amounts owed to Sponsor and/or its affiliates. Further, Membership may be terminated for any misuse of the Vacation Sidekick program, violation of any federal, state or local law or regulation in connection with use, failure to pay for charges associated with a Vacation Sidekick program or benefit or for any other reason. Membership in Vacation Sidekick will automatically terminate if Member is no longer a CLUB WYNDHAM Plus Owner.

5. **Program Changes.** Terms and conditions of this Agreement and of Vacation Sidekick programs and benefits may be changed from time to time at sole discretion of Sponsor. **Sponsor reserves its right to increase the annual fee or future fees from time to time.** Members shall be notified of any information regarding such changes in Vacation Sidekick from publications or by written correspondence. Current editions of these publications supersede prior editions with respect to terms and conditions of membership and Vacation Sidekick programs and benefits. Sponsor is bound only by representations that it makes concerning terms and conditions of its programs and benefits set forth in its official publications or written correspondence and is not responsible for contrary or conflicting representations made by any other person.

DocuSign Envelope ID: 38F08466-310C-4D8A-8097-00A48FEEC70E

6. **Limitation of Liability and Release.** Sponsor, its subsidiaries, officers, directors, employees and agents, including without limitation, its advertising agencies, printers and other suppliers, shall not be liable for and expressly disclaim any and all liability for any injury, liability, expense, cost, damage, penalty or loss of any kind incurred or caused by a Member, their family, or their guests (i) in connection with the utilization of or participation in any Vacation Sidekick program or benefit, or (ii) resulting from any acts or omissions of any individual or entity providing a product, benefit or service in Vacation Sidekick program. Sponsor's liability for any other loss or damage incurred by a Member through use of the Vacation Sidekick programs or benefits is limited to membership fees paid by such Member. Member hereby agrees to release and hold harmless Sponsor, its subsidiaries, successors and assigns, its and their advertising agencies, printers and other suppliers, as well as its officers, directors, employees and agents for any injury, liability, expense, cost, damage, penalty or loss of any kind incurred by Member, the Member's family or guest during any trip or utilization of any Vacation Sidekick program or benefit and for any related damage, theft or loss caused or incurred by the Member, the Member's family or guest.

7. **Effective Date and Activation.** This Agreement is effective when signed by the Member and the Sponsor's Vacation Sidekick Representative. Member must activate Vacation Sidekick Membership as indicated on the Vacation Sidekick Savings Card before commencing use. If Member delays activation of the Vacation Sidekick Savings Card, the period of time between the effective date and the activation date shall be lost.

8. **Effect of Termination.** Termination of Membership in Vacation Sidekick will have no effect on such Member's vacation ownership contractual obligations or agreements and will not result in termination of an ownership interest which a Member may have in real estate, including but not limited to a timeshare, lot, home, condominium, townhouse or undivided interest. Membership in Vacation Sidekick is not additional consideration for the purchase of a vacation ownership interest. Cancellation of Membership in Vacation Sidekick shall in no way relieve a Member of their obligation under any other contract or agreement.

9. **Availability of Programs and Benefits.** As Vacation Sidekick depends on services and programs offered by unrelated third party suppliers, Sponsor cannot guarantee continued availability of all programs and benefits. If a Vacation Sidekick program or benefit becomes unavailable for any reason whatsoever, Member waives any and all claims against Sponsor resulting from unavailability of such program or benefit.

10. **Miscellaneous Disclosures.** Continued availability of Vacation Sidekick is not necessary for use and enjoyment of any accommodation within Member's timeshare plan. No costs of acquisition, operation, maintenance, or repair of Vacation Sidekick are passed on to purchasers of a vacation ownership interest in a timeshare plan as a common expense.

I acknowledge receipt of the "Enrollment Agreement Terms and Conditions" document and agree to abide by these terms and conditions.

# EXHIBIT
# 5

| PIF Number:  | 10002067 |
|--------------|----------|
| Case Name:   | IN RE:  BLUEGREEN VACATIONS UNLIMITED, INC. |
| Case Number: | 192985 |

OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION SECTION

STATE OF OHIO      )
            )
IN THE MATTER OF:    )
            )  DOCKET NO. 192985
BLUEGREEN VACATIONS   )
UNLIMITED, INC.      )

## ASSURANCE OF VOLUNTARY COMPLIANCE

  This Assurance of Voluntary Compliance (hereinafter "Assurance") is entered into this _18th_ day of April, 2002, by Bluegreen Vacations Unlimited, Inc. (hereinafter "Bluegreen") and Betty D. Montgomery, Attorney General of the State of Ohio (hereinafter "Attorney General"). For purposes of this Assurance, "supplier" means Bluegreen under this or any other name, whether acting through its officers, partners, agents, servants, representatives, salespersons, employees, subcontractors, successors or assigns and all persons acting in concert or participation with Bluegreen, directly or indirectly, through any corporate device, partnership or associations.

  WHEREAS, Bluegreen denies any and all allegations of any wrongdoing or any violation of Chapter 1345 or any other provision of Ohio or Federal law; and

  WHEREAS, the Attorney General, having reasonable cause to believe that Bluegreen has engaged in acts and practices which violate Chapter 1345 of the Revised Code, has conducted an investigation pursuant to the authority granted her by Section 1345.06 of the Revised Code; and,

  WHEREAS, this Assurance of Voluntary Compliance does not constitute evidence of an admission by Bluegreen of any liability or wrongdoing nor shall it constitute or be interpreted in any way as an admission by Bluegreen that it engaged in a

violation of either state or Federal law or any wrongful conduct alleged by the Attorney General and in fact, Bluegreen denies same.

WHEREAS, the Attorney General may, pursuant to section 1345.06(F), enter into and accept a written Assurance of Voluntary Compliance; and

WHEREAS, this Assurance of Voluntary Compliance is an assurance in writing by Bluegreen of its intent to conduct itself in a manner designed to comply with the provisions of R.C. §1345.01, *et seq.*, Ohio Consumer Sales Practices Act, and 47 U.S.C.S. §227, and regulations under the Telephone Consumer Protection Act, at 47 C.F.R. 64.1200; and,

WHEREAS, Bluegreen desires to comply with all aspects of the Consumer Sales Practices Act, R.C. §1345.01 *et seq.*, and 47 U.S.C.S. §227, and regulations under the Telephone Consumer Protection Act, at 47 C.F.R. 64.1200. Bluegreen hereby voluntarily enters into this Assurance with the Attorney General.

NOW THEREFORE, in consideration of the mutual promises and conditions set forth herein, the parties hereto agree as follows:

(A) By accepting this written Assurance, the Attorney General agrees to terminate the current investigation of Bluegreen's business practices.

(B) By giving this written Assurance, Bluegreen hereby AGREES that it shall not:

    1.    Violate R.C. §1345.01 *et seq.*, Consumer Sales Practices Act, and Section 227, Title 47, U.S. Code, by contacting consumers after the consumers have requested to be placed on Bluegreen's do-not-call list.

    2.    Violate R.C. §1345.01 *et seq.*, Consumer Sales Practices Act, by and through its salespersons misrepresenting;

        (a) the availability of vacation locations and travel times;

2

(b) the ability of the consumer to sell back a membership to Bluegreen at anytime at no cost;

(c) the monthly payments owed by the consumer to Bluegreen;

(d) the requirements involved in order to bank points; and,

(e) the payment of maintenance fees by Bluegreen upon the consumer providing ten referrals.

(C)     Bluegreen agrees that its business practices shall comply with R.C. §1345.01 *et seq.*, Consumer Sales Practices Act, and 47 U.S.C.S. §227, and regulations under the Telephone Consumer Protection Act, at 47 C.F.R. 64.1200.

(D)     Bluegreen shall not represent directly or indirectly, or in any way whatsoever, that the Attorney General has sanctioned, condoned or approved any part or aspect of its business practices.

(E)     Bluegreen shall pay the sum of Twenty-Five Thousand Dollars ($25,000.00) to be deposited in the Attorney General's Consumer Protection Enforcement Fund.   Seventeen Thousand Five Hundred Dollars ($17,500.00) of this payment is hereby suspended on the condition that Bluegreen does not violate the terms of this Assurance of Voluntary Compliance.  The imposition of the suspended portion of this assurance will not be payable if Bluegreen shows by a preponderance of evidence that: (i) the violation resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error; or, (ii) the payment of the suspended portion would be unreasonable in light of the nature of the violation.  For the sole purpose of effectuating this assurance, the term "unreasonable" shall mean that

imposition of the suspended fine would be manifestly unjust when considered in light of the totality of the circumstances giving rise to the violation;

(F)     Bluegreen shall pay the amount listed in paragraph (E) herein by tendering to counsel for the Attorney General, within thirty (30) days of signing this Assurance of Voluntary Compliance, a certified check, in the amount of Seven Thousand Five Hundred Dollars ($7,500.00) made payable to the Ohio Attorney General.

(G)     If the Attorney General believes that Bluegreen is in default of any provision of this Assurance, the Attorney General shall make reasonable efforts to notify it in writing prior to the institution of any action to enforce this Assurance. The Attorney General shall set forth the basis for her belief that Bluegreen has violated this Assurance and shall provide Bluegreen an opportunity to cure the alleged violation within a reasonable period of time but not to exceed thirty (30) days. The Attorney General reserves the right to require immediate correction if warranted by the circumstances giving rise to the default. Limited to the first instance only, if Bluegreen cures the alleged violation, the suspended portion shall remain suspended.

(H)     This Assurance shall be a public record and shall be filed in the Public Inspection File pursuant to R.C. §1345.05(A)(3); and

(I)     This Assurance shall in no way exempt Bluegreen from any other obligations imposed by law, and nothing contained herein shall relieve it of any legal responsibility for any acts or practices engaged by them.

(J)     Nothing in this Assurance shall in any way preclude any investigative or enforcement action against Bluegreen under any legal authority granted to the Attorney General:

4

(1)    With respect to the transactions which are the subject of this enforcement action if the terms of this Assurance are not fully obeyed; or

(2)    With respect to transactions or occurrences which are not the subject of this Assurance.

WHEREFORE, the parties hereto affix their signatures in recognition and acceptance of the terms contained herein and warrant and represent that by affixing their signatures below they have the legal right to do so on the behalf of their respective parties on this 18th day of April, 2002.

APPROVED:

BETTY D. MONTGOMERY
Attorney General

VALERIE A. ROLLER (0040026)
Assistant Attorney General
Consumer Protection Section
30 E. Broad Street, 14th Floor
Columbus, Ohio 43215
(614) 644-9618
(614) 466-8898 Fax

RANDI S. TOMPKINS
Director of Legal Affairs
Bluegreen Vacations Unlimited, Inc.
4960 Blue Lake Drive
Boca Raton, Florida 33431
(561) 921-8000
(561) 921-8100 Fax

F:\consumer\0\cases\bluegreen\AVC Final Version.doc

| PIF Number: | 10001817 |
| --- | --- |
| Case Name: | STATE EX REL. MONTGOMERY V. FLORIDA TRAVEL NETWORK, INC., CROWN PLAZA RESORTS, L.C. DBA IMPERIAL MAJESTY CRUISE LINE, VOGEL & HERRON |
| Case Number: | 00CVH021064 |



TERMINATION NO. 18
BY PK

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

COPY

STATE OF OHIO, ex rel.          )
BETTY D. MONTGOMERY                        CASE NO. 00CVH-02-1064
ATTORNEY GENERAL OF OHIO,       )

    Plaintiff,              )        JUDGE **SHEWARD**

v.                              )

FLORIDA TRAVEL NETWORK, INC.,   )
CROWN PLAZA RESORTS, L.C. d/b/a
IMPERIAL MAJESTY CRUISE LINE,   )        **AGREED ENTRY AND FINAL**
VANCE L. VOGEL & JAMES M.                **JUDGMENT ORDER**
HERRON, SR.                     )

    Defendants.             )

## PREAMBLE

This matter came to be heard upon the filing of a complaint by the Ohio

Attorney General alleging Defendants Florida Travel Network, Inc., Crown Plaza

Resorts, L.C. d/b/a Majesty Cruise Line, Vance L. Vogel and James M. Herron, Sr.

(hereinafter Defendants) with having violated Ohio Consumer Sales Practices Act,

R.C. §1345.01 et seq. and Home Solicitation Sales Act, R.C. §1345.21 et seq.

Defendants waive service of the summons and complaint. Plaintiff State of

Ohio appears by and through its attorneys, Betty D. Montgomery, Attorney

General, Michael S. Ziegler, Assistant Attorney General and Cheryl R. Hawkinson,

Assistant Attorney General.

RECEIVED
ATTORNEY GENERAL OF OHIO

FEB 1 5 2000

CONSUMER PROTECTION SECTION
PUBLIC INSPECTION FILE

Plaintiff and Defendants have agreed on a basis for the settlement of the matters alleged in the Complaint, and to the filing of this Agreed Entry and Final Judgment Order against Defendants without a trial or adjudication of any issues of law or facts. Defendants by entering into this Agreed Entry and Final Judgment Order do not admit the allegations, and by entering into this Agreed Entry and Final Judgment Order does not constitute an admission by Defendants regarding any issue of fact alleged in the Complaint.

Defendants recognize and state that this Agreed Entry and Final Judgment Order is entered into voluntarily and that no promises have been made by the Attorney General's office or any member, officer, agent or representative thereof to induce Defendants to enter into this Agreed Entry and Final Judgment Order, except as provided herein.

Defendants waive any right Defendants may have to appeal from this Agreed Entry and Final Judgment Order.

Defendants further agree that Defendants will not oppose the entry of this Agreed Entry and Final Judgment Order on the grounds that it fails to comply with Rule 65(d) of the Ohio Rules of Civil Procedure and hereby waives any objection based thereon.

### GENERAL PROVISION

1.  <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the subject matter of this action and of the parties. Plaintiff's complaint in this matter states claims upon which relief may be granted under the Consumer Sales Practices Act, Revised

Code Chapter 1345, and the Home Solicitation Sales Act, Revised Code Chapter 1345.

2.   Defendants. For the purpose of this Agreed Entry and Final Judgment Order, the term "Defendants" where not otherwise specified, shall mean all named Defendants.

THEREFORE, IT IS HEREBY:

3.   ORDERED, ADJUDGED, and DECREED that as used in this Agreed Entry and Final Judgment Order, the following definitions shall apply:

## DEFINITIONS

(a)   "Clear and conspicuous" means that the required disclosures, when made in writing, by facsimile, televised communications, or the Internet shall be presented in such a manner, given their size, color, contrast and proximity to any related information as to be readily noticed and understood by consumers.  A disclosure is not clear and conspicuous if, among other things, it is ambiguous or is obscured by the background against which it appears, or obscured by its location within a lengthy disclosure of non-material information.  Clear and conspicuous also means that the required disclosures, when made in an oral presentation, are presented in a manner that a consumer will hear and understand at a normal speed in the same tone and volume as the sales offer.

(b)   "Material" means likely to affect a person's choice or decision to purchase or receive goods or services.

3

(c) "Offer" means an offer of goods and/or services to one or more consumers including, but not limited to, an offer of a vacation package, regardless of whether the offer is conveyed in writing, orally, by facsimile, televised communications, the Internet, or in any other manner. The term "offer" includes any solicitation made directly to consumers by telemarketing or any written solicitation or mailing to which consumers are asked to respond by calling a telephone number for the purpose of receiving information regarding the purchase of a vacation package. Offer also includes any solicitation made by means of inviting or asking consumers to register to enter a contest, a random drawing, or any other promotion which results in the consumer being solicited directly or indirectly to purchase a vacation package.

(d) "Represent" and "representation" includes any communication, whether made in writing, orally, or by facsimile, televised communication, the Internet, or any other manner.

(e) "Solicitation" means any communication to a consumer, that contains an offer, whether made in writing, orally, or by facsimile, televised communications, the Internet, or in any other manner.

(f) "Time share" means any arrangement whereby a purchaser receives a right to use accommodations and/or facilities for specific periods of time on a recurring basis. The term includes any vacation ownership interest or similar interest.

(g)     "Vacation package" means goods and/or services, which involve a stay in a location away from the consumer's home, and includes use of accommodations, with or without meals.

(h)     "Defendants" means Florida Travel Network, Crown Plaza Resorts, L.C. d/b/a Imperial Majesty Cruise Lines, Vance L. Vogel, and James M. Herron, Sr.

### PARTIES SUBJECT TO ORDER

3.     IT IS FURTHER ORDERED, ADJUDGED and DECREED that this Agreed Entry and Final Judgment Order shall apply to and bind Florida Travel Network, Crown Plaza Resorts, L.C. d/b/a Imperial Majesty Cruise Lines, Vance L. Vogel, and James M. Herron, Sr. whether acting through their principals, officers, directors, agents, telemarketers, direct mail marketers, servants, employees, subsidiaries, successors or assigns, or acting through any corporation or other business entity whose acts, practices, or policies are directed, formulated, or controlled by Florida Travel Network, Crown Plaza Resorts, L.C. d/b/a Imperial Majesty Cruise Lines, Vance L. Vogel, and/or James M. Herron, Sr.

4.     IT IS FURTHER ORDERED, ADJUDGED and DECREED that all corporate, partnership and individual Defendants, and any shareholder, partner, member, manager, director or officer of the corporate Defendants, who are a Defendants herein shall immediately inform all successors, assigns, transferees, officers, agents, servants, employees, representatives, and all other persons or entities in active concert or participation with Defendants, or with the corporations named as Defendants in the Complaint, of the terms and conditions of this Agreed

Entry and Final Judgment Order, and shall direct those persons and/or entities to comply with this Agreed Entry and Final Judgment Order. In addition, the Defendants as described herein shall provide copies of the injunctive provisions of this Agreed Entry and Final Judgment Order to all sales agents and other employees and representatives who have responsibilities under this Agreed Entry and Final Judgment Order, and upon request, shall make the entire Agreed Entry and Final Judgment Order available to any requesting employee, representative, or sales agent.

5.     IT IS FURTHER ORDERED, ADJUDGED and DECREED that under no circumstances shall this Agreed Entry and Final Judgment Order or the name of the State of Ohio, the Office of the Attorney General, Consumer Protection Section, or any of their employees or representatives be used by any defendant, or their officers, agents, servants, employees, successors, assigns, attorneys or other persons and/or entities acting in concert or participation with Defendants, in connection with any selling, advertising, or promotion of products or services, or as an actual or implied endorsement or approval of Defendants' acts, practices, or methods or conducting business.

### INJUNCTIVE RELIEF

6.     IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall be permanently enjoined from distributing any solicitation in the state of Ohio unless the solicitation clearly and conspicuously discloses:

6

(A)     That a purchase of the vacation package is required, if the consumer is required to make a purchase to receive the subject matter of the solicitation. Such disclosure shall be made on the same page as the first material statement of the offer in any solicitation and shall be made: (1) where a certificate mail piece is used, by providing in at least twelve-point bold print (a) the total price per person of the vacation package or (b) one of the following statements appearing verbatim without modification: **"This Is An Offer To Sell Travel;" "Call Toll Free To Purchase;" or "Purchase Required;"** (2) when a postcard mail piece is used, by providing in at least ten-point bold print (a) the price of the vacation, or (b) one of the following statements appearing verbatim without modification: **"This Is An Offer To Sell Travel;" "Call Toll Free To Purchase;" or "Purchase Required;"**

(b)     Whether the vacation package includes: (i) transportation, including air fare, (ii) meals, [or some category of meals]; and/or (iii) accommodations, [or some category of accommodations], as applicable;

(c)     That a consumer, when traveling on Defendants' vacation, will be solicited to tour and purchase a time share or vacation ownership interest if:

(i)     such tour is required,

7

(ii)    the consumer must participate in the tour to take advantage of the offer, or

(iii)   the tour is offered to the consumer in such a manner that it may tend to lead the consumer to conclude that the failure to attend the tour would adversely affect the consumer receiving the vacation package as represented, and/or result in a reduction of the level of goods or services which would otherwise be available to such consumer as part of the purchase.

(d)    All additional material terms and conditions which apply to the purchase, receipt or use of goods or services that are the subject of the offer, including, but not limited to travel restrictions and additional fees, costs or charges which the consumer must pay to the Defendants and any other types of charges (but not necessarily the amounts) which the consumer must pay to any third parties, such as charges for taxes, gratuities, and the like;

(e)    Before requesting payment for goods or services, the oral and written disclosures required by law as set forth in the Telemarketing and Consumer Fraud and Abuse Prevention Act at 15 U.S.C. § 6106 et seq.; and

(f)    If a "bonus" (or words conveying a similar meaning) vacation is referenced in any mail piece, unsolicited call to a consumer, or in telephone calls placed by the consumer in response to Defendants'

8

solicitation, then the Defendants shall disclosure the terms and conditions for any and all bonus vacations, including whether the bonus vacation will be given if a purchase is not made and, if any further costs or restrictions will be required prior to using the bonus trip, such costs and restrictions.  If the bonus vacation is only referenced in the calls and not in the mail piece, the mail piece is not required to disclose the material terms of the bonus vacation.

7.     IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall be permanently enjoined from:

(a)     Failing to comply with Ohio law which governs the offering or sale of a time share, including registration requirements, as set forth in R.C. Chapter 4735;

(b)     Failing to comply with all applicable Ohio requirements and prohibitions relating to representations of "special selection," representations of winning a prize, and eligibility to win a prize as set forth in R.C. §1345.02 and OAC §109:4-3-06;

(c)     Failing to comply with all Ohio statutes and regulations, which govern the right of a consumer to cancel a transaction of the type offered or entered into by Defendants as set forth in R.C. §1345.21 et seq.;

(d)     Failing to comply with all Ohio registration requirements for telemarketing as set forth in R.C. §4719.01 et seq.; and

9

    (e)    Failing to comply with all statute and regulations, which regulate solicitations by unsolicited facsimiles as set forth in R.C. §4931.55.

8.    IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall be permanently enjoined, in any telemarketing solicitation offering a vacation package, from:

    (a)    Failing to promptly state in a clear and conspicuous manner that a purchase is required;

    (b)    Failing to promptly state: (i) the identity of the seller; and (ii) that the purpose of the call is to sell the consumer a vacation package or other goods and services; and

    (c)    Failing to state the total cost of the trip, including any and all costs or fees paid directly to the seller, at any time during the call when any cost associated with the trip is disclosed to the consumer.

For the purpose of this provision, "promptly" shall mean that the disclosure shall be made prior to the time any material information about the vacation package or other goods or service is conveyed to the consumer.

9.    IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants, in connection with any solicitation, shall be permanently enjoined from:

    (a)    Representing, directly or by implication, that a particular destination or particular services are included in the vacation package or bonus package when such is not the case;

<div align="center">10</div>

(b)    Representing, directly or by implication, the nature of the vacation package, including but not limited to the accommodations at which consumers will be placed on the trip though the use of "world class," "first class," or similar representations unless Defendants can substantiate these representations through comparable ratings or evaluations by an independent, internationally recognized publication on travel or tourism;

(c)    Representing to any consumer, directly or by implication, that the consumer is a "winner" or that the consumer has been "selected" or is otherwise being included in a select group for receipt of a prize or opportunity unless that is, in fact, true, or that the consumer is entering a "contest," "sweepstakes," "drawing," or other competitive enterprise form which a winner or select group of winners will receive a prize or opportunity when, in fact, the enterprise is a promotional scheme designed to make contact with prospective customers, and all or a substantial number of those "entering" receive the same "prize;"

(d)    Representing limitations on the offer or creating a false sense of urgency, directly or by implication, including, but not limited to misrepresenting limitations on:

    (i)    the time within which the consumer must take action (including contacting Defendants);

    (ii)    the number of offers of vacation packages;

11

      (iii)    who is entitled to take advantage of the vacation package offer; or,

      (iv)    the number of contacts that a person or household may make to take advantage of the offer;

(e)    Representing, directly or by implication, that a vacation package has been reserved for a consumer, by using the term "Reservation Number" or similar term, unless such number is unique to the consumer;

(f)    Using "Control Numbers," or any similar identifier in any communications relating to a vacation package unless such identifier is in fact employed by Defendants for a specific business purpose;

(g)    Representing, directly or by implication, the purpose of its contact or its offer including, but not limited to the following:

      (i)    that the purpose of the contact or offer is to "promote tourism," or similar wording;

      (ii)    that the purpose of the contact or offer is to "regulate" or "administer" the "disbursement" of vacation packages, or similar wording;

      (iii)    that the purpose of the contact or offer is to engender "word of mouth" advertising, or any similar wording, unless Defendants have a realistic likelihood, based on past experience, of

12

generating substantial business from consumer-to-consumer communications; or

(iv) that the purpose of the contact or offer is to lead the consumer to buy another vacation package in the future, unless Defendants have a realistic likelihood, based on past experience, of generating substantial repeat business form consumers;

(h) Representing to any consumer, directly or by implication, that a certain number or percentage of its customers have been satisfied with their vacation packages, or similar wording, unless there is reasonable numerical substantiation for that statement based on documentation from those consumers who have purchased and actually used the vacation packages from Defendants; and

(i) Representing, directly or by implication, through the use of any envelope, other mailing device, or other communication, that Defendants, or the contents of any of its communications, are in any way connected to the government or a government agency, included, but not limited to:

(i) citing the possibility of criminal penalties on the front of an envelope; or

(ii) using the names of departments that are non-existent or do not represent actual entities such as "The Office of Records of ,

13

Entitlement Disbursements Division" and "The Offices of Records Entitlement/Disbursements Division;"

(j) Referring to a document as "confidential" or any other word of that nature unless the contents of the mailing are unique to that individual and have not been sent to other similarly situated individuals;

(k) Referring to documents as delivered by registered mail, express mail, overnight delivery, special delivery, or any other form of mail or delivery other than by the rate that actually applies, such as bulk rate or first class mail;

(l) Representing that the duration of a time share sales presentation tour is of a specific period or amount of time unless there is reasonable numerical substantiation for that statement based on records which Defendants keep and which can be verified and provided to plaintiff; and

(m) Disparaging the goods and/or services that are the subject of the offer in order to sell goods and/or services at an additional cost including, but not limited to, hotel or cruise accommodation upgrades.

10. IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall be permanently enjoined from misrepresenting, directly or by implication, the price of the vacation package by "unbundling" any part of the cost of the vacation package as a port fee, port charge, port tax, or any other tax unless the entire port fee, port charge, port tax, or other tax is imposed by and passed on to a quasi-

14

governmental authority. Defendants shall include in the stated or advertised price of its vacation packages all mandatory (non-optional) charges, other than those imposed by, and passed on to, a governmental or quasi-governmental agency. Where a charge is passed on to a governmental or quasi-governmental agency as a port fee, port charge, port tax, or other tax, Defendants shall disclose the amount of the fee at the time the cost of the vacation is first disclosed. For the purpose of this Agreed Entry and Final Judgment Order, the term quasi-governmental shall refer to an entity that is either:

(a)    a subordinate agency with a foreign, domestic, federal, state, or legal governmental authority; or

(b)    an entity created or authorized by a foreign or domestic governmental authority to carry out a governmental function for the benefit of the public.

This shall include port authorities within the United States or within a foreign jurisdiction.

11.    IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall be permanently enjoined from informing any and all consumers they are confirmed for a specific date for their trip unless:

(a)    Defendants have specific accommodations available as promised for the confirmed date at the time the confirmation is initially made to the consumer;

15

(b)  The consumers must take no further actions to confirm the date upon receipt of the confirmation notice; and

(c)  Defendants do not in any way attempt to alter the confirmed date unless specifically requested to do so by the consumer.

12.  IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall disclose any right of cancellation as applicable, and if no right of cancellation is applicable, then Defendants shall inform consumers prior to accepting payments towards the purchase price of the vacation package that no right of cancellation exists.

13.  IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall be enjoined from:

(a)  Representing to consumers that Defendants' vacation packages are being sold at prices which are below the cost consumers would pay if they did not acquire the accommodations through the purchase of Defendants' vacation packages unless such representation is true and can be substantiated on a quantifiable basis with documentation provided to the Attorney General's office on the first day of every sixth month for the first twenty-four months after the date of this Agreed Entry and Final Judgment Order;

(b)  Representing to consumers that Defendants are paying for a portion of the cost of each vacation package unless such representation is true and can be substantiated on a quantifiable basis with documentation

16

provided to the Attorney General's office on the first day of every six month for the first twenty-four months after the date of this Agreed Entry and Final Judgment Order; and

(c) Including any bonus days in the calculation of the cost per day of the vacation package, unless Defendants at the time of making any such representation also disclose: (1) that such bonus days are included in such calculation, and the number thereof; (2) that transportation to the bonus location(s) is not included in the price(s) quoted for the vacation package; (3) that customers must take the Ft. Lauderdale vacation package (initial or original trip) before they can take the bonus trip(s); and (4) that the vacation package and bonus trips must all be completed within the eighteen-month period, unless the customer pays an additional fee for the extension of such period (if that is an option and if that is the case).

## ENDORSEMENTS

14. IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants are permanently enjoined from using a spokesperson, endorser, or other representative, or the likeliness of such person, to sponsor, approve, or endorse Defendants' vacation package or other travel-related services unless Defendants are in full compliance with the FTC Guides Concerning Use of Endorsements and Testimonials in Advertising at 16 C.F.R. § 255 et seq.

## RESTITUTION

17

15. IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall refund the total price of the vacation package to Ohio consumers (a) who purchased a vacation package from Defendants; (b) who have not traveled on that vacation package; and (c) who request a refund in the manner set out in paragraph 16. Any Ohio consumers who have already received a partial refund or have not paid the entire cost of the vacation package shall only be refunded the amount they have paid to Defendants for the package, provided, however, that any individual responsibility of James Herron to make refunds shall be limited to vacation package that were purchased prior to December 31, 1998.

16. IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall refund any money paid to Defendants by each Ohio consumer who purchased a vacation package from Defendants, and who has not yet traveled using the vacation package, and who has complained in writing to the Defendants, or to the Ohio Attorney General's Office or to any state or local governmental consumer protection agency or bureau located in the State of Ohio, to the Better Business Bureaus located in the State of Ohio or Ohio consumers who have filed with any other agency or Better Business Bureau on or before the sixtieth day following the entry of this Agreed Entry and Final Judgment Order, provided, however, that any individual responsibility of James Herron to make refunds shall be limited to vacation package that were purchased prior to December 31, 1998.

17. IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall refund $200 to each Ohio consumer who:

18

(a)    Purchased a vacation package from Defendants, and who traveled using the vacation package and who has, on or before the date of this Agreed Entry and Final Judgment Order, complained in writing to the Defendants or to the State of Ohio's Attorney General's Office, Consumer Protection Section, or to any other State agency;

(b)    Purchased a vacation package from Defendants, and who traveled using the vacation package, and who complains in writing to the Defendants or to the State of Ohio's Attorney General's Office, Consumer Protection Section, or to any other State agency.  The complaint must cite specific instances where the vacation accommodations were not as represented or portrayed by the Defendants and must be in verified form, i.e. it must either be notarized or signed by the consumer as a declaration pursuant to 28 U.S.C. § 1746.  This complaint must be postmarked no later than 30 days after the entry of the Agreed Entry and Final Judgment Order.  For those consumers who file pursuant to this paragraph, Defendants will be responsible for payment up to but not exceeding $35,000.  This $35,000 is exclusive of any other financial limitations or amounts set forth in this Agreed Entry and Final Judgment Order and are an aggregate cap for all states participating in the settlement of this action.[1]  Should consumers claim under this section exceed $35,000, consumers will be paid on a pro rata basis, provided,

---

[1] These states include Arizona, Arkansas, Connecticut, the District of Columbia, Florida, Georgia, Illinois, Kansas, Michigan, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Washington, West Virginia, and Wisconsin.

19

however, that ant individual responsibility of James Herron to make refunds shall be limited to vacation package that were purchased prior to December 31, 1998.

18.   IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall issue all refunds to consumers eligible for refunds as set out in paragraphs 15 through 17 as funds become available but in no event more than two-hundred (200) days from the entry of this Agreed Entry and Final Judgment Order.

19.   IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants shall adopt and maintain procedures with regard to the handling of claims and/or requests for refunds from consumers, including maintaining copies of all written complaints or requests for refunds received, and records of all oral complaints or requests for refunds.  Such records shall include the name and address of each Ohio consumer from whom a complaint or request for refund was received, the amount of refund requested, the resolution of each complaint, and the amount refunded, if any.  The State of Ohio shall have access to review these records upon reasonable notice to Defendants.

20.   IT IS FURTHER ORDERED, ADJUDGED and DECREED that within two-hundred and twenty (220) days after the entry of this Agreed Entry and Final Judgment Order or sixty (60) days of the completion of restitution to all consumers pursuant to paragraphs 15 through 18, whichever is earlier, Defendants shall submit an affidavit to the Ohio Attorney General's office identifying by name and address each Ohio consumer to whom restitution has been provided and the amount of the refund.

20

## CIVIL PENALTIES AND COSTS

21. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that prior to entry of this Agreed Entry and Final Judgment Order, the Ohio Attorney General's Office shall recover from Defendants the sum of $2,500, via certified check made payable to Ohio Attorney General, Betty D. Montgomery, for attorney's fees, costs, and consumer education. Within ten (10) days after Defendants have completed payment of restitution to consumers pursuant to the provisions of this Agreed Entry and Final Judgment Order, Defendants shall pay to the Ohio Attorney General's Office an additional $2,500, via certified check made payable to Ohio Attorney General, Betty D. Montgomery, for attorney's fees, costs, and consumer education.

22. IT IS FURTHER ORDERED, ADJUDGED and DECREED that upon execution of this Agreed Entry and Final Judgment Order, plaintiffs shall recover from Defendants the sum of $25,000 for civil penalties, attorney's fees, costs, consumer education, and enforcement purposes at the discretion of the Attorney General. Said $25,000 shall be paid to the Ohio Attorney General's Office; provided, however, that such payment shall be suspended indefinitely conditioned on Defendants' full compliance with the restitution provisions set forth herein. In the event Defendants default in any portion of their restitution obligations under this Agreed Entry and Final Judgment Order, the payment of $25,000 shall become immediately due and payable without notice to Defendants.

## ENFORCEMENT

21

23.    IT IS FURTHER ORDERED, ADJUDGED and DECREED that, for a period of three (3) years from the date of this Agreed Entry and Final Judgment Order, Defendants shall provide a copy of this Agreed Entry and Final Judgment Order to all officers, employees, and agents (including "independent contractors") who have responsibility for developing, authorizing, or using promotional materials, scripts, or marketing programs for vacation packages. Defendants may redact the amount of any monetary payment prior to distribution of a copy of the Agreed Entry and Final Judgment Order.

24.    IT IS FURTHER ORDERED, ADJUDGED and DECREED that for a period of three (3) years after the date of this Agreed Entry and Final Judgment Order, and except as the same may be filed otherwise with the State of Ohio or any agency thereof pursuant to applicable Ohio law, upon request by any Ohio agency, Defendants shall, within thirty (30) days of the request, provide the State of Ohio a copy of all promotional materials and scripts used in the solicitation or sale of vacation packages to residents of Ohio since the date of entry of this Agreed Entry and Final Judgment Order.

25.    IT IS FURTHER ORDERED, ADJUDGED and DECREED that at any time upon proper notice, any party to this Agreed Entry and Final Judgment Order may apply to this Court, which shall retain jurisdiction, for such further orders as may be necessary or appropriate for the construction or modification of any of the provisions of this Agreed Entry and Final Judgment Order, or the enforcement of

compliance with this Agreed Entry and Final Judgment Order, and for the punishment of violations of this Agreed Entry and Final Judgment Order.

26. IT IS FURTHER ORDERED, ADJUDGED and DECREED that this Agreed Entry and Final Judgment Order does not constitute an approval by the State of Ohio of any of Defendants' advertising, programs, or practices, and Defendants shall make no representation to the contrary.

27. This Agreed Entry and Final Judgment Order shall not bind any other offices, boards, commissions, or agencies of the State of Ohio except as to the matters specified herein. This Agreed Entry and Final Judgment Order finally resolves all claims that the State of Ohio may have against Defendants in connection with the promoting and marketing of its vacation packages prior to the date of entry of this Agreed Entry and Final Judgment Order.

28. IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants submit to the jurisdiction of the courts of the State of Ohio for the purposes of any action taken to enforce this Agreed Entry and Final Judgment Order, including any action seeking sanctions for violations of same. Unless a temporary restraining order is sought, the Ohio Attorney General's office shall make reasonable efforts to notify Defendants in writing, prior to instituting any action to enforce this Agreed Entry and Final Judgment Order, that Ohio believes Defendants to be in default of any provision of this Agreed Entry and Final Judgment Order. Notwithstanding the foregoing, such notice shall not be deemed to be a jurisdictional prerequisite for the Ohio to institute an enforcement action. The notice to Defendants shall set forth

23

the basis for the Ohio Attorney General's belief that Defendants have violated any provision of this Agreed Entry and Final Judgment Order.

29. IT IS FURTHER ORDERED, ADJUDGED and DECREED that this Agreed Entry and Final Judgment Order does not limit the remedies available to the State of Ohio in connection with any future violation of its laws or regulations by Defendants which are not specifically addressed herein.

30. IT IS FURTHER ORDERED, ADJUDGED and DECREED that this Agreed Entry and Final Judgment Order shall not affect the rights of any private party to pursue any remedy or remedies pursuant to the laws of the State of Ohio.

This the _____ day of _____, 2000.

*Richard S Sheward*

JUDGE

BETTY D. MONTGOMERY
Attorney General

MICHAEL S. ZIEGLER
Sup. Ct. No. 0042206
Assistant Attorney General

CHERYL R. HAWKINSON
Sup. Ct. No. 0055429
Assistant Attorney General

FLORIDA TRAVEL NETWORK
a Florida Corporation

By _____
President

CROWN PLAZA RESORTS, L.C.
d/b/a IMPERIAL MAJESTY CRUISE
LINES, a Florida Limited Liability
Company

24

By _____
     President

_____
VANCE L. VOGEL, Individually

_____
JAMES M. HERRON, SR., Individually

f:\...\hawk\florida-agrdentry.doc

*Front*

# DO NOT INTERRUPT DELIVERY TO RECEIVER




### INDIVIDUAL FILE NO. 56 IDENTIFIED

We have identified you and you are now ON RECORD. We are
happy to contact you directly at your residence to inform you that
you have been confirmed to receive this notice for our Promotional
Vacation Package. This is real and is no mistake. Please do
respond promptly so that we may process you.

Robin Leach          Celebrity Spokesperson







**BAHAMAS PRINCESS**
RESORT & CASINO
GRAND BAHAMA ISLAND

Posada Laguna
C A N C U N



YOU ARE ALREADY IDENTIFIED
SO PLEASE CALL THE NUMBER
ASSIGNED TO YOU ON THE FRONT OF THIS NOTICE...
ENJOY YOUR VACATION!



ROYAL ISLANDER

Florida Travel Network is a licensed, bonded, full service travel agency with the State of Florida Seller of Travel Registration #13906. OH #TA1097
CST #1013343-50. Only one call per notification please.





**TICKETING ID:** 7932 LEAMAN
**CONFIRMATION N°:** 081802227

FTN ✈ **FLORIDA TRAVEL NETWORK BOARDING**

NAME OF TRAVELER

LEAMAN. / CAROL

DESTINATION

FLORIDA / CARIBBEAN

ORIGIN OF BAGGAGE

RESIDENCE

8849 CARR RD

TRAVEL PROVIDER

**Florida Travel Network**
**3641 Gulf Boulevard**
FTN **Treasure Island, FL 33706**

| PROVIDER | PURCHASE REQUIRED | NOTICE | CODE |
|---|---|---|---|
| | VT | ee | 22A |

---

**96-10-56**
**IMPORTANT ITINERARY**



AUTO PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE PAID
FT MYERS, FL
PERMIT NO. 7

Dear CAROL

Robin Leach says PACK YOUR BAGS!
You were confirmed as of 08/18/97 and as
a result of this offer your Name and
**Ticketing Number are Identified**
and Issued!  Robin Leach's
Spectacular 8 day Florida/Caribbean
Vacation Package includes All
Accommodations,  and a Round Trip
Cruise... We're excited for YOU!
*Call us immediately...* You will be personally attended to:
1-800-782-0355 If Busy Keep Calling!
Monday-Friday 10am to 10pm (EST) Saturday 11am to 6pm (EST)!

*Have a Great Time!...*

CAROL LEAMAN  166 .
8849 CARR RD
FREDERICKSBURG, OH 44627-9212

Date of Transaction  2-03
8-18-97   8-20-97



IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

STATE OF OHIO, <u>ex rel</u>.                    )
BETTY D. MONTGOMERY                               )        CASE NO.
ATTORNEY GENERAL
30 East Broad Street, 25th Floor       )            00CVH02  01064
Columbus, Ohio 43215-3428                         )        JUDGE

        Plaintiff,                                )

v.                                                )

FLORIDA TRAVEL NETWORK, INC.                      )        **COMPLAINT FOR DECLARATORY**
Treasure Island, Florida 33706                             **JUDGMENT, INJUNCTIVE RELIEF**
                                                  )        **AND CONSUMER RESTITUTION**
9641 Gulf Boulevard
Treasure Island, Florida 33706                    )

and                                               )

CROWN PLAZA RESORTS, L.C. d/b/a                   )
IMPERIAL MAJESTY CRUISE LINES
9641 Gulf Boulevard                               )
Treasure Island, Florida 33706
                                                  )
and                                               )

VANCE L. VOGEL, Individually and as              )
President of FLORIDA TRAVEL                        )
NETWORK, INC. and CROWN PLAZA
RESORTS, L.C. d/b/a IMPERIAL                       )
MAJESTY CRUISE LINES
9641 Gulf Boulevard                               )
Treasure Island, Florida 33706
                                                  )
and                                               )

JAMES M. HERRON, SR., Individually
and as former President of FLORIDA                )
TRAVEL NETWORK, INC. and CROWN
PLAZA RESORTS, L.C. d/b/a IMPERIAL)
MAJESTY CRUISE LINES
9641 Gulf Boulevard                               )

Treasure Island, Florida 33706

                         )

    Defendants.          )

                         )

1. This is a civil action brought by the State of Ohio, by and through counsel, Betty D. Montgomery, Attorney General of Ohio, pursuant to R.C. §1345.07(A), to restrain defendant, Florida Travel Network, Inc., Crown Plaza Resort, L.C. d/b/a Imperial Majesty Cruise Line, Vance L. Vogel and James M. Herron, Sr., and, from engaging in unfair or deceptive acts or practices relating to the sale of vacation packages. The State of Ohio also seeks declaratory relief, restitution for consumers, and the costs of its investigation and litigation of this matter, including reasonable attorney fees and civil penalties.

2. Jurisdiction over this subject matter of this action lies with this Court pursuant to R.C. §1345.04 of Ohio's Consumer Sales Practices Act.

**THE PARTIES**

3. The Plaintiff is the State of Ohio, represented by the Attorney General, who brings this action in the public interest pursuant to R.C. §1345.07(A).

4. Defendant Florida Travel Network, Inc. (FTN) is a Florida corporation engaged in the promotion and sale of vacation packages and time share properties. FTN's principal place of business of business is located at 9641 Gulf Boulevard, Treasure Island, Florida 33706.

2

5.     Defendant Crown Plaza, L.C. d/b/a Imperial Majesty Cruise Line (IMCL) is a Florida limited liability company engaged in the promotion and sale of vacation packages and timeshare properties. IMCL's principal place of business is located at 9641 Gulf Boulevard, Treasure Island, Florida 33706.

6.     Defendant Vance L. Vogel was at one time vice-president of defendant FTN and is now president of both defendants FTN and IMCL and engaged in the formulation, management and control of the operation of FTN and IMCL.

7.     Defendant James M. Herron, Sr. was the president of defendant FTN and was a shareholder in IMCL and engaged in the formulation, management and control of the operation of FTN and IMCL.

## FACTUAL ALLEGATIONS

8.     Defendants market and sell vacation packages to consumers in Ohio and throughout the United States. These vacation packages typically offer trips to the Bahamas and/or Florida consisting of accommodations, some meals and travel on a cruise ship.

9.     Defendants have advertised these vacation packages in Ohio through the use of postcards, travel certificates, and similar mass mailings in which consumers are asked to respond by calling a toll-free telephone number. A true and accurate copy of a postcard which FTN has mailed to consumers in Ohio is attached to this Complaint as Exhibit A and is incorporated by reference.

10. Defendants' solicitations lead consumers to believe that they are among a select group of individuals chosen to receive a free or low-cost, "no strings attached" vacation to Florida and the Caribbean. In fact, consumers are not members of a select group chosen to receive the vacation because defendants have sent out thousands of these solicitations.

11. The mass mailings direct consumers to "Pack Your Bags" and represent that "you will receive a World Class Florida/Tropical Caribbean Vacation." The solicitations do not disclose the price of the trip and lead consumers to believe that the trip is free. In fact, the vacations which defendants market are neither free nor low-cost.

12. The mass mailing solicitations and the telemarketing calls do not inform consumers that, while they are on the vacations, they will be required or pressured to attend a high-pressured time share sales presentation.

13. In connection with its marketing and selling of vacation packages, defendants, through both written materials and telemarketing, have engaged in a pattern of unfair or deceptive practices, including but not limited to the following:

      a. Misrepresenting, directly and by implication, that consumers have won a vacation package, and/or that they need not pay for the vacation package;

      b. Omitting material facts from promotional materials, including the fact that the consumer is responsible for paying certain costs of the vacation, the fact that the consumer may

4

be required or pressured to attend a time share tour or other sales presentations, and identification of goods and services that are not included in the price of the vacation;

c.      Misrepresenting the purpose of defendants' offer of a vacation package, including stating that the purpose of the offer is to "promote tourism," to "regulate" or "administer" the "disbursement" of vacation packages, and to engender "word of mouth advertising" and repeat vacation business, when the actual purpose is to sell vacation packages and time shares;

d.      Creating a false sense of urgency, including misrepresenting that consumers have a limited time within which to buy, that the number of offers is limited, and that eligibility is limited to a designated class of consumers, such as those who received defendants' certificate, when in fact defendants have not applied these limitations to all consumers;

e.      Misrepresenting certain changes as "port fees" when in fact they are not paid to any governmental or quasi-governmental entity but merely offset cruise-related expenses;

f.      Misrepresenting the price of the vacation by failing to include in the price the charges denominated as "port fees";

5

g.    Printing disclosures with type which is difficult to read, or otherwise failing to clearly and conspicuously disclose all material conditions and limitations to defendants' offer;

h.    Using language, a logo or other form of communication which implies that defendants or the contents of their communications are connected with the government or a governmental agency;

i.    Implying that the recipient has been specially selected to receive a solicitation;

j.    Misrepresenting that the consumer has won a "bonus" or a "complimentary" rental car by failing to disclose clearly and conspicuously that these items are, in fact, inducements for purchasing defendants' vacation packages and visiting time share resorts; and

k.    Failing to cancel contracts and provide refunds to consumers who request them even though defendants have used deceptive solicitations, misrepresented the benefits of vacation packages, and used high pressure sales tactics to sell such packages.

## COUNT ONE

14. Plaintiff incorporates by reference, as if completely rewritten herein, the allegations set forth in paragraphs One through Thirteen (1-13) of the Complaint.

15. FTN, IMCL, Vance L. Vogel and James M. Herron, Sr. have deceptively represented that consumers or prospective consumers have been specifically selected to receive a bargain, discount, or other advantage without any obligation when such is not the case in violation of O.A.C. § 109:4-3-11(A)(3) of the Direct Solicitation Rule and R.C. § 1345.02(A) of the Consumer Sales Practices Act.

## COUNT TWO

16. Plaintiff incorporates by reference, as if completely rewritten herein, the allegations set forth in paragraphs One through Thirteen (1-13) of the Complaint.

17. FTN, IMCL, Vance L. Vogel and James M. Herron, Sr. have deceptively represented that the subject of the consumer transaction (i.e., vacation) is available at a discounted price when such is not the case in violation of R.C. § 1345.02(B)(4) of the Consumer Sales Practices Act.

## COUNT THREE

18. Plaintiff incorporates by reference, as if completely rewritten herein, the allegations set forth in paragraphs One through Thirteen (1-13) of the Complaint.

19.  FTN, IMCL, Vance L. Vogel and James M. Herron, Sr. failed to provide "notice of cancellation" forms when entering into consumer transactions that are home solicitation sales, in violation of R.C. §1345.23(B) of the Home Solicitation Sales Act and R.C. §1345.23(a) of the Consumer Sales Practices Act.

## COUNT FOUR

20.  Plaintiff incorporates by reference, as if completely rewritten herein, the allegations set forth in paragraphs One through Thirteen (1-13) of the Complaint.

21.  FTN, IMCL, Vance L. Vogel and James M. Herron, Sr. failed to honor notices of cancellations from consumers in violation of R.C. §1345.23(D)(4) of the Home Solicitation Sales Act and R.C. §1345.02(A) of the Consumer Sales Practices Act.

## COUNT FIVE

22.  Plaintiff incorporates by reference, as if completely rewritten herein, the allegations set forth in paragraphs One through Thirteen (1-13) of the Complaint.

23.  FTN, IMCL, Vance L. Vogel and James M. Herron, Sr. failed to disclose to consumers all material terms of the vacation package in its mail solicitation in violation of R.C. § 1345.02(A) of the Consumer Sales Practices Act.

## COUNT SIX

24.  Plaintiff incorporates by reference, as if completely rewritten herein, the allegations set forth in paragraphs One through Thirteen (1-13) of the Complaint.

25.   FTN, IMCL, Vance L. Vogel and James M. Herron, Sr. failed to set forth the terms, conditions and obligations of the bonus vacation (i.e. airfare) in violation of O.A.C. §109:4-3-04(C) and R.C. §1345.02(A)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1.   ISSUE an order declaring that FTN, IMCL, Vance L. Vogel and James M. Herron, Sr. have engaged in acts and practices in violation of the Consumer Sales Practices Act, R.C. § 1345.01 et seq. and the Home Solicitation Sales Act, R.C. §1345.21 et seq.

2.   ISSUE a permanent injunction enjoining FTN, IMCL, Vance L. Vogel and James M. Herron, Sr., its agents, servants, employees, successors or assigns, and all other persons acting in concert and participation with it, directly or indirectly, through any corporate device, partnership or other associations under this or any other name, from engaging in acts and/or practices of which Plaintiff complains.

3.   ORDER FTN, IMCL, Vance L. Vogel and James M. Herron, Sr. to provide restitution to persons damaged by the conduct of defendants as set forth in the Complaint.

4.   ASSESS FINE and IMPOSE upon FTN, IMCL, Vance L. Vogel and James M. Herron, Sr., a civil penalty of Twenty Five Thousand Dollars ($25,000)

for each separate and appropriate violation described herein pursuant to R.C. § 1345.07(D).

5. GRANT Plaintiff its attorneys fees, costs of investigation and costs incurred in bringing this action.

6. GRANT such other relief as the Court deems to be just, equitable and appropriate.

Respectfully submitted,

BETTY D. MONTGOMERY
Attorney General

CHERYL R. HAWKINSON (0055429)
Assistant Attorney General
Consumer Protection Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215-3428
614/644-9628

MICHAEL S. ZIEGLER (0042206)
Assistant Attorney General
Consumer Protection Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215-3428
614/644-9618

Counsel for Plaintiff

f:\...\hawk\ftn2-complaint.doc

10

# SUMMONS

**WARREN COUNTY COURT OF COMMON PLEAS**
**500 JUSTICE DRIVE - P.O. BOX 238**
**LEBANON, OHIO 45036**

**CASE #  25CV099309**

SANDRA LESLIE, ET. AL.

VS

TRAVEL AND LEISURE CO, ET. AL.

**TO THE FOLLOWING NAMED PARTY:**

BARCLAYS BANK DELAWARE
C/O CORPORATION SERVICE COMPANY
1160 DUBLIN ROAD
SUITE 400
COLUMBUS, OH 43215

You have been named in a complaint filed in this court by the following party:

SANDRA LESLIE, ET. AL.

**You are hereby summoned and required to serve upon the plaintiff's attorney, or upon the plaintiff if he has no attorney of record, a copy of your answer to this complaint within twenty-eight (28) days after service of this summons upon you, excluding the date of service. Your answer must also be filed with our court within three days after the service of a copy of the answer on the plaintiff's attorney.**

Failure to appear and present a defense to this complaint will result in a judgment by default being rendered against you for the relief demanded in the complaint.

The address of his/her attorney is:

BRENT S SNYDER, ATTORNEY AT LAW
15000 MADISON AVENUE
LAKEWOOD, OH 44107

Breighton Smith, Clerk of Courts
500 Justice Drive - P.O. Box 238
Lebanon, Ohio 45036

By: _____

NIKKI A TORRES, DEPUTY CLERK
July 23, 2025

IF THE ABOVE NAMED DEFENDANT IS A CORPORATION PLEASE REFER TO OHIO REVISED
CODE 4705.01.

# SUMMONS

**WARREN COUNTY COURT OF COMMON PLEAS**
**500 JUSTICE DRIVE - P.O. BOX 238**
**LEBANON, OHIO 45036**

**CASE #  25CV099309**

SANDRA LESLIE, ET. AL.

VS

TRAVEL AND LEISURE CO, ET. AL.

**TO THE FOLLOWING NAMED PARTY:**

TRAVEL AND LEISURE CO
C/O WYNDHAM WORLDWIDE OPERATIONS INC
6277 SEA HARBOR DRIVE
ORLANDO, FL 32821

You have been named in a complaint filed in this court by the following party :

SANDRA LESLIE, ET. AL.

**You are hereby summoned and required to serve upon the plaintiff's attorney, or upon the plaintiff if he has no attorney of record, a copy of your answer to this complaint within twenty-eight (28) days after service of this summons upon you, excluding the date of service. Your answer must also be filed with our court within three days after the service of a copy of the answer on the plaintiff's attorney.**

Failure to appear and present a defense to this complaint will result in a judgment by default being rendered against you for the relief demanded in the complaint.

The address of his/her attorney is:

BRENT S SNYDER, ATTORNEY AT LAW
15000 MADISON AVENUE
LAKEWOOD, OH 44107

Breighton Smith, Clerk of Courts
500 Justice Drive - P.O. Box 238
Lebanon, Ohio 45036

By: _____

NIKKI A TORRES, DEPUTY CLERK
July 23, 2025

IF THE ABOVE NAMED DEFENDANT IS A CORPORATION PLEASE REFER TO OHIO REVISED
CODE 4705.01.



**UNITED STATES**
**POSTAL SERVICE.**

Mailer: Warren County Common Pleas Clerks Office

Date Produced: 07/29/2025

ConnectSuite Inc.:

The following is the delivery information for Certified Mail™/RRE item number 9202 8901 9403 8325 1957 85. Our records indicate that this item was delivered on 07/28/2025 at 12:51 p.m. in COLUMBUS, OH 43215. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

This USPS proof of delivery is linked to the customers mail piece information on file as shown below:

BARCLAYS BANK DELAWARE
C/O: CORP SERVICE COMPANY
1160 DUBLIN RD
STE 400
COLUMBUS OH 43215-1052

Customer Reference Number:     C6075325.36939913

Case Number                    25CV99309

2


**UNITED STATES**
**POSTAL SERVICE**®

**Return address:**

BREIGHTON SMITH
CLERK OF COURTS
PO BOX 238
LEBANON OH 45036

MAILING DATE: 07/25/2025
DELIVERY DATE: 07/28/2025

**Recipient address:**

BARCLAYS BANK DELAWARE
C/O: CORP SERVICE COMPANY
1160 DUBLIN RD
STE 400
COLUMBUS OH 43215-1052



USPS CERTIFIED MAIL

9202 8901 9403 8325 1957 85

## USPS Tracking Label Number: 9202 8901 9403 8325 1957 85

| USPS Tracking History | Location | Date / Time |
|---|---|---|
| PRE-SHIPMENT INFO SENT USPS AWAITS ITEM | LEBANON,OH 45036 | 07/25/2025 08:30 |
| ORIGIN ACCEPTANCE | LEBANON,OH 45036 | 07/25/2025 20:09 |
| PROCESSED THROUGH USPS FACILITY | CINCINNATI,OH 45246 | 07/25/2025 21:24 |
| PROCESSED THROUGH USPS FACILITY | COLUMBUS OH DISTRIBUTION CENTER 43218 | 07/27/2025 05:49 |
| DEPARTED USPS REGIONAL FACILITY | COLUMBUS OH DISTRIBUTION CENTER 43218 | 07/27/2025 19:20 |
| DEPARTED USPS REGIONAL FACILITY | COLUMBUS OH DISTRIBUTION CENTER 43218 | 07/27/2025 19:45 |
| ARRIVED AT USPS REGIONAL FACILITY | COLUMBUS OH DISTRIBUTION CENTER 43216 | 07/27/2025 20:09 |
| ARRIVE USPS FACILITY | COLUMBUS OH DISTRIBUTION CENTER 43216 | 07/28/2025 03:26 |
| ARRIVAL AT UNIT | COLUMBUS,OH 43216 | 07/28/2025 04:50 |
| OUT FOR DELIVERY | COLUMBUS,OH 43215 | 07/28/2025 06:10 |
| DELIVERED FRONT DESK/RECEPTION/MAIL ROOM | COLUMBUS,OH 43215 | 07/28/2025 12:51 |



## UNITED STATES
## POSTAL SERVICE.

Mailer: Warren County Common Pleas Clerks Office

Date Produced: 07/29/2025

ConnectSuite Inc.:

The following is the delivery information for Certified Mail™/RRE item number 9202 8901 9403 8325 1955 63. Our records indicate that this item was delivered on 07/28/2025 at 01:10 p.m. in ORLANDO, FL 32821. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

This USPS proof of delivery is linked to the customers mail piece information on file as shown below:

TRAVEL AND LEISURE CO
OPERATION INC
C/O: WYNDHAM WORLDWIDE
6277 SEA HARBOR DR
ORLANDO FL 32821-8043

Customer Reference Number:       C6075325.36939912

Case Number                      25CV99309

2


**UNITED STATES**
**POSTAL SERVICE** ®

**Return address:**

BREIGHTON SMITH
CLERK OF COURTS
PO BOX 238
LEBANON OH 45036

MAILING DATE: 07/25/2025
DELIVERY DATE: 07/28/2025

**Recipient address:**

TRAVEL AND LEISURE CO
OPERATION INC
C/O: WYNDHAM WORLDWIDE
6277 SEA HARBOR DR
ORLANDO FL 32821-8043


**USPS CERTIFIED MAIL**

9202 8901 9403 8325 1955 63

## USPS Tracking Label Number: 9202 8901 9403 8325 1955 63

| USPS Tracking History | Location | Date / Time |
|---|---|---|
| PRE-SHIPMENT INFO SENT USPS AWAITS ITEM | LEBANON,OH 45036 | 07/25/2025 08:30 |
| ORIGIN ACCEPTANCE | LEBANON,OH 45036 | 07/25/2025 20:09 |
| PROCESSED THROUGH USPS FACILITY | CINCINNATI,OH 45246 | 07/25/2025 21:24 |
| PROCESSED THROUGH USPS FACILITY | SEMINOLE-ORLANDO FL DISTRIBUTIO 32824 | 07/27/2025 20:13 |
| DEPARTED USPS REGIONAL FACILITY | SEMINOLE-ORLANDO FL DISTRIBUTIO 32824 | 07/28/2025 01:07 |
| ARRIVE USPS FACILITY | ORLANDO,FL 32819 | 07/28/2025 01:10 |
| ARRIVAL AT UNIT | ORLANDO,FL 32819 | 07/28/2025 07:13 |
| OUT FOR DELIVERY | ORLANDO,FL 32821 | 07/28/2025 07:24 |
| DELIVERED FRONT DESK/RECEPTION/MAIL ROOM | ORLANDO,FL 32821 | 07/28/2025 13:10 |